## IN THE CHANCERY COURT OF
## HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**F I L E D**

THE STATE OF MISSISSIPPI, EX REL.
JIM HOOD, ATTORNEY GENERAL
FOR THE STATE OF MISSISSIPPI,

DEC 0 2 2008

EDDIE JEAN CARR, CHANCERY CLERK

BY_____

       Plaintiff,

v.

Case No. C-2008-2086 T/1

ENTERGY MISSISSIPPI, INC., ENTERGY
CORPORATION, ENTERGY SERVICES,
INC., ENTERGY POWER, INC., and
FICTITIOUS DEFENDANTS A through Z,
those individuals, corporations or otherwise
who acted as officer, director, agent,
representative or employee of any of the other
defendants, and have acted within the course
and scope of that official capacity, agency,
representation or employment; and have
participated in, have conspired with, and/or
have aided and abetted others, including
the other defendants in committing the
violations of law alleged in this Complaint,

       Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### COMPLAINT

The Plaintiff, the State of Mississippi, by and through Jim Hood, Attorney General of the State

of Mississippi (the "Attorney General"), complains of the defendants, as follows:

### NATURE OF THE CASE

1.    Entergy Mississippi is the largest electric utility in Mississippi, serving over 430,000

customers (including households, businesses and governmental entities) in the western half of the

State.   Traditionally, the Entergy Mississippi service area is ranked among the lowest per capita

income in the country. The State has recently learned that dating back as early as 1974, Entergy

**EXHIBIT**

tabbies

**A**

Mississippi has been padding its invoices and forcing Mississippi to be a dumping ground for unloading on Mississippians the highest-priced power Entergy has to offer within its four-state system. Entergy Mississippi's ("EMI") actions have resulted in many hundreds of millions of dollars of increased electricity and fuel costs paid by Mississippi consumers.

2.     As set forth herein, EMI has engaged in a pattern of fraudulent behavior. EMI's fraud upon Mississippi consumers and the Mississippi Public Service Commission ("MPSC") arises primarily out of EMI's scheme to have its Mississippi customers buy the most expensive electricity the Entergy companies produce. Whether the power is produced here, in Texas, in Louisiana or in Arkansas, Mississippi has become the backyard for dispatching Entergy's highest-priced electricity. Meanwhile, EMI's parent Entergy, through EMI affiliates, sells its lowest-cost power to outside companies for a profit. These profits are staggering: Entergy enjoys annual revenues of $11.5 Billion, earning it place 231 in the Fortune 500.

3.     EMI recently admitted under oath that the law requires it to provide Mississippi consumers with the least expensive, reliable electricity. Yet, EMI is not only forcing Mississippians to bear the cost of the most expensive electricity in Entergy's system, it is also illegally including surcharges, or "adders," in its customers' bills, such as "phantom" SO2 (sulfur dioxide) adders, that were never incurred, have never been approved by, and are presumably unknown to, the MPSC.

4.     EMI has a state-sanctioned monopoly in the provision of retail electricity[1] to portions of Mississippi. In exchange for the State granting EMI this monopoly, EMI has an inherent duty to act in the best interest of its customers by providing the best and most efficient service/electricity possible.

---

[1]The term "retail electricity" refers to electricity provided to end users like residences, businesses and governmental entities. The "wholesale electricity" market includes electricity sold, e.g., by a independent power plant, to a utility which will in turn provide that power to its retail customers.

The cost of the EMI power (either internally generated or purchased from affiliates) provided to Mississippians is substantially higher than power otherwise available to EMI from numerous third-party suppliers on the open market.

5. EMI's disregard of its inherent duties to the public are in some part a natural consequence of the control and domination that its parent company and its affiliates exercise over EMI. Specifically, the key EMI officers and directors are also officers and directors of the parent and other affiliates. As a result, they have conflicting duties: fulfilling EMI's duty to provide its customers with the least expensive, reliable electricity **versus** the duty to maximize profits for the parent and its stockholders by passing on their inflated production costs and other unapproved charges to EMI, which then passes these on to its customers.

6. EMI has exploited its position as a monopoly for providing electricity to the western half of the State by, among other things, employing a patchwork of shady accounting mechanisms. In short, Entergy gets to "have its cake and eat it too": it gets to sell all of the overpriced electricity generated by its archaic plants to its captive retail customers *and* to prevent those same customers from accessing the benefits of competition from newer, more efficient plants which would otherwise supply them with less expensive electricity.

7. Mississippians are having to pay these inflated power bills at a time when they are struggling to make ends meet in a recession economy; the State (one of EMI's largest power consumers) and political subdivisions are faced with these bills at a time when they are having to severely cut their budgets. On the other hand, Entergy is enjoying record profits, is one of the few Dow Jones stocks recommended as a "buy," has recently voted its regular quarterly dividend of 75 cents per share paid December 1, and has enjoyed such monstrous liquidity over the past few years that

3

it has been able to repurchase over $3 Billion in corporate stock. As a further affront to prudent business practices, particularly in the current recession, Entergy's Chairman and CEO J. Wayne Leonard remains America's highest paid utility executive at $26.3 million in 2008.

8.     EMI's fraud includes not only its inflation of invoices to its Mississippi customers, but also its submission of false documents and testimony to the MPSC. Defendants will undoubtedly challenge the jurisdiction of this Court - as they have already done in the subpoena enforcement action - saying state and federal regulators should decide these issues. The Defendants would be mistaken. This is not a regulatory case, but rather a fraud and deceptive practices case for restitution, unjust enrichment, civil penalties, and damages to which Mississippians are entitled but the MPSC has no authority to order. Moreover, the MPSC has no jurisdiction over any defendant, except EMI, since no other is a regulated utility. Only a court has jurisdiction over any of the eight causes of action herein.

PARTIES

9.     This action is brought by the Attorney General on behalf of the State of Mississippi in a statutory, equitable and/or common law capacity: (a) in his sovereign capacity, as representative of, and/or as *parens patriae* on behalf of, or for the benefit of, natural persons under state law; (b) as common law *parens patriae* in his sovereign capacity on behalf of the State's general economy; and (c) in his proprietary and/or sovereign capacity, which may include state departments, bureaus, agencies, political subdivisions, and other instrumentalities as purchasers of electricity from EMI. The Attorney General possesses significant and relevant authority to bring such a case, including Miss. Code of 1972, §§ 7-5-1, 75-21-3(a), (b) and (c), 75-24-1, et seq., 77-1-43(2), and Miss. Const., Article 6, Section 173. The Attorney General also possesses extensive common law authority and numerous

duties, paramount of which is his duty to protect the interest of the general public and the economy of the State.

10. Defendant EMI, domiciled in Mississippi, is a wholly-owned subsidiary of Entergy and is the electricity provider (electric public utility) for the western half of Mississippi. EMI's principal place of business is located in Jackson, Mississippi. Its registered agent for service of process is James W. Snider, Jr.; 308 East Pearl Street; Jackson, Mississippi 39215-1640. EMI is regulated by the MPSC with regard to retail rates and services for electricity and is regulated by Federal Energy Regulatory Commission ("FERC") with regard to wholesale rates and services for electricity.

11. Defendant Entergy Corporation ("Entergy") is a publicly traded holding company incorporated in Delaware, with its principal place of business in New Orleans, Louisiana. Entergy is operating within the State of Mississippi. Its registered agent for service of process is Marcus V. Brown; 639 Loyola Avenue, New Orleans, Louisiana 70113. Entergy owns a number of subsidiary companies involved in businesses designed to profit from, *inter alia*, the provision, transmission, sale and trading of electricity as well as fuel used to generate electricity. Entergy and its subsidiaries, other than EMI, are not regulated by the MPSC. As the corporate parent, Entergy has, and exercises, control over the pricing policies of EMI's electricity and fuel services. Entergy also exercises complete domination and control over EMI's management, finances, policy and business practices, including the procurement of fuel and transportation services, the output of EMI's generating units, as well as the purchase, sale and resale of electricity on the wholesale power market on behalf of EMI, making EMI and its customers captive to Entergy's wishes and predatory practices.

