## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSISSIPPI, EX REL. JIM HOOD, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI, | ) ) ) ) | |
| Plaintiff-Counterclaim Defendant, | ) ) | |
| v. | ) ) | No. 3:08-CV-780-HTW-LRA |
| ENTERGY MISSISSIPPI, INC., ENTERGY CORPORATION, ENTERGY SERVICES, INC., AND ENTERGY POWER, INC., | ) ) ) ) | |
| Defendants-Counterclaim Plaintiffs. | ) ) | |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF ENTERGY MISSISSIPPI, INC., ENTERGY CORPORATION, ENTERGY SERVICES, INC., AND ENTERGY POWER, INC., TO COMPLAINT FILED BY PLAINTIFF, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI

Defendants Entergy Mississippi, Inc., Entergy Corporation, Entergy Services, Inc. and Entergy Power, Inc. (collectively, "Defendants"), by and through their attorneys herein, answer the Complaint filed by Plaintiff Jim Hood, Attorney General for the State of Mississippi ("Plaintiff").

Any allegation not specifically admitted is denied. Unless specifically stated, answers to allegations in a paragraph in the Complaint that contains a footnote also address the allegations set forth in the footnote. Defendants state as follows:

### NATURE OF THE CASE

1.     Entergy Mississippi is the largest electric utility in Mississippi, serving over 430,000 customers (including households, businesses and governmental entities) in the western half of the State. Traditionally, the Entergy Mississippi service area is ranked among the lowest per capita income in the country. The State has recently learned that dating back as early as 1974, Entergy Mississippi has been padding its invoices and

forcing Mississippi to be a dumping ground for unloading on Mississippians the highest-priced power Entergy has to offer within its four-state system.  Entergy Mississippi's ("EMI") actions have resulted in many hundreds of millions of dollars of increased electricity and fuel costs paid by Mississippi consumers.

**ANSWER TO NO. 1**:  Defendants admit that Entergy Mississippi, Inc.

("EMI") is an electric utility that serves customers in portions of roughly the western half of

the State of Mississippi and that EMI serves over 430,000 customers, but otherwise deny the

allegations of the first sentence of Paragraph No. 1.  While the allegations of the second

sentence are immaterial, Defendants admit that significant portions of EMI's service area are

low per-capita income areas, but Defendants are without knowledge or information sufficient

to form a belief as to the remaining allegations of the second sentence, and therefore deny

these allegations.  The allegations of the third sentence are immaterial and impertinent

allegations to which no response is required, but to the extent a response is required,

Defendants deny the allegations.   Defendants deny the allegations of the fourth sentence.


2.       As set forth herein, EMI has engaged in a pattern of fraudulent behavior.  EMI's fraud upon Mississippi consumers and the Mississippi Public Service Commission ("MPSC") arises primarily out of EMI's scheme to have its Mississippi customers buy the most expensive electricity the Entergy companies produce.  Whether the power is produced here, in Texas, in Louisiana or in Arkansas, Mississippi has become the backyard for dispatching Entergy's highest-priced electricity.  Meanwhile, EMI's parent Entergy, through EMI affiliates, sells its lowest-cost power to outside companies for profit.  These profits are staggering:  Entergy enjoys annual revenues of $11.5 billion, earning it place 231 in the Fortune 500.

**ANSWER TO NO. 2**:  Defendants deny the allegations of the first three

sentences of Paragraph No. 2 and further state that the allocation of power among EMI and

the other public utilities owned by Entergy Corporation is effected through the "Entergy

System Agreement" (sometimes, "ESA"), which is a federal tariff that has been approved by

the Federal Regulatory Energy Commission ("FERC") and which is designed to ensure that

EMI has access to an adequate and reliable source of power on terms that promote efficiency

and fairness at the lowest reasonable costs consistent with assuring reliability and continuity

of service, safety, efficient loading of facilities, and compliance with the law.  The fourth

sentence contains immaterial and impertinent allegations to which no response is required,

but to the extent a response is required, Defendants deny the allegations of the fourth

sentence.  Defendants admit that the total revenue for the Entergy Corporation and its

subsidiaries was approximately $11.5 billion in 2007 and that, as of April 2008, Entergy

Corporation was No. 231 on the Fortune 500 list of companies, but otherwise deny the

allegations of the fifth sentence of Paragraph No. 2.

> 3.      EMI recently admitted under oath that the law requires it to provide
> Mississippi consumers with the least expensive, reliable electricity.  Yet, EMI is not only
> forcing Mississippians to bear the cost of the most expensive electricity in Entergy's
> system, it is also illegally including surcharges, or "adders," in its customers' bills, such
> as "phantom" SO2 (sulfur dioxide) adders, that were never incurred, have never been
> approved by, and are presumably unknown to, the MSPC.

**ANSWER TO NO. 3**:  Defendants admit that representatives of EMI have

recently testified during hearings before the Mississippi Public Service Commission

("MPSC") regarding EMI's obligations to its customers and other matters.  The remaining

allegations of the first sentence of Paragraph No. 3 seek to characterize such testimony,

which speaks for itself, and therefore no responsive pleading is required, but Defendants

deny that Plaintiff's characterization is accurate.  Defendants deny the remaining allegations

of Paragraph No. 3.

> 4.      EMI has a state-sanctioned monopoly in the provision of retail electricity[1]
> to portions of Mississippi.  In exchange for the State granting EMI this monopoly, EMI
> has an inherent duty to act in the best interest of its customers by providing the best and
> most efficient service/electricity possible.  The cost of the EMI power (either internally

---

[1] The term "retail electricity" refers to electricity provided to end users like residences, businesses and governmental entities.  The "wholesale electricity" market includes electricity sold, e.g., by an independent power plant, to a utility which will in turn provide that power to its retail customers.

generated or purchased from affiliates) provided to Mississippians is substantially higher than power otherwise available to EMI from numerous third-party suppliers on the open market.

**ANSWER TO NO. 4**: Defendants admit that at all times relevant hereto EMI

has held certificates of public convenience and necessity that have been issued by the MPSC

and that authorize EMI to provide retail electric service in portions of Mississippi, but

otherwise deny the allegations of the first sentence. The allegations of the second sentence

state legal conclusions to which no responsive pleading is required, but to the extent that a

response is required, Defendants admit that EMI seeks to provide reliable service at the

lowest reasonable cost and otherwise deny the allegations of the second sentence.

Defendants deny the remaining allegations of Paragraph No. 4.

5.     EMI's disregard of its inherent duties to the public are in some part a natural consequence of the control and domination that its parent company and its affiliates exercise over EMI. Specifically, the key EMI officers and directors are also officers and directors of the parent and other affiliates. As a result, they have conflicting duties: fulfilling EMI's duty to provide its customers with the least expensive, reliable electricity versus the duty to maximize profits for the parent and its stockholders by passing on their inflated production costs and other unapproved charges to EMI, which then passes these on to its customers.

**ANSWER TO NO. 5**: Defendants deny that EMI has disregarded any duties

to the public and deny the remaining allegations of the first sentence of Paragraph No. 5.

Defendants admit that certain officers of Entergy Corporation are also officers of EMI, but

otherwise deny the allegations of the second sentence of Paragraph No. 5. Defendants deny

the remaining allegations of Paragraph No. 5.

6.     EMI has exploited its position as a monopoly for providing electricity to the western half of the State by, among other things, employing a patchwork of shady accounting mechanisms. In short, Entergy gets to "have its cake and eat it too": it gets to sell all of the overpriced electricity generated by its archaic plants to its captive retail customers and to prevent those same customers from accessing the benefits of competition from newer, more efficient plants which would otherwise supply them with less expensive electricity.

4

**ANSWER TO NO. 6**:  The allegations of Paragraph No. 6 are immaterial and impertinent, and therefore no responsive pleading is required.  To the extent that a response is required, Defendants deny the allegations of Paragraph No. 6.

   7.     Mississippians are having to pay these inflated power bills at a time when they are struggling to make ends meet in a recession economy; the State (one of EMI's largest power consumers) and political subdivisions are faced with these bills at a time when they have having to severely cut their budgets.  On the other hand, Entergy is enjoying record profits, is one of the few Dow Jones stocks recommended as a "buy," has recently voted its regular quarterly dividend of 75 cents per share paid December 1, and has enjoyed such monstrous liquidity over the past few years that it has been able to repurchase over $3 Billion in corporate stock.  As a further affront to prudent business practices, particularly in the current recession, Entergy's Chairman and CEO J. Wayne Leonard remains America's highest paid utility executive at $26.3 million in 2008.

**ANSWER TO NO. 7**:  The allegations of Paragraph No. 7 are immaterial, and therefore no responsive pleading is required.  To the extent that a response is required, Defendants state as follows.  Defendants deny that EMI's customers have paid inflated power bills, admit that the State of Mississippi is one of EMI's largest power customers, admit that Mississippi, like the nation as a whole, currently is experiencing difficult economic times, and are without knowledge and information sufficient to form a belief as to the remaining allegations of the first sentence of Paragraph No. 7, and therefore deny the remaining allegations of the first sentence.  Defendants admit that certain stock analysts have recommended Entergy Corporation stock as a "buy," and that Entergy Corporation declared a dividend of 75 cents per share on December 1, 2008 and repurchased a substantial number of shares in prior years, but otherwise deny the allegations of the second sentence of Paragraph No. 7.  Defendants deny the remaining allegations of Paragraph No. 7

   8.     EMI's fraud includes not only its inflation of invoices to its Mississippi customers, but also its submission of false documents and testimony to the MPSC.  Defendants will undoubtedly challenge the jurisdiction of this Court – as they have already done in the subpoena enforcement action – saying state and federal regulators should decide these issues.  The Defendants would be mistaken.  This is not a regulatory

case, but rather a fraud and deceptive practice case for restitution, unjust enrichment, civil penalties, and damages which Mississippians are entitled but the MPSC has no authority to order.  Moreover, the MPSC has no jurisdiction over any defendant, except EMI, since no other is a regulated utility.  Only a court has jurisdiction over any of the eight causes of action herein.

**ANSWER TO NO. 8**:  Defendants deny that EMI has committed fraud and denies the remaining allegations of the first sentence of Paragraph No. 8.  The second and third sentences do not purport to allege any facts, but rather speculate about future actions by Defendants, and therefore no responsive pleading is required.  Defendants admit that in the fourth sentence Plaintiff purports to characterize his claims as state common law causes of action, but Defendants deny such a characterization is legally correct, and further state that such allegations are legal conclusions to which no responsive pleading is required.  The remaining allegations of Paragraph No. 8 state legal conclusions to which no responsive pleading is required, and to the extent a response is required, Defendants deny the allegations.

9.      This action is brought by the Attorney General on behalf of the State of Mississippi in a statutory, equitable and/or common law capacity:  (a) in his sovereign capacity, as representative of, and/or as *parens patriae* on behalf of, or for the benefit of, natural persons under state law; (b) as common law *parens patriae* in his sovereign capacity on behalf of the State's general economy; and (c) in his proprietary and/or sovereign capacity, which may include state departments, bureaus, agencies, political subdivisions, and other instrumentalities as purchasers of electricity from EMI.  The Attorney General possesses significant and relevant authority to bring such a case, including Miss. Code of 1972, §§7-5-1, 75-21-3(a), (b) and (c), 75-24-1, *et seq*., 77-1-43(2), and Miss. Const., Article 6, Section 173.  The Attorney General possesses extensive common law authority and numerous duties, paramount of which is his duty to protect the interest of the general public and the economy of the State.

**ANSWER TO NO. 9**:  Defendants admit that the Attorney General purports to bring his claims in a statutory, equitable and/or common law capacity on behalf of citizens of the State of Mississippi.  The remaining allegations of Paragraph No. 9 state legal conclusions to which no responsive pleading is required.

10.     Defendant EMI, domiciled in Mississippi, is a wholly-owned subsidiary of Entergy and is the electricity provider (electric public utility) for the western half of Mississippi. EMI's principal place of business is located in Jackson, Mississippi. Its registered agent for service of process is James W. Snider, Jr., 308 East Pearl, Jackson, Mississippi 39215-1640. EMI is regulated by the MPSC with regard to retail rates and services for electricity and is regulated by Federal Energy Regulatory Commission ("FERC") with regard to wholesale rates and services for electricity.

**ANSWER TO NO. 10**: Defendants admit that EMI is a wholly-owned

subsidiary of Entergy Corporation, that it is organized and existing under the laws of the

State of Mississippi, and that it is an electric public utility that serves customers in western

Mississippi, but otherwise deny the allegations of the first sentence of Paragraph No. 10.

Defendants admit the allegations of the second and third sentences. The allegations of the

fourth sentence state legal conclusions to which no responsive pleading is required, but to the

extent that a response is required, Defendants admit that EMI is regulated by the MPSC with

regard to the matters within the MPSC's jurisdiction and by the FERC with regard to the

matters that are within the FERC's jurisdiction, but otherwise deny the allegations set out in

the fourth sentence.

11.     Defendant Entergy Corporation ("Entergy") is a publicly traded holding company incorporated in Delaware, with its principal place of business in New Orleans, Louisiana. Entergy is operating with the State of Mississippi. Its registered agent for service of process if Marcus V. Brown, 539 Loyola Avenue, New Orleans, Louisiana 70113. Entergy owns a number of subsidiary companies involved in businesses designed to profit from, *inter alia*, the provision, transmission, sale and trading of electricity as well as fuel used to generate electricity. Entergy and its subsidiaries, other than EMI, are not regulated by the MPSC. As the corporate parent, Entergy has, and exercises, control over the pricing policies of EMI's electricity and fuel services. Entergy also exercises complete domination and control over EMI's management, finances, policy and business practices, including the procurement of fuel and transportation services, the output of EMI's generating units, as well as the purchase, sale, and resale of electricity on the wholesale power market on behalf of EMI, making EMI and its customers captive to Entergy's wishes and predatory practices.

**ANSWER TO NO. 11**: Defendants admit the allegations of the first sentence

of Paragraph No. 11. Defendants deny the allegations of the second sentence and deny that

Entergy Corporation is constitutionally or otherwise legally amenable to personal jurisdiction

in the State of Mississippi.  Defendants admit the allegations of the third sentence, but note

that the correct address for the registered agent for service of process is 639 Loyola Avenue,

New Orleans, Louisiana, 70113.  Defendants admit that Entergy Corporation owns a number

of subsidiaries and that, collectively, those subsidiaries are involved in many aspects of

providing electric service to customers, but otherwise deny the allegations of the fourth

sentence.  The remaining allegations of Paragraph No. 11 state legal conclusions to which no

responsive pleading is required, but to the extent that a response is required, Defendants deny

the allegations.

> 12.     Defendant Entergy Services, Inc. ("ESI") is a wholly-owned subsidiary of
> Entergy which is domiciled in Delaware and has its principal place of business in New
> Orleans, Louisiana.  ESI is registered to do and is doing business in Mississippi.  Its
> registered agent for service of process is James W. Snider, Jr., 308 East Pearl Street,
> Jackson, Mississippi 39215-1640.  ESI provides certain services for and on behalf of
> EMI, including, but not limited to, purchasing fuel for EMI's generating units used to
> produce electricity and purchasing electricity to provide to EMI's Mississippi customers.
> ESI also provides accounting, legal, regulatory assistance and other services for and on
> behalf of EMI.

**ANSWER TO NO. 12**:  Defendants admit the allegations of Paragraph No.

12, but further state that ESI performs services not just for EMI, but also for the other five

Entergy Operating Companies that provide electric service outside Mississippi, as well as

certain other Entergy Corporation affiliates.

