# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF MISSISSIPPI, EX REL. JIM HOOD, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI, | ) ) ) ) | |
| Plaintiff-Counterclaim Defendant, | ) ) | |
| v. | ) ) | No.3:08-CV-780-HTW-LRA |
| ENTERGY MISSISSIPPI, INC., ENTERGY CORPORATION, ENTERGY SERVICES, INC., AND ENTERGY POWER, INC., | ) ) ) ) ) | |
| Defendants-Counterclaim Plaintiffs. | ) ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants-Counterclaim Plaintiffs Entergy Mississippi, Inc. ("Entergy Mississippi" or "EMI"), Entergy Corporation, Entergy Services, Inc. ("Entergy Services" or "ESI"), and Entergy Power, Inc. ("Entergy Power" or "EPI") – collectively "Defendants" – respectfully submit this memorandum in support of their motion for judgment on the pleadings.

## INTRODUCTION AND SUMMARY

In this action, Plaintiff ("Hood") seeks to recover civil penalties and "many hundreds of millions of dollars" on behalf of electric ratepayers in Mississippi. These claims rest on allegations that the four-state Entergy electric system caused excessively-priced electricity to be sold in Mississippi and thus made Mississippi "a dumping ground for high-cost electricity." Hood alleges that defendant Entergy Services has "illegally" allocated Entergy Mississippi "expensive" electricity produced by other Entergy Companies that operate in other states, rather than purchasing cheaper power that allegedly was available from third parties. Hood also alleges

that Entergy Mississippi acted illegally by "accep[ting]" this "high cost" power and by passing through all the resulting wholesale power costs to Mississippi ratepayers.

This complaint is legally defective on its face. Hood's claims depend on federal law claims that are within the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC") or squarely contrary to federal law. Indeed, the allegations of the Complaint ultimately rest on the same federal law claims that the United States Supreme Court has TWICE rejected and held inapplicable to Entergy Mississippi (which was called Mississippi Power & Light until 1996) and the other Entergy Operating Companies – including once in a case brought by a previous Mississippi Attorney General. *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1987) ("*MP&L*"); *Entergy Louisiana, Inc. v. Louisiana Public Serv. Comm'n*, 539 U.S. 39 (2003) ("*ELI*").

In particular, Hood admits, as he must, that the four-state Entergy electric system is governed by tariffs that have been approved by FERC pursuant to the Federal Power Act, 16 U.S.C. § 791a, *et seq*. However, Hood claims that FERC does not "regulate" the "amount and timing" of the power that is obtained by Entergy Mississippi and its sister companies. Compl. ¶¶ 38-39. Hood also asserts that the FERC tariffs allowed Entergy Mississippi to refuse to "accept" the Entergy System's power and cost allocations and to purchase electricity directly from third parties – and that Entergy Mississippi violated state law by failing to exercise this putative federal right. *Id.*

These claims are simply wrong. The Supreme Court has TWICE held that the valid FERC tariffs that govern the Entergy System *require* Entergy Mississippi and the other Entergy Operating Companies to purchase "specific quantities" of power at specific times and at "rates" established under the FERC tariffs. *MP&L*, 487 U.S. at 373-74; *accord ELI*, 539 U.S. at 47-50.

Accordingly, because federal law mandates that Entergy Mississippi incur the power costs that have been allocated to it under the FERC tariffs that govern the Entergy System, the Supreme Court has held that states must treat these FERC-mandated wholesale costs as lawful and allow them to be flowed through to retail ratepayers – unless and until the costs are found unreasonable or discriminatory by FERC. If a state believes that the costs allocated by a FERC tariff are excessive or discriminatory, its exclusive remedy is a complaint before FERC. *MP&L*, 487 U.S. at 371-73; *ELI*, 539 U.S. at 47-50.

Because FERC has exclusive jurisdiction over these issues, Hood's claims that Entergy Services acted "illegally" in allocating power supplies and costs to Mississippi must be dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). To the extent Hood claims that Entergy Mississippi violated state law by "accepting" ESI's power and cost allocations and flowing through the resulting cost to ratepayers, these claims violate federal law and must be dismissed under Rule 12(c). The Complaint should now be dismissed in its entirety.

Foremost, the primary allegation of the Complaint is that the Defendants made Mississippi a "dumping ground" for high-cost electricity because they allegedly allocated Entergy Mississippi high-cost electricity generated by Entergy companies, rather than purchasing cheaper power from third parties. Compl. ¶¶ 1, 41, 43-44, 46, 53, 65-67, 84-85, 90. But the Federal Power Act gives FERC exclusive jurisdiction to assure that power and cost allocations among the Operating Companies in the Entergy System are just, reasonable, and not unduly discriminatory. Indeed, FERC has long exercised its jurisdiction to assure not only that the wholesale rates that Entergy companies charge one another are reasonable, but also that Entergy Mississippi and the other Entergy Operating Companies have roughly *equal* power costs. In this regard, Hood's allegations are variations on claims that have been considered and rejected by

FERC or that are now pending before FERC – in proceedings in which the Mississippi Attorney

General and/or the Mississippi Public Service Commission ("MPSC") have been parties.  Thus,

Hood is collaterally attacking FERC's prior determinations as well as its exclusive jurisdiction.

Hood also alleges that it has been illegal for Entergy Mississippi to use its "fuel

adjustment" clauses to pass through to its retail ratepayers all the power expenses that Entergy

Mississippi was required to incur under the FERC tariffs.  In particular, Hood correctly states

that "SO2 emission" costs were one component of the wholesale rates that Entergy Mississippi

was required to pay to other Operating Companies under the FERC tariffs.  Hood contends that

the portion of these wholesale rates  that are attributable to SO2 emission costs should have been

excluded from the fuel adjustment clause and recovered through what are known as "base rates."

Compl. ¶¶ 59-63.  However, Mississippi statutes, regulations, and decisions have expressly

authorized Entergy Mississippi to use its fuel adjustment clauses to recover both all "purchased

energy" expenses and all SO2 emission costs.  Even if state law were otherwise, Entergy

Mississippi has a federal right to flow these amounts through to its retail customers.  *See ELI*,

539 U.S. at 49-50; *MP&L*, 487 U.S. at 373-74.  State law would thus be invalid if it prevented

Entergy Mississippi from recovering these purchased power expenses, including the SO2

emission cost component of them.

Finally, even if Hood were held to have made some allegations that do not violate federal

law, those claims would have to be dismissed on state law grounds.  Under settled law, the issues

that Hood raises would then be within the "exclusive original jurisdiction" of the Mississippi

Public Service Commission ("MPSC") under Miss. Code § 77-3-5.  It is preposterous for Hood

to suggest that a court could perform the legislative function of determining the rates Entergy

Mississippi "should" have charged in the past and awarding the equivalent of rate refunds.

## BACKGROUND

To place these issues in perspective, it is appropriate briefly to describe (1) the Entergy System and the FERC tariff that governs it, (2) the longstanding FERC policy of requiring that Entergy Mississippi and the other Entergy Operating Companies have power costs that are roughly equal, and (3) Hood's claims in this case and closely related prior proceedings. Because the United States Supreme Court has described the operation of the Entergy System in two previous opinions, appropriate citations will be provided to the *MP&L* and *ELI* decisions.

**1.    The Multi-State Entergy Electrical System.** Defendant Entergy Corporation is a holding company that owns six electric utilities that sell electricity to retail customers in four different states: (1) Defendant Entergy Mississippi, which serves portions of Mississippi; (2) Entergy Arkansas, Inc., which serves portions of Arkansas (and a few customers in Tennessee); (3) Entergy Louisiana, LLC, which serves portions of Louisiana; (4) Entergy Gulf States Louisiana, LLC, which serves other portions of Louisiana; (5) Entergy New Orleans, Inc., which serves the City of New Orleans, and (6) Entergy Texas, Inc., which serves portions of Texas. Compl. ¶¶ 11, 30 & n.5. These six companies are referred to as "Entergy Operating Companies" or "EOCs." The Entergy Operating Companies, Defendant Entergy Services,[1] and two of their affiliates (System Energy Resources, Inc., and Entergy Operations, Inc.)[2] are sometimes referred to collectively as the "Entergy System."[3]

---

[1]  Defendant Entergy Services is another wholly-owned subsidiary of Entergy Corporation. Entergy Services performs management, administrative, and other services for the Entergy Operating Companies and for the Entergy System. Compl. ¶¶ 12, 31.

[2]  System Energy Resources, Inc., a subsidiary of Entergy Corporation, owns 90 percent of the Grand Gulf Nuclear Station, and sells the electric power and energy from that 90 percent share to Entergy Arkansas, Entergy Mississippi, Entergy Louisiana, LLC, and Entergy New Orleans. Entergy Operations, Inc., is the Entergy subsidiary that operates Grand Gulf.

[3]  Entergy Corporation also owns subsidiaries that sell electricity only at wholesale and that do not have retail customers. Defendant Entergy Power is one such subsidiary. Compl. ¶ 13.

The six Entergy Operating Companies own and operate the local distribution facilities that are used to deliver electricity to homes and businesses located within their service areas. However, the arrangements under which the Entergy Operating Companies obtain the electricity that they sell to their customers over these local facilities are governed by the Entergy System Agreement (sometimes referred to as "ESA"), which is a "tariff filed with and approved by FERC" (Compl. ¶¶ 31-39) and which is reproduced in Exhibit A to this memorandum.

The parties to the Entergy System Agreement are Defendant Entergy Services, Defendant Entergy Mississippi, and the five other Entergy Operating Companies.  Compl. ¶ 30.[4]

The Entergy System Agreement – like the prior versions of the agreement, which first took effect in 1951 – provides for the operation of the electrical generating facilities (and transmission facilities) of the Entergy Operating Companies as a single integrated "power pool." *MP&L*, 487 U.S. at 357.  In particular, the Entergy System Agreement both provides for the centralized "planning, construction, and operation of the electrical generation, transmission and other facilities of the Companies" and provides a "basis for equalizing among the Companies any imbalance of costs associated with the construction, ownership, and operation of such facilities as are used for the mutual benefit of all the Companies."  ESA § 3.01.  The System Agreement rests on express determinations that coordinated planning and centralized operation of these facilities will achieve economies of scale and result in lower costs for the Entergy Operating Companies and their customers.  ESA §§ 3.02, 3.06-3.08.

---

Similarly, Entergy Corporation owns separate subsidiaries that own nuclear generating units in New England.  Compl. ¶ 94.

[4]  Defendant Entergy Power is not a party to the Entergy System Agreement.  However, the rates and terms under which Entergy Operating Companies obtain electricity from Entergy Power is governed by a separate FERC-approved tariff.  *See* p. 30, *infra*.

The System Agreement is administered by a System Operating Committee, which is composed of representatives of Entergy Corporation and each of the Entergy Operating Companies. ESA § 5.01. But under the System Agreement, certain critical functions are performed by Defendant Entergy Services, subject to the direction and control of the System Operating Committee. *E.g.*, ESA §§ 4.03, 4.08.

Under the System Agreement, the Operating Committee (or Entergy Services) makes centralized determinations of (1) whether and when Entergy Operating Companies will build electrical generating units or purchase electric generating capacity or energy from third parties, (2) which generating units will be used to meet the needs of System companies at each minute of each day, and (3) how the costs of this power will be allocated among the Entergy Operating Companies.

First, the System Operating Committee is charged with assuring that the Operating Companies have sufficient capacity to "furnish reliable service to customers at the lowest cost consistent with sound business practice." ESA § 4.01; *see also* Compl. ¶¶ 31, 34. Under this standard, the System Operating Committee decides whether and when Entergy Operating Companies should construct new generating units, whether and when units should be retired, and whether and when electric capacity or energy should be purchased from outside sources. *See* ESA §§ 4.01, 4.03. In this regard, the System Agreement requires the System Operating Committee to coordinate these purchases "from external sources as may be required or will result in savings to the Companies." ESA § 5.06(p). All these decisions must be made to achieve the lowest reasonable costs for the Entergy System as a whole consistent with the highest practicable reliability of service. ESA §§ 3.01, 6.02(a) & (d).

