UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

THE STATE OF MISSISSIPPI, EX REL.
JIM HOOD, ATTORNEY GENERAL
FOR THE STATE OF MISSISSIPPI,

    Plaintiff,

V.

                                                      No. 3:08cv780-HTW-LRA

ENTERGY MISSISSIPPI, ET AL.

    Defendants.

### THE STATE OF MISSISSIPPI'S STATEMENT OF DISPUTED FACTS MATERIAL TO DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

Pursuant to this Court's Order [Doc. 77], dated December 8, 2015, the Attorney General, on behalf of the State of Mississippi, provides its Statement of Disputed Facts Material to Defendants' Motion for Judgment on the Pleadings [Doc. 19] and Amended Motion for Judgment on the Pleadings [Doc. 24] (collectively, Defendants' "Motion for Judgment on the Pleadings"). The Attorney General incorporates his Response to Motions for Judgment on the Pleadings herein [Doc. 56] and supplements that response with Statement of Disputed Facts Material to Defendants' Motion for Judgment on the Pleadings, and avers as follows:

**I. Statement Regarding the Court's Request for Stipulated, Undisputed Facts**

Attorney General Jim Hood asserts that Defendants' Motion for Judgment on the Pleadings should be decided based strictly upon the allegations in the Complaint [Docket No. 1-3], which must be taken as true. Nonetheless, and in order to comply with the Court's Order [Docket No. 77], Attorney General Jim Hood worked with Defendants to develop a set of stipulated, undisputed facts material to the motion. For the facts regarding which the parties

1

could not stipulate, the Attorney General provides the following Statement of Disputed Facts Material to the Motion for Judgment on the Pleadings:

1.   This action is brought by the Attorney General on behalf of the State of Mississippi in a statutory, equitable and/or common law capacity: (a) in his sovereign capacity, as representative of, and/or as *parens patriae* on behalf of, or for the benefit of, natural persons under state law; (b) as common law *parens patriae* in his sovereign capacity on behalf of the State's general economy; and (c) in his proprietary and/or sovereign capacity, which may include state departments, bureaus, agencies, political subdivisions, and other instrumentalities as purchasers of electricity from EMI.  The Attorney General possesses significant and relevant authority to bring such a case, including Miss. Code of 1972, §§ 7-5-1, 75-21-3(a), (b) and (c), 75-24-1, et seq., 77-1-43(2), and Miss. Const., Article 6, Section 173. [Complaint (Docket No. 1-3), at ¶¶ 9 and 17.]

2.   The Attorney General also possesses common law authority and numerous duties, paramount of which is his duty to protect the interest of the general public and the economy of the State.  [Complaint (Docket No. 1-3), at ¶¶ 9 and 17.]

3.   Pursuant to Miss. Code § 7-5-1 (1972), the Attorney General is the "chief legal officer and advisor for the state ... and is charged with managing all litigation on behalf of the state" and holds all such powers as prescribed to him by the Constitution, statutes and common law. [Complaint (Docket No. 1-3), at ¶ 17(a).]

4.   With respect to the Mississippi Public Service Commission ("MPSC"), the Attorney General is "authorized to institute any suits arising out of any act or order of the ... public service commission affecting the laws and revenues of the state."  Miss. Code § 7-5-51.  Section 77-1-43(2) specifically authorizes the Attorney General to institute "in any court of competent jurisdiction" an "action for violation of the law, or for the violation of any lawful rule, regulation or order of the commission."  [Complaint (Docket No. 1-3), at ¶ 17(b).]

5.   Pursuant to the Mississippi Consumer Protection Act ("MCPA"), Miss. Code §§ 75-24-1, et seq., the Attorney General is authorized to file suit to remedy "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Specifically, Miss. Code § 75-24-9 permits the Attorney General to bring an action in the name of the state against violators to enjoin the use of such prohibited acts, methods or practices.  The Attorney General may also seek a judgment of restitution under Miss. Code § 75-24-11. [Complaint (Docket No. 1-3), at ¶ 17(c).]

6.   EMI has a state-sanctioned monopoly in the provision of retail electricity to portions of Mississippi.  [Complaint (Docket No. 1-3), at ¶ 4.]

