# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| THE STATE OF MISSISSIPPI EX REL. JIM HOOD, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI, ) ) ) ) | |
| Plaintiff-Counterclaim Defendant, ) ) | |
| v. ) ) | No. 3:08-CV-780-CWR-LRA |
| ENTERGY MISSISSIPPI, INC., ENTERGY CORPORATION, ENTERGY SERVICES, INC., AND ENTERGY POWER, INC., ) ) ) ) ) | |
| Defendants-Counterclaim Plaintiffs. ) ) | |

## DEFENDANTS' MOTION TO STRIKE SUPPLEMENTAL EXPERT REPORTS OR, IN THE ALTERNATIVE, FOR LIMITED DISCOVERY

Defendants[1] respectfully submit this motion to strike portions of Plaintiff's supplemental expert reports for failing to comply with Federal Rule of Civil Procedure 26.

In the alternative, if the Court does not strike those portions, Defendants move the Court to allow limited deposition discovery of the experts on their supplemental expert reports.

On November 3, 2017, Plaintiff submitted direct expert reports from Neil Copeland, David DeRamus, Charles Griffey, and Spencer Yang. On March 5, 2018, Defendants submitted reports from their experts. On April 16, 2018, Plaintiff submitted additional reports from all four of its experts that were labelled "Rebuttal" reports. In fact, these reports are not exclusively rebuttal opinions as provided for in Rule 26(a)(2)(ii). Instead, they contain opinions that are either completely new in nature and/or could have been included in the initial expert disclosures/reports. For these reasons, they must be stricken in part.

---

[1] Entergy Mississippi, Inc.; Entergy Corporation; Entergy Services, Inc.; and Entergy Power, Inc.

In the alternative, should the Court determine that the supplemental reports appropriately contain opinions solely to contradict or rebut evidence Defendants presented subsequent to the initial reports, Defendants should be allowed limited discovery upon those rebuttal opinions so as to prevent any unfair prejudice to Defendants.

## ARGUMENT

### I. Plaintiff's "Rebuttal" Expert Reports Do Not Meet the Standard of Proper Supplemental Disclosures and Must Be Stricken.

Rule 26 of the Federal Rules of Civil Procedure requires parties to disclose a written report from a retained expert witness that contains "a complete statement of all opinions the witness will express and the basis and reasons for them; [and] the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). Those disclosures are to be made in the sequence ordered by the court and are to be supplemented in accordance with Rule 26(e). If expert evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party, it must be done, absent an extension, within 30 days of the other party's disclosure. If an expert desires to supplement his or her initial report based solely on newly produced evidence, he or she can do so under Rule 26(e).

Supplemental expert reports, however, cannot be used to "fix" problems in initial reports. *Cooper Tire & Rubber Co. v. Farese*, 2008 WL 5104745, at *4 (N.D. Miss. Nov. 26, 2008). With regard to whether a supplementation of an expert report is proper, courts examine whether the expert's alleged supplemental or rebuttal theories could have been offered in the initial disclosures. Supplemental expert testimony that is based on information that was available at the time of the initial disclosures should be rejected. *Buxton v. Lil' Drug Store Prods. Inc.*, 2007 WL 2254492, at *5 (S.D. Miss. Aug 1, 2007), *aff'd*, 294 F. Appx. 92 (5th Cir. 2008). As noted above, the only

way a supplementation or rebuttal is proper is if it solely addresses new evidence identified by another party since the expert's initial disclosure. Otherwise, it is improper.

"New" and/or "untimely" opinions may be excluded as a discovery sanction under Fed. R. Civ. P. 37, as a party is required to make its expert disclosures in a timely manner, in the sequence ordered by the court and pursuant to Rule 26(e), including any timely supplementation upon learning that a disclosure is in some material respect "incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Accident Ins. Co. v. Classic Bldg. Design, LLC*, No. 2:11CV33KS-MTP, 2012 WL 3913090, at *7 (S.D. Miss. Sept. 7, 2012), *aff'd sub nom. Accident Ins. Co. v. Classic Bldg. Design, L.L.C.*, 539 F. Appx. 465 (5th Cir. 2013).

A district court possesses broad, considerable discretion in discovery matters, and in determining whether to exclude expert witness testimony, a district court's discretion is guided by the following factors: "(1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness." *Bradley v. United States*, 866 F.2d 120, 125 (5th Cir. 1989); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996) (striking expert reports that failed to include both "a *complete* statement of *all* opinions to be expressed and the basis and reasons therefor" and "the data or other information relied upon in forming such opinions" is not an abuse of discretion (emphasis in original)).