12. Defendant Entergy Services, Inc. ("ESI") is a wholly-owned subsidiary of Entergy which is domiciled in Delaware and has its principal place of business in New Orleans, Louisiana. ESI

5

is registered to do and is doing business in Mississippi. Its registered agent for service of process is James W. Snider, Jr.; 308 East Pearl Street; Jackson, Mississippi 39215-1640. ESI provides certain services for and on behalf of EMI, including, but not limited to, purchasing fuel for EMI's generating units used to produce electricity and purchasing electricity to provide to EMI's Mississippi customers. ESI also provides accounting, legal, regulatory assistance and other services for and on behalf of EMI

      13.   Defendant Entergy Power, Inc. ("EPI") is a wholly-owned subsidiary of Entergy. EPI is domiciled in Delaware and has its principal place of business in the State of Arkansas. Its registered agent for service of process is The Corporation Company; 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201. EPI operates electricity generating plants in Arkansas and sells its electricity on the wholesale market. EPI has sold much of its power to Entergy Arkansas, Inc. ("EAI") which then provided that power to the Entergy System Exchange to be purchased by EMI.

      14.   The true names and capacities, whether individual or otherwise, of Fictitious Defendants A through Z are unknown to the Attorney General, who thus sues these defendants by these fictitious names. The Attorney General will amend this complaint to show the true names of these defendants when their names and capacities are ascertained.

      15.   At all relevant times, each of Fictitious Defendants A through Z has acted as a director, officer, agent, representative, affiliate or employee of the other defendants, and has acted within the course and scope of that capacity; and has participated in, has conspired with, and/or has aided and abetted others, including the other Defendants in committing the violations of law alleged herein.

      16.   The Defendants have engaged in a conspiracy, common enterprise, joint venture, and/or common course of conduct the purpose of which was and is to commit unfair or deceptive and

fraudulent business practices, methods or acts and unfair methods of competition, and have acted in furtherance of such enterprises and ventures alleged in this Complaint.

## JURISDICTION and VENUE

17. The Attorney General brings this action pursuant to his statutory and common law authority and under the following provisions of law:

A. Pursuant to Miss. Code § 7-5-1 (1972), the Attorney General is the "chief legal officer and advisor for the state ... and is charged with managing all litigation on behalf of the state" and holds all such powers as prescribed to him by the Constitution, statutes and common law.

B. With respect to the MPSC, the Attorney General is "authorized to institute any suits arising out of any act or order of the ... public service commission affecting the laws and revenues of the state." Miss. Code § 7-5-51. Section 77-1-43(2) specifically authorizes the Attorney General to institute "in any court of competent jurisdiction" an "action for violation of the law, or for the violation of any lawful rule, regulation or order of the commission."

C. Pursuant to the Mississippi Consumer Protection Act ("MCPA"), Miss. Code §§ 75-24-1, et seq., the Attorney General is authorized to file suit to remedy "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Specifically, Miss. Code § 75-24-9 permits the Attorney General to bring an action in the name of the state against violators to enjoin the use of such prohibited acts, methods or practices. The Attorney General may also seek a judgment of restitution under Miss. Code § 75-24-11.

D. Miss. Code § 75-21-3(a), (b) and (c) prohibit any corporation engaging in conduct when inimical to public welfare and the effect of which would be to "(a) restrain or attempt to restrain the freedom of trade or production"; "(b) monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business"; or "(c) engross, forestall or attempt to engross or forestall any commodity."

E. Finally, Attorney General Hood brings this action pursuant to his *parens patriae* authority, which allows him to commence legal actions for violations of state law, including the common law for *the protection of public rights* (or quasi-sovereign interests). This includes protecting Mississippi residents' economic well-being and against unfair, unjust, deceptive and anti-competitive practices by a public utility's abuse of the public utility franchise and certificate of public necessity granted by the State. The Attorney General may also bring suit to vindicate the State's laws intended to protect Mississippi consumers and assure its citizens the full benefit of such laws, in preventing its citizens' earnings from being wrongfully extracted from the State, and in preserving fundamental honesty, fair play and right

dealings in public transactions. Moreover, the Attorney General may bring suit to protect the State's direct interest as a customer of Entergy.

18.     Venue is proper in this action pursuant to Miss. Code Ann. §§ 11-5-1 and 75-24-9.

## FACTUAL BACKGROUND and DEFENDANTS'[2] CONDUCT

### I. Duties of the Defendants

19.     For many years, the Defendants have together enjoyed the status of being a government sanctioned monopoly. Normally, monopolies are disfavored in the law because they tend to thwart competition, which by its very nature results in lower prices and higher quality goods and services being available to consumers. Sometimes, however, circumstances exist with natural monopolies where governments conclude that regulations can be formulated and enforced which overcome, at least to some degree, the negative results otherwise attendant with the lack of competition. This is the *intended* effect to participants in the field of regulated utilities, such as Entergy.

20.     Once a regulated monopoly exceeds the legislative or regulatory framework devised to protect the consumer in the absence of retail competition, however, that monopoly loses its "exception status" and is subject to the rules and penalties applicable to traditional monopolies who act in anti-competitive and unfair ways. As set forth herein, this is the case with the misconduct of Entergy. By manipulating the purchase and sale of electricity to maximize its profits, Entergy has committed illegal and tortious misconduct–detrimental to consumers and the economy of the State of Mississippi.

21.     Public utilities have a guaranteed customer base, a guarantee of no competition and a

---

[2] Whenever reference herein is made to any act of Defendant(s), that allegation shall be deemed to mean the act of each defendant acting individually and/or jointly. Whenever reference in this Complaint is made to any act or transaction of any corporation, partnership, business, firm or other organization, that allegation shall be deemed to mean that the corporation, partnership, business, firm or other organization did or authorized the acts alleged in this Complaint through its principals, officers, directors, employees, partners, agents and/or representatives while they were acting within the actual or apparent scope of their authority.

guaranteed opportunity to earn a return up to an allowed level.[3] In exchange for these public benefits, not conferred upon other businesses, utilities must fulfill their inherent duty to serve the public.

22.     The laws of Mississippi impose certain indelible obligations upon public utilities. Some of these duties are detailed below, followed by a description of how the Defendants have violated, and continue to violate, their legal obligations.

23.     The regulatory compact between a state and a public utility has been recognized as imposing inherent duties upon the public utility by courts around the country for at least 130 years. As then Judge (later United States Supreme Court Justice) Benjamin Cardozo explained back in 1919:

> "This gas company occupies the streets of Jamestown with its mains. Even without any statute, it would be under a duty to furnish gas to the public at fair and reasonable rates. The [N.Y. Public Utilities Law] might be repealed, and still the courts would have the power, if exorbitant charges were made, to give relief to the consumer.... The state in the adoption of this law has not imposed a new burden. It has not created a new duty. It has given a new "sanction" to "an **inherent duty**." *W. U. Tel. Co. v. Commercial Milling Co.*, 218 U.S. 406, 416.

The duty to serve is paramount to the acceptance of the franchise by a public service corporation.