> 13.     Defendant Entergy Power, Inc. ("EPI") is a wholly-owned subsidiary of
> Entergy.  EPI is domiciled in Delaware and has its principal place of business in the State
> of Arkansas.  Its registered agent for service of process is The Corporation Company, 124
> West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.  EPI operates electricity
> generating plants in Arkansas and sells its electricity on the wholesale market.  EPI has
> sold much of its power to Entergy Arkansas, Inc. ("EAI") which then provided that
> power to the Entergy System Exchange to be purchased by EMI.

**ANSWER TO NO. 13**: Defendants admit the allegations of the first three sentences of Paragraph No. 13, but deny that Entergy Power, Inc. ("EPI") is constitutionally or otherwise legally amenable to personal jurisdiction in the State of Mississippi. Defendants admit that Entergy Arkansas, Inc. ("EAI") has contracts for power with EPI and that EMI has been a "short" company in some years in the past decade but less often than EMI has been a "long" company, but Defendants deny the remaining allegations of the fourth sentence.

14.     The true names and capacities, whether individual or otherwise, of Fictitious Defendants A through Z are unknown to the Attorney General, who thus sues these defendants by these fictitious names. The Attorney General will amend this complaint to show the true names of these defendants when their names and capacities are ascertained.

**ANSWER TO NO. 14**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph No. 14. Defendants deny, however, that there are any individual parties who should be named as defendants herein, as Defendants deny that Plaintiff has any valid claims against the Defendants named in the Complaint.

15.     At all relevant times, each of Fictitious Defendants A through Z has acted as a director, officer, agent, representative, affiliate or employee of the other defendants, and has acted within the course and cope of that capacity; and has participated in, has conspired with, and/or has aided and abetted others, including the other Defendants in committing the violations of law alleged herein.

**ANSWER TO NO. 15**: Defendants admit that they have directors, officers, agents, representatives, affiliates, or employees, but otherwise deny the allegations of Paragraph No. 15.

16.     The Defendants have engaged in a conspiracy, common enterprise, joint venture, and/or common course of conduct the purpose of which was and is to commit unfair or deceptive and fraudulent business practices, methods and unfair methods of competition, and have acted in furtherance of such enterprises and ventures alleged in this Complaint.

**ANSWER TO NO. 16**: Denied.

## JURISDICTION AND VENUE

17.     The Attorney General brings this action pursuant to his statutory and common law authority and under the following provisions of law:

A.     Pursuant to Miss. Code §7-5-1 (1972), the Attorney General is the "chief legal officer and advisor for the state … and is charged with managing all litigation on behalf of the state" and holds all such powers as prescribed to him by the Constitution, statutes and common law.

**ANSWER TO NO. 17A**:  To the extent that the allegations of Paragraph No.

17A purport to characterize provisions of certain Mississippi statutes, such provisions speak

for themselves, and therefore no response is required.  Defendants further aver that nothing in

these statutes authorizes the Attorney General to bring an action that raises ratemaking issues

that are within the "exclusive original jurisdiction" of the MPSC under Miss. Code § 77-3-5

or that are within the exclusive jurisdiction of FERC.  The remaining allegations state legal

conclusions to which no responsive pleading is required, but to the extent that a response is

required, Defendants deny the allegations of Paragraph No. 17A.

B.     With respect to the MSPC, the Attorney General is "authorized to institute any suits arising out of any act or order of the … public service commission affecting the laws and revenues of the state."  Miss. Code §7-5-51.  Section 77-1-43(2) specifically authorizes the Attorney General to institute "in any court of competent jurisdiction" an "action for violation of the law, or for the violation of any lawful rule, regulation or order of the commission."

**ANSWER TO NO. 17B**:  To the extent that the allegations of Paragraph No.

17B purport to characterize provisions of certain Mississippi statutes, such provisions speak

for themselves, and therefore no response is required.  Defendants aver, however, that

Plaintiff's characterization of the statutes identified in Paragraph No. 17B is legally incorrect.

Defendants further aver that nothing in these statute authorizes the Attorney General to bring

an action that raises ratemaking issues that are within the "exclusive original jurisdiction" of

the MPSC under Miss. Code § 77-3-5 or that are within the exclusive jurisdiction of the

FERC.  The remaining allegations state legal conclusions to which no responsive pleading is

required, but to the extent that a response is required, Defendants deny the allegations of

Paragraph No. 17B.

C.       Pursuant to the Mississippi Consumer Protection Act ("MCPA"), Miss. Code §§75-24-1, et seq., the Attorney General is authorized to file suit to remedy "[u]nfair methods of competition, affecting commerce and unfair or deceptive trade practices in or affecting commerce.  Specifically, Miss. Code §75-24-9 permits the Attorney General to bring an action in the name of the state against violators to enjoin the use of such prohibited acts, methods or practices.  The Attorney General may also seek a judgment of restitution under Miss. Code  §75-24-11.

**ANSWER TO NO. 17C**:  To the extent that the allegations of Paragraph No.

17C purport to characterize provisions of certain Mississippi statutes, such provisions speak

for themselves, and therefore no response is required.  Defendants aver, however, that

nothing in the MCPA authorizes the Attorney General to bring an action that raises

ratemaking issues that are within the "exclusive original jurisdiction" of the MPSC under

Miss. Code § 77-3-5 or that are within the exclusive jurisdiction of the FERC.  The

remaining allegations state legal conclusions to which no responsive pleading is required, but

to the extent that a response is required, Defendants deny the allegations of Paragraph No.

17C.

D.       Miss. Code §75-21-31(a), (b) and (c) prohibit any corporation engaging in conduct when inimical to public welfare and the effect of which would be to "(a) restrain or attempt to restrain the freedom of trade or production"; "(b) monopolize to attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind. class or description of business"; or "(c) engross, forestall or attempt to engross or forestall any commodity."

**ANSWER TO NO. 17D**:  To the extent that the allegations of Paragraph No.

17D purport to characterize provisions of certain Mississippi statutes, such provisions speak

for themselves, and therefore no response is required.  Defendants aver, however, that

nothing in these statutes authorizes the Attorney General to bring an action that raises

ratemaking issues that are within the "exclusive original jurisdiction" of the MPSC under

Miss. Code § 77-3-5 or that are within the exclusive jurisdiction of the FERC.  The

remaining allegations state legal conclusions to which no responsive pleading is required, but

to the extent that a response is required, Defendants deny the allegations of Paragraph No.

17D.

   E.  Finally, Attorney General Hood brings this action pursuant to his *parens patriae* authority, which allows him to commence legal actions for violations of state law, including the common law for *the protection of public rights* (or quasi-sovereign interests).  This includes protecting Mississippi residents' economic well-being and against unfair, unjust, deceptive and anti-competitive practices by a public utility's abuse of the public utility franchise and certificate of public necessity granted by the State.  The Attorney General may also bring suit to vindicate the State's laws intended to protect Mississippi consumers and assure its citizens the full benefit of such laws, in preventing its citizens' earnings from being wrongfully extracted from the State, and in preserving fundamental honesty, fair play and right dealings in public transactions.  Moreover, the Attorney General may bring suit to protect the State's direct interest as a customer of Entergy.

   **ANSWER TO NO. 17E**:  To the extent that the allegations of Paragraph No.

17E purport to characterize certain Mississippi statutes or other provisions of Mississippi

law, such statutes and provisions of Mississippi law speak for themselves, and therefore no

response is required.  Defendants aver, however, that nothing in these laws authorizes the

Attorney General to bring an action that raises ratemaking issues that are within the

"exclusive original jurisdiction" of the MPSC under Miss. Code § 77-3-5 or that are within

the exclusive jurisdiction of the FERC.  The remaining allegations state legal conclusions to

which no responsive pleading is required.

   18.  Venue is proper in this action pursuant to Miss. Code Ann §§11-5-1 and 75-24-9.

**ANSWER TO NO. 18**: Defendants admit that venue is proper in the First Judicial District of Hinds County, Mississippi, under Miss. Code § 11-5-1, but otherwise deny this allegation.

## FACTUAL BACKGROUND and DEFENDANTS'[2] CONDUCT

### I. Duties of the Defendants

19.     For many years, the Defendants have together enjoyed the status of being a government sanctioned monopoly.  Normally, monopolies are disfavored in the law because they tend to thwart competition, which by its very nature results in lower prices and higher quality goods and services being available to consumers.  Sometimes, however, circumstances exist with natural monopolies where governments conclude that regulations can be formulated and enforced which overcome, at least to some degree, the negative results otherwise attendant with the lack of competition.  This is the *intended* effect to participants in the field of regulated utilities, such as Entergy.

**ANSWER TO NO. 19**: Defendants admit that at all times relevant hereto EMI has held certificates of public convenience and necessity issued by the MPSC to serve portions of Mississippi, but deny the remaining allegations of the first sentence.  The remaining allegations of Paragraph No. 19 set forth legal conclusions and characterizations of reasons for alleged regulatory policies to which no responsive pleading is required.  To the extent that a response is required, Defendants deny the allegations of Paragraph No. 19.

20.     Once a regulated monopoly exceeds the legislative or regulatory framework devised to protect the consumer in the absence of retail competition, however, that monopoly loses its "exception status" and is subject to the rules and penalties applicable to traditional monopolies who act in anticompetitive and unfair ways.  As set forth herein, this is the case with the misconduct of Entergy.  By manipulating the purchase and sale of electricity to maximize its profits, Entergy has committed illegal and

---

[2] Whenever reference herein is made to any act of Defendant(s), that allegation shall be deemed to mean the act of each defendant acting individually and/or jointly.  Whenever reference in this Complaint is made to any act or transaction of any corporation, partnership, business, firm or other organization, that allegation shall be deemed to mean that the corporation, partnership, business, firm or other organization did or authorized the acts alleged in this Complaint through its principals, officers, directors, employees, partners, agents and/or representatives while they were acting within the actual or apparent scope of their authority.

tortious misconduct detrimental to consumers and the economy of the State of Mississippi.

**ANSWER TO NO. 20**: To the extent that the allegations of the first sentence of Paragraph No. 20 state legal conclusions, no responsive pleading is required. To the extent that a response is required, Defendants deny the allegations of Paragraph No. 20.

21.     Public utilities have a guaranteed customer base, a guarantee of no competition and a guaranteed opportunity to earn a return to an allowed level.[3] In exchange for these public benefits, not conferred upon other businesses, utilities must fulfill their inherent duty to serve the public.

**ANSWER TO NO. 21**: The allegations of Paragraph No. 21 state legal conclusions to which no responsive pleading is required. To the extent that a response is required, Defendants deny the allegations, except that Defendants admit that EMI has always sought to provide reliable electric service to customers at the lowest reasonable cost.

22.     The laws of Mississippi impose certain indelible obligations upon public utilities. Some of these duties are detailed below, followed by a description of how the Defendants have violated, and continue to violate, their legal obligations.

**ANSWER TO NO. 22**: The allegations of the first sentence of Paragraph No. 22 purport to characterize Mississippi law, which speaks for itself, and therefore no response is required. Defendants deny the remaining allegations of Paragraph No. 22.

23.     The regulatory compact between a state and a public utility has been recognized as imposing inherent duties upon the public utility by courts around the country for at least 130 years. As then Judge (later United States Supreme Court Justice) Benjamin Cardozo explained back in 1919:

---

[3] This rate of return is set through a utility's base rates, which are "fixed [by the MPSC] by taking into consideration the value of … property" used by the utility in its operation "along with such other factors as operating expenses, service on debt, capital costs and capital structure under prudent and economical management," and which return is "sufficient to assure confidence in the financial integrity of the [utility], so as to maintain its credit and to attract capital." *Mississippi Power Co. v. Mississippi Pub. Serv. Comm'n.*, 291 So.2d 541 (Miss. 1974) (quoting *Southern Bell Tel. & Tel. Co. v. Mississippi Pub. Serv. Comm'n.*, 113 So.2d 622 (Miss. 1959)). "A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility." *Id.*

> "This gas company occupies the streets of Jamestown with its mains.
> Even without any statute, it would be under a duty to furnish gas to the
> public at fair and reasonable rates. The [N.Y. Public Utilities Law] might
> be repealed, and still the courts would have the power, if exorbitant
> charges were made, to give relief to the consumer … The state in the
> adoption of this law has not imposed a new burden. It has not created a
> new duty. It has given a new "sanction" to "an inherent duty." *W. U. Tel.
> Co. v. Commercial Milling Co.*, 218 U.S. 406, 416.

The duty to serve is paramount to the acceptance of the franchise by a public service
corporation.

**ANSWER TO NO. 23**: The allegations of the first two sentences of

Paragraph No. 23 purport to characterize the law and court decisions, which speak for

themselves, and therefore no response is required. But if a response is required, Defendants

admit that Benjamin Cardozo was a Judge sitting on the New York Court of Appeals in 1919,

that he, later, served as a Justice of the United States Supreme Court, and that the quoted

language purports to be from an opinion he authored. The allegations of the final sentence

state legal conclusions to which no responsive pleading is required.

24.     Under its regulatory compact with the State of Mississippi, EMI must act
in the public interest and do all things reasonably necessary to provide the lowest
reasonable cost for electricity to its customers, consistent with reliability. This obligation
was recently acknowledged in sworn testimony of EMI witness before the MPSC. This
obligation is inherent in well-established law that "[c]orporations engaging in a public or
quasi-public occupation enjoy privileges that individuals cannot have, but they have
duties which tend to the public welfare, and the whole scheme of laws is to equip and
control them as instruments for the public good." 73B C.J.S. *Public Utilities* §4 (1983).

**ANSWER TO NO. 24**: The allegations of the first sentence of Paragraph No.

24 state legal conclusions to which no responsive pleading is required. The allegations of the

second and third sentences of Paragraph No. 24 purport to characterize certain testimony and

a legal treatise, which speak for themselves, and therefore no response is required.

25.     EMI is the sole electric public utility provider to electric consumers in and
around 45 counties in western Mississippi. As such, EMI is duty-bound to comply with
all laws, rules and regulations regarding its status as a public utility. Specifically, EMI
must comply with the statutes bestowing certain authority and obligations on the MPSC,

15

as well as the rules and regulations of the MPSC.  The rules and regulations include but are not limited to, Miss. Code 77-1-43(2), and Rule 17 of the MPSC's Rules of Practice and Procedure (hereinafter "MPSC Rules"), requiring EMI to only include "actual costs" of fuel and purchased energy in its fuel adjustment clause charges ("FAC").[4]  The FAC is a type of "automatic adjustment clause" which clauses are exceptions to the traditional ratemaking paradigm in that they permit the utility to recover certain expenses as they are incurred, with little-to-no regulatory lag (i.e., the natural delay between the incurrence of the expense and the next rate case in which the utility's rates can be adjusted to account for the expense) and on a dollar-for-dollar basis.  EMI is not allowed to earn a profit from its FAC.

**ANSWER TO NO. 25**:  Defendants admit that no other electric utility has been certified to provide electric service to retail customers in the portions of Mississippi in which EMI provides retail service, but deny that its service areas encompasses all, or even most, of the geographic area of the 45-county area and otherwise deny the allegations of the first sentence of Paragraph No. 25.  The allegations of the second and third sentences state legal conclusions to which no responsive pleading is required, but EMI admits that it must and does comply with the lawful rules and regulations of the MPSC, except where those rules and regulations are preempted by federal law, in which case EMI and the other Defendants must and do comply with the lawful rules and regulations of the FERC or other federal authorities.  The allegations of the fourth and fifth sentences purport to characterize certain Mississippi statutes, administrative rules and tariffs, which speak for themselves, and therefore no response is required.  The allegations of the final sentence of Paragraph No. 25 state legal conclusions to which no responsive pleading is required.