Second, in addition to requiring centralization of decisions of whether, when, and how to add to the Entergy System's generating capacity, the System Agreement provides for centralized determinations of how the Entergy Operating Companies are provided with the energy needed to meet the demand of their customers (called "load") during each second, minute, and hour of each day. These are collectively referred to as "dispatch" decisions. Under the System Agreement, Defendant Entergy Services makes these decisions through a centralized control center located in The Woodlands, Texas. Compl. ¶ 31; *see also* ESA §§ 4.08, 6.02; *MP&L*, 487 U.S. at 357. In particular, Entergy Services decides which of the "roughly 90 generating units" that are owned or operated by an Entergy Operating Company will run at each minute of each day. Compl. ¶¶ 31, 33. Entergy Services may also act "for the joint account of all the [Entergy] Operating Companies" and purchase electric energy from third parties instead of scheduling generation from facilities that are owned or operated by an Entergy Operating Company. ESA, § 4.03.

The System Agreement requires that dispatch decisions be made to achieve the "lowest reasonable cost of energy" for the System as a whole, consistent with a number of factors:

> The System Capability shall be operated as scheduled and/or controlled by the System Operator to obtain the lowest reasonable cost of energy to all the Companies consistent with the requirements of daily operating generation reserve, voltage control, electrical stability, loading of facilities and continuity of service to the customers of each Company.

ESA § 30.02. This is known as "economic dispatch." *See* ESA § 4.08.

Third, the System Agreement also equitably allocates the costs of producing electricity among the Entergy Operating Companies. *MP&L,* 487 U.S. at 357; *ELI,* 539 U.S. at 42-43; Compl. ¶ 39. These allocations are dictated by "Service Schedules" contained in the System Agreement and result in intra-system payments among the Operating Companies. ESA §§ 4.08, 4.12. Two of these Service Schedules will be discussed here.

The first is Service Schedule 1 of the System Agreement ("MSS-1"), ESA § 10.01, which the Supreme Court has colloquially referred to as providing for "capacity equalization payments."[5] *MP&L*, 487 U.S. at 360; *ELI*, 539 U.S. at 42. "Capacity" refers to capital, fixed, and related costs of the generating facilities that are owned by System Operating Companies or available to them under contracts with third parties. Capacity is measured in megawatts ("MW"). Under the System Agreement, each Entergy Operating Company normally owns, or has under contract, sufficient generating facilities to meet the needs of its customers, plus a reasonable reserve margin. ESA § 4.01. But there are inevitably disparities in the amounts of capacity that the different Operating Companies have relative to their loads. Under MSS-1, Entergy Operating Companies that have less than their share of System capacity ("short companies") make monthly payments to Companies having more than their share of System capacity ("long companies"). Capacity costs are not directly at issue in this case, but MSS-1 is the Service Schedule of the System Agreement that was at issue in *ELI*, 539 U.S. 39.

The Service Schedule that is at the heart of this case is Service Schedule MSS-3 ("MSS-3"). It governs exchanges of electric "energy" among the Operating Companies – which the Complaint refers as the "Entergy Exchange" or "ESX." Compl. ¶ 39; *see* ESA §§ 30.01-30.10. "Energy" is the actual quantity of electricity that is generated by operating a generating unit during a particular period of time and is measured in kilowatt hours ("kWh"). In addition to setting forth the standard that governs dispatch decisions (ESA § 30.02), MSS-3 allocates both the energy that is dispatched by Entergy Services from the various generating units on the System and the costs of fuel and other "variable" costs of operating each of these generating

---

[5]  Strictly speaking, MSS-1 provides for reserve capacity equalization payments.

units.  MSS-3 allocates the costs both of generating units that are owned or operated by Entergy Operating Companies and of energy purchased from third parties.

Under MSS-3, determinations are made hourly, on an after-the-fact basis, of the extent to which each Operating Company is providing energy for use by itself or other Entergy Operating Companies.  The lowest-cost energy that has been dispatched is allocated first to meet the needs of the particular Operating Company that owns the generating units or has contracted for its output.  § 30.03; *see* Compl. ¶ 37.  When an Entergy Operating Company has supplied electricity that is in excess of its load, it is entitled to be paid for that excess energy under the rate formula set forth in ESA § 30.08, which provides for recovery of fuel and other costs of operating the generating unit.  ESA §§ 30.08, 30.09, 30.10; *see also* Compl. ¶¶ 33-36.  Hood (inaccurately) refers to such a company as a "long" company.  *Id.*

Conversely, an Operating Company that has supplied less electricity than that required to serve its load is allocated the additional energy it needs from the Entergy Exchange, and is required to make payments for that energy at the wholesales rates prescribed by MSS-3 -- the weighted average cost of energy available through the Exchange in that hour.  ESA § 30.09.  Hood (inaccurately) refers to companies that receive energy from the Exchange as "short" companies.

MSS-1, MSS-3, and the other service schedules in the System Agreement do not contain fixed rates.  Rather, they contain formulas for calculating rates on the basis of the actual costs incurred and other data from the applicable period.  The service schedules are examples of "automatic adjustment clauses," which FERC is authorized to approve under Section 205(f) of the Federal Power Act.  16 U.S.C. § 824d(f).  For purposes of this case, the service schedules give economic effect to the centralized power supply and dispatch decisions that are made by the

Entergy System Operating Committee and by Entergy Services under the standards of the ESA. That is so because the Service Schedules establish rate formulas that prescribe how the resulting costs are to be calculated and then allocated among the Operating Companies. *See* Compl. ¶ 39; *ELI*, 539 U.S. at 42-43. FERC has specifically approved MSS-1, MSS-3, and the other service schedules contained in the Entergy System Agreement. *Middle South Servs. Inc.*, 30 FERC ¶ 63,030 at 65,131-32 (1985); *see ELI*, 539 U.S. at 49-50.

Under MSS-3 (and the other Service Schedules), Entergy Services makes monthly determinations of the obligations of each of the Operating Companies. Compl. ¶ 35; ESA §§ 4.12-4.14. Entergy Services does so by applying the formula rates contained in MSS-3 and the other Service Schedules to the usage and cost data that has been collected, and then renders an intra-System bill that requires some Entergy Operating Companies to make payments to other Operating Companies. *Id.* Under the System Agreement, an Operating Company is required to pay the charges that are properly assessed by Entergy Services in these intra-system bills. Compl. ¶ 35; see *ELI*, 539 U.S. at 49-50. As FERC stated when it approved the Service Schedules, state officials (and others) are to file a complaint before FERC if they believe a Service Schedule is unreasonable or discriminatory in its operation or that its provisions have been misinterpreted or misapplied. *Middle South Servs. Inc.*, 30 FERC ¶ 63,030 at 65,131-32 (1985); *ELI,* 539 U.S. at 48-50.

**2.    FERC's Policy Of Rough Production Cost Equalization Among Entergy Operating Companies.** In light of the allegation that Entergy Mississippi has been made a "dumping ground" for high cost power, it is noteworthy that FERC's regulation of the Entergy System has long attempted to assure that the overall "production costs" of the Entergy System (that is, the sum of capacity and energy costs) are equitably shared and that the average

productions costs of Entergy Mississippi and the other Operating Companies are roughly equal. Indeed, whenever FERC has determined that there could be undue disparities in production costs among the Entergy Operating Companies, it has required modifications to the System Agreement and related tariffs.

For example, in 1985, FERC found that the production costs of the non-nuclear units (*i.e.*, coal, oil and gas) in the Entergy System were roughly equal, but that there would be disparities in production costs when the Grand Gulf nuclear unit came online. *MP&L*, 487 U.S. at 358-59. To assure that the overall production costs of the Entergy Operating Companies continued to be roughly equalized, FERC ordered a radical reallocation of the costs and output of the Grand Gulf nuclear units under the applicable FERC tariff. *MP&L*, 487 U.S. at 360-64. That caused the increase in MP&L's allocated share of Grand Gulf energy, and the resulting increase in MP&L's power costs, that led to the litigation in *MP&L*. 487 U.S. at 360-69.

In the ensuing two decades, FERC did not find any substantial disparities among the production costs of the Entergy Operating Companies. But in 2005, FERC found that increases in certain fuel costs could potentially result in undue disparities in production costs among the Entergy Operating Companies. So FERC required a prospective modification of the System Agreement in order to maintain rough equalization of power costs among the different companies.[6] Under these new provisions of the System Agreement, annual determinations are made of the capacity and energy costs of each Entergy Operating Company, and if any of the

---

[6] *Louisiana Public Service Comm'n v. Entergy Services*, 111 FERC ¶ 61,311 (2005) & 113 FERC ¶ 61,282 (2005), *aff'd on this ground and vacated in part on other grounds*, 522 F.3d 378 (D.C. Cir. 2008). As a result of these FERC orders, FERC has conducted proceedings in which it makes determinations of the "prudence" of all the underlying power production costs of Entergy Mississippi and each other Entergy Operating Company. If FERC finds that any of these costs were imprudent, it excludes them from the bandwidth calculation that it applies to maintain rough production cost equalization. See *Louisiana Public Service Comm'n,* 111 FERC at ¶ 62,376.

System Operating Companies have power production costs more than 11% above or more than 11% below the System average production costs, payments are required to assure that each company has average production costs that fall within this range.  ESA §§ 30.09(d), 30.11-30.14.

In addition, over the past two decades, FERC has decided many complaints filed by state officials that have claimed that aspects of the System Agreement or its administration have resulted in unjust or discriminatory charges to ratepayers in one or more particular states.  In resolving these complaints, FERC has addressed and rejected claims that are identical or very similar to those raised in the Complaint.  *See infra.*

**3.     This Litigation And Related Proceedings.**  Before he filed the instant Complaint, the Attorney General had attempted to investigate the allegations that are now raised in the Complaint.  In August 2008, he served Defendants with Civil Investigative Demands ("CIDs") that demanded the production of literally truckloads of documents spanning over three decades.  Following receipt of these CIDs, Defendants filed an action in this Court that sought equitable relief on the ground that the CIDs were unreasonable searches that violated the Fourth Amendment because the matters that the Attorney General sought to investigate were in the exclusive jurisdiction of FERC or the Mississippi Public Service Commission.  Complaint, *Entergy Corporation, et al. v. Attorney General Jim Hood, et al.*, Civ. Action No. 3:08CV541 WBR-LRA (Dkt. No. 1, filed Aug. 28, 2008, S.D. Miss.).  This complaint was later amended to state both a claim of federal preemption by the Federal Power Act and invasion of the "exclusive original jurisdiction" of the MPSC.  *See id.*; First Amended Complaint (Dkt. No. 24, filed Oct. 29, 2008).

In his motion to dismiss that lawsuit and in a parallel state court action that he instituted, the Attorney General argued that the claims he is asserting here are not barred by the Federal

Power Act. He contended that FERC regulation is limited to the price of electricity sold at wholesale, that the FERC tariff gave EMI a choice whether to obtain electricity from affiliates or to purchase it from third parties, and that the Attorney General's claims would therefore fall within the "*Pike County* exception" to the rule of federal law.. *Id.*, Defendant's Motion to Dismiss, pp. 22-31 (Dkt. No. 14, filed Sept. 19, 2008); *citing Pike County Light and Power Co. v. Pennsylvania Public Utility Comm'n*, 465 A.2d 735, 738 (Pa. Cmwlth. 1983) ("*Pike County*").