7.   EMI has included millions of dollars of non-fuel costs in its Fuel Adjustment Clause ("FAC"), which costs are ultimately paid by its retail customers in Mississippi.  [Complaint (Docket No. 1-3), at ¶ 63.]

8.  Under its regulatory compact with the State of Mississippi, EMI must act in the public interest and do all things reasonably necessary to provide the lowest reasonable cost for electricity to its customers, consistent with reliability. [Complaint (Docket No. 1-3), at ¶ 24.]

9.  EMI recently admitted under oath that the law requires it to provide Mississippi consumers with the least expensive, reliable electricity. [Complaint (Docket No. 1-3), at ¶ 3.]

10. EMI owns generating units (power plants) located in Mississippi that it uses to serve its retail customers' electricity needs. Each Entergy Operating Company ("EOC") shall normally own, or have available to it under contract, such generating capability and other facilities as are necessary to supply all of the requirements of its own customers. [Entergy System Agreement (Docket No. 21-2), at Sec. 4.01.]

11. The cost of the EMI power (either internally generated or purchased from affiliates) provided to Mississippians is substantially higher than power otherwise available to EMI from numerous third-party suppliers on the open market. [Complaint (Docket No. 1-3), at ¶ 4.]

12. After "stacking" the energy resources (from power plants or contracts) of each EOC from least to most expensive in each hour of the prior month for billing purposes, Entergy Services, Inc. ("ESI") allocates to the Entergy System exchange ("ESX") *only the most expensive resources* that are in excess of a "long" company's needs. Therefore, the ESX always consists of the most expensive resources not needed by the "long" EOCs, and the "short" EOCs are assigned the expensive energy from the ESX to meet their resource deficiencies. [Complaint (Docket No. 1-3), at ¶¶ 36 and 37.]

13. EMI was and is, on average, a "net purchaser," or "net taker," from the ESX, i.e., EMI typically is a short company and must purchase power from the ESX. [Complaint (Docket No. 1-3), at ¶ 40.]

14. Each month EMI receives an Intra-System Bill ("ISB") including charges for electricity it purchased from its affiliates through the ESX. These charges are significantly and consistently higher than prices for electricity available from non-affiliates. [Complaint (Docket No. 1-3), at ¶ 42.]

15. The Entergy System Agreement expressly provides that any EOC, acting individually or in combination with one or more other EOCs, may make a purchase of electricity from a non-affiliate for its/their "own account." Entergy System Agreement, Sec. 4.02. Despite the ability to do so, EMI decided not to pursue less expensive non-affiliate supplies of electricity, and, instead, merely accepted transfers of the expensive ESX electricity. [Complaint (Docket No. 1-3), at ¶ 38.]

16. On only two prior occasions did EMI enter into purchase power agreements with third parties in the market: a one-year agreement in 1998 with Tennessee Valley Authority and an 11-month agreement with Big Rivers Cooperative in 1983. [Exhibit G to Opposition to Motion for

Judgment on the Pleadings (Docket No. 56-13) and Exhibit H to Opposition to Motion for Judgment on the Pleadings (Docket No. 56-14), respectively.]

17.     EMI should have pursued purchases from non-affiliates for its own account, as expressly permitted by the Entergy System Agreement, instead of purchasing vast amounts of expensive power from its affiliates via the exchange, and, had it done so, those purchases would have been at FERC-approved rates as well. [Complaint (Docket No. 1-3), at ¶ 39.]

18.     The Federal Energy Regulatory Commission ("FERC") has ruled that it does not regulate a purchasing utility's choice among various FERC-approved rates. [Complaint (Docket No. 1-3), at ¶ 39.]

19.     Because ESX electricity was and is, by design, the most expensive electricity that is not needed by the long EOCs, EMI could and should have pursued power purchases from non-affiliates on its own account to offset the higher cost of ESX power. Despite the ability to do so, EMI chose not to pursue these less expensive alternative sources of electricity. [Complaint (Docket No. 1-3), at ¶ 39.]