In the case at bar, portions of several of the expert reports Plaintiff filed on April 16, 2018, although labeled as "Rebuttal," are instead simply attempts either to "fix" prior reports or completely to change their analysis based on information that was available to the experts prior to their initial disclosures. Specifically, portions of the "supplemental/rebuttal" reports filed by Dr.

3

DeRamus, Dr. Yang, and Mr. Copeland contain opinions that are not based on newly acquired evidence and instead are untimely reports that could have been part of the initial disclosures by those experts. Each will be addressed separately below.

## DERAMUS SUPPLEMENTAL REPORT

### A. Dr. DeRamus Impermissibly Expands the Damages Period in His Rebuttal Report.

Dr. DeRamus's "rebuttal" report both expanded the period of years that he considered for his damages model and modified his initial hourly damages model. Both of these "new" opinions could and should have been included in his initial expert report, as Dr. DeRamus himself admits, and therefore must be stricken from his "rebuttal" report.

In his initial report, Dr. DeRamus admitted that he evaluated Defendants' conduct from 1993 through 2013, but "ha[d] been asked" by Plaintiff's counsel to restrict his calculation of damages to the period from 1998-2008. Exhibit A ¶ 3 & n.1. He nonetheless stated that his damages analysis "could be expanded to include 2009-2013 as well." *Id.* In his "rebuttal" report, Dr. DeRamus did exactly that, expanding his damages calculation period to include the years 2009-2013, at the request of Plaintiff's counsel. Exhibit B at ¶ 6. Dr. DeRamus effectively admits that the extended damages period in his "rebuttal" report is not based on any new information that he was unable to include in his direct report; he simply chose not to do so at the request of Plaintiff's counsel. As such, Dr. DeRamus's expansion of his damages model to include data from the years 2009-2013 constitutes an untimely supplementation and should be stricken. If the Court denies the motion to strike the portion of Dr. DeRamus's "rebuttal" report that adds these additional damages years, Defendants reserve their right to seek to preclude Plaintiff at trial from attempting to prove damages as to those additional years.

4

### B. Dr. DeRamus Was Aware of, and Therefore Should Have Included, Arguments Against Defendants' Flexible Capability Defense in His Direct Report.

A substantial portion of Dr. DeRamus's supplemental report provides opinions about Entergy's flexible capability explanation for why Entergy had to procure some energy from its legacy gas units rather than from Independent Power Producers.[2] However, these opinions about Entergy's flexible capability arguments are not based upon any evidence that Dr. DeRamus acquired after filing his direct report. Instead, Dr. DeRamus has admitted that he had full knowledge of Entergy's argument concerning flexible capability and its surrounding facts from other litigation prior to the case at bar. In his direct expert report at paragraph 4, Dr. DeRamus stated: "The methodology I used to develop that preliminary damage estimate was based on the methodology that I had used previously in my work in *David Jenkins et al. v. Entergy Corporation et al.* ("Jenkins"). . . . [T]he underlying conduct at issue [in *Jenkins*] was sufficiently similar to warrant applying a similar approach to estimating damages." [Exhibit A.] The defendants in *Jenkins*, a case in which the plaintiffs hired Dr. DeRamus as an expert, put forth a flexible capability argument and even used some of the same experts Defendants in this case are using.

The *Jenkins* dispute is replete with references to Defendants' flexible capability argument—and Plaintiff requested (and received) all discovery from *Jenkins* in this dispute. In the order certifying the *Jenkins* class (Dkt. 56-18), the court noted that "[f]ollowing the industry-standard practice known as 'security constrained economic dispatch,' the lowest-cost generation (typically provided by nuclear and coal-fueled facilities)—is normally fully committed, leaving the more expensive gas generation to supply much of the *flexible capacity*" (emphasis added).

---

[2] For reference, Plaintiff claims that Entergy should have purchased power from third parties (Independent Power Producers) instead of running certain EMI-owned "legacy" generators. Defendants' "flexible capability defense" generally argues that these legacy units provided flexibility that was necessary for reliable system operations and was typically not offered by the third parties.