24.     Under its regulatory compact with the State of Mississippi, EMI must act in the public interest and do all things reasonably necessary to provide the lowest reasonable cost for electricity to its customers, consistent with reliability. This obligation was recently acknowledged in sworn testimony of EMI witnesses before the MPSC. This obligation is inherent in well-established law that "[c]orporations engaging in a public or quasi-public occupation enjoy privileges that individuals cannot

---

[3]This rate of return is set through a utility's base rates, which are "fixed [by the MPSC] by taking into consideration the value of ... property" used by the utility in its operation "along with such other factors as operating expenses, service on debt, capital costs and capital structure under prudent and economical management," and which return is "sufficient to assure confidence in the financial integrity of the [utility], so as to maintain its credit and to attract capital." *Mississippi Power Co. v. Mississippi Pub. Serv. Comm'n*, 291 So. 2d 541 (Miss. 1974) (quoting *Southern Bell Tel. & Tel. Co. v. Mississippi Pub. Serv. Comm'n*, 113 So. 2d 622 (Miss. 1959)). "A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility." Id.

have, but they have duties which tend to the public welfare, and the whole scheme of laws is to equip and control them as instruments for the public good." 73B C.J.S. *Public Utilities* § 4 (1983).

25.     EMI is the sole electric public utility provider to electric consumers in and around 45 counties in western Mississippi. As such, EMI is duty-bound to comply with all laws, rules and regulations regarding its status as a public utility. Specifically, EMI must comply with the statutes bestowing certain authority and obligations on the MPSC, as well as the rules and regulations of the MPSC. The rules and regulations include but are not limited to, Miss. Code § 77-1-43(2), and Rule 17 of the MPSC's Rules of Practice and Procedure (hereinafter "MPSC Rules"), requiring EMI to only include "actual costs" of fuel and purchased energy in its fuel adjustment clause charges ("FAC").[4] The FAC is a type of "automatic adjustment clause" which clauses are exceptions to the traditional ratemaking paradigm in that they permit the utility to recover certain expenses as they are incurred, with little-to-no regulatory lag (*i.e.*, the natural delay between the incurrence of the expense and the next rate case in which the utility's rates can be adjusted to account for the expense) and on a dollar-for-dollar basis. EMI is not allowed to earn a profit from its FAC.

26.     Pursuant to Miss. Code §§ 97-7-11 and -13 and common law, Defendants have an obligation to provide accurate, truthful and complete information to the MPSC and to customers in connection with FAC charges. Defendants may not mislead the MPSC or customers as to the true nature, quality or sources of the charges for electricity in its bills, invoices and filings, including whether such charges represent "actual costs" for fuel and purchased power and whether such costs are reasonable in light of alternatives available in the wholesale power market.

---

[4]Beginning in or around 1997, EMI replaced its FAC with the Energy Cost Recovery Rider, or "Rider ECR." There is no material difference between the two mechanisms as relates to this Complaint. So, for the sake of simplicity, the FAC and the Rider ECR will be referred to in this Complaint, unless otherwise indicated, jointly and severally as the "FAC."

27. Defendants, like all entities engaged in business in Mississippi, have a duty to comply with Miss. Code § 75-24-1, et seq. to conduct their business affairs in a fair and honest manner and to refrain from unfair or deceptive trade practices affecting commerce. This includes, but is not limited to, Defendants' duty to conduct their affairs in a manner such that they do not:

    (1)    misrepresent the source, approval or certification of goods or services;

    (2)    misrepresent the affiliation, connection, or association with, or certification by another; or

    (3)    represent that goods or services are of a particular standard, quality or grade if they are of another.

28. EMI also has a duty to deal in good faith and fairly with its customers, including the State and other governmental entities as ratepayers. EMI possesses a far superior bargaining position with respect to its customers regarding the charges it imposes upon them relating to the acquisition of electricity and fuel needed to generate electricity and other charges.

29. Finally, Defendants are duty-bound to comply with state antitrust laws as to commodities and services subject to competition and "not act in a manner inimical to the public welfare, the effect of which would be to restrain the freedom of trade or production; monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business; or engross, forestall or attempt to engross or forestall any commodity." Miss. Code § 75-21-3(a), (b) or (c).

## II. Defendants' Conduct

## A. The Provision and Billing of Power to Mississippi Customers

### i. The Entergy System Exchange

30.     EMI, Entergy and other utility company affiliates, called "Entergy Operating Companies," ("EOCs") entered into an agreement known as the "System Agreement" (now called the "Entergy System Agreement") in 1951 to govern the joint operation of, and planning involving, the electricity generating units and bulk transmission facilities of the EOCs.[5]

31.     Pursuant to the System Agreement, the EOCs coordinate the operation of all of their generating units and transmission facilities through one control center, called the "Dispatch Center," located in Texas and operated by ESI personnel. ESI therefore controls the output level, fuel purchases and other activities related to each of the roughly 90 generating units in the entire four-state Entergy System, including the plants owned by EMI.

32.     One of the agreements contained in the overall Entergy System Agreement concerns the pooling or sharing of excess electricity among the EOCs through an accounting device called the "Entergy System Exchange" ("ESX").

33.     The ESX is a pooling mechanism through which the EOCs share energy. EOCs with more generation resources than needed at any given time to meet their customers' needs (known as "long" companies) may transfer excess energy into the ESX. EOCs without enough generating

---

[5]The "Entergy Operating Companies" are EMI's sister retail electric utilities: Entergy Arkansas, Inc. ("EAI"; formerly Arkansas Power & Light Co.), Entergy Louisiana, LLC ("ELL"; formerly Entergy Louisiana, Inc., and prior to that Louisiana Power & Light Co.); Entergy Gulf States, Inc. ("EGSI"; formerly Gulf States Utilities Co.); Entergy Gulf States Louisiana, LLC ("EGSL"; formerly the Louisiana retail and wholesale operations of EGSI); Entergy Texas, Inc. ("ETI"; formerly the Texas retail and wholesale operations of EGSI) and Entergy New Orleans, Inc. ("ENO"; formerly New Orleans Public Service, Inc., or "NOPSI").

resources and electricity purchased from non-affiliates (by ESI on their behalf) to meet their customers' needs (known as "short" companies) can take energy from the ESX.

34. The transfers of electricity into and receipts of electricity taken from the ESX are not physical deliveries of electricity. Rather, these transfers are solely accounting transactions performed by ESI on behalf of the EOCs. The electrical grid operates in such a way that makes it practically impossible to physically track the electrons sold by a supplier to a purchaser. Instead, the entire electrical grid must be kept in balance—meaning the supply of electricity must always match the demand—on an instantaneous basis, because electricity, in general, cannot be stored. Therefore, a sale of electricity can be analogized to a supplier pouring a cup of water into one end of a pool and the purchaser withdrawing a cup of water from the opposite end. All the while the "System Operator" (i.e., Entergy, in the relevant geographical area) must ensure that a sufficient amount of water remains in the pool so the entire system remains in balance. After the sale is completed, the accounting for the sale of electricity is performed on paper and funds change hands.

35. At the end of each month, on an after-the-fact basis, ESI performs the accounting for energy transferred to and taken from the ESX. The process of this accounting is memorialized in the "Intra-System Bills ("ISBs") by ESI.

36. In allocating the costs of power transferred to the ESX on the ISBs, ESI will, in any given hour in which a long company had more resources than needed to meet its customers' electricity needs, "stack" that company's resources from cheapest to most expensive in order that the most expensive energy is transferred as an accounting entry into the ESX. Conversely, in each hour in which a short company's resources are insufficient to meet its customers' electricity needs, ESI assigns to that short company resources from the ESX in an amount sufficient to match the company's customers' demand.

37.   The process by which the long EOCs send electricity to the exchange is such that *only the most expensive resources* that are in excess of the long company's needs are sent to the exchange. Therefore, the ESX always consists of the most expensive resources not needed by the long EOCs.