26.     Pursuant to Miss. Code §§97-7-11 and 13 and common law, Defendants have an obligation to provide accurate, truthful and complete information to the MPSC and to customers in connection with FAC charges.  Defendants may not mislead the MPSC or customers as to the true nature, quality or sources of the charges for electricity

---

[4] Beginning in or around 1977, EMI replaced its FAC with the Energy Cost Recovery Rider, or "Rider ECR."  There is no material difference between the two mechanisms as relates to this Complaint.  So, for the sake of simplicity, the FAC and the Rider ECR will be referred to in this Complaint, unless otherwise indicated, jointly and severally as the "FAC."

in its bills, invoices and filings, including whether such charges represent "actual costs" for fuel and purchased power and whether such costs are reasonable in light of alternatives available in the wholesale power market.

      **ANSWER TO NO. 26**: The allegations of the first sentence of Paragraph No.

26 purport to characterize certain Mississippi statutes and common law, which speak for

themselves, and therefore no response is required.  The allegations of the second sentence

state legal conclusions to which no responsive pleading is required.

      27.     Defendants, like all entities engaged in business in Mississippi, have a duty to comply with Miss. Code §75-24-1, <u>et seq</u>. to conduct their business affairs in a fair and honest manner and to refrain from unfair or deceptive trade practices affecting commerce.  This includes, but is not limited to, Defendants' duty to conduct their affairs in a manner such that they do not:

      (1)  misrepresent the source, approval or certification of goods or services;

      (2)  misrepresent the affiliation, connection, or association, with certification by another, or

      (3)  represent that goods or services are of a particular standard, quality or grade if they are of another.

      **ANSWER TO NO. 27**: The allegations of the first sentence of Paragraph No.

27 purport to characterize certain Mississippi statutes and the common law, which speak for

themselves, and therefore no response is required.  The allegations of the first and second

sentences state legal conclusions to which no responsive pleading is required.

      28.     EMI also has a duty to deal in good faith and fairly with its customers, including the State and other governmental entities as ratepayers.  EMI possesses a far superior bargaining position with respect to its customers regarding the charges it imposes upon them relating to the acquisition of electricity and fuel needed to generate electricity and other charges.

      **ANSWER TO NO. 28**: The allegations of the first sentence of Paragraph No.

28 state legal conclusions to which no responsive pleading is required.  Defendants deny the

remaining allegations of Paragraph No. 28, and aver that EMI's charges for electricity are

regulated by the MPSC and that, save for rare instances of "special contracting" with large

customers, which occurs only with MPSC approval pursuant to Section 77-3-35 of the

Mississippi statutes, EMI provides services in accord with its tariffs without "bargaining"

with individual customers.

      29.    Finally, Defendants are duty-bound to comply with state antitrust laws as
to commodities and services subject to competition and "not act in a manner inimical to
the public welfare, the effect of which would be to restrain the freedom of trade or
production, monopolize or attempt to monopolize the production, control or sale of any
commodity, or the prosecution, management or control of any kind, class or description
of business, or engross, forestall or attempt to engross or forestall any commodity."
Miss. Code § 75-21-3(a), (b) or (c).

      **ANSWER TO NO. 29**:  The allegations of Paragraph No. 29 purport to

characterize certain Mississippi statutes, which speak for themselves, and therefore no

response is required.  To the extent that the allegations of Paragraph No. 29 also state legal

conclusions, no responsive pleading is required.

## II. Defendants' Conduct

### A.  The Provision and Billing of Power to Mississippi Customers

#### i. The Entergy System Exchange

      30.    EMI, Entergy and other utility company affiliates, called "Entergy
Operating Companies," ("EOCs") entered into an agreement known as the "System
Agreement" (now called the "Entergy System Agreement") in 1951 to govern the joint
operation of, and planning involving, the electricity generating units and bulk
transmission facilities of the EOCs.[5]

---

[5] The "Entergy Operating Companies" are EMI's sister retail electric utilities:  Entergy Arkansas,
Inc. ("EAI"; formerly Arkansas Power & Light Co.), Entergy Louisiana, LLC ("ELL"; formerly
Entergy Louisiana, Inc., and prior to that Louisiana Power & Light Co.); Entergy Gulf States,
Inc. ("EGSI"; formerly Gulf States Utilities Co.); Entergy Gulf States Louisiana, LLC ("EGSL";
formerly the Louisiana retail and wholesale operations of EGSI); Entergy Texas, Inc. ("ETI";
formerly the Texas retail and wholesale operations of EGSI), and Entergy New Orleans, Inc.
("ENO"; formerly New Orleans Public Service, Inc., or "NOPSI").

**ANSWER TO NO. 30**: Defendants admit that the Mississippi Power & Light Co., Middle South Utilities, and their affiliates entered into a "System Agreement" in 1951 that governs planning for the most efficient means of acquiring the power and transmission facilities required to meet the needs of their wholesale and retail customers, that these companies were later renamed EMI and Entergy, that this agreement is often referred to as the Entergy System Agreement, and that it governs the operation of the facilities and contains mechanisms to allocate costs among the System Operating Companies. Defendants also admit that the entities identified in the footnote to Paragraph No. 30, save for Entergy Gulf States, Inc., are Entergy Operating Companies. Defendants further admit that the System Agreement, and subsequent amendments to it, were approved by the FERC, and that the System Agreement is a binding FERC tariff. Defendants otherwise deny the allegations of Paragraph No. 30.

31.   Pursuant to the System Agreement, the EOCs coordinate the operation of all of their generating units and transmission facilities through one control center, called the "Dispatch Center," located in Texas and operated by ESI personnel. ESI therefore controls the output level, fuel purchases and other activities related to each of the roughly 90 generating units in the entire four-state Entergy System, including the plants owned by EMI.

**ANSWER TO NO. 31**: Defendants admit that the generating units of the Entergy Operating Companies are centrally dispatched, but further state that the electric transmission facilities of the Entergy System are, per FERC requirements, functionally separated from the rest of the Entergy System and are controlled out of a dispatch center in Pine Bluff, Arkansas, and not out of the "Dispatch Center" in Texas. To the extent that the remaining allegations of Paragraph No. 31 purport to characterize certain provisions of the System Agreement, those provisions speak for themselves, and therefore no response is required. Defendants otherwise deny the remaining allegations of Paragraph No. 31.

32.     One of the agreements contained in the overall Entergy System Agreement concerns the pooling or sharing of excess electricity among the EOCs through an accounting device called the "Entergy System Exchange" ("ESX").

**ANSWER TO NO. 32**:  Defendants admit that MSS-3 of the Entergy System Agreement governs exchanges of electricity among Entergy Operating Companies and that MSS-3 contains the formula that allocates System energy resources among the Entergy Operating Companies, and under which Entergy Operating Companies who provide electricity to meet the load and energy requirements of other Companies in any given hour are compensated for that electricity.  Defendants deny that the "Entergy System Exchange" is merely an "accounting device."  The remaining allegations of Paragraph No. 32 state legal conclusions to which no responsive pleading is required.

33.     The ESX is a pooling mechanism through which the EOCs share energy. EOCs with more generation resources than needed at any given time to meet their customers' needs (known as "long" companies) may transfer excess energy into the ESX. EOCs without enough generating resources and electricity purchased from non-affiliates (by ESI on their behalf) to meet their customers' needs (known as "short" companies) can take energy from the ESX.

**ANSWER TO NO. 33**:  The allegations of Paragraph No. 33 characterize provisions of the Entergy System Agreement, which speak for themselves, and therefore no response is required.

34.     The transfers of electricity into and receipts of electricity taken from the ESX are not physical deliveries of electricity.  Rather, these transfers are solely accounting transactions performed by ESI on behalf of the EOC's.  The electrical grid operates in such a way that makes it practically impossible to physically track the electrons sold by a supplier to a purchaser.  Instead, the entire electrical grid must be kept in balance-meaning the supply of electricity must always match the demand-on an instantaneous basis, because electricity, in general, cannot be stored.  Therefore, a sale of electricity can be analogized to a supplier pouring a cup of water into one end of a pool and the purchaser withdrawing a cup of water from the opposite end.  All the while the "System Operator" (i.e., Entergy, in the relevant geographical area) must ensure that a sufficient amount of water remains in the pool so the entire system remains in balance. After the sale is completed, the accounting for the sale of electricity is performed on paper and funds change hands.

**ANSWER TO NO. 34**: Defendants admit that determinations of cost responsibilities for exchanges of electricity within what is referred to as the "Entergy Energy Exchange" are made after-the-fact in accord with the requirements of the System Agreement, and admit that the entire electrical grid must be kept in balance – meaning the supply of electricity must always match the demand on an instantaneous basis because electricity, in general, cannot be stored – but otherwise deny the allegations of Paragraph No. 34, and aver that Plaintiff's metaphors and analogies are inaccurate and inapt.

35.     At the end of each month, on an after-the-fact basis, ESI performs the accounting for energy transferred to and taken from the ESX.  The process of this accounting is memorialized in the "Intra-System Bills ("ISBs") by ESI.

**ANSWER TO NO. 35**: Defendants admit that ESI determines the financial obligations of individual customers after-the-fact in accord with the System Agreement, and that Intra-System Bills are issued, but otherwise deny the allegations of Paragraph No. 35.

36.     In allocating the costs of power transferred to the ESX on the ISBs, ESI will, in any given hour in which a long company had more resources than needed to meet its customers' electricity needs, 'stack" that company's resources from cheapest to most expensive in order that the most expensive energy is transferred as an accounting entry into the ESX.  Conversely, in each hour in which a short company's resources are insufficient to meet its customers' electricity needs, ESI assigns to that short company resources form the ESX in an amount sufficient to match the company's customers' demand.

**ANSWER TO NO. 36**: The allegations of Paragraph No. 36 purport to describe certain provisions of the System Agreement, which speak for themselves, and therefore no response is required.  Defendants aver, however, that the allegations consist of generally accurate metaphorical explanations of express requirements of the System Agreement, which have been specifically approved by FERC.

37.     The process by which the long EOCs send electricity to the exchange is such that *only the most expensive resources* that are in excess of the long company's

needs are sent to the exchange.  Therefore, the ESX always consists of the most expensive resources not needed by the long EOC's.

**ANSWER TO NO. 37**:  The allegations of Paragraph No. 37 – including the italicized language – are characterizations of provisions of the System Agreement containing explicit requirements for the Entergy Operating Companies that have been specifically approved by the FERC.  Because these speak for themselves, no response is required.  Defendants aver, however, that the allegations of Paragraph No. 37 in large part mischaracterize the nature and cost of the electric energy that Entergy Operating Companies receive through MSS-3, which is sometimes called the "Entergy Energy Exchange."

38.     The Entergy System Agreement expressly provides that any EOC, acting individually or in combination with one or more other EOCs, may make a purchase of electricity from a non-affiliate for its/their "own account."  Entergy System Agreement, Sec. 4.02.  Despite the ability to do so, EMI deliberately decided not to pursue less expensive non-affiliate supplies of electricity, and, instead, merely accepted transfers (which as previously mentioned, are not physical transfers of electricity, but rather accounting transactions) of the expensive ESX electricity.

**ANSWER TO NO. 38**:  The allegations of the first sentence of Paragraph No. 38 purport to characterize the provisions of the System Agreement, which speak for themselves, and therefore no response is required.  Defendants deny that EMI had the ability to purchase electricity outside the System without the approval of the System Operating Committee in accordance with the requirements of the System Agreement, and Defendants deny the remaining allegations of Paragraph No. 38.

39.     The Entergy System Agreement, including the formula contained in one of its "service schedules," MSS-3, for *pricing* the power purchased from the ESX, is a tariff filed with and approved by the FERC and therefore regulated by FERC.  On the other hand, the *amount* and *timing* of power EMI purchases from whomever, including the ESX, is *not* regulated by FERC.  EMI should have pursued purchases from non-affiliates for its own account, as expressly permitted by the Entergy System Agreement, instead of purchasing vast amounts of expensive power from its affiliates via the exchange, and, had it done so, those purchases would have been at FERC-approved rates as well.  The courts

and FERC itself have made plain that FERC does not regulate a purchasing electric utility's choice among various FERC-approved rates.

**ANSWER TO NO. 39**:  Defendants admit that the System Agreement is a tariff on file with the FERC.  The remaining allegations of the first sentence of Paragraph No. 39 and the allegations of the second sentence state legal conclusions, and further purport to characterize certain court and FERC decisions, which speak for themselves, and thus no response is required.  To the extent that a response is required, Defendants deny the allegations and further aver that the System Agreement governs the amount and timing of any energy allocated to EMI as well as its price.  Defendants deny the allegations in the third sentence.  The allegations of the final sentence purport to characterize certain court and FERC decisions, which speak for themselves, and therefore no response is required.

40.    EMI was and is, on average, a "net purchaser," or "net taker," from the ESX, i.e., EMI typically is a short company and must purchase power form the ESX.

**ANSWER TO NO. 40**:  Denied.

41.    Because ESX electricity was and is, by design, the most expensive electricity that is not needed by the long EOC's, EMI could and should have pursued power purchases from non-affiliates on its own account to offset the higher cost of ESX power.  Despite the ability to do so, EMI chose not to pursue these less expensive alternative sources of electricity.

**ANSWER TO NO. 41**:  Denied.

42.    As described above, each month EMI receives an ISB including charges for electricity it purchased from its affiliates through the ESX.  These charges are significantly and consistently higher than prices for electricity available from non-affiliates.

**ANSWER TO NO. 42**:  Defendants admit that Intra-System Bills are sent out monthly, but deny the remaining allegations of the first sentence of Paragraph No. 42.  Defendants deny the remaining allegations of Paragraph No. 42.

43.     Through accounting machinations reminiscent of Enron, EMI misrepresents to the MPSC that the charges for the electricity purchased from its affiliates and contained in the ISBs and other documents qualify as the lowest reasonable costs for electricity.

**ANSWER TO NO. 43**:  Paragraph No. 43 consists of allegations that are immaterial and impertinent to which no responsive pleading is required.  To the extent that a response is required, Defendants deny the allegations of Paragraph No. 43.

44.     Rather than acting in the best interest of its customers by pursuing the less-expensive electricity from the third party vendors, EMI routinely passes on the inflated costs of its affiliates' electricity to its captive customers (i.e., Mississippi consumers).

**ANSWER TO NO. 44**:  Denied.

45.     In short, EMI's filings with the MPSC and its bills to its customers amount to inflated invoices containing charges for the over-priced electricity it purchases from its affiliates.

**ANSWER TO NO. 45**:  Denied.

### iii. Billing Through the Fuel Adjustment Clause for ESX Power

46.     Instead of pursuing less expensive sources of electricity, EMI merely accepts the transfers of expensive ESX electricity and then passes the cost of this expensive electricity on to its customers through its FAC charges.

**ANSWER TO NO. 46**:  Denied.

47.     A fuel adjustment clause is an automatic rate recovery mechanism whereby EMI is allowed to pass through to its customers, dollar-for-dollar, the "actual costs" of its fuel and purchased electricity.  MPSC Rule 17 specifically restricts the types of costs electric utilities may include in their FACs to certain categories of actual costs for fuel and purchased energy.

**ANSWER TO NO. 47**:  Defendants admit that the fuel adjustment clause (which consists of EMI Rider Schedule ECR-2, also sometimes referred to as the "ECR Rider") allows EMI to pass through to customers the actual costs of EMI's fuel and purchased energy, but otherwise deny the allegations of the first sentence of Paragraph No.

47. The allegations of the second sentence purport to characterize an MPSC administrative rule, which speaks for itself, and therefore no response is required. To the extent that a response is required, Defendants deny the allegations of the second sentence of Paragraph No. 47.

48. Charges included in EMI's FAC receive far less scrutiny than "base rates." The MPSC has never given EMI's FAC regulatory approval, as a utility's base rates would receive pursuant to a rate case.