On December 2, 2008, Hood withdrew his CIDs and filed this action in the Chancery Court of Hinds County, Mississippi. Hood purports to bring the suit "in his sovereign capacity, as representative of, and/or as *parens patriae* on behalf of, or for the benefit of, natural persons under state law," as "*parens patriae* on behalf of the State's general economy," and on behalf of state agencies and other consumers who purchase electricity from Entergy Mississippi. Compl. ¶ 9. This Complaint sets forth eight different state law causes of action, but all its claims rests on three allegations: (1) that the Entergy System imposed excessive costs on Mississippi by using expensive electricity generated by Entergy Companies to meet the needs of Mississippi, rather than cheaper electricity that was available from third parties (*see* Compl. ¶¶ 41, 44-46, 49, 52-56, 65-76, 84-90), (2) that Entergy Mississippi illegally recovered all costs of energy purchased from the Energy Exchange under MSS-3 (including amounts attributable to SO2 emissions costs) through its fuel adjustment clauses (Compl. ¶¶ 61-62) and (3) that Entergy Mississippi cross-subsidized an "unregulated" Entergy nuclear affiliate by issuing loans or loan guarantees to this subsidiary and by diverting tax benefits resulting from Hurricane Katrina to this subsidiary. (Compl. ¶¶ 91-103). The Complaint seeks to recover "many hundreds of millions of dollars" of overcharges on behalf of Entergy Mississippi's retail ratepayers. It further seeks penalties under various provisions of state law.

In recognition that these claims all relate to interstate wholesale sales of electricity in interstate commerce, the Complaint sets forth allegations that are designed to establish that the claims are not within FERC's exclusive jurisdiction. Compl. ¶¶ 38-39. The Complaint also sets forth allegations designed to take these claims outside the exclusive original jurisdiction that the MPSC has over all ratemaking matters that are not committed to FERC jurisdiction. *Id.* ¶ 8.

On December 29, 2008, Defendants removed this action to this Court and filed their Answer and Counterclaim. The Counterclaim seeks a declaration that the conduct that the Attorney General previously sought to investigate and has now challenged in the Complaint is within the exclusive jurisdiction of FERC or is authorized by federal law. Alternatively, the Counterclaim seeks a declaration that the challenged conduct is within the exclusive original jurisdiction of the MPSC to the extent any claims are not within FERC's exclusive jurisdiction.

## LEGAL STANDARD

This is a motion for a judgment on the pleadings. It requests that the Court grant Defendants judgment on their Counterclaim and that it dismiss Hood's Complaint without prejudice to Hood's right to assert its claims before FERC (or before the MPSC to the extent that some claims are held to be outside FERC's exclusive jurisdiction). This motion is based on both Rule 12(b)(1) and Rule 12(c).

A motion under Rule 12(c) is governed by the same standard that applies to motions to dismiss under Rule 12(b)(6). *See Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes v. The Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001). Because the Entergy System Agreement is "referred to in the Complaint and is central to [Hood's] claim," it is part of the pleadings. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d

496, 499 (5th Cir. 2000). In any event, a "tariff, required by law to be filed, is . . . the law" that governs the services of the regulated firms. *Carter v. American Telephone & Telegraph Co.*, 365 F.2d 486, 496 (5th Cir. 1966).  Judgment on the pleadings is appropriate when the state law claims asserted in the Complaint are preempted as a matter of federal law or are otherwise meritless as a matter of law.

Under Rule 12(b)(1), it is presumed that the court lacks jurisdiction, and the plaintiff bears the burden of establishing subject matter jurisdiction. *Kokonnen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  Accordingly, allegations asserting that this case is not within the exclusive jurisdiction of FERC or the MPSC cannot be merely accepted for purposes of a Rule 12(b)(1) motion.  Moreover, the Court is not limited to considering the allegations of the complaint and may consider extrinsic materials and evidence, including other relevant FERC tariffs and matters of public record, to determine whether a plaintiffs' claims are within the exclusive jurisdiction of FERC or the MPSC.  See *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1298 (5th Cir. 1985); see also *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

## ARGUMENT

### I.   FERC HAS EXCLUSIVE JURISDICTION OVER THE CLAIMS THAT ENTERGY MISSISSIPPI HAS INCURRED EXCESSIVE POWER COSTS.

The central allegation in the Complaint is that the Entergy System has forced Entergy Mississippi to obtain excessive amounts of expensive electricity for resale to its customers and has thereby made Mississippi a "dumping ground for high-cost electricity."  Hood is thus contending that a Mississippi tribunal should determine whether the power supply arrangements of the Entergy System were reasonable and whether excessive portions of the resulting costs were allocated to Entergy Mississippi.  But under the Federal Power Act, FERC has exclusive

jurisdiction over cost and power allocations among the Entergy Operating Companies. FERC alone may determine whether these costs and power allocations are unjust, unreasonable, discriminatory, or otherwise unlawful. FERC has aggressively exercised this jurisdiction to assure that the power costs of the Entergy System are reasonably and equitably allocated among the different Operating Companies. In this regard, FERC has either previously rejected or is now addressing claims that are identical or very similar to those that Hood sets forth in his Complaint.

> A.   **Under The Federal Power Act, FERC Has Exclusive Jurisdiction Over The Allocation Of Energy And The Costs Of Production Among The Operating Companies Of The Entergy System.**

Congress enacted the Federal Power Act because it concluded that "uncontrolled regulation by the states" of the "production and transmission of energy" would "patently interfere with broader national interests." *Arkansas Elec. Co-op. Corp.* v. *Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). It recognized that the business of generating, transmitting, and selling electricity at wholesale inherently affects customers in multiple states. Thus, Congress recognized that if each affected state were free to determine how the power supplies and their costs should be allocated, the reasonableness of power supply arrangements would be litigated in multiple state forums, and each state would act in its own parochial interests by seeking "to benefit[] its residents to the detriment of its neighbors." *Massachusetts Dep't of Pub. Utils.* v. *United States*, 729 F.2d 886, 888 (1st Cir. 1984) (Breyer, J.). The result would be "inconsistent obligations" and other burdens on interstate commerce that is vital to the nation. *Appeal of Sinclair Machine Products*, 498 A.2d 696, 704 (N.H. 1985). Indeed, even before the Federal Power Act was passed, the Supreme Court held that state regulation of interstate wholesale sales of electricity violated the Commerce Clause because each state otherwise would seek to "protect its respective local interests." *Public Utils. Comm'n* v. *Attleboro Steam & Elec. Co.*, 273 U.S. 83, 90 (1927).

In the Federal Power Act, Congress not only codified the Supreme Court's holding in *Attleboro*, but also categorically prohibited state tribunals or courts from regulating wholesale power sales and cost allocation either directly or indirectly. Instead, Congress established a neutral federal forum – FERC – to resolve these matters.

In particular, the Federal Power Act gives FERC exclusive jurisdiction over the "transmission" and "sale of [electric] energy at wholesale in interstate commerce." 16 U.S.C. § 824. To implement this exclusive jurisdiction, the Act requires each utility that engages in wholesale transactions to file with FERC rate schedules (*i.e.*, tariffs) that contain the utility's rates for wholesale sales of electricity. *Id.* § 824d(a). The Act further requires FERC to assure that the schedules, and the resulting charges, are just, reasonable, and nondiscriminatory. *Id.* § 824d(c). The Act recognizes that the allocations of wholesale power supplies under FERC tariffs will result in costs to retail utilities that must be recovered in retail rates that are regulated by state utility commissions (like the Mississippi Public Service Commission). *See generally Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 956 (1986). To assure that the interests of retail ratepayers are protected, the Act gives state utility commissions, state attorneys general, municipalities, and retail ratepayers the right to file complaints at FERC and to participate in FERC proceedings. 16 U.S.C. §§ 824d, 824e, 825e.

The Supreme Court has repeatedly held that FERC's jurisdiction is both exclusive and expansive. It has held that the Federal Power Act gives FERC "plenary" jurisdiction to regulate all aspects of wholesale transactions, regardless of their "impact" on state law, and thus draws a "bright line easily ascertained" that divides federal and state authority. *FPC v. Southern Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964). Similarly, it has held that FERC's jurisdiction is "exclusive" and that its exclusive jurisdiction "applies not only to rates but also to power

allocations that affect wholesale rates." *MP&L,* 487 U.S. at 371; *accord Nantahala,* 476 U.S. at 956; *see also MP&L,* 487 U.S. at 377 (Scalia, J., concurring) ("It is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over that subject."). The Supreme Court has similarly held that the Federal Power Act broadly preempts state law, holding, for example, that it preempts any state law that has the "effect" of interfering with FERC's interstate "allocation of costs." *Maryland v. Louisiana,* 451 U.S. 725, 749-50 (1981) (preempting state tax law on this ground).

But the doctrine that is most commonly applied to enforce FERC's exclusive jurisdiction is the "filed rate doctrine." Under this doctrine, a tariff that is filed with a federal agency and approved by it is the "equivalent of a federal regulation," *Cahnmann v. Sprint,* 133 F.3d 484, 488 (7th Cir. 1988), so a FERC tariff is the "law," *Carter v. AT&T,* 365 F.2d 486, 496 (5th Cir. 1966)). As the Supreme Court has held, the filed rate doctrine was developed to "enforce the exclusive jurisdiction vested by Congress in FERC," for this doctrine requires states to give effect to wholesale rates and power allocations contained in FERC tariffs unless and until FERC determines that the tariff is unjust, unreasonable, or unreasonably discriminatory and orders modifications to the tariff. *Nantahala,* 476 U.S. at 966. The filed rate doctrine thus requires that challenges to the effects of FERC tariffs be raised at FERC.

### B.   The Supreme Court Has Twice Rejected Hood's Current Claims In Cases Involving The Entergy System.

As noted above, FERC has exercised its jurisdiction under the Federal Power Act to ensure that the production costs incurred by the Entergy System are just and reasonable and that these costs are allocated in ways that roughly equalize production costs among Entergy Mississippi and the other Entergy Operating Companies. *See* pp. 7-13, *supra.* Thus, it should come as no surprise that the Supreme Court has twice applied principles of exclusive jurisdiction

19

and federal preemption to hold that claims against the Entergy System that are legally indistinguishable from those at issue here may only be litigated before FERC. Indeed, in *MP&L*, then-Mississippi Attorney General Michael Moore was a party to the case and made the same arguments about the purportedly limited scope of FERC jurisdiction that are now being pressed by current-Mississippi Attorney General Jim Hood.

**MP&L.** In *MP&L*, as here, the Mississippi Attorney General contended that the power supply decisions of the Entergy System were unreasonable and that excessive amounts of high cost electricity were being allocated to MP&L, which is the former name of Entergy Mississippi. In particular, the Mississippi Attorney General there complained that a FERC tariff allocated to MP&L 33% of the capacity and energy of the Grand Gulf nuclear unit, which the Mississippi Attorney General contended "'sold power that was not needed at a price that was not prudent.'" *MP&L*, 487 U.S. at 367-68. There, as here, the Mississippi Attorney General claimed that FERC's jurisdiction applied only to the price of Grand Gulf power and not to the specific quantities that were to be obtained by MP&L. *Compare id*, *with* Compl. ¶ 39. There, as here, the Mississippi Attorney General claimed that a state tribunal could find that it was imprudent for MP&L to accept this power rather than obtaining electricity from other lower cost sources. *MP&L*, 487 U.S. at 367-68. But the Supreme Court rejected those claims.