20.     ESI controls the dispatch (output) of all of the power plants owned by the EOCs, including EMI. ESI does not consider the non-fuel, variable operating and maintenance ("VO&M") costs involved in producing power in deciding whether to run an EOC's unit or make a purchase from a non-affiliate in the wholesale market. When an EOC, such as EMI, is billed at the end of the month for power produced by its affiliates' power plants, however, ESI includes the VO&M charge. These activities favor the EOCs' power plants over those of non-affiliates' and result in higher energy costs for the EOCs', including EMI's, customers. [Kenneth Slater, Ph.D. Report (Docket No. 56-12), at pp. 7-8 and 9.]

21.     ESI also sets certain parameters for the dispatch of certain of the EOCs' power plants that may have "take-or-pay" fuel contracts, or fuel contracts that result in the plant having a "minimum burn" requirement, associated with them, such that the affected plants are run at higher levels than would otherwise be dictated by economics simply to meet the fuel contract requirements. This practice also results in higher energy costs for the EOCs', including EMI's, customers. [Kenneth Slater, Ph.D. Report (Docket No. 56-12), at pp. 8 and 9.]

22.     ESI personnel also have limited the amount of economical power purchases from non-affiliates that could have been made and transported into the Entergy System, resulting in excessive energy costs for the EOCs', including EMI's, customers. [Kenneth Slater, Ph.D. Report (Docket No. 56-12), at pp. 8 and 9.]

23.     EMI misrepresents to the MPSC that the charges for the electricity purchased from its affiliates and contained in the ISBs and other documents qualify as the lowest reasonable costs for electricity. [Complaint (Docket No. 1-3), at ¶ 43.]

24.     The cost of the ESX energy purchased by EMI from 1998-2009 (which cost was passed on to its Mississippi customers) exceeded market prices for third party power by $134 million. [David DeRamus, Ph.D. Affidavit (Docket No. 56-1), at ¶ 5.]

25.     Since approximately 1974, EMI has misused its FAC mechanism by flowing through to its Mississippi customers excessive fuel and purchased power expenses on an automatic dollar-for-dollar basis.  Pursuant to Miss. Code § 77-3-42(1)(a), no utility shall include in its FAC anything but the "actual cost" of the fuel burned in its generating units and the cost of purchased energy.  [Complaint (Docket No. 1-3), at ¶ 49.]

26.     EMI also uses the FAC to recover the costs of fuel associated with the electricity generated by some of EMI's power plants, which were built in the 1950's and 1960's and are less efficient than more modern power plants.  [Complaint (Docket No. 1-3), at ¶¶ 51 and 52.]

27.     Defendants run EMI's older power plants at high levels month after month and pass on to Mississippi customers the cost of this expensive electricity instead of replacing some of that electricity with less expensive electricity from third parties on the open wholesale market.  [Complaint (Docket No. 1-3), at ¶ 52.]

28.     The cost of energy generated by EMI's power plants from 1998 – 2009 (which cost was paid by its Mississippi customers) was $632 million higher than market prices for third party power.  [David DeRamus, Ph.D. Affidavit (Docket No. 56-1), at ¶ 5.]

29.     The sum of the cost by which the ESX energy purchased by EMI from 1998-2009 exceeded market prices for third party power ($134 million) and the cost by which the energy generated by EMI's older power plants from 1998-2009 exceeded market prices for third party power ($632 million) is $766 million in nominal terms and between $868 million and $1.1 billion on a present value basis as of September 2012.  [David DeRamus, Ph.D. Affidavit (Docket No. 56-1), at ¶ 5.]

30.     ESI purchases electricity from non-affiliates on the wholesale power market, some of which is considerably less expensive than the cost of generating electricity in EMI's plants.  Yet, rather than providing this inexpensive purchased power to EMI's customers, ESI instead resells it to other non-affiliates.  [Complaint (Docket No. 1-3), at ¶ 54.]

31.     When ESI conducts resales to non-affiliated purchasers in the wholesale power market, it does not credit and/or does not fully credit the relevant EOC's customers for the cost of that electricity so resold.  A "resale" by ESI refers to an ESI sale of electricity, which ESI had previously purchased from a non-affiliate, to a non-affiliated third party in the wholesale market.  Thus, ESI does not properly credit EMI's customers with the resale even though the entire original purchase price had been booked to their account when the initial purchase was made.  [Complaint (Docket No. 1-3), at ¶¶ 57 and 58.]