5

Exhibit C. In his direct testimony in the *Jenkins* class certification hearing, Defendants' expert John Hurstell explained flexible capability at length, including the types of units that are best suited to providing flexible capability, and contrasting those units with merchant generator contracts. Exhibit D, Hurstell Transcript from *Jenkins* (8/24/11) at 275:20-277:19 and Exhibit E, Hurstell PowerPoint from *Jenkins* hearing, Slide 18. Dr. DeRamus's direct report submitted in the *Jenkins* dispute itself anticipated the *Jenkins*' defendants' flexible capability argument in acknowledging that some legacy capacity may not be displaceable, the heart of the flexible capability issue: "[T]his estimated effect in turn restricts the actual displacement quantity, because in certain hours, the resulting increase in but-for prices may be sufficiently large (based on the economic estimates) such that it would not have been economical for Defendants to displace the Entergy pool power or their own generation under the higher but-for nonaffiliate power purchase cost." Exhibit F, DeRamus direct report from *Jenkins*, ¶ 39.

In his "rebuttal" report at paragraph 13, Dr. DeRamus acknowledges this case's similarity with *Jenkins*: "In *Jenkins*, the Court accepted my economic analysis of Entergy's refusal to purchase adequate amounts of lower-cost third-party power, as well as my damages model, *both of which are similar in many respects to the analyses I provide in my Direct Report*, and the Court certified the class on that basis." Exhibit B (emphasis added); *see also* Exhibit G (DeRamus Depo. at 237:19-238:11) (admitting awareness of Defendants' flexible capability issue from prior proceedings, including *Jenkins*). Dr. DeRamus cannot credibly claim that he was unable to put forth his opinions on flexible capability until his "rebuttal" report, when he was fully aware of the similarities between the *Jenkins* dispute and the instant dispute, where he himself relies on many of his same theories and evidence from that dispute in this case, and where he could reasonably anticipate that Defendants' experts would likewise rely on similar arguments in their reports. These opinions constitute untimely rebuttal opinions and must be stricken.

6

### C. Dr. DeRamus Impermissibly Addresses Power Plant Operating Constraints That Could Have Been Addressed In His Direct Report

Dr. DeRamus also offered "rebuttal" opinions that modified the calculation of his hourly damages model: "Although unnecessary to support the validity of my Direct Report, in order to address the criticisms of Entergy's witnesses, as a sensitivity analysis, I modify my hourly damages model to account for the following operating constraints associated with EMI's legacy units: minimum runtime, minimum downtime, minimum operating level, and minimum/maximum ramp rates." Exhibit B ¶ 68. None of the specific operating constraints associated with EMI's legacy units that Dr. DeRamus listed as the basis for his "rebuttal" opinion were unavailable to him at the time of his initial report. Indeed, Plaintiff specifically requested (and received) discovery on this issue. Exhibit H, Defendants' Responses to Plaintiff's Third Set of Interrogatories (Oct. 31, 2017), at § III. Dispatch and Commitment Issues (requesting information on unit operating parameters, including "Reliability Must Run" reports). These operational constraints inform Defendants' need for and use of flexible capability vis a vis Defendants' legacy units.

Furthermore, Dr. DeRamus was fully aware of these operational constraints from the *Jenkins* litigation. *See* Exhibit F, DeRamus Report from *Jenkins* at ¶ 39 (acknowledging that some legacy may not be displaceable due to operational restrictions); Exhibit G (DeRamus Depo. at 237:19-238:11) (acknowledging Defendants' flexible capability issue was addressed in *Jenkins*); *see also* Exhibit I, Hurstell Transcript from *Jenkins* (8/24/11) at 275:20-277:19; Exhibit J, Slater Transcript from *Jenkins* (8/23/11) at 15:17-16:23; 133:15-134:16; 138:11-139:22; 142:18-143:12; 151:12-22; 156:2-158:10. Dr. DeRamus's modification of his hourly damages model is untimely and must be stricken.

7

## YANG SUPPLEMENTAL REPORT

Dr. Yang's "supplemental/rebuttal" report similarly includes opinions based on facts and evidence that were readily available to him at the time of his direct report, but which he is now modifying to match the analysis found in Dr. DeRamus's initial expert report. Dr. Yang's direct expert report included a displacement analysis that included two legacy power generation units (Delta and Natchez) that were no longer in service, but Dr. DeRamus's direct report (served on Defendants on the same day as Dr. Yang's direct report) removed those two units from his displacement analysis. Dr. Yang's "rebuttal" report simply changed his analysis to remove those two legacy power generation units such that his inputs matched Dr. DeRamus's. Exhibit K ¶ 25. Dr. Yang should have "matched" his analysis to DeRamus's in the first instance, rather than waiting for Defendants to point out his deficiency before attempting to cure it in a "rebuttal" report. This additional opinion is an obvious attempt to "fix" his prior report with facts that were known and available at the time of his direct report. As such, it is an untimely supplementation and should be stricken.