38.   The Entergy System Agreement expressly provides that any EOC, acting individually or in combination with one or more other EOCs, may make a purchase of electricity from a non-affiliate for its/their "own account." Entergy System Agreement, Sec. 4.02. Despite the ability to do so, EMI deliberately decided not to pursue less expensive non-affiliate supplies of electricity, and, instead, merely accepted transfers (which as previously mentioned, are not physical transfers of electricity, but rather accounting transactions) of the expensive ESX electricity.

39.   The Entergy System Agreement, including the formula contained in one of its "service schedules," MSS-3, for *pricing* the power purchased from the ESX, is a tariff filed with and approved by the FERC and therefore regulated by FERC. On the other hand, the *amount* and *timing* of power EMI purchases from whomever, including the ESX, is *not* regulated by FERC. EMI should have pursued purchases from non-affiliates for its own account, as expressly permitted by the Entergy System Agreement, instead of purchasing vast amounts of expensive power from its affiliates via the exchange, and, had it done so, those purchases would have been at FERC-approved rates as well. The courts and FERC itself have made plain that FERC does not regulate a purchasing electric utility's choice among various FERC-approved rates.

### ii. Mississippi Customers Receive More Expensive Power Through the ESX

40.   EMI was and is, on average, a "net purchaser," or "net taker," from the ESX, i.e., EMI typically is a short company and must purchase power from the ESX.

41.    Because ESX electricity was and is, by design, the most expensive electricity that is not needed by the long EOCs, EMI could and should have pursued power purchases from non-affiliates on its own account to offset the higher cost of ESX power. Despite the ability to do so, EMI chose not to pursue these less expensive alternative sources of electricity.

42.    As described above, each month EMI receives an ISB including charges for electricity it purchased from its affiliates through the ESX. These charges are significantly and consistently higher than prices for electricity available from non-affiliates.

43.    Through accounting machinations reminiscent of Enron, EMI misrepresents to the MPSC that the charges for the electricity purchased from its affiliates and contained in the ISBs and other documents qualify as the lowest reasonable costs for electricity.

44.    Rather than acting in the best interest of its customers by pursuing the less-expensive electricity from the third party vendors, EMI routinely passes on the inflated costs of its affiliates' electricity to its captive customers (i.e., Mississippi consumers).

45.    In short, EMI's filings with the MPSC and its bills to its customers amount to inflated invoices containing charges for the over-priced electricity it purchases from its affiliates.

### iii. Billing Through the Fuel Adjustment Clause for ESX Power

46.    Instead of pursuing less expensive sources of electricity, EMI merely accepts the transfers of expensive ESX electricity and then passes the cost of this expensive electricity on to its customers through its FAC charges.

47.    A fuel adjustment clause is an automatic rate recovery mechanism whereby EMI is allowed to pass through to its customers, dollar-for-dollar, the "actual costs" of its fuel and purchased electricity. MPSC Rule 17 specifically restricts the types of costs electric utilities may include in their FACs to certain categories of actual costs for fuel and purchased energy.

48.     Charges included in EMI's FAC receive far less scrutiny than "base rates." The MPSC has never given EMI's FAC regulatory approval, as a utility's base rates would receive pursuant to a rate case.

49.     Since approximately 1974, EMI has misused its FAC mechanism by flowing through to its Mississippi customers excessive fuel and purchased power expenses on an automatic dollar-for-dollar basis. Pursuant to Miss. Code § 77-3-42(1)(a), no utility shall include in its FAC anything but the "actual cost" of the fuel burned in its generating units and the cost of purchased energy.

50.     These statutes and regulations clearly prohibit inclusion in a FAC of charges that are not the "actual cost" of fuel and purchased energy, strictly defining the types of costs that may be recovered from customers through these mechanisms. EMI chose to ignore these proscriptions, however, and has deliberately passed on to its customers inflated electricity costs and illegal surcharges.

### iv. Billing Through FAC For Inefficient EMI Plants

51.     In addition to purchasing more expensive power through ESX, EMI also uses the FAC to recover the costs of fuel associated with the electricity generated by EMI's inefficient power plants.

52.     Several of EMI's generating units are old and inefficient, having been built in the 1950's and 1960's. Contrary to its legal duty, and its self-professed and represented goal, to provide the lowest reasonable price for electricity to its consumers, Defendants run EMI's antiquated power plants at unreasonably high levels month after month and pass on to Mississippi customers the cost of this expensive electricity instead of replacing some of that electricity with less expensive electricity it could purchase from third parties on the open wholesale market.

53.     Succinctly stated, ESI's manipulation of the purchasing and selling of electricity for, and on behalf of EMI, in the competitive wholesale electric power market, *in tandem with* its control

16

over the output of EMI's generating units and *de facto* prohibition of access by its customers to alternative electricity sources, has produced illegal and unrestricted profits for its (and EMI's) parent Entergy and transformed Mississippi into a dumping ground for high-cost electricity. All of this has been done with EMI's participation and acquiescence.

### v. Using FAC to Further Power-for-Profits Shell Game

54. As part of the Defendants' scheme, ESI purchases electricity from non-affiliates on the wholesale power market, some of which is considerably less expensive than the cost of generating electricity in EMI's plants. Yet, rather than providing this inexpensive purchased power to EMI's customers, ESI instead resells it to other non-affiliates.

55. At the same time ESI is reselling this inexpensive purchased power to other non-affiliates for an unregulated profit to Entergy, EMI's customers are forced to purchase the expensive electricity generated by EMI or one of its affiliated EOCs.

56. Meanwhile, the cost of the expensive EMI-, EPI- or Entergy System-generated electricity is passed on to EMI's customers dollar-for-dollar through the FAC, Rider ECR and/or PMR[6] mechanisms.

### vi. Using Accounting Manipulations of FAC to Produce Illegal Profits for Entergy

57. When ESI conducts resales to non-affiliated purchasers in the wholesale power market, it deliberately fails to credit and/or does not fully credit the relevant EOC's customers for the cost of

---

[6]In or around 2002, EMI filed with the MPSC its PMR mechanism, which operates similarly to the Rider ECR, except that it is designed to recover certain "capacity charges" associated with purchased power. Capacity charges are essentially rental payments required by sellers in the wholesale power market for "firm" (i.e., assured delivery) sales. Capacity charges are not fuel or purchased energy and typically are only allowed to be recovered in a utility's base rates. The PMR, however, allows EMI to recover certain capacity charges automatically and on a dollar-for-dollar basis, like the Rider ECR for fuel and purchased power expenses.

that electricity so resold. A "resale" by ESI refers to an ESI sale of electricity, which ESI had previously purchased from a non-affiliate, to a non-affiliated third party in the wholesale market.

58. Thus, ESI does not properly credit EMI's customers with the resale even though the entire original purchase price had been booked to their account when the initial purchase was made. This manipulation of the FAC produces illegal profits for Entergy at the expense and injury of EMI's customers.

### vii. Passing Fraudulent and Illegal Adders to EMI Customers Through the FAC

59. EMI has also systematically included non-fuel costs in FAC charges passed through to its customers which violates Miss. Code § 77-3-42 and MPSC Rule 17. These laws and regulations permit only the "actual cost" of fuel and purchased energy costs to be included in EMI's FAC and/or Rider ECR. Miss. Code § 77-3-42(1)(b) and (2)(a); MPSC Rules 17.101(1) and 17.102. Non-fuel costs, including capital costs and fixed, known or measurable expenses, are typically required to be recovered through an electric public utility's base rates so that such costs may be amortized over time and so that the regulator may take such costs into account in relation to all of the utility's other base rate costs and offsetting factors such as increased demand (and, thus, increased profit) and potential cost reductions resulting from areas in which efficiencies may be improved or expenses reduced. In other words, including a particular cost in base rates does not carry with it the assurance that 100% of the cost will be recovered–and the cost certainly does not get collected automatically from ratepayers–as do costs included in a utility's FAC.