**ANSWER TO NO. 48**: Denied.

49. Since approximately 1974, EMI has misused its FAC mechanism by flowing through to its Mississippi customers excessive fuel and purchased power expenses on an automatic dollar-for-dollar basis. Pursuant to Miss. Code § 77-3-42(1)(a), no utility shall include in its FAC anything but the "actual cost" of the fuel burned in its generating units and the cost of purchased energy.

**ANSWER TO NO. 49**: Defendants deny the allegations of the first sentence of Paragraph No. 49. The allegations of the second sentence purport to characterize a Mississippi statute, which speaks for itself, and therefore no response is required.

50. These statutes and regulations clearly prohibit inclusion in a FAC of charges that are not the "actual cost" of fuel and purchased energy, strictly defining the types of costs that may be recovered from customers through these mechanisms. EMI chose to ignore these proscriptions, however, and has deliberately passed on to its customers inflated electricity costs and illegal surcharges.

**ANSWER TO NO. 50**: The allegations of the first sentence of Paragraph No. 50 state legal conclusions for which no responsive pleading is required. Defendants deny the remaining allegations of Paragraph No. 50.

### iv. Billing Through FAC For Inefficient EMI Plants

51. In addition to purchasing more expensive power through ESX, EMI also uses the FAC to recover the costs of fuel associated with the electricity generated by EMI's inefficient power plants.

**ANSWER TO NO. 51**: Defendants deny that EMI uses the Fuel Adjustment Clause ("FAC," also sometimes referred to as the "ECR Rider") to purchase power through the ESX, admits that fuel costs of EMI plants are recovered through the FAC, and denies the remaining allegations of Paragraph No. 51.

52.    Several of EMI's generating units are old and inefficient, having been built in the 1950's and 1960's.  Contrary to its legal duty, and its self-professed and represented goal, to provide the lowest reasonable price for electricity to its consumers, Defendants run EMI's antiquated power plants at unreasonably high levels month after month and pass on to Mississippi customers the cost of this expensive electricity instead of replacing some of that electricity with less expensive electricity it could purchase from third parties on the open wholesale market.

**ANSWER TO NO. 52**:  Denied.

53.    Succinctly stated, ESI's manipulation of the purchasing and selling of electricity for, and on behalf of EMI, in the competitive wholesale electric power market, *in tandem with* its control over the output of EMI's generating units and de facto prohibition of access by its customers to alternative electricity sources, has produced illegal and unrestricted profits for its (and EMI's) parent Entergy and transformed Mississippi into a dumping ground for high-cost electricity.  All of this has been done with EMI's participation and acquiescence.

**ANSWER TO NO. 53**:  Denied.

### v. Using FAC to Further Power-for-Profits Shell Game

54.    As part of the Defendants' scheme, ESI purchases electricity from non-affiliates on the wholesale power market, some of which is considerably less expensive than the cost of generating electricity in EMI's plants.  Yet, rather than providing this inexpensive purchased power to EMI's customers, ESI instead resells it to other non-affiliates.

**ANSWER TO NO. 54**: Defendants admit that the Entergy System purchases power on the wholesale market from non-affiliated producers, but deny the remaining allegations of Paragraph No. 54.

55.    At the same time ESI is reselling this inexpensive purchased power to other non-affiliates for an unregulated profit to Entergy, EMI's customers are forced to purchase the expensive electricity generated by EMI or one of its affiliated EOCs.

**ANSWER TO NO. 55**: Denied.

56.    Meanwhile, the cost of the expensive EMI-, EPI- or Entergy System-generated electricity is passed on to EMI's customers dollar-for-dollar through the FAC, Rider ECR and/or PMR[6] mechanisms.

**ANSWER TO NO. 56**: Defendants admit that EMI is entitled to recover

costs of electricity generated by EMI's affiliates and purchased by EMI in accordance with

FERC-approved tariffs from EMI customers through MPSC-approved Rider Schedules, and

further states that the MPSC has adopted a PMR Rider Schedule that provides for the rate

recovery of certain capacity costs by EMI. Defendants deny that the PMR Rider flows

through the costs of affiliate-generated power, and otherwise deny the remaining allegations

of Paragraph No. 56.

### vi. Using Accounting Manipulations of FAC to produce Illegal Profits for Entergy

57.    When ESI conducts resales to non-affiliated purchasers in the wholesale power market, it deliberately fails to credit and/or does not fully credit the relevant EOC's customers for the cost of that electricity so resold. A "resale" by ESI refers to an ESI sale of electricity, which ESI had previously purchased from a non-affiliate, to a non-affiliated third party in the wholesale market.

**ANSWER TO NO. 57**: Defendants deny the allegations of the first sentence

of Paragraph No. 57. The second sentence merely states Plaintiff's definition of "[a] 'resale'

by ESI,'" and because Plaintiff is free to define terms as desired, no responsive pleading is

required to the second sentence.

---

[6] In or around 2002, EMI filed with the MPSC its PMR mechanism, which operates similarly to the Rider ECR, except that it is designed to recover certain "capacity charges" associated with purchased power. Capacity charges are essentially rental payments required by sellers in the wholesale power market for "firm" (i.e., assured delivery) sales. Capacity charges are not fuel or purchased energy and typically are only allowed to be recovered in a utility's base rates. The PMR, however, allows EMI to recover certain capacity charges automatically and on a dollar-for-dollar basis, like the Rider ECR for fuel and purchased power expenses.

58.    Thus, ESI does not properly credit EMI's customers with the resale even though the entire original purchase price had been booked to their account when the initial purchase was made.  This manipulation of the FAC produces illegal profits for Entergy at the expense and injury of EMI's customers.

**ANSWER TO NO. 58**: Denied.

### vii. Passing Fraudulent and Illegal Adders to EMI Customers Through the FAC

59.    EMI has also systematically included non-fuel costs in FAC charges passed through to its customers which violates Miss. Code § 77-3-42 and MPSC Rule 17. These laws and regulations permit only the "actual cost" of fuel and purchased energy costs to be included in EMI's FAC and/or Rider ECR.  Miss. Code. § 77-3-42(1)(b) and (2)(a); MPSC Rules 17.101(1) and 17.102.  Non-fuel costs, including capital costs and fixed, known or measurable expenses, are typically required to be recovered through an electric public utility's base rates so that such costs may be amortized over time and so that the regulator may take such costs into account in relation to all of the utility's other base rate costs and offsetting factors such as increased demand (and, thus, increased profit) and potential cost reductions resulting from areas in which efficiencies may be improved or expenses reduced.  In other words, including a particular cost in base rates does not carry with it the assurance that 100% of the cost will be recovered-and the cost certainly does not get collected automatically from ratepayers-as do costs included in a utility's FAC.

**ANSWER TO NO. 59**: Defendants deny the allegations of the first sentence of Paragraph No. 59.  The allegations of the second sentence purport to characterize certain Mississippi statutes and administrative rules, which speak for themselves, and therefore no response is required.  Defendants admit that capital costs of regulated utilities are often lawfully recovered through their base rates, but deny the remaining allegations of Paragraph No. 59.

60.    EMI has violated Mississippi law and the MPSC Rules by charging its customers illegal "adders" and surcharges to the fuel and purchased electricity costs.

**ANSWER TO NO. 60**: Denied.

61.    EMI, through and with ESI, includes costs purportedly in connection with environmental compliance such as the purchase price of emissions credits or allowances, known as SO2 allowances, in the charges for energy purchased from the ESX.  These are flowed through in the FAC for payment by Mississippi customers.

**ANSWER TO NO. 61**: Defendants admit that SO2 allowances and certain other costs are included in the charges of electricity that EMI obtains from affiliates pursuant to Service Schedule MSS-3 of the System Agreement, and state that such charges become part of the purchased power expenses that EMI is required to incur under the System Agreement, but otherwise deny the remaining allegations of the first sentence of Paragraph No. 61. Defendants admit the remaining allegations of Paragraph No. 61.

62.     The pricing formula under the Entergy System Agreement includes the cost of these non-fuel "adders" in the price for ESX energy. However, State law determines the lawful means by which EMI may collect the adders from its Mississippi customers and specifically requires such costs to be collected through base rates, not through the FAC and/or rider ECR.

**ANSWER TO NO. 62**: Defendants admit the allegations of the first sentence of Paragraph No. 62 insofar as it contends that adders for SO2 and O&M are recovered in wholesale rates that EMI pays for electric energy it obtains pursuant to MSS-3 of the Entergy System Agreement. The allegations of the second sentence state legal conclusions to which no responsive pleading is required. Defendants deny any remaining allegations in Paragraph No. 62.

63.     These and other unauthorized and illegal non-fuel adders and costs add millions of dollars of prohibited costs each year to EMI's FAC charges which are passed directly through dollar-for-dollar to EMI's Mississippi customers.

**ANSWER TO NO. 63**: Denied.

**B. Deceptive Practices Designed to Hide their Fraudulent Schemes**

64.     Defendants surreptitiously employed accounting maneuvers designed to secretly and illegally include unauthorized charges in its FAC, for purposes of carrying out a fraudulent scheme in a manner intended to escape the oversight of the MPSC.

**ANSWER TO NO. 64**: Denied.

65.    Defendants fraudulently represented to the MPSC that the amount and price of its expensive power generated by antiquated plants resulted in the most reasonable cost of electricity being provided to EMI's Mississippi customers

**ANSWER TO NO. 65**: Denied.

66.    Defendants also fraudulently represented to the MPSC that the costs and amount of electricity EMI purchased from the ESX were and are reasonable.

**ANSWER TO NO. 66**: Denied.

67.    Similarly, Defendants continually misled the MPSC and consumers that the charges for fuel and purchased electricity included in EMI's FAC were the lowest reasonable cost, relative to third party supplies of electricity.

**ANSWER TO NO. 67**: Denied.

68.    For instance, Mr. Dorman Davis, in sworn written testimony to the MPSC in Dkt. No. 2008-AD-170, testified of his familiarity with Miss. Code § 77-3-42 and MPSC Rule 17 and states that these laws allow for "only" the recovery of the actual costs listed therein.[7]

**ANSWER TO NO. 68**: Defendants admit that Dorman Davis provided testimony in MPSC Dkt. No. 2008-AD-170. The remaining allegations of Paragraph No. 68 seek to characterize that testimony, which speaks for itself, and therefore no response is required.

69.    However, Mr. Davis then falsely states that EMI does not profit through its Rider ECR (formerly the FAC).[8]

**ANSWER TO NO. 69**: Denied.

70.    Similarly, Mr. Theodore H. Bunting, Jr., Chief Accounting Officer for Entergy and EMI, testified in the MPSC FAC Proceeding that, "EMI makes no profit from fuel and purchased power costs collected under [Rider ECR], and although the System takes reasonable steps and commits a significant amount of time and manpower

---

[7] Direct Testimony of Dorman J. Davis, MPSC Docket No. 2008-AD-270, July 7, 2008, at 11.
[8] *Id.*, at 11-12.

to prudently manage its fuel expenses, it has no direct control over this aspect of the customer bill."[9]

**ANSWER TO NO. 70**:  Defendants admit that Theodore H. Bunting, Jr. provided testimony in MPSC Dkt. No. 2008-AD-170.  The remaining allegations of Paragraph No. 70 purport to quote testimony, which is a matter of public record and which accurately represents EMI's and the Entergy System's situation.

71.     Mr. Bunting's statements are false for the same reasons that similar statements made in sworn testimony by Mr. Davis (quoted in the preceding paragraph) are false.

**ANSWER TO NO. 71**:  Denied.

72.     Likewise, Mr. Robert R. Cooper, employed by ESI, but testifying on behalf of EMI, stated in his sworn written testimony that the projected fuel and purchased power expenses for the third quarter of 2008, which are the subject of Docket No. 2008-AD-270, "are reasonable estimates of the costs needed for [EMI] to continue to meet its legal obligation to provide reasonably adequate electric service to its customers *at the lowest reasonable cost*."[10]

**ANSWER TO NO. 72**:  Defendants admit that Robert R. Cooper provided testimony in MPSC Dkt. No. 2088-AD-170.  The remaining allegations of Paragraph No. 72 provide quotations and characterizations of testimony, which is a matter of public record and which accurately described EMI's then-projected fuel and purchased power expenses for the third quarter of 2008.

73.     However, the projected fuel and purchased power expenses about which Mr. Cooper testified include charges associated with excessively-priced electricity to be purchased from EMI's affiliates through the ESX instead of less expensive electricity available from non-affiliates in the wholesale power market.  Therefore, the costs and charges flowed through the FAC by EMI to its Mississippi customers for fuel and purchased power have not, as represented by Mr. Cooper, equated to the lowest

---

[9] Direct Testimony of Theodore H. Bunting, Jr., MPSC Docket No. 2008-AD-270, July 7, 2008, at 3.
[10] Direct Testimony of Robert R. Cooper, MPSC Docket No. 2008-AD-270, July 7, 2008, at 3. (emphasis added).

reasonable cost for such fuel and purchased power, but instead have included excessive prices for both.

**ANSWER TO NO. 73**: Denied.

74.     Mr. William M. Mohl, Vice President of ESI, stated in his sworn written testimony that ESI's electricity supply and procurement strategy is intended to provide "reliable, cost effective, and more stably priced power . . ." and that as part of its procurement efforts, "ESI has conducted nine formal RFPs [Requests for Proposals] on behalf of the [EOCs], beginning with the Fall 2002 RFP."[11] Mohl stated that the EOCs "have entered numerous contracts representing over 5,600 MW of capacity as a result of the RFPs . . . issued by ESI since 2002."[12] As Mohl described the RFP process, its "primary objective is to solicit competitive proposals to provide the [EOCs] with flexible and cost-effective generating resources to meet their retail customers' needs in a **reliable and economical manner**."[13] Mohl testified that the "key considerations for selecting a potential resource" are the "proposal price and the resulting benefits to the [EOCs]."[14] Mohl attached a draft Summer 2008 RFP to his testimony as Exhibit WMM-3.[15]

**ANSWER TO NO. 74**: Defendants admit that William H. Mohl provided testimony in MPSC Dkt. No. 2008-AD-170. The remaining allegations of Paragraph No. 74 quote and characterize the testimony, which is a matter of public record and which was accurate.

75.     John Hurstell, Vice President of Energy Management System Planning and Operations for ESI, provided sworn written testimony on EMI's "underlying organization, strategy, and process for fuel and purchased power acquisitions."[16] In describing EMI's fuel and purchased power procurement process, Hurstell explained how third-party electricity generators had "increased opportunities" to sell power to the Entergy System via the "formal RFP process"[17] Hurstell concluded that "[t]he fuel and purchased power expenses that [EMI] incurred were the result of prudent planning and acquisition processes."[18]

---

[11] Direct Testimony of William M. Mohl, MPSC Docket No. 2008-AD-270, July 7, 2008, at 20-21.

[12] *Id.*, at 21.

[13] *Id.*, at 23-24 (emphasis added).

[14] *Id.*, at 24.

[15] *Id.*, at 26 & Exhibit WMM-3.

[16] Direct Testimony of John Hurstell, MPSC Docket No. 2008-AD-270, July 7, 2008, at 3.

[17] *Id.*, at 13-14 and Exhibit JPH-2.

[18] *Id.*, at 18-19 (emphasis added).

**ANSWER TO NO. 75**: Defendants admit that John Hurstell provided testimony in MPSC Dkt. No. 2008-AD-170. The remaining allegations of Paragraph No. 75 quote and characterize the testimony, which is a matter of public record and which was accurate.