First, the Supreme Court held that FERC's exclusive jurisdiction "applies not only to rates but also to power allocations that affect wholesale rates." *MP&L*, 487 U.S. at 370-71. It further held that that the FERC tariff required MP&L to purchase specific quantities of power at the prices prescribed by the FERC tariff, that the Federal Power Act required that the resulting costs be passed through to retail ratepayers, and that the Mississippi Attorney General's various state law challenges were all barred by federal law. *Id*. at 371-75. For this reason, the Supreme

Court expressly rejected Mississippi Attorney General Moore's claim that the case fell within the so-called "*Pike County* exception" to FERC jurisdiction – which is the same claim that Attorney General Jim Hood now makes. *Id.* at 373-74 (holding that the *Pike County* exception that had been discussed in *Nantahala* was inapplicable because MP&L was required to incur the power costs allocated to it by the Entergy System Agreement); *Nantahala*, 476 U.S. at 972 (assuming existence of *Pike County* exception *arguendo* and holding that the exception cannot apply when the utility legally could not have obtained power from other sources).

Second, the Supreme Court also held that it was irrelevant that FERC's prior orders had not expressly rejected the precise claim of imprudence that the Mississippi Attorney General sought to litigate under state law. The Supreme Court held that the Federal Power Act preempts any state action that would have the effect of preventing the recovery of costs mandated by FERC tariffs, even if the state law challenge is based on grounds that have not been previously decided by FERC. *MP&L,* 487 U.S. at 375. It held that "[t]he reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission [FERC] or a court reviewing the Commission's Order." *Id.*

*ELI.* The Supreme Court expanded upon the holding of *MP&L* in a second case involving cost allocations within the Entergy System: *Entergy Louisiana Inc. v. Louisiana Public Service Commission,* 539 U.S. 39 (2003) ("*ELI*"). In that case, the Louisiana Public Service Commission had refused to allow Entergy Louisiana to recover in retail rates the amount of certain (reserve capacity equalization) payments that had been required by one of the Service Schedules of the Entergy System Agreement (MSS-1) and that had resulted from the inclusion of certain generating units (called ERS units) in that calculation of the Entergy System's generating

capacity.  Louisiana Supreme Court upheld this Order, relying on the *Pike County* exception to

exclusive FERC jurisdiction.  *Entergy Louisiana, Inc. v. Louisiana Public Service Commission,*

815 So. 2d 27, 36-38 (2002).  It concluded that the rule of *MP&L* applies only when the tariff

itself has "mandated" a specific cost allocation and not when a cost allocation is the result of

"discretionary" and other decisions made by the Entergy System Operating Committee pursuant

to the provisions of an "automatic adjustment" clause like Service Schedule MSS-1 of the

Entergy System Agreement.  *See ELI*, 539 U.S. at 49-50.

The Supreme Court unanimously reversed.  It held that the rule of *MP&L* and its many

precursors applies not only where "cost allocations were specific mandates" of tariffs but also

where the cost allocations result from decisions that are committed to the "discretion" of the

Operating Committee under the Service Schedules of the Entergy System Agreement.  *ELI*, 539

U.S. at 49-50.  The Court held that, in both events, the tariff requires that the Entergy Operating

Company incur the costs that have been allocated to it.  It held that, under the filed rate doctrine,

"[i]t matters not whether FERC has spoken to the precise classification but only whether the

FERC tariff dictates how and by whom that classification should be made."  *Id.* at 50.  The Court

further held that there was "no reason to create an exception to the filed rate doctrine for tariffs

of this type," for that "would substantially limit FERC's flexibility in approving" automatic

adjustment clauses and other forms of "cost allocation arrangements."  *Id.*

*ELI* thus ruled that, unless and until disapproved by FERC, the charges that  Entergy

Operating Companies incur under the Service Schedules of the System Agreement must be

treated as reasonable operating expenses by state tribunals, and that state tribunals cannot seek to

"trap" or otherwise prevent recovery of these costs on the ground that they are imprudent or were

otherwise incurred in violation of state law.  *ELI*, 539 U.S. at 49-51.  *ELI* thus establishes that if

a state official believes Entergy Services' discretionary purchase and dispatch decisions imposed excessive costs on Entergy Mississippi, his exclusive remedy is to file a Complaint at FERC. [7]

In *AEP Tex. North Co. v. Tex. Industrial Energy Consumers*, 473 F.3d 581, 585 (5th Cir. 2006), the Fifth Circuit expanded *ELI*'s holding, ruling that FERC has exclusive jurisdiction over any claim that requires interpretation of FERC tariffs.[8]  This decision is also relevant here, for many of Hood's claims depend on his "interpretations" of the Entergy System Agreement.

Against the background of the Supreme Court's decisions in *ELI* and *MP&L* and the Fifth Circuit's decision in *AEP Texas*, Hood's claims must be dismissed on the ground that they are in FERC's exclusive jurisdiction and that any state law claims are preempted by the Federal Power Act.

## II.     FERC HAS EXCLUSIVE JURISDICTION OVER ALLEGATIONS THAT THE ENTERGY SYSTEM UNLAWFULLY ALLOCATED HIGH-COST

---

[7]  Hood has relied on *Jenkins v. Entergy Corp.,* 187 S.W.3d 785 (Tex. App. 2006), where an intermediate Texas appeals court rejected federal law claims similar to those raised in this case on the basis of a purported "distinction" of *ELI*.  In particular, *Jenkins* concluded that *ELI* and *MP&L* establish that that FERC has exclusive jurisdiction over those charges that result from "discretionary decisions" under a FERC tariff only if they are the "type" that "do not impact or impair FERC's flexibility in approving cost-allocation arrangements" and that charges imposed under MSS-3 do not satisfy this purported test.  *Id.* at 805.  This is flatly wrong, and this state court's fundamental error illustrates why claims raising Federal Power Act issues belong in federal court.  *ELI* held that *all* charges imposed pursuant to congressionally authorized automatic adjustment clauses in tariffs should be treated the same as charges that are fixed by the tariff, for a different rule "would substantially limit FERC's flexibility in approving cost allocation arrangements." *ELI,* 539 U.S. at 49-50.  By its terms, this holding applies to both charges under MSS-1 and charges under MSS-3 of the Entergy System Agreement, for both are FERC-approved automatic adjustment clauses.

[8]  There, the Texas Public Utilities Commission had concluded that the American Electric Power System had allocated too little revenue to AEP Texas, in violation of the terms of its system-wide agreement.  *AEP Tex. North*, 473 F.3d. at 583.  The Court held that the state commission had no authority to make this determination.  It concluded that that "the entire [agreement], not simply the formula in question, is filed with FERC," and "the agreement authorizes only [AEP] to implement the formula." *Id.* at 585.  Thus, the Court hold held that state officials are required to give effect to AEP's application of the formula, and if they believe that AEP had misapplied the formula, their exclusive remedy is to file a complaint before FERC. *Id.* at 586.

**ELECTRICITY TO MISSISSIPPI, RATHER THAN LOW-COST ELECTRICITY THAT WAS ALLEGEDLY AVAILABLE FROM THIRD PARTIES.**

First, virtually all Hood's claims in this case rest on his allegation that the Entergy System unreasonably required Entergy Mississippi to use high cost electricity generated by itself or its affiliates, rather than purchase lower-cost electricity purportedly available from unaffiliated suppliers. This allegation rests on two subsidiary claims. First, Hood contends that Entergy Services acted "illegally" by (1) dispatching high-price electricity that was generated by plants owned by Entergy Power, Entergy Mississippi, or other Entergy Operating Companies, (2) refusing to purchase cheaper off-system electricity for resale to Entergy Mississippi, and (3) earning "an unregulated profit" by selling third parties the cheaper electricity that Entergy Services had in fact purchased outside the Entergy System. Second, Hood contends that Entergy Mississippi acted imprudently by "accepting" the electricity that it had been allocated, rather than itself independently purchasing the cheaper power that was allegedly available on the open market. These allegations are also the basis for Hood's claims that facts were misrepresented to the MPSC (Compl. ¶¶ 65-77) and that Entergy Mississippi had illegally recovered excessive purchased power expenses through fuel adjustment clause charges. Compl. ¶¶ 49, 50, 56-58.

These allegations all rest on a single erroneous claim under federal law: Hood's allegation that FERC has jurisdiction only over the "price" of electricity sold at wholesale and not over the "amounts" of electricity allocated to Entergy Mississippi from particular sources at particular "time[s]." Compl. ¶¶ 38-39. As noted above, that is the precise claim that the Supreme Court rejected in *MP&L* and *ELI*. In addition to depending on this single fundamental erroneous premise, Hoods' allegations also depend on an array of other erroneous claims under federal law. Further, these allegations are identical or substantially similar to claims that have

been raised in FERC proceedings involving the Mississippi Attorney General, the MPSC or both. FERC has either rejected these claims or is currently considering them.

**A.    FERC Has Exclusive Jurisdiction Over The Claims That Entergy Services' Purchase, Dispatch, And Accounting Decisions Were "Illegal."**

It is logical to begin with the claims that Entergy Services (sometimes "ESI ") acted "illegally" (1) in dispatching power from Entergy Power, Entergy Mississippi, and other System plants and in failing to purchase (or in selling-off) power produced by third parties and (2) in making the "accounting" decisions that allocated resulting costs to Entergy Mississippi.[9]  These are challenges to decisions that Entergy Services makes under the System Agreement, and this conduct of Entergy Service can only be challenged before FERC.

**1.    Allegations That Entergy Makes Insufficient Use Of Off-System Power.**

First, Hood's primary allegation is that Entergy Services has made insufficient use of power generated outside the Entergy System to meet the needs of Entergy Mississippi (and the other Operating Companies).  In his view, Entergy Services' historic practice has been to schedule too many generating units owned by Entergy companies, and Entergy Services should have instead bought greater quantities of the allegedly cheaper power that is alleged to have been available from third parties.  For this reason, Hood alleges that Entergy Mississippi had too much high-cost electricity allocated to it from the "Entergy exchange" (under Entergy Service

---

[9]  In particular, Hood alleges that Entergy Services imposed excessive costs on Entergy Mississippi because Entergy Services (1) failed to purchase and provide to Entergy Mississippi inexpensive electricity that was allegedly available from third parties and instead allocated Entergy Mississippi higher cost electricity generated by Entergy System Companies, Compl. ¶¶ 52-56, 104(c); (2) failed properly to account for these transactions, Compl.¶¶ 57-58; and (3) used its "manipulation" of the wholesale market, "its control over the output of EMI's generating units," and "its *de facto* prohibition of access by its customers to alternative energy sources" to produce "illegal and unrestricted profits for its (and EMI's) parent Entergy and transform[ ] Mississippi into a dumping ground for high-cost electricity," Compl. ¶ 53.

Schedule MSS-3) and that Entergy Services thereby caused Entergy Mississippi's costs to be higher than they should have been. Compl. ¶¶ 40-45. On these grounds, Hood alleges that Entergy Services' conduct was "illegal."

But the power and cost allocations that Hood is challenging were required by the Entergy System Agreement, and Hood's claims are within FERC's exclusive jurisdiction. Indeed, Hood's contentions are indistinguishable from those that the Supreme Court rejected in *ELI* and *MP&L* (and their many precursors).

The decisive fact is that the System Agreement provides that Entergy Services is to make "dispatch" decisions under the standards of the Entergy System Agreement. The System Agreement requires Entergy Services to acquire energy from third parties when doing so would meet the needs of the Entergy Operating Companies "at the lowest reasonable cost" consistent with reliability and subject to operating constraints. ESA, §30.02; *see also* §§ 3.01, 4.03. Entergy Services' decisions to dispatch energy from plants owned by Entergy Companies and not to make greater use of off-system power is thus a "discretionary" decision that Entergy Services is authorized to make under the System Agreement in accord with the standards of this tariff. Thus, as in *ELI*, the FERC tariff "dictates how" dispatch decisions are made (to achieve "the lowest reasonable cost" consistent with these factors ) and "by whom" (Entergy Services). As in *ELI*, the System Agreement required Entergy Mississippi to incur the costs that result from those discretionary decisions of Entergy Services. So as in *ELI,* the power supply decisions of Entergy Services cannot be challenged before state tribunals or federal courts under state or federal law. Rather, Hood's exclusive remedy is to bring these claims to FERC.