32.     Defendant Entergy Power, Inc. ("EPI") is a wholly-owned subsidiary of Entergy.  EPI operates electric generating plants in Arkansas and sells its electricity on the wholesale market. EPI has sold much of its power to Entergy Arkansas, Inc. ("EAI") which then provided that power to the Entergy System Exchange to be purchased by EMI.  [Complaint (Docket No. 1-3), at ¶ 13.]

33.     EPI owns a portion of the coal-fired Independence Steam Electric Station ("ISES"), Unit 2, and the natural gas-fired Ritchie Station ("Ritchie"). The electric energy produced by the ISES unit is less expensive, at most times, than that produced by the Ritchie unit, because coal is most often cheaper than natural gas as a generating fuel. [Complaint (Docket No. 1-3), at ¶¶ 86 and 87.]

34.     EPI began selling the *entire output* of the Ritchie unit back to EAI when EAI did not need it because EAI had too much generating capacity relative to its customers' needs. EAI would thus transfer the expensive Ritchie electricity into the ESX. Meanwhile, EPI continued to sell the inexpensive output of its coal-fired ISES plant into the wholesale market at a profitable margin. [Complaint (Docket No. 1-3), at ¶ 88.]

35.     EPI's more expensive Ritchie-generated electricity was transferred by EAI into the ESX and was taken (purchased) by EMI and charged to its retail customers, while EPI sold the less expensive ISES-generated power into the wholesale power market. [Complaint (Docket No. 1-3), at ¶ 89.]

36.     EMI has also included non-fuel costs in FAC charges passed through to its customers. Miss. Code § 77-3-42 and MPSC Rule 17 permit only the "actual cost" of fuel and purchased energy costs to be included in EMI's FAC and/or Rider ECR. Miss. Code § 77-3-42(1)(b) and (2)(a); MPSC Rules 17.101(1) and 17.102. [Complaint (Docket No. 1-3), at ¶ 59.]

37.     For example, EMI, through and with ESI, includes costs purportedly in connection with environmental compliance such as the purchase price of emissions credits or allowances, known as $SO_2$ allowances, in the charges for energy purchased from the ESX. These are flowed through in the FAC for payment by Mississippi customers. [Complaint (Docket No. 1-3), at ¶¶ 61 and 63.]

38.     During the relevant time period, EMI officers and directors were or are also officers and directors of the parent and other affiliates. [Complaint (Docket No. 1-3), at ¶¶ 5 and 80-81.]

39.     Mr. Theodore H. Bunting, Jr., Chief Accounting Officer for Entergy and EMI, testified in an MPSC FAC Proceeding that, "Entergy Mississippi makes no profit from fuel and purchased power costs collected under [Rider ECR], and although the System takes reasonable steps and commits a significant amount of time and manpower to prudently manage its fuel expenses, it has no direct control over this aspect of the customer bill."[1] [Complaint (Docket No. 1-3), at ¶ 70.]

40.     Likewise, Mr. Robert R. Cooper, employed by ESI, but testifying on behalf of EMI, stated in his sworn written testimony that the projected fuel and purchased power expenses for the third quarter of 2008, which are the subject of Docket No. 2008-AD-270, "are reasonable estimates of the costs needed for [EMI] to continue to meet its legal obligation to provide

---

[1] Direct Testimony of Theodore H. Bunting, Jr., MPSC Docket No. 2008-AD-270, July 7, 2008, at 3.

reasonably adequate electric service to its customers *at the lowest reasonable cost*."[2] [Complaint (Docket No. 1-3), at ¶ 72.]

41.     However, the projected fuel and purchased power expenses about which Mr. Cooper testified include charges associated with electricity to be purchased from EMI's affiliates through the ESX instead of less expensive electricity available from non-affiliates in the wholesale power market. Therefore, the costs and charges flowed through the FAC by EMI to its Mississippi customers for fuel and purchased power have not, as represented by Mr. Cooper, equated to the lowest reasonable cost for such fuel and purchased power. [Complaint (Docket No. 1-3), at ¶ 73.]

42.     EMI has loaned sums to a non-utility operating segment of Entergy, referred to as its "unregulated nuclear generating business," so that segment could compete in the wholesale power market in the northeast United States to produce unregulated profits for Entergy. [Complaint (Docket No. 1-3), at ¶ 92.]