## COPELAND SUPPLEMENTAL REPORT

As with Dr. Yang's direct report, Mr. Copeland's direct expert report included opinions that incorporated data from the same Delta and Natchez units. Exhibit L ¶ 25. After Defendants' experts criticized this inclusion due to its inconsistency with Dr. DeRamus's analysis, Mr. Copeland's "rebuttal" report changed his analysis to remove those two units such that his inputs matched those of Dr. DeRamus. Exhibit M. Mr. Copeland's opinions on these points did not incorporate any new information that was not known at the time of his direct report. He could

have coordinated with Dr. DeRamus in preparing direct reports and ensured compatibility of their analyses then.[3] These opinions are therefore untimely and should be stricken.

II.     **If the Court Determines the New Opinions Are Allowed as Appropriate Rebuttal, Defendants Should Be Allowed Limited Discovery on the New Opinions.**

As noted above, portions of the "rebuttal" reports that are not based on any new information that an expert received since filing his direct report should be stricken. However, if the Court denies that request, Defendants should be allowed to take another deposition of each of these experts limited solely to the new opinions provided in the reports, as well as the additional opinions discussed below.

This Court has the discretion to allow discovery on what essentially is a substantive change to a previously disclosed expert report—even if that change is deemed proper. In *Walker v. George Koch Sons Inc.*, 2008 WL 4371372 (S.D. Miss. 2008), the court found that supplemental reports served on the eve of the discovery cutoff would result in prejudice to the defendants. The Court ruled that it was appropriate to extend the discovery deadline "briefly, to eliminate prejudice to the defendant." *Id.* at 7; *see also Mumphard v. Kemper Cty.*, 2006 WL 2882232 at *1 (S.D. Miss. 2006) (supplemental discovery response triggered extension of deadline to permit expert witness to be deposed).

Defendants deposed Plaintiff's experts prior to filing Defendants' responsive reports in order to clarify Plaintiff's positions and so that Defendants could fully address those positions in filing their expert reports. Accordingly, none of the "supplemental" opinions included in

---

[3] In deposition, both Dr. DeRamus and Mr. Copeland conceded that they had done nothing to coordinate with one another in preparing their direct reports, and that Dr. DeRamus had given no instruction to Mr. Copeland as to how to conduct his analysis. *See* Exhibit N, DeRamus Depo. at 71:21-72:7 ("Q. Did you discuss with Mr. Copeland the specific inputs that he would utilize for the PROMOD analysis? A. No."), 75:20-80:23 (denying any interaction with Mr. Copeland concerning his analysis); Exhibit O, Copeland Depo. at 51:8-52:1 ("I haven't looked at Dr. DeRamus's Report. I didn't interact with him when I was writing my report or his report."); 190:11-23 ("I never spoke to Dr. DeRamus about any of my modeling."); 206:9-14 ("Q. Do you have any understanding of [Dr. DeRamus's] damages model? A. None at all.").

9

Plaintiff's experts' rebuttal reports had yet been disclosed at the time their depositions were taken. As such, without Court intervention, Defendants will be prejudiced by not having adequate discovery on these new opinions. If allowed to stand with no deposition or further inquiry, Plaintiff will have an unfair advantage by putting forth new expert opinions, on the eve of the discovery deadline, that cannot be properly tested by Defendants prior to trial.

## DERAMUS DEPOSITION TOPICS

As discussed above, if the Court does not strike Dr. DeRamus's untimely supplemental opinions on the additional damages time period, the flexible capability argument, and his modification of his hourly damages model to address power plant operating constraints, Defendants should be allowed to conduct limited deposition discovery on those topics. In addition, Dr. DeRamus's rebuttal report includes additional opinions on the following topics that arguably rise to the standard of a "rebuttal" response, and therefore need not be stricken, but have not been tested by Defendants' discovery and should be included in a limited deposition:

1. DeRamus Rebuttal Report ¶¶ 76-78: Failure to include hurricane impact in response to Defendants' expert Mr. Hurstell.

2. DeRamus Rebuttal Report ¶¶ 89-92: Exclusion of capacity payments from his damages analysis.

3. DeRamus Rebuttal Report ¶¶ 94-95: Exclusion of EMI purchases that went to the Entergy Pool as opposed to sinking to EMI load.