60. EMI has violated Mississippi law and the MPSC Rules by charging its customers illegal "adders" and surcharges to the fuel and purchased electricity costs.

61. EMI, through and with ESI, includes costs purportedly in connection with environmental compliance such as the purchase price of emissions credits or allowances, known as SO2 allowances, in the charges for energy purchased from the ESX. These are flowed through in the FAC for payment by Mississippi customers.

62. The pricing formula under the Entergy System Agreement includes the cost of these non-fuel "adders" in the price for ESX energy. However, State law determines the lawful means by which EMI may collect the adders from its Mississippi customers and specifically requires such costs to be collected through base rates, not through the FAC and/or Rider ECR.

63. These and other unauthorized and illegal non-fuel adders and costs add millions of dollars of prohibited costs each year to EMI's FAC charges which are passed directly through dollar-for-dollar to EMI's Mississippi customers.

## B. Deceptive Practices Designed to Hide Their Fraudulent Schemes

64. Defendants surreptitiously employed accounting maneuvers designed to secretly and illegally include unauthorized charges in its FAC, for purposes of carrying out a fraudulent scheme in a manner intended to escape the oversight of the MPSC.

65. Defendants fraudulently represented to the MPSC that the amount and price of its expensive power generated by antiquated plants resulted in the most reasonable cost of electricity being provided to EMI's Mississippi customers.

66. Defendants also fraudulently represented to the MPSC that the costs and amount of electricity EMI purchased from the ESX were and are reasonable.

19

67.     Similarly, Defendants continually misled the MPSC and consumers that the charges for fuel and purchased electricity included in EMI's FAC were the lowest reasonable cost, relative to third party supplies of electricity.

68.     For instance, Mr. Dorman Davis, in sworn written testimony to the MPSC in Dkt. No. 2008-AD-170, testified of his familiarity with Miss. Code § 77-3-42 and MPSC Rule 17 and states that these laws allow for "only" the recovery of the actual costs listed therein.[7]

69.     However, Mr. Davis then falsely states that EMI does not profit through its Rider ECR (formerly the FAC).[8] EMI has and continues to illegally reap profits through its manipulation of the FAC and/or Rider ECR.

70.     Similarly, Mr. Theodore H. Bunting, Jr., Chief Accounting Officer for Entergy and EMI, testified in the MPSC FAC Proceeding that, "Entergy Mississippi makes no profit from fuel and purchased power costs collected under [Rider ECR], and although the System takes reasonable steps and commits a significant amount of time and manpower to prudently manage its fuel expenses, it has no direct control over this aspect of the customer bill."[9]

71.     Mr. Bunting's statements are false for the same reasons that similar statements made in sworn testimony by Mr. Davis (quoted in the preceding paragraph) are false.

72.     Likewise, Mr. Robert R. Cooper, employed by ESI, but testifying on behalf of EMI, stated in his sworn written testimony that the projected fuel and purchased power expenses for the third quarter of 2008, which are the subject of Docket No. 2008-AD-270, "are reasonable estimates of the

---

[7] Direct Testimony of Dorman J. Davis, MPSC Docket No. 2008-AD-270, July 7, 2008, at 11.

[8] *Id.*, at 11-12.

[9] Direct Testimony of Theodore H. Bunting, Jr., MPSC Docket No. 2008-AD-270, July 7, 2008, at 3.

costs needed for [EMI] to continue to meet its legal obligation to provide reasonably adequate electric service to its customers *at the lowest reasonable cost.*"[10]

73.    However, the projected fuel and purchased power expenses about which Mr. Cooper testified include charges associated with excessively-priced electricity to be purchased from EMI's affiliates through the ESX instead of less expensive electricity available from non-affiliates in the wholesale power market.  Therefore, the costs and charges flowed through the FAC by EMI to its Mississippi customers for fuel and purchased power have not, as represented by Mr. Cooper, equated to the lowest reasonable cost for such fuel and purchased power, but instead have included excessive prices for both.

74.    Mr. William M. Mohl, Vice President of ESI, stated in his sworn written testimony that ESI's electricity supply and procurement strategy is intended to provide "reliable, cost effective, and more stably priced power...." and that as part of its procurement efforts, "ESI has conducted nine formal RFPs [Requests for Proposals] on behalf of the [EOCs], beginning with the Fall 2002 RFP."[11] Mohl stated that the EOCs "have entered numerous contracts representing over 5,600 MW of capacity as a result of the RFPs ... issued by ESI since 2002."[12]  As Mohl described the RFP process, its "primary objective is to solicit competitive proposals to provide the [EOCs] with flexible and cost-effective generating resources to meet their retail customers' needs in **a reliable and economical manner.**"[13]  Mohl testified that the "key considerations for selecting a potential resource" are the

---

[10]Direct Testimony of Robert R. Cooper, MPSC Docket No. 2008-AD-270, July 7, 2008, at 3. (emphasis added).

[11]Direct Testimony of William M. Mohl, MPSC Docket No. 2008-AD-270, July 7, 2008, at 20-21.

[12]*Id.*, at 21.

[13]*Id.*, at 23-24 (emphasis added).

21

"proposal price and the resulting benefits to the [EOCs]."[14] Mohl attached a draft Summer 2008 RFP to his testimony as Exhibit WMM-3.[15]

75.     John Hurstell, Vice President of Energy Management System Planning and Operations for ESI, provided sworn written testimony on EMI's "underlying organization, strategy, and process for fuel and purchased power acquisitions."[16] In describing EMI's fuel and purchased power procurement process, Hurstell explained how third-party electricity generators had "increased opportunities" to sell power to the Entergy System via the "formal RFP process."[17] Hurstell concluded that "[t]he fuel and purchased power expenses that [EMI] incurred were the result of **prudent** planning and acquisition processes."[18]

76.     Though representing to the MPSC that the RFP process ensured the lowest reasonable price for purchased power and fuel, neither Mr. Mohl or Mr. Hurstell (or any other EMI representative) informed the MPSC of the crucial material fact that FERC concluded that Entergy, ESI and EAI engaged in affiliate abuse with respect to the 2002 RFP.[19] Specifically, Entergy senior management (including Mr. Mohl), responsible for evaluating the bid proposals, shared confidential information

---

[14]*Id.*, at 24.

[15]*Id.*, at 26 & Exhibit WMM-3.

[16]Direct Testimony of John Hurstell, MPSC Docket No. 2008-AD-270, July 7, 2008, at 3.

[17]*Id.*, at 13-14 and Exhibit JPH-2.

[18]*Id.*, at 18-19 (emphasis added).

[19]In re Entergy Servs., Inc., EWO Marketing, LP, Entergy Power, Inc., Entergy La., Inc., 116 F.E.R.C. P61,296 (Sept. 27, 2006), at ¶¶ 75-82.

with Entergy affiliate EAI, who was also bidding on the RFP, about competitors' bids.[20] Of course, EAI won the bid.