76.     Though representing to the MPSC that the RFP process ensured the lowest reasonable price for purchased power and fuel, neither Mr. Mohl or Mr. Hurstell (or any other EMI representative) informed the MPSC of the crucial material fact that FERC concluded that Entergy, ESI and EAI engaged in affiliate abuse with respect to the 2002 RFP.[19] Specifically, Entergy senior management (including Mr. Mohl), responsible for evaluating the bid proposals, shared confidential information with Entergy affiliate EAI, who was also bidding on the RFP, about competitors' bids.[20] Of course, EAI won the bid.

**ANSWER TO NO. 76**: The allegations of the first sentence of Paragraph No. 76 seek to characterize the testimony of Messrs. Mohl and Hurstell, which speaks for itself and which was accurate and not misleading. Defendants admit that the FERC found that ESI's use of bid information was improper after the 2002 RFP concluded and that EAI won the bid, but deny that this conduct violated any rules that were in effect at the time of the conduct, and aver that the FERC specifically found that the conduct did not violate Entergy's code of conduct. Defendants deny any remaining allegations in Paragraph No. 76.

77.     These and other representations before the MPSC are deceptive and illegal and violate the MCPA, including but not limited to the following:

(a)     misrepresented the source, approval or certification of goods or services by falsely asserting to the MPSC and the consuming public that the fuel and purchased electricity costs included in its FAC charges were: (i) reasonable, (ii) approved by the MPSC for inclusion in the FAC (i.e., were "actual costs"), (iii) free from manipulation, and (iv) actually incurred;

(b)     Misrepresented the affiliation, connection, or association with, or certification by another through failing to disclose their relationship and the

---

[19] In re Entergy Servs., Inc., EWO Marketing, LP, Entergy Power, Inc., Entergy La., Inc., 116 F.E.R.C. P61,296 (Sept. 27, 2006), at ¶¶ 75-82.
[20] Id.

excessive costs that had been charged to EMI by affiliates, including, but not limited to EPI, for electricity that was significantly more expensive than EMI could have obtained from third party vendors in the wholesale power market, and by virtue of EMI's tacit certification to the consuming public that the MPSC was aware of the true nature and level of the costs included in its FAC charges and had approved same;

(c)     represented that goods or services (i.e., fuel and purchased electricity) were of a particular standard, quality or grade when they were of another, by deceptively misleading the MPSC and the consuming public into believing that the fuel and purchased electricity costs included in its FAC charges were:  (i) reasonable, (ii) approved by the MPSC for inclusion in the FAC (i.e., were "actual costs"), (iii) free from manipulation, and (iv) actually incurred; and

(d)     represented that EMI's intrastate transmission system was constrained so that independent power producers (sometimes known as "merchants"), municipalities and electric cooperatives could not use or sell into the transmission system.

**ANSWER TO NO. 77**:  Denied.


78.     EMI, based upon all of the same conduct described above, has breached its obligation of good faith and fair dealing with its customers through its unreasonable charges described above and illegal self-dealing with its affiliates.  EMI's conduct has further forced its customers to unwittingly and illegally subsidize a number of its affiliates, both regulated and unregulated, to the great expense and exposure to risk of its customers in Mississippi.

**ANSWER TO NO. 78**:  Denied.


### C. Illegal Subsidization by EMI's Customers

79.     Through its manipulation of the FAC described above-forcing excessive, unauthorized costs on Mississippi consumers-Defendants have used EMI's customers to subsidize unregulated ventures in competitive markets without any examination beforehand of the attendant risks and benefits, and without appropriate safeguards and compensation.

**ANSWER TO NO. 79**:  Denied.


80.     Furthermore, as a result of numerous interlocking directorships and office holdings, the Defendants, their officers and directors completely control EMI's operations, management and business decisions to the ultimate detriment of its Mississippi customers.

**ANSWER TO NO. 80**:  Denied.

81.    For example, key EMI executives are or have also been executives of the parent Entergy and other EMI affiliates, including: Theodore H. Bunting, Jr. Senior Vice President and Chief Accounting Officer for Entergy, EMI and all other EOCs; Jay A. Lewis, Vice President and Chief Financial Officer of Entergy, EMI and all other EOCs; Robert D. Sloan, Executive Vice President, General Counsel and Secretary of Entergy, EMI and four other EOCs; Gary J. Taylor, Director of EMI and four other EOCs; Leo P. Denault, Director of EMI and four other EOCs; and, Mark T. Savoff, Director of EMI and four other EOCs.

**ANSWER TO NO. 81**: Defendants admit that, save for the fact that Jay A.

Lewis has never served as CFO of Entergy Corporation, the individuals named in Paragraph

No. 81 either now hold or previously held the identified positions, but otherwise deny the

allegations of Paragraph No. 81.

82.    Parent Entergy's domination and control of EMI has led to irreconcilable conflicts of interests by the directors and officers of each of the corporate Defendants and EMI, which has allowed for the hidden subsidization by Mississippi consumers of substantial operations of Defendants' unregulated ventures.

**ANSWER TO NO. 82**: Denied.

83.    The Defendants have not operated as separate entitles and were never intended, nor truthfully disclosed to the MPSC, to be such. Through their actions described in this Complaint, the Defendants are a single business enterprise and should be treated as such as to all legal obligations and duties toward EMI's Mississippi customers.

**ANSWER TO NO. 83**: Denied.

**i. Unregulated Affiliate Scheme involving Entergy Power, Inc.**

84.    As previously mentioned, FERC has jurisdiction over the *price* of energy purchased by EMI from ESX; FERC also sets the price that non-affiliates charge in the wholesale power market. However, FERC does not regulate the *amount* of electricity EMI purchased from EPI through the ESX (an amount within the exclusive control of Entergy, through and with ESI). Therefore, FERC's jurisdiction is not implicated here as this Complaint **in no way challenges the price of energy purchased by EMI from the ESX** but rather exposes the **choices** Defendants made as between two (or more) FERC-approved prices for energy – the higher priced ESC electricity versus the less expensive electricity that could be acquired from third party vendors, or non-affiliates.

**ANSWER TO NO. 84**: The allegations of the first and second sentences of

Paragraph No. 84 state legal conclusions to which no responsive pleading is required.

Defendants deny the remaining allegations of Paragraph No. 84 and further state that FERC

regulates the amount and timing of energy obtained by EMI from its affiliates, pursuant to

the System Agreement.

85.    Defendants have forced EMI's customers to subsidize the speculative market activities of one of EMI's affiliates, EPI. Defendants did this through EMI's consistent choice to continue to purchase the excessively-priced EPI electricity in lieu of buying less expensive energy from non-affiliates to serve its Mississippi customers.[21]

**ANSWER TO NO. 85**: Denied.

86.    The genesis for the formation of EPI, around 1990, was a finding by the Arkansas Public Service Commission that EMI's EOC affiliate, Entergy Arkansas, Inc., possessed too much electric generating capacity relative to the need of its retail customers. As a result, EAI had to spin off two generating units to EPI.

**ANSWER TO NO. 86**: To the extent that the allegations of Paragraph No.

86 purport to characterize an Order of the Arkansas Public Service Commission, that Order

speaks for itself, and therefore no response is required. Defendants otherwise deny the

allegations of Paragraph No. 86.

87.    EAI spun off its ownership interest in two of its generating units, a portion of the coal-fired Independence Steam Electric Station ("ISES"), Unit 2, and the natural-gas fired Ritchie Station ("Ritchie"). The electric energy produced by the ISES unit is less expensive, at most times, than that produced by the Ritchie unit, because coal is most often cheaper than natural gas as a generating fuel.

**ANSWER TO NO. 87**: Defendants admit that EAI "spun off" its ownership

interest in Unit -2 of the Independence Steam Electric Station and one generation unit located

at the Ritchie Station, but otherwise deny the allegations of the first sentence of Paragraph

---

[21] Another way to describe the conduct is to say that ESI dispatched EPI's units as though they were part of the Entergy System when, in fact, they were not, and the purchases of power from EPI should have been treated as through they were from a third party (i.e., at arms'-length) so that ESI would only have purchased EPI's power if it was the most economical power available. The EPI power sold to EAI from its Ritchie unit was not economical; EAI did not need the Ritchie power; and the excessively-priced Ritchie power was passed on to EMI's customers via its FAC, Rider ECR and/or PMR.

No. 87.  Defendants admit that coal sometimes has been cheaper than natural gas as a

generating fuel, but aver that the Ritchie unit was committed and operated only when it was

efficient to do so and deny any remaining allegations of Paragraph No. 87.

88.     The scheme evolved as EPI and Entergy naturally realized it would be difficult to make profits selling the natural gas-fired electricity from EPI's Ritchie unit into the competitive wholesale power market.  Consequently, EPI begun selling the ***entire output*** of the Ritchie unit back to EAI, when EAI did not need it because EAI had too much generating capacity relative to its customers' needs.  EAI would thus transfer the expensive Ritchie electricity into the ESX.  Meanwhile, EPI continued to sell the inexpensive output of its coal-fired ISES plant into the wholesale market at a profitable margin.

**ANSWER TO NO. 88**:  Denied.

89.     In this way, EPI's expensive Ritchie-generated electricity was transferred by EAI into the ESX and was taken (purchased) by EMI and charged to its customers.  Therefore, EMI's customers provided EPI with a captive site to force-feed the expensive electricity which would have yielded EPI less or no profits in the competitive wholesale market.  Freed from the burden of this high-priced electricity going to Mississippi, EPI was then able to sell its cheaper-cost ISES electricity in the market for higher unregulated profits to Entergy.

**ANSWER TO NO. 89**:  Denied.

90.     To make matters worse, EMI's purchases of the expensive EPI electricity through ESX prevented it from purchasing less expensive sources of electricity that were available from non-affiliates.  The costs of the electricity purchased by EMI from the ESX were included in its FAC and/or Rider ECR charges.

**ANSWER TO NO. 90**:  Defendants admit that costs of electricity obtained by

EMI pursuant to Schedule MSS-3 of the System Agreement were purchased power expenses

recovered through its FAC and/or Rider ECR charges, but otherwise deny the allegations of

Paragraph No. 90.

### ii. Operation of Nuclear Plants in the Northeast United States

91.     Defendants also have used EMI's customers to subsidize and underwrite the speculative activities of its unregulated affiliates through loans and guaranties EMI has provided for Entergy's unregulated nuclear generating business.

**ANSWER TO NO. 91**:  Denied.

92.     In order to fully leverage its monopoly powers – to the detriment of its customers and to the benefit of its parent – EMI has loaned substantial sums to a non-utility operating segment of Entergy, referred to as its "unregulated nuclear generating business," so that segment could compete in the wholesale power market in the northeast United States to produce unregulated profits for Entergy.  EMI and the other EOCs have thus "propped up" their parent's ability to acquire and operate non-utility nuclear generating units in the northeast for the purpose of making unrestricted profits, which conduct has placed the assets, revenue streams and creditworthiness of EMI and the other EOCs in jeopardy.

**ANSWER TO NO. 92**:  Denied.

93.     By jeopardizing its assets, revenue streams and creditworthiness, EMI has harmed Mississippi consumers by driving up its cost of capital.

**ANSWER TO NO. 93**:  Denied.

94.     Beginning in or around 2000, Entergy began purchasing nuclear generating units in the northeast United States.  These nuclear plants are not regulated by any state public service commission; they are what are known as "merchant plants" that sell their electricity into the wholesale electric power market.  EMI does not receive any electricity generated by these unregulated nuclear plants.

**ANSWER TO NO. 94**:  Defendants admit that a subsidiary of Entergy

Corporation owns certain nuclear generation facilities located in the Northeastern United

States, that the electricity generated by such facilities is sold into the wholesale market, that

these sales are not regulated by state utility commissions, and that such facilities are

sometimes colloquially referred to as "merchant" generation plants, but otherwise deny the

allegations of Paragraph No. 94.

95.     According to Entergy's Securities and Exchange Commission ("SEC") Annual Report, Form 10-K, for 2007, Entergy's unregulated nuclear business accounted for 48% of its net income that year as compared to 27% in 2006.  Entergy has stated in its SEC filings that "an Entergy subsidiary" (without naming any particular subsidiary) may be required to guaranty certain power sales agreements entered by Entergy's nuclear business.  Entergy SEC Form 10-K, 2007, at 43.  EMI is an "Entergy subsidiary" guaranteeing the contractual obligations of the nuclear generating business.

**ANSWER TO NO. 95**:  The allegations of the first two sentences of Paragraph No. 95 purport to characterize the annual report and other filings made by Entergy Corporation with the Securities and Exchange Commission ("SEC"), which speak for themselves, and therefore no response is required.  Defendants deny the remaining allegations of Paragraph No. 95.

96.    The sizeable loans, guarantees and other financial assistance provided to Entergy's nuclear business by the regulated utility subsidiaries have enabled and will continue to enable Entergy to compete in the wholesale power markets in the northeast United States.

**ANSWER TO NO. 96**:  Denied.

97.    Somewhere in late 2007 through the spring of 2008, Entergy formed a plan to spin off its unregulated nuclear plants to a new company, called Energy Corporation ("Enexus").  In the Registration Statement filed by Enexus with the SEC on May 12, 2008, Enexus revealed that is has (as Entergy's unregulated nuclear generating segment) received ***approximately $1.2 billion in loans from "associated companies,"*** which includes EMI.  In addition, Enexus' SEC filing indicates that Entergy and/or its subsidiaries have signed "guarantees" for the performance of obligations of the unregulated nuclear generating segment's business operations ***in the amount of $1.9 billion***.

**ANSWER TO NO. 97**:  Defendants admit that Entergy Corporation has plans to spin off its "unregulated" nuclear generating subsidiary.  The remaining allegations of Paragraph No. 97 purport to characterize the annual report and other filings made by Entergy Corporation with the SEC, which speak for themselves, and therefore no response is required.  Defendants deny any remaining allegations of Paragraph No. 97.

98.    The loans and guarantees mentioned above are for the benefit of Entergy's unregulated nuclear generating business and will benefit the new entity, Enexus, until the spin-off is fully implemented.

**ANSWER TO NO. 98**:  Denied.

99.    These loans, guaranties, other financial backing and other conduct surrounding Entergy's spin-off of its nuclear generating business to Enexus constitute on-

going and prohibited subsidies in favor of Entergy, Enexus and their shareholders to the detriment of EMI and its Mississippi customers. EMI has placed its assets, revenue stream and creditworthiness at great risk by making these large loans and guaranties in favor of its parent's unregulated nuclear generating business. The stress on EMI's creditworthiness and liquidity, alone, will directly affect its Mississippi customers by adversely affecting its cost of capital and the ability to access reasonable interest rates on moneys it must borrow from time-to-time, which costs are ultimately borne by EMI's customers.

**ANSWER TO NO. 99**: Denied.

### III. Diversion of Tax Refunds from EMI to Entergy's
### Unregulated Nuclear Generating Business

100.    EMI has acquiesced and/or participated in the diversion of approximately $71 million of federal tax refunds related to the Gulf Opportunity Zone Act of 2003 ("GO Zone Act") (which provided certain tax relief to utilities to assist in recovering from Hurricane Katrina) to Entergy's unregulated nuclear generating business. This diversion of refunds harmed EMI's customers, who would have benefited from such funds through a reduction in FAC expenses.

**ANSWER TO NO. 100**: Denied.

101.    Entergy received a ***$344 million income tax refund*** as a result of net operating loss carryback provisions contained in the GO Zone Act. The GO Zone Act, enacted in December 2005, allows a public utility incurring a net operating loss as a result of Hurricane Katrina to carry back the casualty loss portion of the net operating loss ten years to offset previously taxed income, and provides other benefits, including favorable depreciation on Hurricane Katrina capital expenditures.