In fact, these very allegations have been raised in pending FERC proceedings to which the MPSC is a party. There, various parties have claimed that the Entergy System's power

supply decisions have been unreasonable because the Entergy System allegedly makes insufficient use of off-system power.  A FERC Administrative Law Judge has rejected these allegations, finding that the Entergy System "purchases power, including economy energy, from third parties instead of running its own facilities when it is economic to do so and is consistent with operational reliability requirements."  *Entergy Services, Inc.*, 124 FERC ¶ 63,026 (2008).  FERC is currently reviewing the findings of this FERC Administrative Law Judge.  This vividly confirms that these claims are in FERC's exclusive jurisdiction.

### 2.    Allegations That "Antiquated EMI Units" Should Not Have Been Run.

For the same reason, FERC also has exclusive jurisdiction over Hood's allegations that the Entergy System illegally decided to schedule "old and inefficient" EMI plants at "unreasonably high levels month after month," rather than purchasing power from other less expense sources.  Compl. ¶ 52.  Again, this is a claim that Entergy Service's "dispatch" decisions to schedule these plants to operate were unlawful and caused Entergy Mississippi to incur excessive power costs.  Again, this is a claim that FERC is now addressing.  As *MP&L, ELI*, and *AEP* hold, these claims are within FERC's exclusive jurisdiction.

### 3.    Alleged "Power For Profits Shell Game" and "Accounting Manipulations."

Next, Hood alleges that Entergy Services has engaged in "accounting manipulations." He alleges that when Entergy Services "purchases electricity from non-affiliates on the wholesale power market," it is "considerably less expensive than the cost of generating electricity" in plants of Entergy Mississippi and its affiliated Entergy Operating Companies. Compl. ¶ 54.  But rather than "provide this inexpensive power to EMI's customers," Entergy Services allegedly resells it to "non-affiliates for an unregulated profit." *Id.* ¶¶ 54-55.  Hood alleges that this unregulated profit arises because ESI engages in "accounting manipulations" in

which it "does not properly credit [Entergy Mississippi] with the resale even though the entire purchase price had been booked to its account when the initial purchase was made." *Id.*

These, too, are necessarily allegations that Entergy Services violated the System Agreement, and the claims would be preempted by federal law if they were based on state law. The Entergy Systems agreement prescribes what Entergy Services is to do when it sells energy outside the System: Entergy System is required to reimburse the Company that made the purchase for its costs and then credit any "profits" (the "net balance") to the accounts of the System Operating Companies. ESA §§ 50.01-50.03. It would have violated the System Agreement if Entergy Services had not credited to Entergy Mississippi and the Operating Companies with any profits from the alleged off-system purchases and sales. So here, too, the FERC tariff specifies who is to make these decisions (Entergy Services) and how they are to be made (by crediting Operating Companies with profits). Under *ELI* and its precursors, FERC has exclusive jurisdiction over these allegations, and Hood's remedy for these claimed illegalities is a complaint at FERC.

### 4.    Allegations Relating to EPI's Ritchie Generating Units.

FERC also has exclusive jurisdiction over Hood's allegations that Entergy Services illegally used the purportedly "unregulated" Ritchie 2 unit to meet the needs of Entergy Mississippi and other System Operating Companies and that the Entergy System caused an illegal "cross-subsidy" of an unregulated affiliate by doing so. Compl. ¶¶ 84-90. This claim, too, is an allegation that Entergy Services unreasonably dispatched high-cost power and thereby caused Entergy Mississippi to incur higher purchased power expenses than it should have. This claim is within FERC's exclusive jurisdiction under *ELI* and *MP&L.*

As the Complaint correctly states (¶¶ 86-90), Entergy Arkansas formerly owned both the Ritchie 2 gas generating unit and an interest in the ISES 2 coal generating unit. But Entergy

Arkansas (and the other Entergy Operating Companies) did not need this capacity, so Entergy Arkansas's interests in these units were transferred to Entergy Power in 1990. As the Complaint also correctly states, Entergy Power is not an Entergy Operating Company, and Entergy Power provides power exclusively to wholesale customers. Hood's allegation is that following Entergy Power's acquisition of the interests in these two units, Entergy Power sold "the inexpensive output of its coal fired ISES plant into the wholesale market at a profitable margin" while selling the "entire output of the [expensive] Ritchie unit back to EAI [Entergy Arkansas]." Because Entergy Arkansas did not need the energy, it allegedly then "transfer[red] the expensive Ritchie electricity into the [Entergy System Exchange]" where it was "purchased" by Entergy Mississippi," which passed these "excessive" costs onto its ratepayers in Mississippi. Compl. ¶¶ 88-89.

These allegations are squarely within FERC's exclusive jurisdiction, for they are challenges to dispatch decisions made by Entergy Services. Under the FERC tariffs, Entergy Services determines the power that is needed to meet the needs of Entergy Mississippi and the other Entergy Operating Companies at each minute of each day. To the extent that power from the Ritchie 2 unit was used to meet their needs, it would have been because Entergy Services dispatched this power and allocated it to the Exchange System Exchange under the standards of the applicable FERC tariffs. Under *ELI*, *MP&L*, and their many precursors, FERC has exclusive jurisdiction over the question whether any such dispatch and allocations decisions were unreasonable. Therefore, here, too, Hood's exclusive remedy is before FERC.

But Hood's Complaint appears to allege that different principles should apply to the Entergy Power unit because FERC purportedly "does not regulate the ***amount*** of electricity [Entergy Mississippi] purchased from EPI through the [Entergy System Exchange]." Compl. ¶

84. Specifically, Hood states that one way to describe his allegation is that Entergy Services "dispatched [Entergy Power's] units as though they were part of the Entergy System when, in fact, they were not, and the purchases of power from [Entergy Power] should have been treated as though they were from a third party (*i.e.*, at arms'-length) so that [Entergy Services] would have purchased EPI's power only if was the most economical power available." Compl. ¶ 85 n. 21.

This is not only an allegation that Entergy Services has violated a FERC tariff; it is also an allegation that FERC has specifically rejected – as the Mississippi Attorney General's Office knows very well.  Hood's current allegation ignores that, when the interests in the Ritchie 2 and ISES 2 units were transferred to Entergy Power, Entergy Power and Entergy Arkansas entered into a contract – called the Power Coordination, Interchange, and Transmission Service Agreement ("PCITA") — that provides that Entergy Arkansas is to operate these units and to purchase excess electricity from Entergy Power under particular terms and conditions.  The PCITA was filed with FERC and is a FERC-approved tariff.  And when FERC approved this tariff, it rejected the claims that Hood now makes.  It then specifically held that, under this tariff, Entergy Power's generating units are "generating units on the Entergy System." *Entergy Services, Inc.*, 51 FERC ¶ 61,376, at 62,286 (1990).  Contrary to Hood's current claims, FERC also then held that the FERC tariffs "unambiguous[ly]" require that energy from Entergy Power's generating units be dispatched as part of the Entergy System. *Id.*.[10]

---

[10] *Entergy Services, Inc.,* 51 FERC ¶ 61,376, at 62,286 (1990) ("Entergy Power's generating units, *like all of the generating units* on the Entergy system, will be dispatched on an economic dispatch basis . . .   when they represent the most economic resource available to meet the Entergy System's loads").  FERC's holding reflected the facts that the PCITA provides that Entergy Arkansas will operate these units and that the Entergy System Agreement provides that generating units that are operated by an Entergy Operating Company under a contract are dispatched by Entergy Services (ESA § 4.02).

In response to this decision, a previous Mississippi Attorney General then pursued other remedies before FERC by intervening in support of a complaint that the City Of New Orleans had filed at FERC. This complaint claimed that the PCITA tariff and the transfers of the interests in the ISES and Ritchie units to Entergy Power were unreasonable and discriminatory because the resulting power and cost allocations would unreasonably increase the costs of Entergy Mississippi and the other Operating Companies (other than Entergy Arkansas).. FERC rejected these claims.[11]

In short, Hood is here making claims that arise under FERC tariffs and that are identical or substantially similar to those FERC has previously considered and rejected. That vividly underscores that Hood's allegations that Entergy Services has dispatched excessive amounts of high-cost energy from Entergy Power's Ritchie 2 unit are within the exclusive jurisdiction of FERC.

### 5.   Allegations Relating To Entergy Louisiana's Evangeline Gas Contract.

Since the Complaint was filed, Hood has issued a series of press releases that identify another power supply decision of the Entergy System that allegedly has resulted in the imposition of inflated charges on Mississippi customers. *See* Exh. B. In particular, in these press releases, Hood refers to allegations that Entergy Mississippi was allocated electricity – through the Entergy exchange that had been produced by Entergy Louisiana using natural gas obtained under a contract (with a company named Evangeline) that allegedly contained excessive

---

[11] *City of New Orleans v. Entergy Corporation,* 65 FERC ¶ 61,333 (1993) (finding that the transfers of the units to Entergy Power and the tariff would result in net *reductions* in power costs for the Entergy Operating Companies and that the only way that a detriment could be found would be to make impermissibly speculative assumptions about capacity replacement costs that could be incurred by the Entergy System in 20 years or more).

prices. Hood is claiming either that this electricity should not have been allocated to the Entergy

Exchange or that excessive prices were paid by Entergy Mississippi for the "Evangeline" energy

that was allocated to it under MSS-3 of the Entergy System Agreement.

In either event, these claims are within the exclusive jurisdiction of FERC. First, any

allocation of the Evangeline energy to the Entergy System Exchange occurred pursuant to MSS-

3 of the Entergy System Agreement, and any challenge to Entergy Services' actions under MSS-

3 are within FERC's exclusive jurisdiction under *ELI* and *MP&L*. Second, because FERC has

exclusive jurisdiction over wholesale electricity rates, FERC alone may determine whether

Entergy Mississippi paid excessive rates for any Evangeline energy that was generated by

Entergy Louisiana and allocated to Entergy Mississippi through the Entergy System Exchange

under MSS-3.

Indeed, FERC is now addressing the questions whether Entergy Louisiana's Evangeline

gas contract is imprudent and whether costs of "Evangeline" energy produced by Entergy

Louisiana should have been allocated to Entergy Mississippi and other Entergy Operating

Companies in accordance with the provisions of MSS-3.[12] This confirms that FERC has

exclusive jurisdiction over Hood's Evangeline allegations.

### 6.    The Claimed Wholesale Overcharges.

Finally, the Federal Power Act also squarely preempts Hood's claim that the foregoing

conduct resulted in "many hundreds of millions of dollars" in overcharges to Entergy

Mississippi. To determine that overcharges occurred, the court would have to determine the

wholesale rates that Entergy Mississippi should have been charged and subtract this figure from

---

[12] *Entergy Services, Inc.*, Docket No. ER08-1056-000, Order Accepting And Suspending
Proposed Rates And Establishing Hearing And Settlement Judge Procedures, 124 FERC ¶
61,101 (July 29, 2008); Revised Preliminary Joint Statement of Issues, Issue Nos. 26 & 32,
FERC Docket No. ER08-1056-001, filed January 23, 2009.

the amounts that Entergy Mississippi was in fact charged.  But as the Supreme Court has repeatedly held, only ratemaking agencies may determine the rates that "should" have been charged, and the filed rate doctrine bars courts from making these determinations.  *Square D Co. v. Niagara Frontier*, 476 U.S. 409, 415-23 (1986); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577-80 (1981); *Keough v. Chicago & N.W. Ry.*, 240 U.S. 156, 161-64 (1922).