43.     In late 2007 through the spring of 2008, Entergy formed a plan to spin off its unregulated nuclear plants to a new company, called Enexus Energy Corporation ("Enexus"). In the Registration Statement filed by Enexus with the SEC on May 12, 2008, Enexus revealed that it has (as Entergy's unregulated nuclear generating segment) received *approximately $1.2 billion in loans from "associated companies,"* which includes EMI. In addition, Enexus' SEC filing indicates that Entergy and/or its subsidiaries have signed "guarantees" for the performance of obligations of the unregulated nuclear generating segment's business operations *in the amount of $1.9 billion.* [Complaint (Docket No. 1-3), at ¶ 97.]

44.     Entergy received a *$344 million income tax refund* as a result of net operating loss carryback provisions contained in the GO Zone Act. The GO Zone Act, enacted in December 2005, allows a public utility incurring a net operating loss as a result of Hurricane Katrina to carry back the casualty loss portion of the net operating loss ten years to offset previously taxed income, and provides other benefits, including favorable depreciation on Hurricane Katrina capital expenditures. [Complaint (Docket No. 1-3), at ¶ 101.]

45.     Of the $344 million tax refund related to the net operating loss carryback to its EOCs, Entergy only allocated $273 million to the EOCs, including EMI, in April 2006, *with the remainder distributed primarily to Entergy's unregulated nuclear generating business*. Entergy stated in its SEC Form 10-K for 2007 that approximately $71 million was provided to the unregulated nuclear generating business, which sustained virtually, if not absolutely, no damage as a result of Hurricane Katrina, instead of EMI and the other Operating Companies, "[i]n accordance with Entergy's intercompany tax allocation agreement*,"* Entergy SEC Form 10-K, 2007, at 24. [Complaint (Docket No. 1-3), at ¶¶ 102 and 103.]

---

[2] Direct Testimony of Robert R. Cooper, MPSC Docket No. 2008-AD-270, July 7, 2008, at 3.  (emphasis added).

Respectfully submitted, this 19th day of January, 2016.

**RESPECTFULLY SUBMITTED,
STATE OF MISSISSIPPI, ex rel
JIM HOOD, ATTORNEY GENERAL**

**By:** JIM HOOD, ATTORNEY GENERAL
      STATE OF MISSISSIPPI

/s/ VINCENT F. KILBORN, III
**Vincent F. Kilborn, III, Esq. (MSB #103028)**
KILBORN, ROEBUCK & McDONALD
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747
**Attorney for Plaintiff**

**David A. McDonald, Esq. ( MSB #103027)**
KILBORN, ROEBUCK & McDONALD
Post Office Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Fax: (251) 434-0047

/s/ LUKE F. PIONTEK
**J. Kenton Parsons (La. Bar # 10377)
Luke F. Piontek (La. Bar # 19979)
Andre G. Bourgeois (La. Bar # 19298)
Shelley Ann McGlathery (La. Bar # 32585)**
*Pro Hac Vice*
**ROEDEL PARSONS KOCH BLACHE
BALHOFF & McCOLLISTER**
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

**Harold E. Pizzetta, III, MSB No. 99867
Assistant Attorney General**
Office of the Attorney General
P. O. Box 220
Jackson, Mississippi 39225-2947
Telephone: (601) 359-4230
Facsimile: (601) 359-4231
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Vincent F. Kilborn, III, Attorney for the State of Mississippi, do hereby certify that on January 19, 2016, I caused to be electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

James L. Robertson, Esq.
Michael B. Wallace, Esq.
Wise, Carter, Child & Caraway, PA
Post Office Box 651
Jackson, Mississippi 39205

James W. Snider, Jr., Esq.
Managing Counsel
Entergy Mississippi, Inc.
Post Office Box 1640
Jackson, Mississippi 39215-1640

David W. Carpenter, Esq.
Sidley, Austin, LLP - Chicago
One South Dearborn
Chicago, Illinois 60603

O. H. Storey, III, Esq.
Entergy Services, Inc. - Little Rock
425 West Capitol Avenue, 27th Floor
Little Rock, Arkansas 72201

This the 19th day of January, 2016.

                                        /s/ VINCENT F. KILBORN, III
                                        VINCENT F. KILBORN, III