## YANG DEPOSITION TOPICS

Should the Court not strike Dr. Yang's untimely supplemental opinions matching his displacement analysis to Dr. DeRamus's direct report (¶ 25), discussed above, Defendants should be allowed to conduct limited deposition discovery on that topic. In addition, Dr. Yang's rebuttal

report includes new opinions on the following topics that have not been tested by Defendants' discovery and should be included in a limited deposition:

1. Yang Rebuttal Report ¶ 23: "Nonetheless, as a sensitivity analysis, I conducted a new SIC study precluding both EMI's legacy generation and IPPs being studied from participating in the off-system import transaction (because the chosen IPPs are assumed to displace EMI's legacy generation simultaneously)."

2. Yang Rebuttal Report ¶¶ 29-30: Yang's rebuttal of Morrow's argument that Yang should have removed all 3 of Gerald Andrus, Baxter Wilson, and Rex Brown units from service simultaneously in order to accurately analyze the ability of an IPP to displace those plants' output, as DeRamus assumes simultaneous displacement of all of EMI's legacy generation in his full displacement scenario.

3. Yang Rebuttal Report ¶¶ 31-37: Yang performs full AC contingency analysis of Entergy's July 2004 power flow "as suggested by Mr. Morrow" in response to criticism that Yang did not analyze voltage issues.

### COPELAND DEPOSITION TOPICS

Should the Court not strike Mr. Copeland's untimely supplemental opinions matching his displacement analysis to Dr. DeRamus's direct report (¶¶ 24-25), discussed above, Defendants should be allowed to conduct limited deposition discovery on that topic. In addition, Dr. Copeland's rebuttal report includes new opinions on the following topics that have not been tested by Defendants' discovery and should be included in a limited deposition:

1. Copeland Rebuttal Report ¶ 12: reveals for the first time on rebuttal that he used a different forced outage file than used by Entergy. In his direct report at 3 [Exhibit L], Mr. Copeland said the only change he made was the availability of the EMI legacy generation and substitute purchases.

2. Copeland Rebuttal Report ¶¶ 11 & 22: Mr. Copeland performs an "additional" analysis using a new version of PROMOD that contains added functionalities, which was provided to him by the software vendor after Mr. Copeland filed his direct report.

3. Copeland Rebuttal Report ¶ 24: Mr. Copeland "developed two additional scenarios" for study in the new version of PROMOD, which scenarios were not addressed in his direct report, to test the effect on EMI's planning reserve margins. He points out that the modeled operations in these new scenarios are "different" from those scenarios addressed in his direct report.

## **CONCLUSION**

The Court should strike the portions of Plaintiff's expert "rebuttal" reports that contain improper rebuttal arguments for the reasons discussed above. Alternatively, the Court should allow limited deposition discovery on those portions of Plaintiff's expert "rebuttal" reports and several additional topics included in those reports.

RESPECTFULLY SUBMITTED, this 4th day of May, 2018.

ENTERGY MISSISSIPPI, INC.,
ENTERGY CORPORATION, ENTERGY
SERVICES, INC. AND ENTERGY
POWER, INC., Defendants

By /s/ Roy D. Campbell, III
    Roy D. Campbell, III (MSB 5562)
    J. William Manuel (MSB 9891)
    Alicia N. Netterville (MSB 105055)

BRADLEY ARANT BOULT
CUMMINGS LLP
One Jackson Place
188 East Capitol Street, Suite 400
P.O. Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
rcampbell@bradley.com
wmanuel@bradley.com
anetterville@bradley.com

James L. Robertson (MSB 5612)
Charles E. Ross (MSB 5683)
Rebecca Hawkins (MSB 8786)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS 39205-0651
(601) 968-5534 – Telephone
(601) 944-7738 – Facsimile
jlr@wisecarter.com
cer@wisecarter.com
rwh@wisecarter.com

OF COUNSEL:

Tianna H. Raby, MSB #100256
Christopher R. Shaw, MSB #100393
ENTERGY MISSISSIPPI, INC.
308 E. Pearl Street, Suite 700 (39201)
Mail Unit M-ELEC-4A
P.O. Box 1640
Jackson, MS 39215-1640
(601) 969-2656 – Telephone
(601) 969-2696 – Facsimile
traby@entergy.com
cshaw4@entergy.com

John A. Braymer, *Pro Hac Vice*
Associate General Counsel
ENTERGY SERVICES, INC.
639 Loyola Avenue, Suite 2600
New Orleans, LA 70133
jbrayme@entergy.com

**CERTIFICATE OF SERVICE**

      I do hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

      This 4th day of May, 2018.

                                              /s/ Roy D. Campbell, III
                                              OF COUNSEL