77. These and other representations before the MPSC are deceptive and illegal and violate the MCPA, including but not limited to the following:

(a) misrepresented the source, approval or certification of goods or services by falsely asserting to the MPSC and the consuming public that the fuel and purchased electricity costs included in its FAC charges were: (i) reasonable, (ii) approved by the MPSC for inclusion in the FAC (i.e., were "actual costs"), (iii) free from manipulation, and (iv) actually incurred;

(b) misrepresented the affiliation, connection, or association with, or certification by another through failing to disclose their relationship and the excessive costs that had been charged to EMI by affiliates, including, but not limited to EPI, for electricity that was significantly more expensive than EMI could have obtained from third party vendors in the wholesale power market, and by virtue of EMI's tacit certification to the consuming public that the MPSC was aware of the true nature and level of the costs included in its FAC charges and had approved same;

(c) represented that goods or services (i.e., fuel and purchased electricity) were of a particular standard, quality or grade when they were of another, by deceptively misleading the MPSC and the consuming public into believing that the fuel and purchased electricity costs included in its FAC charges were: (i) reasonable, (ii) approved by the MPSC for inclusion in the FAC (i.e., were "actual costs"), (iii) free from manipulation, and (iv) actually incurred; and

(d) represented that EMI's intrastate transmission system was constrained so that independent power producers (sometimes known as "merchants"), municipalities and electric cooperatives could not use or sell into the transmission system.

78. EMI, based upon all of the same conduct described above, has breached its obligation of good faith and fair dealing with its customers through its unreasonable charges described above and illegal self-dealing with its affiliates. EMI"s conduct has further forced its customers to unwittingly and illegally subsidize a number of its affiliates, both regulated and unregulated, to the great expense and exposure to risk of its customers in Mississippi.

---

[20] Id.

## C. Illegal Subsidization by EMI's Customers

79.    Through its manipulation of the FAC described above—forcing excessive, unauthorized costs on Mississippi consumers—Defendants have used EMI's customers to subsidize unregulated ventures in competitive markets without any examination beforehand of the attendant risks and benefits, and without appropriate safeguards and compensation.

80.    Furthermore, as a result of numerous interlocking directorships and office holdings, the Defendants, their officers and directors completely control EMI's operations, management and business decisions to the ultimate detriment of its Mississippi customers.

81.    For example, key EMI executives are or have also been executives of the parent Entergy and other EMI affiliates, including:  Theodore H. Bunting, Jr., Senior Vice President and Chief Accounting Officer for Entergy, EMI and all other EOCs; Jay A. Lewis, Vice President and Chief Financial Officer of Entergy, EMI and all other EOCs; Robert D. Sloan, Executive Vice President, General Counsel and Secretary of Entergy, EMI and four other EOCs; Gary J. Taylor, Director of EMI and four other EOCs; Leo P. Denault, Director of EMI and four other EOCs; and, Mark T. Savoff, Director of EMI and four other EOCs.

82.    Parent Entergy's domination and control of EMI has led to irreconcilable conflicts of interests by the directors and officers of each of the corporate Defendants and EMI, which has allowed for the hidden subsidization by Mississippi consumers of substantial operations of Defendants' unregulated ventures.

83.    The Defendants have not operated as separate entities and were never intended, nor truthfully disclosed to the MPSC, to be such. Through their actions described in this Complaint, the

Defendants are a single business enterprise and should be treated as such as to all legal obligations and duties toward EMI's Mississippi customers.

### i. Unregulated Affiliate Scheme involving Entergy Power, Inc.

84. As previously mentioned, FERC has jurisdiction over the *price* of energy purchased by EMI from the ESX; FERC also sets the price that non-affiliates charge in the wholesale power market. However, FERC does not regulate the *amount* of electricity EMI purchased from EPI through the ESX (an amount within the exclusive control of Entergy, through and with ESI). Therefore, FERC's jurisdiction is not implicated here as this Complaint **in no way challenges the *price* of energy purchased by EMI from the ESX** but rather exposes the **choices** Defendants made as between two (or more) FERC-approved prices for energy — the higher priced ESX electricity versus the less expensive electricity that could be acquired from third party vendors, or non-affiliates.

85. Defendants have forced EMI's customers to subsidize the speculative market activities of one of EMI's unregulated affiliates, EPI. Defendants did this through EMI's consistent choice to continue to purchase the excessively-priced EPI electricity in lieu of buying less expensive energy from non-affiliates to serve its Mississippi customers.[21]

86. The genesis for the formation of EPI, around 1990, was a finding by the Arkansas Public Service Commission that EMI's EOC affiliate, Entergy Arkansas, Inc., possessed too much

---

[21]Another way to describe the conduct is to say that ESI dispatched EPI's units as though they were part of the Entergy System when, in fact, they were not, and the purchases of power from EPI should have been treated as though they were from a third party (i.e., at arms'-length) so that ESI would only have purchased EPI's power if it was the most economical power available. The EPI power sold to EAI from its Ritchie unit was not economical; EAI did not need the Ritchie power; and the excessively-priced Ritchie power was passed on to EMI's customers via its FAC, Rider ECR and/or PMR.

electric generating capacity relative to the need of its retail customers. As a result, EAI had to spin off two generating units to EPI.

87. EAI spun off its ownership interest in two of its generating units, a portion of the coal-fired Independence Steam Electric Station ("ISES"), Unit 2, and the natural gas-fired Ritchie Station ("Ritchie"). The electric energy produced by the ISES unit is less expensive, at most times, than that produced by the Ritchie unit, because coal is most often cheaper than natural gas as a generating fuel.

88. The scheme evolved as EPI and Entergy naturally realized it would be difficult to make profits selling the natural gas-fired electricity from EPI's Ritchie unit into the competitive wholesale power market. Consequently, EPI began selling the *entire output* of the Ritchie unit back to EAI, when EAI did not need it because EAI had too much generating capacity relative to its customers' needs. EAI would thus transfer the expensive Ritchie electricity into the ESX. Meanwhile, EPI continued to sell the inexpensive output of its coal-fired ISES plant into the wholesale market at a profitable margin.

89. In this way, EPI's expensive Ritchie-generated electricity was transferred by EAI into the ESX and was taken (purchased) by EMI and charged to its customers. Therefore, EMI's customers provided EPI with a captive site to force-feed the expensive electricity which would have yielded EPI less or no profits in the competitive wholesale market. Freed from the burden of this high-priced electricity going to Mississippi, EPI was then able to sell its cheaper-cost ISES electricity in the market for higher unregulated profits to Entergy.

90. To make matters worse, EMI's purchases of the expensive EPI electricity through ESX prevented it from purchasing less expensive sources of electricity that were available from non-

affiliates. The costs of the electricity purchased by EMI from the ESX were included in its FAC and/or Rider ECR charges.

### ii. Operation of Nuclear Plants in the Northeast United States

91.　Defendants also have used EMI's customers to subsidize and underwrite the speculative activities of its unregulated affiliates through loans and guaranties EMI has provided for Entergy's unregulated nuclear generating business.

92.　In order to fully leverage its monopoly powers–to the detriment of its customers and to the benefit of its parent--EMI has loaned substantial sums to a non-utility operating segment of Entergy, referred to as its "unregulated nuclear generating business," so that segment could compete in the wholesale power market in the northeast United States to produce unregulated profits for Entergy. EMI and the other EOCs have thus "propped up" their parent's ability to acquire and operate non-utility nuclear generating units in the northeast for the purpose of making unrestricted profits, which conduct has placed the assets, revenue streams and creditworthiness of EMI and the other EOCs in jeopardy.

93.　By jeopardizing its assets, revenue streams and creditworthiness, EMI has harmed Mississippi consumers by driving up its cost of capital.

94.　Beginning in or around 2000, Entergy began purchasing nuclear generating units in the northeast United States. These nuclear plants are not regulated by any state public service commission; they are what are known as "merchant plants" that sell their electricity into the wholesale electric power market. EMI does not receive any electricity generated by these unregulated nuclear plants.

95.　According to Entergy's Securities and Exchange Commission ("SEC") Annual Report, Form 10-K, for 2007, Entergy's unregulated nuclear business accounted for 48% of its net income that

27

year as compared to 27% in 2006. Entergy has stated in its SEC filings that "an Entergy subsidiary" (without naming any particular subsidiary) may be required to guaranty certain power sales agreements entered by Entergy's nuclear business. Entergy SEC Form 10-K, 2007, at 43. EMI is an "Entergy subsidiary" guaranteeing the contractual obligations of the nuclear generating business.