**ANSWER TO NO. 101**: Defendants admit that Entergy Corporation

received a $344 million income tax refund pursuant to the provisions of the "GO Zone Act"

of December 2005. The remaining allegations of Paragraph No. 101 purport to characterize

the "GO Zone Act," which speaks for itself, and therefore no response is required.

102.    Of the $344 million tax refund related to the net operating loss carryback to its EOCs, Entergy only allocated $273 million to the EOCs, including EMI, in April 2006, ***with the remainder distributed primarily to Entergy's unregulated nuclear generating business***. Entergy stated in its SEC Form 10-K for 2007 that approximately $71 million was diverted to the unregulated nuclear generating business instead of EMI

and the other Operating Companies, **"[i]n accordance with Entergy's intercompany tax allocation agreement,"** Entergy SEC Form 10-K, 2007, at 24.

      **ANSWER TO NO. 102**:  Defendants admit that a portion of the income tax refund Entergy Corporation received pursuant to the provisions of the GO Zone Act was allocated to the Entergy Corporation nuclear generation subsidiary, but otherwise deny the allegations of the first sentence of Paragraph No. 102.  The remaining allegations of Paragraph No. 102 purport to characterize a filing made by Entergy Corporation with the Securities and Exchange Commission ("SEC"), which speaks for itself, and therefore no response is required.  Defendants deny any remaining allegations in Paragraph No. 102.

      103.    Entergy's unregulated nuclear generating business is located in the northeast United States and sustained virtually, if not absolutely, no damage as a result of Hurricane Katrina, yet it was allocated nearly 21% of the $344 million in tax refunds directly related to operating losses resulting from Hurricane Katrina.  EMI's complicity in the diversion of such tax refunds to Entergy's nuclear generating business caused harm to its customers and was injurious to the public interest.  By secretly diverting tax refunds from their intended purpose, Defendants have profited from a calamity suffered by this State and her citizens and thereby violated the regulatory compact to act in the best interests of the public and breached their duty of good faith and fair dealing with EMI's Mississippi customers.

      **ANSWER TO NO. 103**:  Defendants admit that the Entergy Corporation nuclear generation subsidiary's facilities are primarily located in the Northeastern portion of the United States, that such facilities sustained little, if any, damage from Hurricane Katrina, and that a portion of the $344 million income tax refund was allocated to the nuclear generation subsidiary, but otherwise deny the allegations in the first sentence of Paragraph No. 103.  Defendants further aver that allocation of a portion of the income tax refund to the nuclear generating subsidiary was appropriate because, among other things, the financial results from the operation of such subsidiary were included in the consolidated tax returns

filed by Entergy Corporation.  Defendants deny the remaining allegations of Paragraph No.

103.

104.    In sum, Defendants have abused, manipulated, and unlawfully caused EMI to breach the regulatory bargain or compact between the State of Mississippi and its public utilities, which requires every such utility to submit to intense public scrutiny and control for the purpose of receiving just and reasonable rates, which are constitutional, valid and binding, in return for protection as a lawfully sanctioned monopoly, including protection from retail competition, the right of eminent domain and the use of public rights-of-way.  Defendants sought to accomplish this illegal outcome by:

(a)  Surreptitiously evading and avoiding regulatory oversight;

(b)  Dissipating the public utility's assets, revenues and creditworthiness by forcing EMI to make sizeable loans, sign letters of credit, guaranties and/or enter other financing transactions to support or subsidize Entergy's unregulated multi-billion dollar nuclear generating business in the northeast United States (which is to be, but has not yet been, spun-off into Enexus Energy) from which nuclear plants EMI's customers receive no electricity);

(c)  reselling inexpensive electricity that was purchased from non-affiliates to other non-affiliates while at the same time providing expensive EMI-, EPI- or Entergy System-generated electricity to EMI's customers;

(d)  Forcing EMI's customers to subsidize the unregulated wholesale market activities of its unregulated affiliate, EPI, by acquiring them to purchase EPI's expensive electricity while EPI sold its inexpensive electricity into the wholesale market to produce unrestricted profits for EMI's and EPI's parent company Entergy;

(e)  deliberately not crediting EMI's customers with the full amount of profits from the sale of generated electricity and/or resale of purchased electricity, respectively, and thereby producing profits for Entergy from the manipulation of the FAC and/or Rider ECR contrary to Mississippi law;

(f)  including unauthorized "adders" in the fuel and purchased electricity charges embedded in EMI's FAC, Rider ECR and/or Power Management Rider ("PMR") mechanisms, all in violation of Mississippi law; and

(g)  misrepresented to the MPSC that the RFP process begun in Fall 2002 and continuing through today with the Summer 2008 RFP ensured that fair and reasonable fuel costs were paid by Mississippi consumers when, in fact, Defendants fraudulently shared many third party bids with their successful bidder affiliates, thus completely corrupting the RFP process.

**ANSWER TO NO. 104**:  Denied.

105.    The above actions have and will continue to harm EMI customers, whom the duties are specifically intended to protect since they are captive customers of a state-sanctioned monopoly and have no other electric option to use except the EMI monopoly.

**ANSWER TO NO. 105**: Denied.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Consumer Protection Act

### Under Miss. Code § 75-24-1, <u>et seq.</u>

106.    The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

**ANSWER TO NO. 106**:  Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

107.    The acts and practices of EMI and the other Defendants described in this Complaint have violated Miss. Code §75-24-1, <u>et seq.</u>

**ANSWER TO NO. 107**:  Denied.

108.    Specifically, EMI and the other Defendants have violated, and continue to violate, Miss. Code §75-24-5(1) and (2).

**ANSWER TO NO. 108**:  Denied

109.    EMI and the other Defendants have violated and continue to violate Miss. Code §75-24-5(1) by using unfair methods of competition affecting intra-state commerce in the manner set forth in the Fifth Cause of Action below for violation of the Mississippi Antitrust Act.

**ANSWER TO NO. 109**:  Denied.

### SECOND CAUSE OF ACTION
### Violation of Mississippi Public Service Commission
### Statutes and Rules and Regulations
### Under Miss. Code § 77-1-43(2)

110.    The Attorney General adopts and realleges the above paragraphs as if fully set forth therein.

43

**ANSWER TO NO. 110**: Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

111.    The acts and practices of EMI and the other Defendants described in this Complaint have violated Miss. Code § 77-1-43(2) and Rule 17 of the MPSC's Rules of Practice and Procedure.

**ANSWER TO NO. 111**: Denied.

112.    Specifically, the Defendants have charged its customers excessive prices for fuel and purchased electricity, and included unauthorized and illegal "adders" and surcharges to the fuel and purchase electricity costs.

**ANSWER TO NO. 112**: Denied.

**THIRD CAUSE OF ACTION**
**Restitution**

113.    The Attorney General Adopts and realleges the above paragraphs as if fully set forth herein.

**ANSWER TO NO. 113**: Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

114.    The acts and practices of EMI and the other Defendants described in this Complaint have violated Miss. Code § 75-24-1, et seq., thereby supporting a cause of action for restitution, including disgorgement, of the ill-gotten gains received by EMI and the other Defendants as the expense of EMI's customers pursuant to Miss. Code § 75-24-11.

**ANSWER TO NO. 114**: Denied.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

115.    The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

**ANSWER TO NO. 115**: Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

116.    EMI and the other Defendants hold monies and assets received and usurped from Mississippi residents and the State of Mississippi, as well as its subdivisions, operations and agencies, as consumers, which were improperly paid or transferred to, or usurped by, EMI and the other Defendants because of the acts and practices described hereinabove and which, in equity and good conscience, belong to Mississippians and the State, its subdivisions, operations and agencies.

**ANSWER TO NO. 116**:  Denied.

117.    EMI and the other Defendants were thereby unjustly enriched and secured benefits and profits in the form of monies and/or assets improperly paid by, transferred by, or usurped from Mississippians and the State of Mississippi, as well as its subdivisions, operations and agencies.

**ANSWER TO NO. 117**:  Denied.

118.    It would be unconscionable and unjust for EMI and the other Defendants to retain these benefits and profits.

**ANSWER TO NO. 118**:  Denied.

**FIFTH CAUSE OF ACTION**
**Violation of Mississippi Antitrust Statutes**
**Under Miss. Code § 75-21-3(a), (b) and (c)**

119.    The  Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

**ANSWER TO NO. 119**:  Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

120.    In Violation of Miss. Code § 75-21-3, by their actions and practices described above, EMI and the other Defendants have intended to accomplish and/or have accomplished to a degree inimical to the public and welfare the following:

a.    Restraint or attempted restraint of trade or production of electricity;

b.    Engrossed, forestalled and/or attempted to engross or forestall electricity.

**ANSWER TO NO. 120**:  Denied.

121.    As a result of these actions, Mississippi consumers and the State of Mississippi have been and continue to be injured and damaged.

**ANSWER TO NO. 121**: Denied.

## SIXTH CAUSE OF ACTION
### Fraud

122.    The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

**ANSWER TO NO. 122**: Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

123.    The acts and practices of EMI described in this Complaint violate Mississippi Fraud Statutes and common law respecting fraud see Miss. Code §§ 97-7-11 and 97-7-13; Qualcomm, Inc. v. Am. Wireless License Group, LLC, 980 So. 2d at 274; Windham v. Latco of Mississippi, Inc., 972 So. 2d at 611.

**ANSWER TO NO. 123**: Denied.

124.    Defendants knowingly and intentionally made false, material representations upon which the MPSC, on behalf of Mississippi citizens, reasonably relied.  The Defendants have consistently and repeatedly misrepresented to Mississippi consumers and regulators, through their words, deeds and actions, the materials facts:  (a) that they were complying with Mississippi law, policy and the regulatory bargain or compact; (b) that EMI was providing electricity to consumers at the lowest reasonable cost, (c) that the FAC charges were actual costs of fuel and purchased power, and (d) that EMI assets were being used solely for the benefit of Mississippi consumers when, in truth and fact, such assets were being misappropriated by Defendants to benefit their unregulated businesses all the while causing EMI's customers to subsidize such activities.

**ANSWER TO NO. 124**: Denied.

125.    Further, the Defendants knowingly and intentionally concealed certain material facts from regulators and consumers, knowing that said information was material and that withholding this information would seriously damages the consumers, including the facts that the Defendants were not complying with Mississippi law, policy and the regulatory bargain or compact, that EMI was not providing electricity to consumers at the lower reasonable cost, that EMI assets were not being used solely for the benefit of Mississippi consumers but were instead being misappropriated by Defendants to benefit their unregulated businesses thereby causing EMI's customers to subsidize such activities.

**ANSWER TO NO. 125**: Denied.

126.    As a result of these actions, Mississippi consumers and the State of Mississippi have been and continue to be injured and damaged.

**ANSWER TO NO. 126**: Denied.

## SEVENTH CAUSE OF ACTION
### Breach of Obligation of Good Faith and Fair Dealing

127.    The Attorney General adopts and realleges the above paragraphs as if fully set forth herein.

**ANSWER TO NO. 127**: Defendants incorporate by reference the responses

to the preceding paragraphs of the Complaint as if fully set forth herein.

128.    The acts and practices of EMI constitute a breach of its obligations of good faith and fair dealings with its customers, which customers include the State of Mississippi.

**ANSWER TO NO. 128**: Denied.

129.    Specifically, EMI has breached its obligations of good faith and fair dealings by, among other things:

(a)    surreptitiously evading and avoiding regulatory oversight;

(b)    dissipating its assets, revenues and creditworthiness by making sizeable loans, letters of credit, guaranties, and/or entering other financing transactions to support and subsidize Entergy's unregulated nuclear generating business, form which nuclear plants EMI's customer receive no electricity;

(c)    reselling inexpensive electricity that was purchased from non-affiliates to other non-affiliates while at the same time providing expensive EMI-, EPI- or Entergy System-generated electricity to EMI's customers;

(d)    forcing EMI's customers to subsidize the unregulated wholesale market activities of its unregulated affiliate, EPI, by requiring them to purchase EPI's expensive electricity while EPI sold its inexpensive electricity into the wholesale market to produce unrestricted profits for EMI's and EPI's parent company Entergy;

(e)    deliberately not crediting EMI's customers with the full amount of profits from the sale of generated electricity and/or resale of purchased electricity, respectively, and thereby producing profits of Entergy from the manipulation of the FAC and/or Rider ECR contrary to Mississippi Law;

(f)     including unauthorized "adders" in the fuel and purchased electricity charges embedded in EMI's FAC, Rider ECR and/or PMR mechanisms, all in violation of Mississippi law; and

(g)     misrepresenting to the MPSC that the RFP process begun in Fall 2002 and continuing through today with the Summer 2008 RFP ensured that fair and reasonable fuel costs were paid by Mississippi consumers when, in fact, Defendants fraudulently shared many third party bids with their successful bidder affiliates, thus completely corrupting the RFP process.

**ANSWER TO NO. 129**:  Denied.

130.     As a result of these actions, Mississippi consumers and the State of Mississippi have been and continue to be injured and damaged.

**ANSWER TO NO. 130**:  Denied.

## EIGHTH CAUSE OF ACTION
### Accounting

131.     EMI should be ordered to render an accounting of any and all amounts derived by its and/or its parent and/or affiliates as a result of the unlawful conduct that its described in this Complaint.

**ANSWER TO NO. 131**:  Denied.

132.     Moreover, the Defendants should be ordered to render an accounting of all transactions between and among the Defendants and their affiliates that resulted in EMI paying unlawfully higher power bills.

**ANSWER TO NO. 132**:  Denied.

133.     The accounts between and among EMI and the other Defendants are complex, intricate, in conflict with the public trust and seemingly commingled, thus there is an urgent need for in-depth discovery because all records of the dealings by and among EMI and the other Defendants are under the sole control of Defendants.

**ANSWER TO NO. 133**:  Denied.

## ANSWER TO PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief sought.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff's Complaint is barred because it fails to state claims upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's Complaint is barred because this Court lacks subject matter jurisdiction over Plaintiff's claims; Plaintiff's claims are subject to the exclusive jurisdiction of the Federal Energy Regulatory Commission pursuant to the Federal Power Act, 16 U.S.C. §§ 824d, 824e.

### Third Affirmative Defense

Plaintiff's claims fail because they are preempted by federal law under U.S. Const. Art. VI and 16 U.S.C. §§ 824d, 824e.

### Fourth Affirmative Defense

To the extent any of Plaintiffs' claims are not within the exclusive jurisdiction of the FERC, they are barred because they are in the exclusive original jurisdiction of the MPSC under Miss. Code § 77-3-5.

### Fifth Affirmative Defense

Plaintiff's claims for damages are barred by the filed rate doctrine and because recovery of retroactive damages would violate the principle against retroactive rate making.

### Sixth Affirmative Defense

Plaintiff's claims are barred because they are subject to the primary jurisdiction of the Federal Energy Regulatory Commission and/or to the primary jurisdiction of the MPSC.

### Seventh Affirmative Defense

Plaintiff Attorney General lacks standing to bring some or all of the claims made in the Complaint, including, but not limited to, claims on behalf of customers of EMI on a class basis (*see Mississippi Rules of Court: State 29* (2008) ("Rule 23:  Class Actions [Omitted]").

**Eighth Affirmative Defense**

Plaintiff's Complaint fails with respect to Entergy Corporation and Entergy Power, Inc. because neither of these Defendants is constitutionally or otherwise legally amenable to personal jurisdiction in the State of Mississippi.

**Ninth Affirmative Defense**

Plaintiff's claims are barred by the doctrine of accord and satisfaction.

**Tenth Affirmative Defense**

Plaintiff's Complaint is barred by the doctrines of waiver and estoppel.