**B.    The Claims That Entergy Mississippi Violated State Law By "Accepting" ESI's Power Allocations Rest On Misinterpretations Of Federal Law.**

Hood does not merely allege that each of the foregoing dispatch, cost allocation, and accounting decisions of Entergy Services were illegal, but also claims that it was unlawful for Entergy Mississippi to "accept[ ]" these allocations of purportedly high cost-electricity, rather than itself independently purchase the cheaper power that allegedly was available from third parties.  Compl. ¶ 46.  This allegation rests on a patently erroneous interpretation of the Entergy System Agreement and is also the precise claim under the "*Pike County*" doctrine that the Supreme Court rejected in the *MP&L* and *ELI*.

These claims are based upon Hood's assertion that the FERC tariff allows Entergy Mississippi independently to purchase "cheap" electricity from third parties and to reject the "expensive" power that is allocated to it by Entergy Services pursuant to the System Agreement. Compl. ¶¶ 37, 39; *see also* Compl. ¶¶ 41, 44, 46, 55.  On this basis, Hood states that state tribunals are free to conclude that it was imprudent for Entergy Mississippi to "choose" to purchase power from the Entergy Exchange rather than electricity generated by third parties, stating that "[t]he courts and FERC itself have made plain that FERC does not regulate a purchasing electric utility's *choice* among various FERC-approved rates." Compl. ¶ 39 (emphasis added).

These are the very claims that the Supreme Court rejected in *MP&L* and *ELI*. Preliminarily, Hood's claims rest on a rather blatant misstatement of the provisions of Section 4.02 of the Entergy System Agreement. *See* Compl. ¶ 38. Section 4.02 does not state that "any EOC [Entergy Operating Company], acting individually or in combination with one or more other EOCs, may make a purchase of electricity from a non-affiliate for its/their 'own account.'" Compl. ¶ 38. To the contrary, it states that the "Operating Companies, *with the consent of or under the conditions specified by the [System] Operating Committee,*" may purchase electricity from outside sources. Thus, it is only with the approval and at the direction of the System Operating Committee that Entergy Mississippi or any other Entergy Operating Company can contract to purchase power from a third party, and the System Agreement requires that power supply decisions be made for the benefit of the System as a whole, not for those of EMI or other individual companies. ESA §§ 3.01, 3.09, 4.02-4.05. Thus, Entergy Mississippi has no right unilaterally to make power purchases from third parties.

In addition, the System Agreement otherwise requires Entergy Mississippi to "accept" the electricity that is allocated to it under the System Agreement. It requires Entergy Mississippi to pay the rate specified in MSS-3 for the quantities of electricity it receives from its affiliates through the Entergy Exchange and to pay the intra-system bill that it is presented each month. EMI has no "choice" in such matters. See *supra,* at 8-11.

These are the reasons that the Supreme Court has TWICE held that the so-called "*Pike County*" exception to exclusive FERC jurisdiction does not apply to power and cost allocations within the Entergy System. In *MP&L*, the Mississippi AG had tried to invoke this doctrine, contending that Entergy Mississippi (which was then called MP&L) could have declined to accept the Grand Gulf electricity that was allocated to it under the FERC tariffs and could have

34

instead used electricity obtained from other lower-cost sources.  The Supreme Court expressly

rejected this claim, relying on its rejection of an indistinguishable *Pike County* claim in its earlier

decision in *Nantahala*:

> [I]t might well be unreasonable for a utility to purchase
> unnecessary quantities of high-cost power, even at FERC-approved
> rates, if it had the legal right to refuse to buy that power.  But if the
> integrity of FERC regulation is to be preserved, it obviously cannot
> be unreasonable for MP&L to procure the particular quantity of
> high-priced Grand Gulf power that FERC has ordered it to pay for.
> Just as Nantahala had no legal right to obtain any more low-cost
> TVA power than the amount allocated by FERC, it is equally clear
> that MP&L may not pay for less Grand Gulf power than the
> amount allocated by FERC.

*MP&L*, 487 U.S. at 374; *see also Nantahala*, 476 U.S. at 972.[13]

In *ELI*, the Court again upheld FERC's exclusive jurisdiction over challenges to the

reasonableness of costs that are allocated to Entergy Operating Companies' pursuant to the

Entergy System Agreement.  The Louisiana Supreme Court had relied upon *Pike County* in

upholding the Louisiana Public Service Commission's refusal to permit recovery through retail

rates of certain payments that had been made by Entergy Louisiana to other Entergy companies

under the Service Schedules of the Entergy System Agreement.  *See Entergy Louisiana, Inc. v.*

*Louisiana Public Serv. Comm'n*, 815 So.2d 27, 36-38 (La. 2002).  The U.S. Supreme Court

---

[13]  The Fifth Circuit concisely summed up the relevant principles in yet another case reviewing
what is now called the Entergy System Agreement:  *New Orleans Public Service, Inc. v. Council*
*of City of New Orleans,* 911 F.2d 993 (5th Cir. 1990) (subsequent history omitted).  In that case,
the Fifth Circuit examined whether the New Orleans regulatory authority, "the Council," had
authority to review the prudence of system power purchases by the electric utility New Orleans
Public Service, Inc. ("NOPSI," now called Entergy New Orleans):

> The Council [ ] could not penalize NOPSI for buying an unreasonably high
> amount of Grand Gulf power, because FERC allocated the power NOPSI had to
> buy.  NOPSI had no legal right to take any less.  *Nantahala* established that the
> Pike Co. line of cases did not apply to facts like ours; *Mississippi Power and*
> *Light* established specifically that they do not apply to our facts.

reversed, holding that "the FERC tariff dictates how and by whom" classifications supporting

power purchases were to be made, that "the LPSC's second-guessing of the classification of ERS

units is pre-empted," and that "the LPSC's order impermissibly 'traps' costs allocated to an

Entergy Operating Company under a FERC-approved tariff.  539 U.S. at 49-50.  Because the

same FERC-approved System Agreement compelled the purchases made by Entergy Mississippi

under MSS-3, the *Pike County* exception is irrelevant here for the same reason that it was

irrelevant in *MP&L* and *ELI*.[14]

In addition, Hood argues that FERC exceeded its authority under the Federal

Power Act by approving tariffs that require Entergy Mississippi (and other System Operating

Companies) to purchase the quantities of higher-cost and lower-cost electricity allocated to them

by the Entergy System.  Specifically, he contends that the Federal Power Act gives FERC

jurisdiction only over the "rates" at which electricity is sold at wholesale and not over the

"quantity and timing" of power supplies that are allocated to the member companies in interstate

electrical systems like the Entergy System.  Compl. ¶¶ 38-39.

These federal law claims are also simply wrong.  The Supreme Court has

expressly held that , FERC's authority is not limited to "rates *per se*."  *Nantahala*, 476 U.S. at

---

[14]  For the same reason, the Mississippi AG is also wrong in relying on FERC's statements that
"wholesale ratemaking does not, *as a general matter*, determine whether a *purchaser* has
prudently chosen from among available supply options."  *Cent. Vt. Pub. Serv. Corp.*, 84 FERC ¶
61,194 at 61,975 (1998)).  These statements are inapplicable here for the same reasons that the
*Pike County* doctrine is inapplicable.  As the Supreme Court has held, FERC has exclusive
jurisdiction of rates, terms, and conditions under which sales *and* purchases of electricity are
made among the members of interstate power pools, and the Court specifically held that Entergy
Mississippi and its sister Entergy Operating Companies are each simultaneously acting both as a
"wholesaler-as-seller" and as a "wholesaler-as-buyer" of electricity when they exchange power
with one another.  *MP&L*, 487 U.S. at 372.  FERC exercises exclusive jurisdiction over claims
that it was imprudent for members of power pools to receive electricity at particular wholesale
rates as a "wholesaler-as-buyer."  *Id.*; *see also AEP Generating Co.*, 36 FERC ¶ 61,226 at
61,550-51 (1986); *MP&L*, 487 U.S. at 378 (Scalia, J., concurring).

966. It also applies to the "power allocations that affect wholesale rates" that are at issue in this

case. *MP&L*, 487 U.S. at 371. That is why the Supreme Court held, in *MP&L* and *ELI*, that

FERC has exclusive jurisdiction over claims (like those at issue here) that it was unlawful for

Entergy Mississippi and other Entergy Operating Companies to purchase the *quantities* of high-

cost (and low-cost) electricity that had been allocated to MP&L under FERC tariffs. *MP&L*, 487

U.S.. at 372-74; *ELI*, 539 U.S. at 49-50; *see also Nantahala*, 476 U.S. at 966. .

    **C.**    **Hood's Related Claims That Excessive Costs Were Recovered Through EMI's Fuel Adjustment Clauses And That Defendants Engaged In Deceptive Practices Are Likewise Barred By The Federal Power Act.**

    Hood also makes allegations that are premised on his claims that Entergy Mississippi was

unlawfully allocated "expensive" electricity generated by its affiliates, rather than cheaper power

that allegedly was available from third parties. These derivative claims, too, are preempted by

the Federal Power Act.

    First, Hood alleges that because its other allegations established that the power costs that

EMI incurred under the System Agreement were "excessive," it was unlawful for EMI to recover

these purchase power expenses through its fuel adjustment clause charges. Compl. ¶¶ 49-50, 56,

58. This claim fails as a matter of law because the challenged purchased power expenses are

mandated by FERC tariffs and have not been found unlawful by FERC. That establishes that the

expenses were "just and reasonable" as a matter of law and were required to be passed through to

retail ratepayers unless and until FERC finds the costs to be unreasonable. *ELI*, 539 U.S. at 47-

50; *MP&L*, 487 U.S. at 369-74.

    Second, for the same reason, allegations that Entergy Mississippi and Entergy Services

engaged in "deceptive practices" and made "false statements" that hid a "fraudulent scheme" are

preempted. Compl. ¶¶ 65-77. The alleged "false statements" were representations that the

Entergy System obtains power at the lowest reasonable cost consistent with operating constraints

and reliability – which is the requirement of the Entergy System Agreement.  To claim that these statements were false, Hood merely repeats his allegations that Entergy Services dispatched "excessively-priced electricity" of its affiliates, "instead of less expensive electricity available from non-affiliates in the wholesale power market." *Id.* ¶ 73.  Similarly these allegations are the basis for Hood's claims that Entergy System officials falsely stated to the MPSC that "fuel and purchased electricity included in EMI's fuel adjustment clause were the lowest reasonable cost, relative to third party supplies of electricity," and thereby prevented the MPSC from investigating the charges and disallowing the expenses.  *Id.* ¶ 67.  However, because the expenditures were required by FERC tariffs and had not been found unlawful by FERC, the MPSC was required to flow these expenses through to retail ratepayers and could not find them to be unreasonable or excessive.  *MP&L,* 487 U.S. at 369-74; *Nantahala,* 476 U.S. at 963-64.

**D.      The "Single Business Enterprise Claims" Are Likewise Preempted.**

Finally, Hood seeks to avoid FERC's exclusive jurisdiction by alleging that Entergy Corporation and its Operating Companies "are a single business enterprise" and that Entergy Mississippi and its affiliates are not separate companies capable of engaging in wholesale sales and exchanges of electricity with one another.  Compl. ¶ 83.  However, FERC has determined otherwise.  It has asserted jurisdiction over the wholesale transactions among the Entergy Operating Companies under the Entergy System Agreement, and FERC's jurisdiction has been upheld by the United States Supreme Court.  The Supreme Court has also squarely held that state officials cannot avoid FERC's jurisdiction by making "single enterprise" or like claims. *Nantahala,* 476 U.S. at 954, 963-71 (reversing order that treated Alcoa, Nantahala, and Tapoca as single enterprise on a "rolled in" basis and that had attempted to impose a different cost allocation than FERC ordered).