96.    The sizeable loans, guaranties and other financial assistance provided to Entergy's nuclear business by the regulated utility subsidiaries have enabled and will continue to enable Entergy to compete in the wholesale power markets in the northeast United States.

97.    Somewhere in late 2007 through the spring of 2008, Entergy formed a plan to spin off its unregulated nuclear plants to a new company, called Enexus Energy Corporation ("Enexus"). In the Registration Statement filed by Enexus with the SEC on May 12, 2008, Enexus revealed that it has (as Entergy's unregulated nuclear generating segment) received *approximately $1.2 billion in loans from "associated companies,"* which includes EMI. In addition, Enexus' SEC filing indicates that Entergy and/or its subsidiaries have signed "guarantees" for the performance of obligations of the unregulated nuclear generating segment's business operations *in the amount of $1.9 billion.*

98.    The loans and guaranties mentioned above are for the benefit of Entergy's unregulated nuclear generating business and will benefit the new entity, Enexus, until the spin-off is fully implemented.

99.    These loans, guaranties, other financial backing and other conduct surrounding Entergy's spin-off of its nuclear generating business to Enexus constitute on-going and prohibited subsidies in favor of Entergy, Enexus and their shareholders to the detriment of EMI and its Mississippi customers. EMI has placed its assets, revenue stream and creditworthiness at great risk by making these large loans and guaranties in favor of its parent's unregulated nuclear generating

business. The stress on EMI's creditworthiness and liquidity, alone, will directly affect its Mississippi customers by adversely affecting its cost of capital and the ability to access reasonable interest rates on moneys it must borrow from time-to-time, which costs are ultimately borne by EMI's customers.

### iii. Diversion of Tax Refunds from EMI to Entergy's Unregulated Nuclear Generating Business

100. EMI has acquiesced and/or participated in the diversion of approximately $71 million of federal tax refunds related to the Gulf Opportunity Zone Act of 2005 ("GO Zone Act") (which provided certain tax relief to utilities to assist in recovering from Hurricane Katrina) to Entergy's unregulated nuclear generating business. This diversion of refunds harmed EMI's customers, who would have benefitted from such funds through a reduction in FAC expenses.

101. Entergy received a *$344 million income tax refund* as a result of net operating loss carryback provisions contained in the GO Zone Act. The GO Zone Act, enacted in December 2005, allows a public utility incurring a net operating loss as a result of Hurricane Katrina to carry back the casualty loss portion of the net operating loss ten years to offset previously taxed income, and provides other benefits, including favorable depreciation on Hurricane Katrina capital expenditures.

102. Of the $344 million tax refund related to the net operating loss carryback to its EOCs, Entergy only allocated $273 million to the EOCs, including EMI, in April 2006, *with the remainder distributed primarily to Entergy's unregulated nuclear generating business*. Entergy stated in its SEC Form 10-K for 2007 that approximately $71 million was diverted to the unregulated nuclear generating business instead of EMI and the other Operating Companies, "**[i]n accordance with Entergy's intercompany tax allocation agreement,**" Entergy SEC Form 10-K, 2007, at 24.

103. Entergy's unregulated nuclear generating business is located in the northeast United States and sustained virtually, if not absolutely, no damage as a result of Hurricane Katrina, yet it was

allocated nearly 21% of the $344 million in tax refunds directly related to operating losses resulting from Hurricane Katrina. EMI's complicity in the diversion of such tax refunds to Entergy's nuclear generating business caused harm to its customers and was injurious to the public interest. By secretly diverting tax refunds from their intended purpose, Defendants have profited from a calamity suffered by this State and her citizens and thereby violated the regulatory compact to act in the best interests of the public and breached their duty of good faith and fair dealing with EMI's Mississippi customers.

104. In sum, Defendants have abused, manipulated, and unlawfully caused EMI to breach the regulatory bargain or compact between the State of Mississippi and its public utilities, which requires every such utility to submit to intense public scrutiny and control for the purpose of receiving just and reasonable rates, which are constitutional, valid and binding, in return for protection as a lawfully sanctioned monopoly, including protection from retail competition, the right of eminent domain and the use of public rights-of-way. Defendants sought to accomplish this illegal outcome by:

(a)     surreptitiously evading and avoiding regulatory oversight;

(b)     dissipating the public utility's assets, revenues and creditworthiness by forcing EMI to make sizeable loans, sign letters of credit, guaranties and/or enter other financing transactions to support and subsidize Entergy's unregulated multi-billion dollar nuclear generating business in the northeast United States (which is to be, but has not yet been, spun-off into Enexus Energy) from which nuclear plants EMI's customers receive no electricity;

(c)     reselling inexpensive electricity that was purchased from non-affiliates to other non-affiliates while at the same time providing expensive EMI-, EPI- or Entergy System-generated electricity to EMI's customers;

(d)     forcing EMI's customers to subsidize the unregulated wholesale market activities of its unregulated affiliate, EPI, by requiring them to purchase EPI's expensive electricity while EPI sold its inexpensive electricity into the wholesale market to produce unrestricted profits for EMI's and EPI's parent company Entergy;

(e)     deliberately not crediting EMI's customers with the full amount of profits from the sale of generated electricity and/or resale of purchased electricity, respectively, and thereby producing profits for Entergy from the manipulation of the FAC and/or Rider ECR contrary to Mississippi law;

(f)    including unauthorized "adders" in the fuel and purchased electricity charges embedded in EMI's FAC, Rider ECR and/or Power Management Rider ("PMR") mechanisms, all in violation of Mississippi law; and

(g)    misrepresented to the MPSC that the RFP process begun in Fall 2002 and continuing through today with the Summer 2008 RFP ensured that fair and reasonable fuel costs were paid by Mississippi consumers when, in fact, Defendants fraudulently shared many third party bids with their successful bidder affiliates, thus completely corrupting the RFP process.

105.    The above actions have and will continue to harm EMI customers, whom the duties are specifically intended to protect since they are captive customers of a state-sanctioned monopoly and have no other electric supply option to use except the EMI monopoly.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the Consumer Protection Act
### Under Miss. Code 75-24-1, et seq.

106.    The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

107.    The acts and practices of EMI and the other Defendants described in this Complaint have violated Miss. Code § 75-24-1, et seq.

108.    Specifically, EMI and the other Defendants have violated, and continue to violate, Miss. Code § 75-24-5(1) and (2).

109.    EMI and the other Defendants have violated and continue to violate Miss. Code § 75-24-5(1) by using unfair methods of competition affecting intra-state commerce in the manner set forth in the Fifth Cause of Action below for violation of the Mississippi Antitrust Act.

31

## SECOND CAUSE OF ACTION
### Violation of Mississippi Public Service Commission
### Statutes and Rules and Regulations
### Under Miss. Code § 77-1-43(2)

110. The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

111. The acts and practices of EMI and the other Defendants described in this Complaint have violated Miss. Code § 77-1-43(2) and Rule 17 of the MPSC's Rules of Practice and Procedure.

112. Specifically, the Defendants have charged its customers excessive prices for fuel and purchased electricity, and included unauthorized and illegal "adders" and surcharges to the fuel and purchased electricity costs.

## THIRD CAUSE OF ACTION
### Restitution

113. The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

114. The acts and practices of EMI and the other Defendants described in this Complaint have violated Miss. Code § 75-24-1, et seq., thereby supporting a cause of action for restitution, including disgorgement, of the ill-gotten gains received by EMI and the other Defendants at the expense of EMI's customers pursuant to Miss. Code § 75-24-11.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment

115. The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

116. EMI and the other Defendants hold monies and assets received and usurped from Mississippi residents and the State of Mississippi, as well as its subdivisions, operations and agencies,

as consumers, which were improperly paid or transferred to, or usurped by, EMI and the other Defendants because of the acts and practices described hereinabove and which, in equity and good conscience, belong to Mississippians and the State, its subdivisions, operations and agencies.