**Eleventh Affirmative Defense**

Plaintiff's Complaint is barred to the extent that the claims are outside the applicable statutes of limitations, including but not limited to the three year statute of limitations provided in Miss. Code § 15-1-49.

**Twelfth Affirmative Defense**

Plaintiff's Complaint in whole or in part is barred by the doctrine of laches.

**Thirteenth Affirmative Defense**

Plaintiff's Complaint is barred by res judicata to the extent that the claims relate to matters that have already been subject to final regulatory review at the FERC, the MPSC, or both.

**COUNTERCLAIMS**

NOW COME ENTERGY CORPORATION, ENTERGY MISSISSIPPI, INC., ENTERGY SERVICES, INC., and ENTERGY POWER, INC., Counterclaim Plaintiffs herein, who, acting in accordance with Fed. R. Civ. P. 13, plead and show unto the Court as follows:

**I. Nature Of The Counterclaims**

1.      These Counterclaims are being brought to prevent the ever-shifting

attempts of the Mississippi Attorney General to bypass the administrative and regulatory commissions that have been given exclusive original jurisdiction over claims that an integrated interstate electrical system has engaged in conduct that has inflated the electricity rates paid by Mississippi consumers.   These Counterclaims seek:

A.  a declaration that under the Federal Power Act and the Supremacy Clause of the Constitution of the United States, the Federal Energy Regulatory Commission (sometimes "FERC") has exclusive jurisdiction over claims that the companies that compose the interstate Entergy System have caused electric rates charged to Mississippi consumers to be excessive by engaging in wholesale power supply and pooling arrangements or other affiliate transactions and conduct that affects wholesale electric rates or the transmission of electricity in interstate commerce, and that the application of Mississippi state law to this conduct is preempted by the Federal Power Act;

B.  a declaration, in the alternative, that any claims that the conduct of members of the Entergy System has caused electric rates paid by Mississippi consumers to be inflated or excessive are within the "exclusive original jurisdiction" of the Mississippi Public Service Commission (sometimes "MPSC") under Miss. Code § 77-3-5; and

C.  such other equitable relief as may be just and proper in the premises.

## II.  **The Parties**

### A.  **Counterclaim Plaintiffs**

2.      ENTERGY CORPORATION is a public utility holding company which is subject to the regulations of the Federal Energy Regulatory Commission that have been adopted under the Federal Power Act, 16 U.S.C. §§ 791, *et seq.*   Entergy Corporation is a corporation chartered, existing and organized under the laws of the State of Delaware with its principal place

of business in the State of Louisiana.  The Mississippi Attorney General has made repeated

attempts to investigate the activities of Entergy Corporation and to prosecute it for allegedly

violating Mississippi law in actions originally brought in state courts.  To date, the Mississippi

Attorney General has prevented Entergy Corporation from obtaining a legal determination of the

lawfulness of the Mississippi Attorney General's conduct.  Entergy Corporation appears

specially and without abandoning its position that it is not amenable to personal jurisdiction in

the State of Mississippi.

       3.     ENTERGY MISSISSIPPI, INC. (sometimes "EMI"), is an electric public utility

corporation organized and existing under the laws of the State of Mississippi, which has and

maintains its principal place of business in Jackson, Mississippi.  EMI is a wholly owned

subsidiary of Entergy Corporation.  EMI is subject to the regulatory authority of the Mississippi

Public Service Commission and the Federal Energy Regulatory Commission.  EMI is one of six

Entergy Operating Companies, and EMI provides service to retail and wholesale customers in

Mississippi.  The other five Entergy Operating Companies provide service in Arkansas,

Louisiana, and Texas.

       4.     ENTERGY SERVICES, INC. (sometimes "ESI"), is a corporation organized and

existing under the laws of the State of Delaware, which has and maintains its principal place of

business in New Orleans, Louisiana.  ESI is a wholly owned subsidiary of Entergy Corporation,

that acts as agent for the six Entergy Operating Companies with respect to certain matters and

operates as a centralized service company providing to the Operating Companies various general

administrative services, such as accounting, billing, planning and the like, as well as various

technical services and operational expertise needed by the Operating Companies for the

operation of their electric generating and bulk transmission facilities on a coordinated basis, as a

single, integrated electric system (which system is sometimes referred to as the "Entergy System").

5.      ENTERGY POWER, INC. (sometimes "EPI"), is a corporation organized and existing under the laws of Delaware, which has and maintains its principal place of business in Arkansas.  EPI is a wholly owned subsidiary of Entergy Corporation.  EPI provides electricity in wholesale transactions subject to FERC's jurisdiction.  EPI appears specially and without abandoning its position that it is not amenable to personal jurisdiction in the State of Mississippi.

### B. Counterclaim Defendant

6.      JIM HOOD is the Attorney General of the State of Mississippi who may be served with process at his office in the Carroll Gartin Justice Building, 550 High Street, Suite 1100, Jackson, Mississippi.  Defendant Hood is sometimes referred to as the "Attorney General." The Attorney General has asserted the authority to bring representative action on behalf of all consumers of electricity in Mississippi, and has asserted such claims in this action.  As detailed below, Attorney General Hood has acted in the premises, under the color of the laws, customs and usages of the State of Mississippi, and he is sued only in his official capacity, as set forth hereinabove.

### III. State Action

7.      The Office of the Attorney General is a creature, agency and arm of the State of Mississippi, organized and existing under the laws thereof, and governed and regulated in its activities by enactments of the Mississippi Legislature, Miss. Code § 7-5-1, *et seq.,* subject to the Constitution and laws of the United States and the Constitution and other applicable laws of the State of Mississippi.  The Office of the Attorney General is a state agency.  Miss. Code §§ 25-43-1.101, -1.102, *et seq.*

## IV.  Jurisdiction And Venue

8.      Count One of this action arises under the Constitution and laws of the United States and, accordingly, is within the subject matter jurisdiction of the district courts of the United States.  28 U.S.C. §§ 1331, 1337, 1343(a)(3).  Count Two of this action arises under the law of the State of Mississippi; it is within this Court's diversity of citizenship jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), and this Court may also exercise supplemental jurisdiction over these state law claims under 28 U.S.C. § 1367.

9.      Counterclaim Plaintiffs seek, *inter alia,* declaratory, injunctive and other coercive relief, arising out of legal relations that they have with Defendant.  28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 57.  42 U.S.C. § 1983 and the Declaratory Judgment Act authorize the entry of declaratory relief in the premises.

10.     The residences and domiciles of the parties are set forth above.  A substantial portion of the acts, omissions and other actionable events that have given rise to this civil action took place, have taken place and will, unless enjoined or otherwise remedied by this Court, continue to take place in Hinds County, Mississippi, as will presently appear.  Venue is proper in the Southern District of Mississippi and in the Jackson Division thereof.  28 U.S.C. § 1391(b); *see also*, 28 U.S.C. § 104(b)(1).

## V.  Structural And Contextual Premises

11.     The six Entergy Operating Companies operate all of their respective electric generation and transmission facilities as an integrated electric system in interstate commerce in order to service the collective load of the entire Entergy System.  The Entergy System provides electric public utility service to over 2.6 million retail customers of the Operating Companies located throughout portions of Arkansas, Louisiana, Mississippi and Texas.  Entergy Corporation

is a holding company which owns all outstanding shares of common stock in the six Operating Companies; the only one of those that operates in Mississippi is EMI.  Entergy Services, Inc. is a subsidiary of Entergy Corporation.  The Federal Energy Regulatory Commission exclusively regulates the transmission and wholesale sales of electricity by and among members of the Entergy System, and the retail electric services provided by EMI and other Entergy System Operating Companies is exclusively regulated within their respective states or local jurisdictions by the Mississippi Public Service Commission and other respective state public service commissions, and by the City of New Orleans with respect to Entergy New Orleans, Inc..

12.     EMI's principal business is the generation, transmission, and distribution of electric power and energy, and in addition and/or incidental thereto EMI operates electric generating stations, administrative offices, control centers, crew headquarters, information technology and telecommunications facilities, and other separate facilities.  EMI provides electric public utility service to over 430,000 retail customers in portions of forty-five (45) counties in western Mississippi, as authorized by certificates of convenience and public necessity granted to it by the Mississippi Public Service Commission.  EMI is rendering electric service in accordance with its service rules and regulations and in compliance with schedules of rates and charges, all of which have been approved by MPSC orders.

13.     EMI is subject to the jurisdiction and processes of the Federal Energy Regulatory Commission with respect to, among other things, all purchases and sales of electricity for resale, including transactions with EMI's affiliates and with non-affiliated entities, and with respect to the provision of electric transmission service.  EMI also provides "partial requirements" wholesale electric service to municipally-owned electric utility systems that operate in several municipalities in western Mississippi.  This service is sometimes referred to as "sale-for-resale"

service.  The FERC jurisdictional tariffs that apply to this service include wholesale fuel adjustment clauses, which flow through an appropriately allocated portion of the same costs that are recovered through EMI's retail (MPSC-jurisdictional) fuel adjustment clause.  Those wholesale tariffs are on file with and are subject to the exclusive regulatory jurisdiction conferred upon the FERC by the Federal Power Act, pursuant to which the FERC exclusively regulates wholesale sales of electricity and transmission of electricity in interstate commerce.

14.     ESI performs centralized management, administrative and other services for the Entergy System, including EMI.  ESI performs all such services at cost and its provision of such services and the costs thereof is subject to the regulatory jurisdiction and processes of the Federal Energy Regulatory Commission.

15.     ESI, as well as EMI and the other five Entergy Operating Companies, are the parties to a FERC-regulated rate schedule that provides the basis for the integrated planning, construction and operation of the electrical generating and bulk transmission (and other) facilities of the Operating Companies.  That FERC rate schedule is the Entergy System Agreement (sometimes "ESA"), which also governs the allocation of the costs and benefits of those facilities among each of the Operating Companies.  An Entergy System Operating Committee is charged with administering the provisions of the ESA, including the development of a "generation addition plan" to assure that the Operating Companies, including Counterclaim plaintiff EMI, will have sufficient capacity to "furnish reliable service to customers at the lowest cost consistent with sound business practice."  Under the ESA, the Entergy System Operating Committee determines whether and when additional transmission facilities will be obtained, whether and when additional electrical generating capacity will be obtained by EMI and other Entergy Operating Companies, and whether and when electric capacity or energy will be purchased or

sold outside the Entergy System.  Under the ESA, the electrical generating capacity of Entergy

Operating Companies is "pooled," and the generation and transmission facilities are centrally

operated and dispatched by ESI, subject to supervision of the Energy System Operating

Committee.  The ESA also governs the allocation of generating and transmission costs among

the Entergy Operating Companies and determines the costs associated with wholesale purchases

of electric power and energy for resale that each Entergy Operating Company incurs for the

electricity that it provides to retail customers.  Thus, under the ESA, EMI and other Entergy

Operating Companies cannot purchase or sell electric power and energy from sources outside the

system absent the approval of the System Operating Committee, and do not have the ability to

choose to obtain electric power and energy from other sources.  The ESA has been filed with the

FERC and litigated before it, and is a FERC-approved rate schedule or tariff.

     16.     The Federal Energy Regulatory Commission has exclusive administrative and

regulatory jurisdiction over the transmission and wholesale sales of electrical energy.  16 U.S.C.

§§ 824d, 824e.  As the Supreme Court has held, the FERC's "exclusive" jurisdiction "applies not

only to rates, but also to power allocations that affect wholesale rates" and thus to the rates,

terms, and conditions under which operating companies exchange electricity in the Entergy

System and other interstate power pools.  *Mississippi Power & Light Co. v. Mississippi*, 487 U.S.

354, 371-72 (1988).  A complaint filed with the FERC is the exclusive remedy for any persons,

including but not limited to the Attorney General, who may desire to assert that the Entergy

System Operating Committee has acted improperly or that the results of transactions pursuant to

the ESA are improper.  *Id*; *Entergy Louisiana, Inc. v. Louisiana Pub. Serv. Comm'n*, 539 U.S. 39

(2003).  Thus, unless and until the FERC orders otherwise, the power and transmission costs that

Entergy Operating Companies incur under the ESA must be treated as reasonable and lawful by

state tribunals and must be permitted to be recovered in the retail rates that Entergy Operating Companies charge their customers.

17.     Whatever authority the Attorney General may otherwise have under the Consumer Protection Act, Miss. Code § 75-24-1, *et seq*., or other provisions of Mississippi state law, that authority does not include and extend to the reasonableness of wholesale power supply and transmission arrangements within the Entergy System or other transactions among the Entergy Operating Companies that affect wholesale rates. This conduct is within the exclusive jurisdiction of the FERC.

18.     In the exercise of its exclusive original jurisdiction, the FERC presently has open and ongoing multiple administrative proceedings addressing production cost prudence and allocation, transmission operations, etc., regarding the Entergy System, *viz*.

> A.     ER08-1078, -1079, -879 and -1006 - Cases involving amended Interconnection and Operating Agreements pursuant to the ICT's Retrospective Analysis.

> B.     ER08-1057 - 2008 Open Access Transmission Tariff rate re-determination.

> C.     ER08-1056 - 2008 Bandwidth Calculation/Implementation Case.

> D.     ER08-774 - ISB v Form 1 Data for Calculating Variable "ER" in Bandwidth formula.

> E.     EL08-72 - NRG Complaint relating to the including of incentive compensation in OATT rates.

> F.     EL08-51 - LPSC Complaint relating to treatment of Spindletop gas storage facility in Bandwidth formula.

> G.     ER07-956 - 2007 Bandwidth Calculation/Implementation Case.

> H.     ER07-682 - Bandwidth Functionalization Case.

I.  ER05-1065 - Main ICT and WPP docket at FERC.

J.  EL01-88 - Original LPSC Complaint relating to System Agreement production cost equalization.

K.  EL00-66 - Interruptible Load Case.

19. The Attorney General has the authority to institute proceedings before the FERC and to intervene on behalf of the State of Mississippi in proceedings before the FERC in the exercise of its regulatory jurisdiction.  The Attorney General has exercised this authority repeatedly over the years, including his intervention in FERC proceedings docketed as ER98-4190, EL96-19, ER95-1042, ER92-806, EC92-21, EL90-48, EL90-45, EL90-16, ER89-678, FA89-28, FA86-190, ER82-616 and ER82-483.

20. The Mississippi Public Service Commission has "exclusive original jurisdiction of the intrastate business and property of public utilities," including Counterclaim plaintiff EMI. Miss. Code § 77-3-5.  The MPSC's exclusive original jurisdiction includes the authority "[t]o provide just and reasonable rates and charges for public utility services without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices . . . ." Miss. Code § 77-3-2(1)(d), -2(2).  This jurisdiction includes determinations of whether the rates that EMI has charged are inflated or excessive because the costs that it has incurred are inflated or otherwise unreasonable.  Thus, the rates that EMI charges are subject to pervasive regulation by the MPSC, and the sole exception to the MPSC's jurisdiction is those matters that are within the exclusive jurisdiction of the FERC.

21. Whatever authority the Defendants may otherwise have under the Consumer Protection Act, Miss. Code § 75-24-1, *et seq.*, that authority does not include and extend (a) to authority regarding the intrastate business and property of EMI, (b) to matters affecting the reasonableness of the cost incurred by, and the retail rates charged by, EMI, or (c) to unfair

methods of competition affecting commerce or any unfair or deceptive trade practice otherwise arguably within Miss. Code § 75-24-5, of public utilities doing business in Mississippi, including EMI, except to the limited extent that the Attorney General is permitted by law to institute or participate in administrative proceedings before the MPSC.  The Mississippi Legislature has instructed that "in construing what constitutes unfair or deceptive trade practices the courts should be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)) as from time to time amended."  Miss. Code § 75-24-3(c).  Neither the Federal Trade Commission nor the federal courts have ever construed Section 5(a)(1) to apply to public utilities, and particularly not in the context of practices similar or analogous to those alleged by the Attorney General in the Complaint.