III.   **THE CLAIMS THAT ENTERGY MISSISSIPPI ILLEGALLY USED ITS FUEL ADJUSTMENT CLAUSE TO RECOVER SO2 EMISSION COSTS ARE FRIVOLOUS UNDER STATE LAW AND PREEMPTED BY FEDERAL LAW.**

Hood's second basic allegation is that Entergy Mississippi has illegally used its "fuel adjustment clause" to recover from retail ratepayers all the purchased energy expenses that Entergy Mississippi has incurred under MSS-3 of the System Agreement. Hood contends that a portion of these costs – those attributable to "cost of emission credits and allowances" that are "known as SO2 allowances" – are "non-fuel costs" that should have instead been recovered through "base rates." Compl. ¶¶ 59-63.

As the Complaint correctly states, base rates are designed to recover costs that are estimated in advance and often end up recovering either more or less than a utility's actual costs. By contrast, fuel adjustment clauses recover the actual amounts of fuel and other costs that are in fact incurred.

Here, Hood's claim is that it was improper for Entergy Mississippi to use its fuel adjustment clause to recover the portion of the FERC mandated MSS-3 costs that can be attributed to SO2 emission costs. In making this allegation, Hood acknowledges that the wholesale rates that are prescribed by the System Agreement expressly provide that the seller of the energy is to be compensated for, among other things, the costs of SO2 allowances. ESA § 30.08(f); Compl. ¶¶ 61-62. But Hood contends that it somehow was unlawful for Entergy Mississippi to recover its entire purchased energy expense from its retail customers through its fuel adjustment clause, and that the portion of the MSS-3 charges attributable to SO2 allowance costs were "overcharges" that should now be refunded to retail customers. *Id.*

However, contrary to Hood's claim, the Mississippi statutes and the MPSC's rules and orders expressly allow what Entergy Mississippi has done. Further, it would violate federal law if Mississippi were now to attempt to change its rules retroactively and require Entergy

39

Mississippi to refund the SO2 costs that it has recovered through its fuel adjustment clause without providing for an alternative means of recovery of these costs.

First, Hood acknowledges that Miss. Code § 77-3-42 and MPSC Rule 17 allow "*purchased energy costs* to be included in EMI's FAC." Compl. ¶ 59 (emphasis added). This admission is necessary because the statute allows utilities to use fuel adjustment clauses to recover both "fuel" and "purchased energy" costs, *see* Miss Code, § 77-3-42(1)(b),[15] and MPSC Rule 17(A) allows "the cost of purchased energy" to be recovered through fuel adjustment clauses. But Hood ignores that the prices that Entergy Mississippi pays for energy purchased from other Operating Companies through the Entergy System Exchange under MSS-3 are "purchased energy costs," just as they would be "purchased energy costs" if Entergy Mississippi had purchased electricity from a gas, oil, or coal-fired plant of an independent power producer.

Second, Hood ignores that insofar as "fuel" costs are recovered through fuel adjustment clauses, the Mississippi statute and regulations do *not* limit the recovery to "'actual cost' of fuel." *Compare* Compl. ¶ 59. Rather, the statute allows fuel adjustment clauses to be used to recover not only the actual costs of fuel, but also the "direct costs associated with burning the

---

[15] *See* also § 77-3-42(1)(a) (fuel adjustment clause may recover "the cost of purchased energy"); § 77-3-42(2)(a) (public utilities staff shall annually audit utility's fuel adjustment clause to "verify fuel costs as might be consumed in generating plants and all purchased energy of such electric utilities"); § 77-3-42(2)(c)(ii) (public utilities staff audit shall include "a determination if *purchased energy* and associated costs are properly identified"); § 77-3-42(5) (Commission shall review audit reports and "all other relevant information relating to fuel purchases, fuel adjustment clauses or riders, and *purchased energy*"; Commission shall initiate a hearing if, upon review, it finds cause "to believe that inefficient or uneconomical procurement or use of fuel or *purchased energy* has resulted in unreasonable or unjust charges"; Commission shall order refund of costs or charges if, following a hearing, it "shall find that any charges for the purchase or procurement of fuel or *purchased energy* were unreasonable or unjust"); § 77-3-42(5)(b) (in its review, Commission shall determine "whether or not the utility has engaged in practices in the acquisition of fuel or *purchased energy* which are efficient and economical"); § 77-3-42(5)(c) (in its review, Commission shall determine "whether or not there is reason to question the practices, contracts, operations or procedures of the utility in the purchase or acquisition of fuel or *purchased energy*") (emphases added).

fuel." Miss. Code § 77-3-42(1)(b); MPSC Rule 17A ("fuel cost may include direct costs associated with burning the fuel at the generating plant"). As the MPSC has held, SO2 emission costs are a direct cost associated with burning fuel because it is the *burning* of the fuel that *causes* the SO2 emissions. The MPSC so held in 1995 when Mississippi Power Co. (MPCo) notified the MPSC that it intended "to change the accounting treatment of recovering sulfur dioxide (SO2) emission allowances expenses ... to the recovery of such expenses *as direct costs associated with burning coal through the Company's Fuel Adjustment Clause ... .*" See Exh. C. The MPSC agreed, holding that "th[is] change in accounting treatment of recovering SO2 emission allowance expenses ... is just and reasonable." *Id.*

Third, in each year since § 77-3-42 was enacted, EMI and MPCo have had their fuel adjustment clauses audited annually by the Public Utilities Staff. *See* Miss. Code § 77-3-42(2)-(6). The MPSC is required to review the audit report and "all other relevant information" to determine "whether or not the utility is properly and correctly employing the use of the fuel adjustment clause or rider applicable to its operations and billing procedures." *Id.* If the audit report and other materials indicate that the utility has fairly stated its costs of fuel and purchased energy, the MPSC is required to certify the audit report to the Mississippi legislature, but if there is reason to believe that the utility has not done so, the MPSC is required to institute proceedings to investigate further. § 77-3-42(7).[16] In the report covering each 12 month period through September 2007, the MPSC has adopted the Staff's audit reports as the MPSC's "full and complete report to the Mississippi Legislature," and thus certified that "the information

---

[16] By contrast to the MPSC's statutorily mandated annual review of a utility's fuel adjustment clause recoveries, the MPSC is not required to review changes to a utility's base rate that are not "major." *See* Miss. Code § 77-3-39(1); *see also* § 77-3-37(8) (defining "major"). Non-"major" changes to the utility's base rates go into effect automatically after 30 days, unless the MPSC chooses to hold a hearing to review the change. *See id.*; § 77-3-42(1).

contained herein is true and correct" and that EMI "is properly and correctly employing the use

of the fuel adjustment clause or rider applicable to its operations and billing procedures." While

the MPSC is now conducting proceedings relating to the period ending September 2008, no one

has questioned the use of fuel adjustment clauses to recover SO2 emission costs.

Finally, even if Hood could demonstrate that the MPSC Rules and Orders violate the

governing Mississippi statute, the Federal Constitution would bar Hood's claims. The purchased

energy expenses that Entergy Mississippi has incurred under MSS-3 are mandated by a FERC

tariff, and Entergy Mississippi has a federal constitutional right to "pass through" these expenses

to retail ratepayers. *Nantahala,* 476 U.S. at 970; *see also MP&L*, 487 U.S. at 369-74; *ELI*, 539

U.S. at 47-50. Entergy Mississippi has relied in the past, and continues to rely, on Mississippi's

express statutory and regulatory authorization of the inclusion of these costs in a fuel adjustment

clause, and any attempt by Mississippi to prevent recovery of these costs would be blatantly

unconstitutional. It would "trap" FERC-mandated costs in violation of *MP&L, ELI,* and

*Nantahala*. It would be an unconstitutional retroactive change in the law. *See Landgraf v. USI*

*Film Prods.*, 511 U.S. 244, 270 (1994). And it would deny EMI its federal due process right to

recover reasonable operating expenses. *See Duquesne Light Co. v. Pennsylvania PUC*, 488 U.S.

299, 307-08 (1989). In short, even if state law did not expressly authorize the recovery of these

costs through fuel adjustment clauses – as it does – Mississippi could not now require the refund

of SO2 emission costs recovered through fuel adjustment clause unless it simultaneously

provided an alternative mechanism that guarantees recovery of these federally-mandated costs.

## IV.   THE CLAIMS THAT EMI HAS CROSS-SUBSIDIZED AN ENTERGY NEW ENGLAND NUCLEAR SUBSIDIARY REST ON MISSTATEMENTS OF HISTORICAL FACTS.

Hood has also advanced incidental allegations that Defendants have cross-subsidized the

operations of a putative Entergy New England nuclear subsidiary through two different acts.

The first was purportedly having Entergy Mississippi provide loans, guarantees, and other forms of financial assistance to this subsidiary. *See* Compl. ¶¶ 91-99.  The second was diverting Entergy Mississippi's tax benefits arising from Hurricane Katrina (under the Gulf Opportunity Zone Act of 2005) to this nuclear subsidiary. *See* Compl. ¶¶100-05.

These allegations obviously relate to actual or alleged transactions in interstate commerce.  But there is no reason to address any federal law issues that are raised by these contentions, for they rest on allegations of historical fact that are flatly false.

First, Hood is simply wrong in alleging that Entergy Mississippi has provided unregulated Entergy nuclear subsidiaries with "sizeable loans, guarantees, and other financial assistance" or other forms of "financial backing."  As explained in the attached declaration of Steven McNeal, Treasurer of Entergy Mississippi, it has not lent money to, guaranteed loans of, or extended financial assistance to unregulated nuclear affiliates.  Exh. D.  In addition, Section 204 of the Federal Power Act prohibits any such conduct in the absence of express prior approval from FERC.  16 U.S.C. § 824(c).

Second, no tax benefits that resulted from Hurricane Katrina were "diverted" from Entergy Mississippi to a New England nuclear subsidiary or to any other Entergy subsidiary.  As explained in the attached declaration of Rory L. Roberts, Director, Income Tax, Entergy Services, Entergy Mississippi incurred losses of $182,352,224 from Hurricane Katrina, which could be used to offset income that would otherwise have been taxed at a rate of 35% (*see* 26 U.S.C. § 11) and which thus could have produced a future tax benefit of $63.8 million for Entergy Mississippi (35% of its Katrina loss) if it had filed an individual tax return.  Exh. E,. ¶ 7. Pursuant to the tax allocation agreement that governs Entergy Corporation and its affiliates, Entergy Mississippi was paid the full amount of this tax benefit – $63.8 million in cash – *in*

*advance* of the time that Entergy Mississippi could have made use of this tax benefit if it had

filed an individual federal income tax return. *Id.* ¶ 8. There was no "diversion" of Hurricane

Katrina tax benefits from Entergy Mississippi to any other Entergy subsidiary. To the extent that

Entergy's New England nuclear subsidiaries were paid income tax refunds, that was due to

losses that they had incurred and to the tax benefits that they would have enjoyed had they filed

individual federal income tax returns. *Id.* ¶¶ 9-10.

Because Defendants' motion to dismiss this set of allegations relies, in part, on evidence

that is not a matter of public record, Defendants will not object if this one aspect of their 12(b)(1)

and 12(b)(6) motions is treated as motions for summary judgment. But however these

allegations are treated, they should be dismissed.

## V.    ANY CLAIM THAT IS NOT SUBJECT TO FERC'S EXCLUSIVE JURISDICTION IS WITHIN THE EXCLUSIVE JURISDICTION OF THE MPSC.

Finally, to the extent that any of the claims raised in the Complaint are held to be outside

FERC's exclusive jurisdiction and not to violate federal law, the claims are within the "exclusive

original jurisdiction" of the MPSC over the "intrastate business and property of public utilities."