117. EMI and the other Defendants were thereby unjustly enriched and secured benefits and profits in the form of monies and/or assets improperly paid by, transferred by, or usurped from Mississippians and the State of Mississippi, as well as its subdivisions, operations and agencies.

118. It would be unconscionable and unjust for EMI and the other Defendants to retain these benefits and profits.

### FIFTH CAUSE OF ACTION
### Violation of Mississippi Antitrust Statutes
### Under Miss. Code § 75-21-3(a), (b) and (c)

119. The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

120. In violation of Miss. Code § 75-21-3, by their actions and practices described above, EMI and the other Defendants have intended to accomplish and/or have accomplished to a degree inimical to the public welfare the following:

a. Restraint or attempted restraint of trade or production of electricity;

b. Engrossed, forestalled and/or attempted to engross or forestall electricity.

121. As a result of these actions, Mississippi consumers and the State of Mississippi have been and continue to be injured and damaged.

### SIXTH CAUSE OF ACTION
### Fraud

122. The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

33

123. The acts and practices of EMI described in this Complaint violate Mississippi Fraud Statutes and common law respecting fraud, see Miss. Code §§ 97-7-11 and 97-7-13; Qualcomm, Inc. v. Am. Wireless License Group, LLC, 980 So. 2d at 274; Windham v. Latco of Mississippi, Inc., 972 So. 2d at 611.

124. Defendants knowingly and intentionally made false, material representations upon which the MPSC, on behalf of Mississippi citizens, reasonably relied. The Defendants have consistently and repeatedly misrepresented to Mississippi consumers and regulators, through their words, deeds and actions, the material facts: (a) that they were complying with Mississippi law, policy and the regulatory bargain or compact; (b) that EMI was providing electricity to consumers at the lowest reasonable cost; (c) that the FAC charges were actual costs of fuel and purchased power, and (d) that EMI assets were being used solely for the benefit of Mississippi consumers when, in truth and fact, such assets were being misappropriated by Defendants to benefit their unregulated businesses all the while causing EMI's customers to subsidize such activities.

125. Further, the Defendants knowingly and intentionally concealed certain material facts from regulators and consumers, knowing that said information was material and that withholding this information would seriously damage the consumers, including the facts that the Defendants were not complying with Mississippi law, policy and the regulatory bargain or compact, that EMI was not providing electricity to consumers at the lowest reasonable costs, that EMI was unlawfully charging its customers unapproved "adders" and surcharges, and that EMI assets were not being used solely for the benefit of Mississippi consumers but were instead being misappropriated by Defendants to benefit their unregulated businesses thereby causing EMI's customers to subsidize such activities.

126. As a result of these actions, Mississippi consumers and the State of Mississippi have been and continue to be injured and damaged.

## SEVENTH CAUSE OF ACTION
### Breach of Obligation of Good Faith and Fair Dealing

127. The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

128. The acts and practices of EMI constitute a breach of its obligation of good faith and fair dealing with its customers, which customers include the State of Mississippi.

129. Specifically, EMI has breached its obligation of good faith and fair dealing by, among other things:

(a)     surreptitiously evading and avoiding regulatory oversight;

(b)     dissipating its assets, revenues and creditworthiness by making sizeable loans, letters of credit, guaranties and/or entering other financing transactions to support and subsidize Entergy's unregulated nuclear generating business, from which nuclear plants EMI's customers receive no electricity;

(c)     reselling inexpensive electricity that was purchased from non-affiliates to other non-affiliates while at the same time providing expensive EMI-, EPI- or Entergy System-generated electricity to EMI's customers;

(d)     forcing EMI's customers to subsidize the unregulated wholesale market activities of its unregulated affiliate, EPI, by requiring them to purchase EPI's expensive electricity while EPI sold its inexpensive electricity into the wholesale market to produce unrestricted profits for EMI's and EPI's parent company Entergy;

(e)     deliberately not crediting EMI's customers with the full amount of profits from the sale of generated electricity and/or resale of purchased electricity, respectively, and thereby producing profits for Entergy from the manipulation of the FAC and/or Rider ECR contrary to Mississippi law;

(f)     including unauthorized "adders" in the fuel and purchased electricity charges embedded in EMI's FAC, Rider ECR and/or PMR mechanisms, all in violation of Mississippi law; and

(g)     misrepresenting to the MPSC that the RFP process begun in Fall 2002 and continuing through today with the Summer 2008 RFP ensured that fair and reasonable fuel costs were paid

35

by Mississippi consumers when, in fact, Defendants fraudulently shared many third party bids with their successful bidder affiliates, thus completely corrupting the RFP process.

130. As a result of these actions, Mississippi consumers and the State of Mississippi have been and continue to be injured and damaged.

## EIGHTH CAUSE OF ACTION
### Accounting

131. EMI should be ordered to render an accounting of any and all amounts derived by it and/or its parent and/or affiliates as a result of the unlawful conduct that is described in this Complaint.

132. Moreover, the Defendants should be ordered to render an accounting of all transactions between and among the Defendants and their affiliates that resulted in EMI paying unlawfully higher power bills.

133. The accounts between and among EMI and the other Defendants are complex, intricate, in conflict with the public trust and seemingly commingled, thus there is an urgent need for in-depth discovery because all records of the dealings by and among EMI and the other Defendants are under the sole control of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, the Attorney General for the State of Mississippi respectfully demands judgment against the Defendants as follows:

A. Finding that each Defendant has engaged in fraudulent, deceptive, unfair and/or illegal acts or practices as described above, all in violation of Mississippi law;

B. Preliminarily and permanently enjoining each Defendant from engaging in acts or practices that violate Mississippi law including, but not limited to, the unlawful acts described herein;

C. Requiring that Defendants, pursuant to Mississippi law, disgorge all profits, dividends and gains, and pay damages and/or restitution caused by the acts complained of herein;

D.     Requiring that the Defendants, pursuant to Mississippi law, to pay penalties of $10,000 per violation as a result of their knowing and willful use of the unfair or deceptive trade practices, methods or acts complained of herein, pursuant to the Mississippi Consumer Protection Act. Miss. Code § 75-24-19(1)(b).

E.     Requiring each Defendant to account for all transactions between and among them and EMI that resulted in profits being diverted from EMI to Entergy or any of its unregulated affiliates, including without limitation the other Defendants, or caused EMI's customers to pay higher prices for fuel and/or purchased power than were legal, justified and authorized;

F.     Holding Entergy to be an alter ego of its affiliates, including EMI, or a single business enterprise with them and thus liable for all unlawful acts committed by any of its affiliates and subsidiaries;

G.     Requiring that the Defendants pay the Attorney General's costs, expenses and a reasonable attorneys' fee as provided by law; and

H.     Awarding such other and further relief to the Attorney General, on behalf of Mississippi and its citizens, as the Court deems just and proper under the circumstances.

RESPECTFULLY SUBMITTED,
STATE OF MISSISSIPPI, ex rel
JIM HOOD, ATTORNEY GENERAL

ATTORNEY GENERAL JIM HOOD

Bridgette W. Wiggins, MSB No. 9676
Special Assistant Attorney General

Meredith M. Aldridge, MSB No. 100696
Special Assistant Attorney General

P. O. Box 22947
Jackson, Mississippi 39225-2947
Telephone:     (601) 359-4230
Facsimile:     (601) 359-4231

37