22.     The Attorney General has the authority to "call upon other state agencies for information."  Miss. Code § 75-24-27(1)(e).  The MPSC is a state agency upon which the Attorney General may call for information, albeit subject to the exclusive original jurisdiction of the MPSC and the restrictions of normal MPSC rules and processes.

23.     The Attorney General has no authority to circumvent or bypass the exclusive original jurisdiction of the MPSC.

24.     On April 10, 1998, the MPSC made and approved a Rule 53 Settlement with Entergy Corporation and EMI which provides:

> Entergy shall ensure that the [MPSC] has access to any books and records of Entergy and each of its subsidiaries, affiliates, and Entergy participants in joint ventures which reasonably relate to transactions within the [MPSC]'s jurisdiction.

This agreement recognized and confirmed the MPSC's authority to view all books and records of each and every subsidiary and affiliate of the Entergy System, as the MPSC may determine

reasonable and necessary to the exercise of its exclusive original jurisdiction and regulatory authority in the public interest. *See* Miss. Code §§ 77-3-42(3), -79.

25.     The Attorney General has no authority, by way of the service of subpoenas or Civil Investigative Demands ("CIDs") or otherwise, to require the production of documents or information over and above those required by the MPSC in its rules, regulations and administrative orders. As stated above, the Attorney General may intervene and participate in MPSC proceedings pursuant to said rules.

26.     In the exercise of its exclusive original jurisdiction, the MPSC presently has open and ongoing two administrative proceedings, *viz.*

        A.     Hearing to Investigate and Review Entergy Mississippi's Fuel Adjustment Charges, MPSC Docket No. 2008-AD-270, initiated July 1, 2008; Defendant Hood has not elected to intervene in this proceeding; and

        B.     Hearing to Investigate and Review Entergy Mississippi's Generation Needs, MPSC Docket No. 2008-AD-158, initiated April 30, 2008; Defendant Hood is an intervener in said proceeding and, through Special Assistant Attorneys General, has participated fully in the discovery and hearings in the proceeding.

## VI. The Attorney General's Earlier Investigations And His Previous Attempts To Prevent Litigation of The Jurisdictional Claims Of The Counterclaim Plaintiffs.

27.     On August 18, 2008, Defendant issued CIDs to Entergy Corporation, to EMI, and to ESI. The CIDs commanded the companies to produce documents, information and records of the Entergy System in multiple subject areas, and over periods of time ranging as far back as the last thirty (30) years, through and including the present. For the most part, the documents, information and records sought relate to filings that have been made with the MPSC or the FERC, as was appropriate, where they have received full regulatory audit, verification and approval.

28.     After these CIDs were served, Entergy Corporation, EMI, and ESI instituted an action contending that the CIDS were "unreasonable" searches that violated the Fourth Amendment because, among other things, the Attorney General was seeking to investigate conduct within the exclusive jurisdiction of the FERC or the MPSC and was acting outside the proceedings of those administrative and regulatory commissions.

29.     In his motion to dismiss that action, Attorney General Hood stated that he was seeking to investigate five allegations:  (1) that the Entergy System is engaged in a "power for profits shell game" in which cheaper power that is purchased off-system is sold for a profit and more expensive power generated by the Entergy System is allocated to EMI and other system operating companies; (2) that the Entergy System, through ESI, has forced EMI to purchase excessively priced power produced by a plant in Arkansas owned by EPI; (3) that the Entergy System used deceptive accounting practices to force EMI and other Entergy Operating Companies to incur purchased power expenses that are well in excess of the actual cost of power; (4) that EMI has included in its fuel adjustment clauses costs that EMI has been charged by its affiliates relating to compliance with environmental laws and regulations; and (5) the Entergy System has driven up the cost of power to EMI's Mississippi customers by allegedly under-investing in the Entergy System's bulk transmission system and thereby allegedly preventing the Entergy transmission system from being capable of transmitting both Entergy's and non-affiliated third parties' power.  The Attorney General also stated that these are the same issues that ratemaking tribunals in Louisiana had addressed.

30.     Entergy Corporation, EMI, and ESI then filed a First Amended Complaint in their federal court lawsuit, contending that each of these allegations is within the exclusive jurisdiction of FERC and that any state law claims based on these allegations are preempted by the Federal

Power Act. Alternatively, they asserted that if any of these allegations were not within the FERC's exclusive jurisdiction, they would be within the exclusive jurisdiction of the MPSC, for each is a claim that the costs recovered through EMI's retail rates are excessive.

31.    The Attorney General resisted litigation of these claims in federal court. He instituted a state proceeding to enforce the CIDs and contended that the existence of this state proceeding meant that the validity of the CIDs could not be litigated in federal court.

32.    Entergy Corporation, ESI, and EMI then filed a motion to dismiss the state court CID enforcement proceeding, contending that the CIDs could not be enforced because the claims were within the exclusive jurisdiction of the FERC and because the claims would be within the exclusive jurisdiction of the MPSC to the extent that they were not within the FERC's exclusive jurisdiction. A brief was submitted in support of this motion.

33.    Shortly before the due date of the Attorney General's responsive brief, a "Resolution" was issued by the MPSC, which acted without prior notice. This "Resolution" was self-contradictory on its face. On the one hand, it stated, correctly, that "the Commission [MPSC] has exclusive original jurisdiction over the rates of regulated utilities" and that the Attorney General was seeking to investigate ratemaking issues that were the same or very similar to those that had been addressed in the ratemaking orders issued by the Louisiana Public Service Commission in the *Delaney v. Entergy Louisiana,* Docket Number U-23356 and by the New Orleans City Council in *Gordon v. Entergy New Orleans*, Resolution R-04-06. On the other hand, the Resolution stated that the Attorney General had independent jurisdiction to investigate these ratemaking issues and that the CIDs did not invade the MPSC's original jurisdiction.

34.    EMI then filed a motion for reconsideration and application for rehearing with the MPSC that pointed out this internal contradiction within the "Resolution" and its procedural

deficiencies.

35.    The Attorney General took action designed to moot the pending controversies. On December 2, 2008, the Attorney General notified Plaintiffs that the CIDs were being withdrawn and that Plaintiffs need not respond to them.

36.    Later that same day, the Attorney General instituted a new action in Chancery Court – the instant case.  The allegations of this new Complaint included what appear to be new versions of the five claims that the Attorney General previously said that he was investigating. In particular, the Attorney General alleges that Entergy Corporation, ESI, and EMI and individual officers and employees (who were identified as "fictitious defendants A through Z") had caused EMI to breach its regulatory compact with Mississippi and to charge excessive rates to Mississippi consumers by (1) forcing EMI to engage in transactions that subsidized the operations of unregulated affiliates, (2) purchasing power off-system and selling it for a profit while providing expensive EMI-, EPI-, or Entergy System-generated power to EMI customers, (3) thereby subsidizing the unregulated wholesale market activities of EPI, (4) failing to credit EMI with the full amount of profits from the sale of generated electricity or resale of purchased electricity,  and (5) including unauthorized "adders" to costs flowed through Fuel Adjustment Clause by recovering the full amount of purchased power expenses that EMI incurred under the System Agreement in the costs that were flowed through.

37.    In addition, the Attorney General advanced some new claims.  He contended that other affiliate transactions within the Entergy System – purported loan guarantees for a nuclear generating subsidiary, the allocation of tax refunds related to Hurricane Katrina, and the use of bidding information in connection with an RFP – had operated unnecessarily and unreasonably to inflate the rates that EMI charges its wholesale and retail customers.

38.     Against this background, it is the case that the Attorney General has repeatedly asserted the authority to investigate and to claim, in tribunals other than the FERC or the MPSC, that the Entergy System has engaged in conduct that has unreasonably inflated rates charged to Mississippi consumers, and has repeatedly threatened the Entergy System with claims that it will be sanctioned both for its conduct or, in some cases, for failing to cooperate with the Attorney General's investigation of the Entergy System's conduct.  Regardless of whether the Attorney General continues to prosecute the most recent Complaint that he has filed or whether he again attempts to moot the issues that he raised by voluntarily dismissing his Complaint, Entergy Corporation, ESI, EMI, and EPI have been subjected to repeated and concrete threats of enforcement actions by the Attorney General and sanctions and are entitled to a declaratory judgment on the question whether the investigations and claims of the Attorney General are within the exclusive jurisdiction of the FERC or the MPSC.

## VII. Count One – Federal Power Act Preemption

39.     Entergy Corporation, EMI, ESI, and EPI incorporate by reference all the allegations in paragraphs 1 through 38.

40.     The claims that the Attorney General was previously investigating and has now asserted are within the exclusive jurisdiction of the FERC.  Accordingly, if the Attorney General wishes to pursue these claims, his exclusive remedy is to file a complaint at the FERC or otherwise to participate in FERC proceedings, as the Attorney General has done many times in the past.

41.     The claims are primarily based on allegations that the power that was dispatched under the System Agreement to meet EMI's needs or that otherwise was obtained by it for resale in Mississippi was excessively costly.  But under the System Agreement – which is a FERC

tariff – the Entergy System Operating Committee and ESI apply the provisions of the System Agreement to determine (1) the particular generating facilities that will be used to meet the needs of EMI and other System Operating Companies, (2) whether power will be purchased  from or sold to third parties outside the Entergy System, (3) the costs and credits that will be allocated to each Operating Company, (4) the intra-System accounting for the foregoing costs, and (5) other matters that affect the power costs of EMI and other operating companies.  Under settled law, the determinations that these entities make are reviewable only by FERC (and by appellate courts with authority to review FERC orders).  FERC thus has exclusive original jurisdiction over allegations that EMI or other System Operating Companies were allocated power which imposed excessive costs because there was a failure to obtain cheaper power off-system, because it was imprudent to use older plants that were costlier to operate, because EMI or other System Operating Companies obtained expensive power generated by affiliates, or because EMI or other System Operating Companies engaged in power sales or other wholesale transactions that unreasonably inflated other costs.

42.  For the same reason, the claims that it was unlawful or unreasonable for alleged loan guarantees, income tax refund allocations, sharing of bidding information, or other affiliate transactions to occur within the Entergy System are claims that are within the FERC's exclusive jurisdiction.  These allegations, too, are claims that unreasonable conduct occurred that affected wholesale rates and that caused EMI to incur excessive costs as a result of its dealings with other Entergy System companies.

43.  Thus, regardless of whether these allegations are pled or denominated under Mississippi state law, the claims that the Attorney General has investigated and asserted are within the FERC's exclusive jurisdiction, are preempted by the Federal Power Act, and are

unlawful under the Supremacy Clause of the United States Constitution.

## VIII.  Count Two  -- Exclusive  Original Jurisdiction Of MPSC

44.   The claim pleaded in this Count Two is pleaded in the alternative to the claim pleaded in Count One.

45.   Counterclaim Plaintiffs incorporate by reference all of the allegations in Paragraphs 1 to 38 above.

46.   To the extent that any of the Attorney General's potential claims are held not to be within the exclusive jurisdiction of the FERC, these claims are within the exclusive original jurisdiction of the MPSC because they rest on claims that excessive rates have been charged to consumers in Mississippi and the MPSC has "exclusive original jurisdiction" over all such claims.  Miss. Code §§ 77-3-2(1)(d), 77-3-2(2) and 77-3-5.

## IX. Remedies

47      Counterclaim Plaintiffs incorporate by reference all of the allegations in Paragraphs 1 to 46 above.

48.     Counterclaim Plaintiffs are entitled to have determined the question of the construction and legal effect of the policy, practice or course of conduct described in these Counterclaims, and to obtain a declaration of their rights, status, and other legal relations there under. 28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 57.  Counterclaim Plaintiffs request a declaratory judgment in accordance with 28 U.S.C. §§ 2201, 2202 and Fed. R. Civ. P. 57.

49.     A declaratory judgment may terminate this controversy or remove an uncertainty.

50.     Counterclaim Plaintiffs respectfully request "a speedy hearing" of this action. Fed. R. Civ. P. 57.

## X. **Request For Relief**

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court enter judgment or such other order as may be appropriate in favor of Counterclaim Plaintiffs and against Attorney General Hood in his official capacity and his successors in office and all persons acting in concert with them:

(A)   Pursuant to 28 U.S.C. §§ 2201, 2202 and Fed. R. Civ. P. 57, declaring that

(1)   the Attorney General has at all times relevant hereto, acted under color of the laws, customs, and usages of the State of Mississippi;

(2)   the aforesaid policy, practice and course of conduct upon which the Attorney General had now engaged and is determined to enforce, both on their face and as applied in the contexts presented herein, offends rights secured to Counterclaim Plaintiffs by the Federal Power Act and the Supremacy Clause of the Constitution of the United States, which give FERC exclusive jurisdiction over claims that conduct governed by the Entergy System Agreement has unreasonably inflated costs incurred by Entergy System Operating Companies; and

(3)   to the extent that any of the subjects of the proposed investigation are held not to be within the exclusive jurisdiction of the FERC, that the aforesaid policy, practice, and course of conduct upon which the Attorney General has now engaged and is determined to enforce, both on their face and as applied in the contexts presented herein, offends rights secured to Counterclaim Plaintiffs by Miss. Code §§ 77-3-2(1)(d), 77-3-2(2), 77-3-5;

(B)   Awarding to Counterclaim Plaintiffs and assessing against Defendant Hood all taxable costs and, as a part thereof, all reasonable and necessary attorneys fees and legal

expenses to which they are exposed, as may be allowable by law, 42 U. S. C. § 1983 and 1988; and

(C)     Granting to Counterclaim Plaintiffs and against Defendant Hood such additional, further and other relief as to which they may be entitled under the law and the facts, or as may otherwise appear proper in the premises.

Respectfully submitted,

ENTERGY MISSISSIPPI, INC.,
ENTERGY CORPORATION,
ENTERGY SERVICES, INC. and
ENTERGY POWER, INC.
Defendants

By their attorneys,


/s/ James L. Robertson
JAMES L. ROBERTSON, MSB 5612
MICHAEL B. WALLACE, MSB 6904
Post Office Box 651
Jackson, MS  39205-0651
Telephone: (601) 968-5500
Facsimile:   (601) 968-5593
E-mail:  jlr@wisecarter.com
E-mail:  mbw@wisecarter.com

OF COUNSEL:

JAMES W. SNIDER, JR., MSB 7671
Managing Counsel
ENTERGY MISSISSIPPI, INC.
Post Office Box 1640
Jackson, MS  39215-1640
Telephone:  (601) 969-2658
E-mail: jsnider@entergy.com

WISE CARTER CHILD & CARAWAY
Post Office Box 651
Jackson, MS  39205-0651
Telephone:  (601) 968-5500

## CERTIFICATE OF SERVICE

I, James L. Robertson, one of the attorneys for Defendants, do hereby certify that I have this day filed via ECF with the Clerk of the Court a true and correct copy of the above and foregoing document.  I further certify that I have this day served, via e-mail and U. S. Mail, a true and correct copy of this document to:

Harold E. Pizzetta, III, Esq.
Special Assistant Attorney General
Chief, Civil Litigation Division
Office of the Attorney General
State of Mississippi
550 High Street, Suite 1100
Jackson, MS  39201
HPIZZ@ago.state.ms.us

Bridgette W. Wiggins, Esq.
Special Assistant Attorney General
Office of the Attorney General
State of Mississippi
550 High Street, Suite 1100
Jackson, MS  39201
BWILL@ago.state.ms.us

So certified, this the 29th day of December, 2008.

/s/ James L. Robertson
JAMES L. ROBERTSON