Miss. Code § 77-3-5. As the Mississippi Supreme Court has held, "only the Mississippi Public

Service Commission may initially decide a matter relating to the regulation of intrastate public

utility activity." *Singing River Mall Co. v. Mark Fields, Inc.*, 599 So.2d 938, 942 (Miss. 1992).

### A.    The MPSC's Exclusive Original Jurisdiction Encompasses All Challenges To The Rates, Terms, And Conditions Of Entergy Mississippi's Retail Electric Service That Are Not Within FERC's Exclusive Jurisdiction.

To the extent that Hood's claims in this case are not within FERC's exclusive

jurisdiction, they necessarily are within the MPSC's "exclusive original jurisdiction over the

intrastate business and property of utilities." Entergy Mississippi's "intrastate business" is the

sale of electricity to retail ratepayers. In the absence of federal law restrictions, the MPSC would

have plenary authority to regulate any and all aspects of this business, including the authority to determine whether the expenses that Entergy Mississippi incurs in obtaining electricity from its affiliates are just and reasonable and excluding from retail rates or refunding costs that are found unreasonable. But because FERC has exclusive jurisdiction over wholesale sales and transmissions in interstate commerce, the MPSC is required to treat costs mandated by FERC rates schedules as just and reasonable and to allow these costs to be passed through to retail ratepayers.

But whatever the precise scope of FERC's authority, the MPSC's exclusive jurisdiction over Entergy Mississippi's retail electricity business begins *wherever* FERC's exclusive jurisdiction ends. Subject only to FERC jurisdiction, the MPSC has exclusive original jurisdiction to determine (1) if the rates that EMI has charged are excessive and the amount of any refunds that should be ordered; (2) if amounts included in fuel adjustment clause are appropriate; (3) if misrepresentations have been made to the MPSC in its proceedings or to retail customers in the bills that have been issued and what remedies are proper if there have been; and (4) if Entergy Mississippi has engaged in transactions with affiliates that have inflated its operating costs or its costs of capital. Because those are the sole matters addressed by the Complaint at issue here, the MPSC necessarily has exclusive original jurisdiction over any aspect of this litigation that is not committed to FERC's jurisdiction.

**B.    Hood's Complaint Consists Entirely Of Ratemaking Claims And Related Claims That Are Committed To The MPSC's Exclusive Original Jurisdiction.**

With this Complaint, Hood is urging that a Mississippi court should determine the rates that Entergy Mississippi should have charged in the past and to award damages to the extent Entergy Mississippi's actual rates were higher than those that "should have" been charged. In

particular, the Complaint consists almost exclusively of allegations that ratepayers have been "overcharged" in the past.[17]

Hood tries to conceal this fact by alleging that "[t]his is not a regulatory case, but rather a fraud and deceptive practices case for restitution, unjust enrichment, civil penalties, and damages to which Mississippians are entitled but the MPSC has no authority to order." Compl. ¶ 8. But no amount of obfuscation can alter the fact that his claims require ratemaking determinations by a Mississippi court. A court cannot find "unjust enrichment" or "fraud and deception" and cannot award civil penalties unless it determines the rates that Entergy Mississippi should have charged and finds that its actual rates were higher than the rates that should have been charged. And an award of "restitution" would be the difference between the rates that Entergy Mississippi has charged and those that the court finds that Entergy Mississippi should have charged.

Mississippi law could not be clearer in providing that these ratemaking issues are in the exclusive original jurisdiction of the MPSC, and courts cannot determine the retail rates that should have been charged. The Mississippi public utility statutes state that it is the obligation of utilities to "provide just and reasonable rates and charges for public utility services without unjust discrimination," and to achieve that end, state law vests in the MPSC the authority "to regulate public utilities." *See* Miss. Code § 77-3-2(1)(d), (2). The MPSC has authority to find that any existing rates or practices are "unjust, unreasonable … or in violation of any provision of law." Miss. Code § 77-3-41 (emphasis added). Indeed, the statute defines "rate" to include

---

[17] *See, e.g.*, Compl. ¶¶ 6 (EMI sells "overpriced electricity … to its captive retail customers"), ¶ 44 ("EMI routinely passes on the inflated costs of its affiliates' electricity to its captive customers (i.e., Mississippi consumers)"); ¶ 46 (EMI "passes the cost of this expensive electricity on to its customers through its FAC charges"), ¶ 112 ("Defendants have charged its [sic] customers excessive prices"); ¶ 114 (defendants' revenues reflect "ill-gotten gains"); ¶ 116 (defendants' revenues have been "usurped from Mississippi residents and the State of Mississippi").

not only the compensation or charge itself, but also the formula or method by which the compensation or charge is determined, and any rules, regulations, practices or contracts relating to such charge or compensation. *See* Miss. Code § 77-3-3(e).

Conversely, it is elementary that a court cannot make these ratemaking determinations. As the Mississippi Supreme Court has held, "[i]t is beyond question that the function of rate making in this state is purely legislative in character and a court is without power to fix rates charged by a public utility.  We firmly have established this rule in a number of cases." *Mississippi Pub. Serv. Comm'n v. South Cent. Bell Tel. Co.*, 464 So.2d 1133, 1135 (Miss. 1984). And the Commission is authorized "at any time, after notice, and after opportunity to be heard … [to] rescind or amend any order or decision made by it." Miss. Code § 77-3-61.  Moreover, Miss. Code § 77-3-35(1) states in part:

> No such public utility shall directly or indirectly, by any device whatsoever, or in anywise, charge, demand, collect or receive from any person or corporation for any service rendered or to be rendered by such public utility *a greater or less* compensation than that prescribed in the schedules of such public utility applicable thereto then filed in the manner provided in this section. . . .

(emphasis added).   The Commission has jurisdiction to enforce utility compliance with Miss. Code § 77-3-35(1).  *See* Miss. Code § 77-3-5 (vesting the Commission with "exclusive original jurisdiction" over the "intrastate business and property of public utilities").

Further, all Hood's allegations relate to fuel and purchased energy costs that were passed on to retail customers through fuel adjustment clauses, and the regulation of these clauses is squarely within the MPSC's exclusive original jurisdiction.  Indeed, the Mississippi code confers on the MPSC alone the authority and obligation "to cause a continuous monitoring by the public utilities staff and a complete audit, as necessary but not less than annually, of all fuel purchases … ." Miss. Code § 77-3-42(2)(a).  The MPSC has authority to "define allowable costs for inclusion in fuel adjustments" and to "establish guidelines for defining what elements

constitute a just and reasonable charge." Beyond that, the Code requires the Public Utilities Staff

to audit each public utility regularly, and to include in that audit "a determination if purchased

energy and associated costs are properly identified." § 77-3-42(2)(c)(ii). The MPSC must then

review the Staff's audit report "and all other relevant information relating to fuel purchases, fuel

adjustment clauses or riders, and purchased energy for the purpose of determining [ ] whether or

not the utility is properly and correctly employing the use of the fuel adjustment clause or rider

applicable to its operations and billing procedures." § 77-3-42(5). The Mississippi Code firmly

plants in the MPSC the sole authority to remedy any problem with the utility's fuel adjustment

clause:

> If the commission, after following the procedures described above,
> has reasonable cause to believe that inefficient or uneconomical
> procurement or use of fuel or purchased energy has resulted in
> unreasonable or unjust charges or costs to the consumers, then the
> commission shall initiate a procedure for hearing as provided for in
> Section 77-3-47 for the purpose of determining whether or not any
> of the costs or charges included in the fuel adjustment charges to
> the consumers were unreasonable or unjust. If the commission
> upon hearing shall find that any charges for the purchase or
> procurement of fuel or purchased energy were unreasonable or
> unjust, then the commission shall order that such costs or charges
> be refunded to the appropriate person or persons together with
> interest

§ 77-3-42(5). If there are no such problems, the MPSC must annually certify the results of the

audit to the state legislature. § 77-3-42(7).

Further, Hood's claims that Entergy Mississippi (and Entergy Services) made

"misrepresentations" to the MPSC all relate exclusively to the reasonableness of Entergy

Mississippi's rates. For the claimed misrepresentations consist of statements that the Entergy

System and Entergy Mississippi seek to obtain electricity "at the lowest reasonable cost" and that

their efforts "resulted in the most reasonable cost of electricity being provided to EMI's

Mississippi customers." Compl. ¶¶ 65-77. The allegation here is that Defendants made

misrepresentations that caused the MPSC to approve rates and charges that were higher than they should have been.

Similarly, the MPSC's exclusive original jurisdiction expressly extends to the billing and operating practices of utilities providing retail electric service in Mississippi. *See* Miss. Code § 77-3-33 ("The commission may ... ascertain and fix just and reasonable standards, regulations and practices of service which are to be furnished, imposed, observed and followed by all public utilities."); § 77-3-42(5) (MPSC shall monitor utility's billing procedures, "whether or not the utility has engaged in practices in the acquisition of fuel or purchased energy which are efficient and economical," and "whether or not there is reason to question the practices, contracts, operations or procedures of the utility in the purchase or acquisition of fuel or purchased energy relative to efficiency, economy and the public interest"). *See also* § 77-3-31 (MPSC may set the accounting practices of Mississippi public utilities).

In short, to the extent Hood's claims are held not to be within the exclusive jurisdiction of FERC, they are in the "exclusive original jurisdiction" of the MPSC.

## CONCLUSION

For the reasons stated, judgment should be granted for Defendants on their Counterclaim, and the Complaint should be dismissed, without prejudice to Hood's right to litigate these claims before FERC or before the MPSC to the extent that any claims are held to be outside FERC's exclusive jurisdiction.

Respectfully submitted,

ENTERGY MISSISSIPPI, INC., ENTERGY
CORPORATION, ENTERGY SERVICES,
INC. and ENTERGY POWER, INC.,
Defendants

By their attorneys,


/s/ James L. Robertson
JAMES L. ROBERTSON, MS Bar No. 5612
Post Office Box 651
Jackson, MS  39205-0651
Telephone: (601) 944-7735
Facsimile: (601) 968-5593
jlr@wisecarter.com


/s/ Michael B. Wallace
MICHAEL B. WALLACE, MS Bar No. 6904
Post Office Box 651
Jackson, MS  39205-0651
Telephone: (601) 968-5534
Facsimile: (601) 944-7738
mbw@wisecarter.com


/s/ David W. Carpenter
DAVID W. CARPENTER, IL Bar No. 3123098
One South Dearborn
Chicago, IL  60603
Telephone: (312) 853-7237
Facsimile: (312) 853-7036
dcarpenter@sidley.com

OF COUNSEL:

O. H. STOREY, III, AR Bar No. 69078
Deputy General Counsel
ENTERGY SERVICES, INC.
425 West Capitol Avenue, 27th Floor
Little Rock, AR  72201
Telephone:  (501) 377-5879
ostorey@entergy.com

JAMES W. SNIDER, JR., MS Bar No. 7671
Managing Counsel
ENTERGY MISSISSIPPI, INC.
Post Office Box 1640
Jackson, MS  39215-1640
Telephone: (601) 969-2658
jnsider@entergy.com

WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS  39205-0651
Telephone:  (601) 968-5500

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Telephone:  (312) 853-7237


Dated May 4, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on this day, May 4, 2009, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent such notification of such filing to the following:

Harold E. Pizzetta, Esq.
Special Assistant Attorney General
Chief, Civil Litigation Division
Office of the Attorney General
State of Mississippi
550 High Street, Suite 1100
Jackson, MS  39201
HPIZZ@ago.state.ms.us

Bridgette W. Wiggins, Esq.
Special Assistant Attorney General
Office of the Attorney General
State of Mississippi
550 High Street, Suite 1100
Jackson, MS  39201
BWILL@ago.state.ms.us

So certified, this 4th day of May, 2009.

/s/  Michael B. Wallace
MICHAEL B. WALLACE

CHI 4680630v.1