# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSISSIPPI, EX REL. | ) | |
| JIM HOOD, ATTORNEY GENERAL | ) | |
| FOR THE STATE OF MISSISSIPPI, | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | **No. 3:08-CV-780-CWR-LRA** |
| | ) | |
| ENTERGY MISSISSIPPI, INC., ENTERGY | ) | |
| CORPORATION, ENTERGY SERVICES, | ) | |
| INC., AND ENTERGY POWER, INC., | ) | |
| | ) | |
| Defendants-Counterclaim Plaintiffs. | ) | |

## MEMORANDUM BRIEF IN SUPPORT OF DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT BASED ON STATE OR FEDERAL PREEMPTION

Roy D. Campbell, III (MSB 5562)
J. William Manuel (MSB 9891)
Alicia N. Netterville (MSB 105055)
BRADLEY ARANT BOULT
CUMMINGS LIP
One Jackson Place
188 East Capitol Street, Suite 400
P.O. Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
rcampbell@bradley.com
wmanuel@bradley.com
anetterville@bradley.com

John A. Braymer, Pro Hac Vice
Associate General Counsel
Entergy Services, Inc.
639 Loyola Avenue, Suite 2600
New Orleans, LA 70133
jbrayme@entergy.com

Charles E. Ross (MSB 5683)
James L. Robertson (MSB 5612)
Rebecca Hawkins (MSB 8786)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS 39205-0651
Telephone: (601) 968-5534
Facsimile: (601) 944-7738
jlr@wisecarter.com
cer@wisecarter.com
rwh@wisecarter.com

Tianna H. Raby (MSB 100256)
Christopher R. Shaw (MSB 100393)
Entergy Mississippi, Inc.
308 E. Pearl Street, Suite 700 (39201)
Mail Unit M-ELEC-4A
P.O. Box 1640
Jackson, MS 39215-1640
Telephone: (601) 969-2656
Facsimile: (601) 969-2696
traby@entergy.com
cshaw4@entergy.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

TABLE OF EXHIBITS ................................................................................................... viii

GLOSSARY OF ACRONYMS .......................................................................................... x

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 5

    A.    Electricity And Reliability ................................................................................ 5

    B.    Federal And State Regulation Of Electricity .................................................. 5

    C.    The Entergy System ......................................................................................... 7

        1.    Operation Of The Entergy System ...................................................... 9

        2.    Cost Allocation Among The Entergy Operating Companies ............. 12

    D.    How EMI's Costs Were Passed On To EMI's Customers............................. 14

    E.    Plaintiff's Theories And Causes Of Action ................................................... 14

ARGUMENT ..................................................................................................................... 15

I.    MISSISSIPPI LAW, ESPECIALLY AS CLARIFIED BY SB 2295, REQUIRES THAT A CHALLENGE CONCERNING ELECTRICITY RATES BE BROUGHT BEFORE THE MPSC RATHER THAN A COURT ................................... 15

II.    PLAINTIFF'S SUIT IS ALSO PREEMPTED BY FEDERAL LAW ............................ 21

    A.    The Filed-Rate Doctrine Applies Because Plaintiff Challenges Operational And Purchasing Decisions Governed By A FERC-Approved Tariff, The ESA ............................................................................................................... 21

    B.    The *Pike County* Exception To Federal Preemption Does Not Apply To Purchasing Decisions Made In The Context Of An Integrated, Multi-Utility, Multi-State System Like The Entergy System ...................................................... 24

    C.    Undisputed Evidence Demonstrates That, If EMI Individually Had Purchased More Energy From IPPs, Entergy Operating Companies In Other States Would Have Been Harmed........................................................................ 30

    D.    Alternatively, This Court Should Defer To FERC Under Primary Jurisdiction ..................................................................................................... 35

III.    THE ENTIRETY OF PLAINTIFF'S SUIT SHOULD BE DISMISSED ON SUMMARY JUDGMENT .............................................................................................. 36

    A.    Plaintiff's Only Damages Theory, That EMI Should Have Individually Purchased More Energy From IPPs Between 1998 and 2008, Is Preempted ....... 36

    B.    Even Aside From Their Reliance On A Preempted Damages Theory, Plaintiff's Liability Theories And Claims Are Preempted .................................... 37

1.  Allegedly Improper Use Of The Fuel Adjustment Clause.........................37

2.  Allegedly Improper Bidding By EPI For Contract With The System ...... 39

3.  Alleged Misrepresentations To The MPSC ............................................... 40

4.  Alleged Purchases Of Energy From IPPs For Resale Off-System ........... 41

5.  Allegedly Imprudent Purchases From EPI ............................................... 41

6.  Allegedly Improper Tax Benefits, Loans, And Guarantees...................... 41

CONCLUSION ............................................................................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*,
　473 F.3d 581 (5th Cir. 2006) ...................................................... 3-4, 8, 21, 23, 29, 30

*Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*,
　812 F.2d 898 (4th Cir. 1987) ................................................ 3, 5, 23, 25, 26, 28, 30

*Arizona v. United States*,
　567 U.S. 387 (2012) ......................................................................................... 21

*Ark. La. Gas Co. v. Hall*,
　453 U.S. 571 (1981) ......................................................................................... 21

*Brazos Elec. Power Co-op., Inc. v. FERC*,
　205 F.3d 235 (5th Cir. 2000) ............................................................................ 7

*Calif. ex rel. Lockyer v. Dynegy, Inc.*,
　375 F.3d 831 (9th Cir.), *as amended*, 387 F.3d 966 (9th Cir. 2004) ..................... 22

*Clark v. Jeter*,
　486 U.S. 456 (1988) ......................................................................................... 17

*Crayton v. Amadeo Rossi, S.A.*,
　384 F. App'x 330 (5th Cir. 2010) (unpub.) ....................................................... 34

*Entergy La., Inc. v. La. Pub. Serv. Comm'n*,
　539 U.S. 39 (2003) .......................................................................... 21, 22, 24, 29

*Entergy Tex., Inc. v. Nelson*,
　889 F.3d 205 (5th Cir. 2018) ............................................................................ 8

*Gipson v. Fleet Mortg. Grp.*,
　232 F. Supp. 2d 691 (S.D. Miss. 2002) ............................................................. 41

*Granger v. Slade*,
　361 F. Supp. 2d 588 (S.D. Miss. 2005) ............................................................. 30

*H.J. Inc. v. Nw. Bell Tel. Co.*,
　954 F.2d 485 (8th Cir. 1992) ............................................................................ 22

*Hughes v. Talen Energy Mktg., LLC*,
　136 S. Ct. 1288 (2016) ..................................................................................... 40

*La. Pub. Serv. Comm'n v. FERC*,
　771 F.3d 903 (5th Cir. 2014) ........................................................................ 8, 12

*Marshall v. Tanner*,
　651 F. App'x 254 (5th Cir. 2016) (unpub.) ...................................................... 17

*Miss. Indus. v. FERC*,
    808 F.2d 1525 (D.C. Cir. 1987) ................................................................ 7

*Miss. Power & Light Co. v. Miss. ex rel. Moore*,
    487 U.S. 354 (1988).......................................... 8, 19, 21, 22, 23, 27, 29

*Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*,
    341 U.S. 246 (1951).............................................................................21-22

*Murungi v. Xavier Univ.*,
    313 F. App'x 686 (5th Cir. 2008) (unpub.).......................................... 43

*N. Nat. Gas Co. v. Kan. Corp. Comm'n*,
    372 U.S. 84 (1963) .................................................................................. 22

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986)................................................................ 21, 22, 29

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    911 F.2d 993 (5th Cir. 1990) ........................................................ 28, 29

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989)........................................................................ 28, 29

*Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*,
    810 F.3d 299 (5th Cir. 2016) ................................................................ 36

*Oneok, Inc. v. Learjet, Inc.*,
    135 S. Ct. 1591 (2015)........................................................................... 40

*Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*,
    922 F.2d 220 (5th Cir. 1991) ................................................................ 35

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
    476 U.S. 409 (1986)................................................................................ 22

*Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*,
    677 F.3d 720 (5th Cir. 2012) ................................................................ 30

*Taffet v. S. Co.*,
    967 F.2d 1483 (11th Cir. 1992) ............................................................ 22

*Tex. Commercial Energy v. TXU Energy, Inc.*,
    413 F.3d 503 (5th Cir. 2005) ................................................................ 22

*Washington v. Armstrong World Indus.*,
    839 F.2d 1121 (5th Cir. 1988) .............................................................. 37

*Zarnow v. City of Wichita Falls*,
    614 F.3d 161 (5th Cir. 2010) ................................................................ 30

**Federal Administrative Decisions**

*AEP Gen. Co.*,
    36 F.E.R.C. P61,226 (1986)...................................... 4, 23, 26, 27, 35

*Cent. Vt. Pub. Serv. Corp.*,
   84 F.E.R.C. P61,194 (1998) ....................................................... 24, 27, 28

*Entergy Servs., Inc.*,
   119 F.E.R.C. P61,019 (2007) ................................................................ 40

*Entergy Servs., Inc.*,
   124 F.E.R.C. P63,026 (2008) ................................................................ 23

*Entergy Servs., Inc.*,
   129 F.E.R.C. P61,143 (2009) .................................................................. 8

*Entergy Servs., Inc.*,
   128 F.E.R.C. P63,015 (2009) ................................................................ 23

*Entergy Servs., Inc.*,
   137 F.E.R.C. P61,029 (2011) .......................................................... 23, 40

*Entergy Servs., Inc.*,
   153 F.E.R.C. P61,154 (2015) .................................................................. 8

*Entergy Tex., Inc.*,
   153 F.E.R.C. P61,347 (2015) .................................................................. 8

*La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*,
   146 F.E.R.C. P61,152 (2014) ................................................................ 12

*Middle S. Servs., Inc.*,
   30 F.E.R.C. P63,030, at 65,142 (1985),
   *vacated in part on other grounds on reh'g*,
   822 F.2d 1104 (D.C. Cir. 1987) ......................................................... 7-8

*Monongahela Power Co.*,
   39 F.E.R.C. P61,350 (1987) ................................................................ 28

*Pa. Power & Light*,
   23 F.E.R.C. P61,006 (1983) .......................................................... 27, 28

**State Cases**

*Am. Bankers' Ins. Co. of Fla. v. Wells*,
   819 So. 2d 1196 (Miss. 2001) .............................................................. 19

*Cellular S., Inc. v. BellSouth Tel., LLC*,
   214 So. 3d 208 (Miss. 2017) .......................................................... 17, 18

*Cenac v. Murry*,
   609 So. 2d 1257 (Miss. 1992) .............................................................. 37

*Cumberland Tel. & Tel. v. State ex rel. Attorney General*,
   54 So. 446 (Miss. 1911) ...................................................................... 19

*Entergy Corp. v. Jenkins*,
   469 S.W.3d 330, 345 (Tex. App. 2015) ....................... 4, 22, 23, 24, 27, 29, 30

*Entergy La., Inc. v. La. Pub. Serv. Comm'n*,
   815 So. 2d 27 (La. 2002) .................................................................... 29

*Fourth Davis Isl. Land Co. v. Parker*,
   469 So. 2d 516 (Miss. 1985) ............................................................................ 37

*Gulf States Utils. Co. v. Pub. Util. Comm'n of Tex.*,
   841 S.W.2d 459 (Tex. App. 1992) .............................................................. 4, 27

*Ill. Cent. R.R. Co. v. M. T. Reed Constr. Co.*,
   51 So. 2d 573 (Miss. 1951) (*per curiam*) ...................................................... 20

*Koury v. Ready*,
   911 So. 2d 441 (Miss. 2005) ............................................................................ 37

*Miss. Dep't of Corr. v. Roderick & Solange MacArthur Justice Ctr.*,
   220 So. 3d 929 (Miss. 2017) ............................................................................ 18

*Miss. Pub. Serv. Comm'n v. Mun. Energy Agency of Miss.*,
   463 So. 2d 1056 (Miss. 1985) .......................................................................... 18

*Miss. Pub. Serv. Comm'n v. S. Cent. Bell Tel. Co.*,
   464 So. 2d 1133 (Miss. 1984) .......................................................................... 16

*Miss. Rural Water Ass'n, Inc. v. Miss. Pub. Serv. Comm'n*,
   222 So. 3d 288 (Miss. 2017) ...................................................................... 6, 16

*Pace v. Miss. Baptist Health Sys., Inc.*,
   No. 3:17-cv-0009-CWR-LRA, 2018 WL 1189918 (S.D. Miss. Mar. 7, 2018) ...................... 15

*Pike County Light & Power Co. v. Pa. Pub. Util. Comm'n*,
   465 A.2d 735 (Pa. Commonwealth Ct. 1983) ............................ 3, 4, 24, 25, 26, 27, 28, 29, 35

*In Re: Report of Applic. of the Fuel Adjustment Rider of Entergy Miss., Inc.*,
   2010-AD-14, 2010 WL 2649748 (Jan. 15, 2010) .............................................. 39

*Singing River Mall Co. v. Mark Fields, Inc.*,
   599 So. 2d 938 (Miss. 1992) ............................................................................ 16

*State ex rel. Allain v. Miss. Pub. Serv. Comm'n*,
   418 So. 2d 779 (Miss. 1982) ............................................................................ 19

*United Gas Pipe Line Co. v. Willmut Gas & Oil Co.*,
   97 So. 2d 530 (Miss. 1957) ............................................................................ 19

## Federal Statutes, Regulations, and Rules

16 U.S.C. § 824a-3(a)(2) .................................................................................... 7

16 U.S.C. § 824b ................................................................................................ 6

42 U.S.C. § 7651b .............................................................................................. 38

18 C.F.R. § 292.303(a) ........................................................................................ 7

Fed. R. Evid. 1006 .............................................................................................. 28

## State Statutes and Rules

Miss. Code Ann. § 75-21-3 ................................................................................ 37

Miss. Code Ann. § 75-24-11 ................................................................................ 37

Miss. Code Ann. § 75-24-19(1)(b) ....................................................................... 37

Miss. Code Ann. § 77-1-43 .................................................................................. 37

Miss. Code Ann. § 77-1-43(2) ........................................................... 2, 3, 17, 18, 19

Miss. Code Ann. § 77-3-5 ........................................................ 2, 5, 16, 17, 18, 19

Miss. Code Ann. § 77-3-35(1) ............................................................................... 6

Miss. Code Ann. § 77-3-42 ................................................................................... 6

Miss. Code Ann. § 77-3-42(2)(a) ........................................................................ 20

Miss. Code Ann. § 77-3-42(2)(b) ........................................................................ 20

Miss. Code Ann. § 77-3-42(2)(c)(iii) ................................................................... 20

Miss. Code Ann. § 77-3-42(5) ............................................................................. 20

Miss. Code Ann. § 77-3-45 .................................................................................. 20

Miss. Code Ann. § 77-3-72(1) ............................................................................. 16

W. Va. Code § 24-2-12 ........................................................................................ 26

MPSC Rule 17 § 102 ........................................................................................... 42

**Other Authorities**

C. Klinger et al., *Power Outages, Extreme Events and Health: a Systematic Review of the Literature from 2011-12, PLOS Currents*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3879211/ (Jan. 2, 2014) .............................. 5

FERC Office of Enforcement, Audit of Entergy Services, Inc., Docket No. PA10-1-000, at 48-49, https://www.ferc.gov/industries/electric/indus-act/reliability/reliability-orders/PA10-1-000.pdf (Oct. 29, 2010) ...................................................................... 7

Letter from Megan E. Vetula (Entergy) to Penny S. Murell (FERC) dated March 27, 2015, https://elibrary.ferc.gov/idmws/file_list.asp?document_id=14317147 ........................... 7

https://www.bateswhite.com/professionals-Nicolas-Puga.html .................................................. 11

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit A | Compendium of excerpts from certain of Exhibits B-Z |
| Exhibit B | Entergy System Agreement, Attachment 1 to Declaration of Michelle Thiry |
| Exhibit C | Deposition Transcript of David DeRamus (Feb. 23, 2018) |
| Exhibit D | Certified Copy of Senate Bill 2295 |
| Exhibit E | Deposition Transcript of Neil Copeland (Feb. 21, 2018) |
| Exhibit F | Declaration and Expert Report of John Hurstell (certain appendices omitted) |
| Exhibit G | Declaration and Expert Report of Donald Morrow (exhibits omitted) |
| Exhibit H | Declaration and Certain of John Hurstell's Workpapers in support of Figures JPH-19-20 in his Expert Report |
| Exhibit I | Rebuttal Expert Report of David DeRamus |
| Exhibit J | Declaration and Expert Report of Frank Gallaher |
| Exhibit K | Declaration and Expert Report of Robert M. Hawkins |
| Exhibit L | Declaration and Expert Report of Bob Marsh |
| Exhibit M | Deposition Transcript of Plaintiff's Rule 30(b)(6) Witness Crystal Secoy (April 19, 2018) |
| Exhibit N | *Jenkins v. Entergy Corp.*, Findings Of Fact And Conclusions Of Law On Plaintiffs' Motion To Certify (Tex. Dist. Ct. Chambers Cnty. Apr. 30, 2012) |
| Exhibit O | [intentionally not used] |
| Exhibit P | [intentionally not used] |
| Exhibit Q | Opening Expert Report of Neil Copeland |
| Exhibit R | Opening Expert Report of David DeRamus |

| Exhibit S | Deposition Transcript of Robert M. Hawkins (May 11, 2018) |
|---|---|
| Exhibit T | Opening Expert Report of Charles S. Griffey |
| Exhibit U | Rebuttal Expert Report of Charles S. Griffey |
| Exhibit V | Declaration of Steven C. McNeal |
| Exhibit W | Declaration of Rory L. Roberts |
| Exhibit X | Plaintiff's Answers to Interrogatories (Apr. 10, 2017) |
| Exhibit Y | Plaintiff's First Supplemental Answers to Interrogatories (Sept. 19, 2017) |
| Exhibit Z | Mississippi Public Service Commission Docket 1992-UN-59 |

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| CCGT | Combined-Cycle Gas Turbine |
| EAI | Entergy Arkansas, Inc. |
| EGSI | Entergy Gulf States, Inc. |
| ELL | Entergy Louisiana, LLC |
| EMI | Entergy Mississippi, Inc. |
| ENOI | Entergy New Orleans, Inc. |
| EOC | Entergy Operating Company |
| EPI | Entergy Power, Inc. |
| ESA | Entergy System Agreement |
| ESI | Entergy Services, Inc. |
| ETI | Entergy Texas, Inc. |
| FAC | Fuel Adjustment Clause |
| FERC | Federal Energy Regulatory Commission |
| IPP | Independent Power Producer |
| KEPCO | Kentucky Power Company |
| MPSC | Mississippi Public Service Commission |
| MPUS | Mississippi Public Utilities Staff |
| MW(H) | Megawatt (Hour) |
| PSC | Public Service Commission |
| PURPA | Public Utilities Regulatory Policies Act |
| QF | Qualifying Facility |
| TEA | Transmission Equalization Agreement |
| TVA | Tennessee Valley Authority |

<u>**INTRODUCTION**</u>

Operating an electricity grid across a multi-state area is a complex endeavor with enormously high stakes. The overriding objective is to maintain reliability (colloquially, to "keep the lights on"), which requires keeping the supply of electricity in balance with the demand for electricity. Even a temporary outage can cause inconvenience, economic loss, and risks to life and health. To be sure, finding economical energy sources is a core objective, but it bows to reliability. As made clear by the Entergy System Agreement ("ESA"), which the Federal Energy Regulatory Commission ("FERC") approved, the Entergy System "shall be operated … to obtain the lowest reasonable cost of energy to all the Companies *consistent with the requirements of daily operating generation reserve, voltage control, electrical stability, loading of facilities and continuity of service to the customers of each Company*." ESA § 30.02 (Ex. A at 14) (emphasis added).[1]

Defendants' witnesses, particularly John Hurstell (former Vice President of Entergy System Planning and Operations), have explained that, during the period at issue (1998-2008), large and unpredictable fluctuations in supply and demand on the multi-state Entergy System required the System to employ certain older gas-fired units ("legacy units") because they could quickly ramp up and down, even though energy from such units may be more expensive than newer combined-cycle gas turbine ("CCGT") units if narrowly evaluated on a per-hour energy-cost basis. Plaintiff's witness David DeRamus, an economist with no experience operating an electric system or purchasing wholesale energy, has disagreed, asserting that Defendant Entergy Mississippi, Inc. ("EMI") should have purchased more energy from Independent Power Producers'

---

[1] "(Ex. _)" denotes exhibits to the motion for summary judgment, which are listed in the motion and the Table of Exhibits, *supra*. Ex. A is a compendium of excerpts of certain other exhibits that are particularly important to this brief. For example, excerpts of the ESA appear in Ex. A, and the complete ESA is Ex. B.

("IPPs") CCGT units instead of generating energy with EMI's legacy units or receiving energy allocated to EMI under the ESA.

Defendants' motion for summary judgment does not ask this Court to resolve that dispute. Rather, the motion argues that the dispute does not belong in court, and instead must proceed before the Mississippi Public Service Commission ("MPSC") or FERC.[2]

EMI was, until 2015, one of six utilities (the Entergy Operating Companies or "EOCs") in four states that belonged to the Entergy System. EMI was allocated its share of the System's costs to produce and to procure energy to serve EMI's retail customers (homeowners and businesses in a portion of Mississippi). Those costs in turn were passed along to EMI's retail customers on their monthly electricity bills. State regulatory bodies have long exercised close control over the rates imposed by utilities on their retail customers. In EMI's case, the state regulator is the MPSC. Throughout the period at issue, EMI made numerous filings with the MPSC and a related state agency, the Mississippi Public Utilities Staff ("MPUS"), and EMI charged its retail customers only rates that had been approved by the MPSC.

Mississippi law is clear—and since the March 19, 2018 enactment of Senate Bill 2295 ("SB 2295") is even clearer—that any challenge to a utility's practices alleged to have impacted rates charged to retail customers must proceed first before the MPSC, and can be reviewed in court only on appeal from the MPSC's order. *See* Miss. Code Ann. § 77-3-5 ("[T]he [MPSC] shall have exclusive original jurisdiction over the intrastate business and property of public utilities."). Although Judge Wingate, Doc. 86 at 32:10-13, interpreted a separate provision, § 77-1-43(2), to

---

[2] Defendants will file a separate motion for summary judgment arguing that Plaintiff's causes of action fail on their merits under Mississippi state law. Defendants respectfully suggest that the Court should consider the instant preemption-based motion first because it argues that Plaintiff's causes of action are not properly before this Court in the first place and instead should be presented to MPSC or FERC.

authorize the Attorney General to sue in court, SB 2295 amended § 77-1-43(2) to clarify that the Attorney General has no such right. Whereas old § 77-1-43(2) stated that an action "may be instituted … by the Attorney General in any court of competent jurisdiction," amended § 77-1-43(2) clarifies that the Attorney General may *not* unilaterally proceed in court, but may do so only "at the request of the commission by order after notice and hearing." SB 2295 § 19 (Ex. A at 21-22). This makes sense as a policy matter because it allows an expert agency (the MPSC) rather than a lay jury to adjudicate complex disputes in the first instance.

SB 2295 makes clear that, as between a court and the MPSC, the proper original forum for Plaintiff's claims is the MPSC. A separate question is whether, as between the MPSC and FERC, most or all of Plaintiff's suit belongs before FERC as a matter of federal preemption. Although this Court should grant Defendants summary judgment based on MPSC preemption and allow the MPSC to decide whether it must defer to FERC, this Court alternatively could grant summary judgment to Defendants on federal preemption grounds. Federal preemption applies because the energy costs at issue are incurred by and allocated to EMI pursuant to the ESA, a federal tariff subject to FERC's exclusive jurisdiction, and Plaintiff's suit challenges EMI's and the System's exercise of discretion under provisions of the ESA. As a matter of law, the *Pike County* exception to federal preemption, which holds that it is for a state public service commission rather than FERC to review the prudence of a *standalone utility*'s choice from which of several wholesale energy sources to purchase, does not apply in the context, as here, of a purchase by a *utility that belongs to an integrated system* of multiple utilities in multiple states that act sometimes as buyers and other times as sellers. *See, e.g., Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 904 (4th Cir. 1987) ("[U]nlike the wholesale agreement at issue in *Pike County*, the TEA [a system agreement] has no distinct 'buyer' and 'seller' of energy."), *cited approvingly by AEP Tex.*

*N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581, 586 n.20 (5th Cir. 2006); *AEP Gen. Co.*, 36 F.E.R.C. P61,226, 61,550 (1986);[3] *compare Gulf States Utils. Co. v. Pub. Util. Comm'n of Tex.*, 841 S.W.2d 459, 468 (Tex. App. 1992) (distinguishing FERC's *AEP* decision, and relying on *Pike County*, because "Gulf States is not a participant in an integrated pooling arrangement which might invoke FERC's exclusive jurisdiction"). Indeed, addressing an allegation identical to Plaintiff's here, a Texas appellate court ruled the claim federally preempted. *Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 342, 345 (Tex. App. 2015) ("Decisions whether to dispatch Entergy-owned resources or to purchase wholesale power off-system are likewise governed by [the] ESA …. Because resolving the dispute in this case involves the consideration and interpretation of a FERC-approved tariff, we conclude that this dispute falls within FERC's exclusive jurisdiction."). And even if *Pike County* applied, it would direct the case to a *state public service commission* (here, MPSC), not to a state or federal court.

The policy rationale behind federal preemption also applies here, given undisputed evidence that Plaintiff's theory would harm Entergy System utilities in other states. Plaintiff's witness Dr. DeRamus conceded: "This is a case brought by the attorney general in the State of Mississippi about overcharges or excessive costs borne by Mississippi ratepayers. It's not a case brought by the attorney generals of … Louisiana, Arkansas, and Texas. So my task is, then, to assess how much higher cost did Entergy Mississippi customers bear as a result of the specific conduct." (Ex. A at 33-34.) Even assuming *arguendo* that EMI could have made additional purchases from IPPs, Plaintiff's Mississippi-only approach fails to consider the harmful effects on states outside Mississippi that would have flowed from the additional energy purchases Plaintiff

---

[3] All FERC decisions cited herein are available on WESTLAW and LEXIS by entering the citation in the format "_ F.E.R.C. P_." The "P_" must be used to pull up the decision; entering only the pin-cite will not do so. For the Court's convenience, this brief provides the "P_" even for short cites.

asserts EMI should have made.  For example, Plaintiff's expert Neil Copeland admitted "there may have been some companies that … might have had some losses" if EMI had made the additional purchases.  (Ex. A at 37.)  That evidence compels a ruling that Plaintiff's suit is within the jurisdiction of FERC, which, "as a central regulatory body, … has the objectivity and comprehensive overview that transcends these local concerns."  *Appalachian*, 812 F.2d at 905.

## STATEMENT OF FACTS

### A.  Electricity And Reliability

Electricity is fundamental to modern life.  Outages prevent businesses and homeowners from powering their computers, air conditioners, and televisions and, worse, pose risks to life and health.[4]  Reliability of electricity supply is not automatic; careful planning is required.  The first commandment of reliability is that, in the relevant grid, the supply of electricity must equal the demand for electricity at all times.  (Ex. F at 2, 30.)  Otherwise, the grid will fail and an outage will result.  (*Id.* at 40.)  Thus, a utility must be able immediately to respond to surges in demand (*e.g.*, hot weather driving up the use of air conditioners) and unexpected interruptions in supply (*e.g.*, a power plant shutting down due to a storm).  (*Id.* at 79, 121.)

### B.  Federal And State Regulation Of Electricity

Technological advances in the early twentieth century enabled utilities to transmit electricity over longer distances and across state lines.[5]  A utility in state A with excess supply

---

[4]  C. Klinger *et al.*, *Power Outages, Extreme Events and Health: a Systematic Review of the Literature from 2011-12, PLOS Currents* (Jan. 2, 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3879211/.

[5]  High-voltage transmission lines carry electricity from the generating plant to a substation, and low-voltage distribution lines carry electricity from a substation to retail customers.  Because transmission and distribution lines are expensive to build and can serve additional customers at increasingly lower average cost as more customers are added, a utility had a "natural monopoly" advantage over would-be competitors. To prevent the utility from exploiting this advantage, state or local agencies, such as the MPSC, regulate the utility's business and the prices it charges retail customers.  *E.g.*, Miss. Code Ann. § 77-3-5.

could sell it to a utility in state B (an interstate wholesale sale), and the utility in state B in turn could resell the electricity to its customers (an intrastate retail sale).

Since the 1935 Federal Power Act, FERC or its predecessor have regulated interstate wholesale sales of electricity and electric transmission service, 16 U.S.C. § 824b, while states through their public service commissions regulate the rates and terms of retail sales to customers and the siting of generation and transmission facilities. Here, the MPSC sets EMI's retail base rates so EMI will recover from its retail customers a reasonable rate of return on EMI's capital investments (such as the amount invested to build a power plant). Beyond base rates, certain ongoing costs incurred by EMI, such as the cost of fuel to run EMI's plants and relevant costs incurred under the ESA, including the cost to purchase energy on the wholesale market from a plant owned by someone else, are allowed to be recovered from retail customers through a fuel adjustment clause ("FAC"). Miss. Code Ann. §§ 77-3-35(1), 77-3-42. A "rate" includes not only the actual dollar amount EMI charges, but also any "formula or method" or "practices or contracts" that affect the amount. *Miss. Rural Water Ass'n, Inc. v. Miss. Pub. Serv. Comm'n*, 222 So. 3d 288, 292-94 (Miss. 2017) (quoting Miss. Code Ann. § 27-3-3(e)) (internal quotation marks omitted). SB 2295 clarifies that all complaints regarding rates, including the "validity or accuracy of rates" or "the accuracy or reliability of information submitted" by utilities, are within the MPSC's "original jurisdiction." SB 2295 § 24 (Ex. A at 23-25).

Another federal law, the Public Utilities Regulatory Policies Act of 1978 ("PURPA"), is also relevant. Enacted in the wake of a national fuel shortage, PURPA sought to encourage industrial facilities (known as qualifying facilities or "QFs"), such as Mississippi Chemical

Company in Yazoo City, Mississippi,[6] whose processes create thermal energy, to harness that energy to produce electricity. *Brazos Elec. Power Co-op., Inc. v. FERC*, 205 F.3d 235, 237 (5th Cir. 2000). Under PURPA, a QF is entitled to "put" electricity into a utility's grid (and to reduce or to end the put) without prior notice. 16 U.S.C. § 824a-3(a)(2); 18 C.F.R. § 292.303(a). Given the utility's need to balance supply and demand at all times, the ability of QFs to provide a sudden influx of energy (and the corresponding potential for a sudden disappearance of QF energy when the QF reduces or ends the put) requires the utility to have readily available sources of energy capable of immediately ramping up or down to assure the reliability of the grid. (Ex. F at 64-67); FERC Office of Enforcement, Audit of Entergy Services, Inc., Docket No. PA10-1-000, at 48-49 (Oct. 29, 2010), https://www.ferc.gov/industries/electric/indus-act/reliability/reliability-orders/PA10-1-000.pdf ("[I]f the model constraint has a level of flexibility lower than what is needed in real-time, then it is possible that economic third-party offers were improperly included in the WPP [*i.e.*, weekly procurement process]—to the detriment of system reliability.").

C.    **The Entergy System**

A system is a group of two or more utilities that form a larger control area (in which, again, supply must exactly match demand) to achieve greater reliability and economies-of-scale benefits than would be obtainable by a single utility. *See, e.g.*, *Miss. Indus. v. FERC*, 808 F.2d 1525, 1529 (D.C. Cir. 1987) ("The [Entergy] System Agreements * * * clearly permit and encourage, for efficiency, reliability, and other economies of scale, that the individual companies from time to time build larger facilities than are necessary to meet their own native load [*i.e.*, demand], to benefit all the generating companies by having lower costs and greater reliability." (quoting *Middle S.*

---

[6] Letter from Megan E. Vetula (Entergy) to Penny S. Murell (FERC) dated March 27, 2015, at 12-13, https://elibrary.ferc.gov/idmws/file_list.asp?document_id=14317147.

*Servs., Inc.*, 30 F.E.R.C. P63,030, at 65,142 (1985)) (asterisks in original)), *vacated in part on other grounds on reh'g*, 822 F.2d 1104 (D.C. Cir. 1987).

At the time Plaintiff filed suit in 2008, the Entergy System encompassed six utilities (also known as "Entergy Operating Companies" or "EOCs") in parts of four States: Entergy Arkansas, Inc. ("EAI") in Arkansas; Entergy Gulf States Louisiana, LLC, Entergy Louisiana, LLC ("ELL") and Entergy New Orleans, Inc. ("ENOI") in Louisiana; Defendant EMI in Mississippi; and Entergy Texas, Inc. ("ETI") in Texas. (Ex. A at 3.)[7] Utilities elsewhere in the country have also formed systems. *E.g.*, *AEP Tex.*, 473 F.3d at 583 (describing AEP system).

The Entergy System was governed by the ESA, a FERC-approved tariff.[8] Section 1.01 of the ESA allowed any of the EOCs to withdraw eight years following provision of a notice of intent to withdraw. (Ex. A at 4.) EAI gave such a notice in December 2005, and EMI did so in November 2007. *Entergy Servs., Inc.*, 129 F.E.R.C. P61,143, at 61,594 (2009). FERC approved both notices. *Id.* In December 2013, the EOCs, including EMI, joined a larger system (a regional transmission organization) known as the Midcontinent Independent System Operator, Inc. *Entergy Servs., Inc.*, 153 F.E.R.C. P61,154, at 61,914 (2015). In 2016, the ESA was terminated. *Entergy Tex., Inc.*, 153 F.E.R.C. P61,347 (2015).

The time period for which Plaintiff seeks damages here, 1998-2008 (Ex. R at 1), predates EMI's exit from the System. The ESA in place during the 1998-2008 period addressed, among

---

[7] Before 2008, Entergy Gulf States, Inc. ("EGSI") served parts of Texas and Louisiana. Its successors are ETI and Entergy Gulf States La., LLC. *Entergy Tex., Inc. v. Nelson*, 889 F.3d 205, 207 (5th Cir. 2018).

[8] The original ESA dates from 1951, with successor ESAs in 1973 and 1982. *E.g.*, *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 357 (1988). Each version, as well as each modification between versions, was approved by FERC. *E.g.*, *Entergy Servs., Inc.*, 153 F.E.R.C. P61,154, at 61,914 (2015); *La. Pub. Serv. Comm'n v. FERC*, 771 F.3d 903, 906 (5th Cir. 2014).

other issues, (1) operating the System, and (2) allocating the costs of operation among the EOCs. As explained in ESA § 3.01 (Ex. A at 7):

> [*Operation*:]  The purpose of this Agreement is to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission and other facilities of the Companies in such a manner as to achieve economies consistent with the highest practicable reliability of service, subject to financial considerations, reasonable utilization of natural resources and minimization of the effect on the environment.  [*Cost-allocation*:]  This Agreement also provides a basis for equalizing among the Companies any imbalance of costs associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all the Companies.

### 1.     Operation Of The Entergy System

"The [ESA] is an Agreement among Entergy [Services, Inc.] and the Operating Companies and a Commission[*i.e.*, FERC]-approved tariff that requires that the Operating Companies' generation and transmission facilities be operated as a single, integrated system." *Entergy Servs.*, 153 F.E.R.C. P61,154, at *1.  The ESA described the efficiencies that result from operating as a system, including that "[t]he combined loads [*i.e.*, demands by customers] of the Companies can be supplied with less aggregate installed capacity," "[i]nstallations of additional capacity can be made at lower cost per kW [kilowatt] because of the larger [generating] unit sizes," and "[e]mergency conditions in any part of the System … can be met with less probability of impairment of service to the general public." ESA § 3.08 (Ex. A at 8-9). The ESA further recognized that "reliability of service and economy of operation require that the energy supply to the system be controlled, to the extent practicable, from a centralized dispatching office …." *Id.* § 3.07 (Ex. A at 8).  An Operating Committee administered the ESA and the Committee's delegate,

the System Operator, oversaw operation. *E.g.*, *id.* §§ 2.06, 5.06(f), 4.01 (third paragraph), 4.02, 4.03, 30.02 (Ex. A at 5, 10-11, 12-13, 14).[9]

The principal sources of supply of energy to the Entergy System were (1) production facilities owned by or under contract to one of the EOCs, *id.* § 4.01 (Ex. A at 10); and (2) purchases from non-Entergy resources, including IPPs, *id.* §§ 4.02, 4.03 (Ex. A at 11). The determination of which sources to use was entrusted to the Operating Committee and System Operator.[10] They were obligated to "obtain the lowest reasonable cost of energy to all the Companies consistent with the requirements of daily operation generation reserve, voltage control, electrical stability, loading of facilities and continuity of service to the customers of each Company." *Id.* § 30.02 (Ex. A at 14).[11]

The demand for electricity and the resources available to provide it changed moment to moment over the course of a day, and the Entergy System needed to own or to control resources able to follow changes in load. Among the principal challenges faced was the existence of a large number of QFs in the EOCs' service territories, which, as discussed above, were entitled by PURPA to "put" energy into the Entergy System (and to reduce or to cease such puts) at any time and

---

[9] The Operating Committee had one representative of each EOC and one representative of Entergy Corporation. ESA § 5.01 (Ex. B at 23).

[10] *See* ESA § 30.02 ("The System Capability shall be operated as scheduled and/or controlled by the *System Operator* ...."); *id.* § 4.02 (first sentence) ("The Companies, with the consent of or under conditions specified by the *Operating Committee*, may agree to a contract by one or more of them, for the purchase of capacity and/or energy from outside sources for the account of a Company or Companies."); *id.* § 4.03 ("Services, through the *System Operations Center*, may purchase energy under economic dispatch or emergency conditions ... for the joint account of all the Companies.") (Ex. A at 11, 14) (all emphases added).

[11] The System did purchase increasing amounts of IPP energy over time to the extent such purchases were less expensive than other sources and consistent with the reliability requirements of the System. From 1999 to 2008, the System increased its purchases from IPPs by more than 30%, while reducing supply from the System's legacy units by more than 50%. (Ex. F at 197 (Fig. JPH-59).)

without prior notice.[12]  For example, on June 2, 2005, puts from QFs into the Entergy System ranged from 468 megawatts ("MW") to 2,073 MW.  (Ex. H.)[13]  As noted above, responding to QF puts required that the System Operator have supply sources that could be quickly ramped up or down (known as flexible capability) so that the System at each moment remained in balance. Flexible capability was also needed to respond to changes in load (which could vary by nearly 10,000 MW in a single day during summer) and IPPs' use of the Entergy System's transmission lines to deliver energy to non-Entergy buyers.  (Ex. F at 56-64, 68-77.)

Dr. DeRamus, an economist who admitted he has "never … been responsible for the dispatch function within a utility" (Ex. C at 10:2-4), disputes that the QFs created a unique need for flexibility and also disagreed that legacy units were superior to IPPs' CCGTs in meeting that need (Ex. I at 32-37).  While Defendants' motion does not ask this Court to resolve this dispute, it is worth noting that, in contrast to Dr. DeRamus's claim that Defendants "overstat[e]" the impact of "relatively low level of QF puts" on system volatility (*id.* at 31-32), his colleague at the Bates White firm who does have training in electrical engineering[14] recognized that QF puts "impose[] significant inefficiencies on the system" (Ex. F at Appx. JPH-14 at 23 of 93), and did not suggest those inefficiencies could be solved by purchasing more energy from IPPs.

Each EOC (and its customers), in real time, received the benefit of having sufficient resources to satisfy the demand for electricity.   As to the costs of supplying that electricity, the

---

[12]  The challenge was particularly severe on the Entergy System relative to other utilities/systems.  In 2006, on the Entergy System, there were 7,986 MW of interconnected QF capacity.  By comparison, Progress Energy had 1,284 MW, and The Southern Company had 1,302 MW.  (Ex. G at 9 (Tbl. 2).)

[13]  Such large swings were common.  In every year from 2003 to 2008, at least 15% of days experienced swings from minimum to maximum QF put that exceeded 1,000 MW.  (Ex. H.)

[14]  (Ex. F at Appx. JPH-14 at 1 of 93 (cover letter signed by Nicolas Puga, MSc, submitting Bates White's report to MPSC)); https://www.bateswhite.com/professionals-Nicolas-Puga.html (Mr. Puga holds a MSc degree in Energy Engineering and a BS degree in Electrical Engineering).

operational decisions were made from the perspective of the System as a whole, without regard to how any individual EOC would be impacted. *E.g.*, ESA § 3.07 (Ex. A at 8). As to long-term planning decisions, individual EOCs' concerns were taken into account, but still through the mechanism of a System-wide planning process. *E.g.*, *id.* § 3.05 (Ex. A at 7-8) ("It is the long term goal of the Companies that each Company have its proportionate share of Base Generating Units available to serve its customers either by ownership or purchase."); *id.* § 3.08 (Ex. A at 8-9) (discussing "join[t] planning on a systemwide basis for the construction and operation of these major facilities"). Long-term equalization of investments by each EOC in generating units located within its territory was intended to translate into a fair allocation of costs. *La. Pub. Serv. Comm'n*, 771 F.3d at 905-06.[15]

## 2. Cost Allocation Among The Entergy Operating Companies

As noted above, in real time the EOCs and their customers received the *benefit* of having their electricity demands satisfied. After the end of each month, the *costs* of the energy were allocated among the EOCs, pursuant to the ESA's Schedule MSS-3, ESA §§ 30.01 *et seq.* (Ex. A at 14-18).[16] MSS-3 established an accounting protocol of stacking of each EOC's resources, from lowest to highest cost, that had been used to supply energy in each hour of the prior month.

---

[15] For reasons including an unexpected increase in the cost of natural gas that adversely affected the Louisiana-based EOCs with a relatively larger number of natural-gas-fired plants, the ESA was unable to accomplish "rough production cost equalization" solely through long-term planning. In 2005, FERC ordered amendment of the ESA to include an annually-imposed "bandwidth remedy," under which "each calendar year the production costs of each operating company are calculated and, if necessary, 'payments [are] made by the low cost Operating Company(ies) to the high cost Operating Company(ies) such that, after reflecting the payments and receipts, no operating company would have production costs more than 11 percent above the Entergy System average or more than 11 percent below the Entergy System average." *La. Pub. Serv. Comm'n*, 771 F.3d at 906 (quoting *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 146 F.E.R.C. P61,152, at 3 (2014) (alteration in original)).

[16] Other Schedules addressed other costs. For example, MSS-1 governed allocation of the costs of reserves (capacity) to provide a reliable supply of energy, and MSS-2 governed allocation of costs of transmission.

Purchases from IPPs were generally "joint account purchases," meaning they were shared by the EOCs based on Responsibility Ratio (defined as an EOC's share of the System's peak hour load). Short-term purchases always received this treatment. ESA §§ 4.02 (first sentence), 4.03, 2.18 (Ex. A at 6, 11). Longer-term purchases usually received this treatment, although on a few rare occasions, the Operating Committee approved a long-term purchase from an IPP for the benefit of a single EOC (an "own account purchase"), meaning the purchase and associated cost were assigned entirely to that EOC. ESA § 4.02 (first sentence) (Ex. A at 11); (Ex. J at 32-36).

In the MSS-3 accounting, the lowest-cost source, and progressively each higher-cost source, owned by or allocated to an EOC for each particular hour were deemed assigned to that EOC until its own load (*i.e.*, demand) in that hour was satisfied. ESA § 30.02 (Ex. A at 14). If the EOC's own sources were exactly sufficient to match its own load, which was rarely the case, that EOC did not participate in the sharing of costs under MSS-3. If the EOC's sources produced more energy than was required to serve its own load (a "long" EOC), the excess was deemed Exchange Energy that was available to supply other EOCs in the System whose sources produced less energy than was necessary to supply their own loads ("short" EOCs). MSS-3 required that a short EOC make a payment corresponding to the cost of the Exchange Energy it was deemed to take from the Exchange, and a long EOC received a payment corresponding to cost of the Exchange Energy it was deemed to give to the Exchange. ESA §§ 30.07, 30.08 (Ex. A at 16-17).[17]

---

[17] To illustrate, consider a simple version of the System comprising two EOCs (A and B), each with 500 MWH of load in each hour. Assume the System used three resources to meet these needs in an hour: 400 MWH from A's $30 per MWH unit, 200 MWH from B's $50 per MWH unit, and 400 MWH from the System's $40 per MWH purchase. If the 400 MWH System purchase was allocated evenly between A and B, A's total resources equaled 600 MWH (400 MWH from its own unit plus 200 MWH of the System purchase) and B's total resources equaled 400 MWH (200 MWH from its own unit and 200 MWH of the System purchase). Applying MSS-3, A was deemed to have kept its cheapest energy (the 400 MWH from its $30 per MWH unit and 100 MWH from its allocation of the $40 per MWH System purchase) for its own load, and sold its excess—the remaining 100 MWH share of the System purchase—to the Exchange at cost

### D. How EMI's Costs Were Passed On To EMI's Customers

As described above, EMI's "rates" charged to Mississippi electricity customers include a base rate and various "rider" schedules, including an FAC. (Ex. K at 8.) EMI's FAC allowed for timely recovery of ongoing costs (including costs incurred by EMI at the wholesale level, such as from IPP purchases and allocations of Exchange Energy to EMI) that could change frequently and significantly, such as fuel and purchased energy costs. (*Id.* at 13-14.) EMI's base rate allowed it to recover a reasonable rate of return on its capital investments (such as costs to build a power plant). (*Id.* at 8-10.) The MPSC has approved several different forms of both EMI's base rate and FAC, and the MPSC and MPUS have reviewed (and still review) EMI's base rates and FACs at least annually. (*Id.* at 12-22; *see also* Ex. L at 7-9.)

The electricity bills that EMI's retail customers received reflected two variables: EMI's "rates" and the customer's "usage." (Ex. K at 11-12.) While Plaintiff alleges that "Mississippians are having to pay … inflated power bills," Doc. 135 ¶ 7, Plaintiff has not asserted that EMI artificially inflated customer usage. (Ex. M at 34:15-36:24.) Thus, Plaintiff's claim that customers' bills were excessive is a claim that EMI's MPSC-approved rates were excessive.

### E. Plaintiff's Theories And Causes Of Action

Plaintiff's primary theory of liability is that EMI, to the detriment of its retail customers in Mississippi, generated expensive energy from its own plants and was allocated expensive energy from the System's Exchange, when EMI supposedly could have purchased cheaper energy from IPPs. *See, e.g.*, Doc. 135 ¶¶ 2, 38. Specifically, Plaintiff alleges that EMI should have sought and

---

($40 per MWH). B was deemed to have kept its 200 MWH from its own plant, its 200 MWH allocation of the System purchase, and purchased its deficit of 100 MWH from the Exchange. Thus, for this hour, A would have received MSS-3 payments of $4,000 (100 MWH sale to Exchange * $40 per MWH) and B would have made MSS-3 payments of $4,000 (100 MWH Exchange purchase * $40 per MWH Exchange cost). A similar calculation was performed for every hour in the month and each EOC made or received a net payment covering the entire month.

obtained permission from the Operating Committee under ESA § 4.02 for EMI to purchase IPP

energy for its "own account." *Id.* ¶¶ 38-39. And Plaintiff's sole theory of damages is based upon

the difference between the costs EMI actually incurred and the costs Plaintiff says EMI would

have incurred had it purchased the additional amounts of energy from IPPs that Plaintiff claims

should have been purchased. (*See, e.g.*, Ex. R at 3.) According to Plaintiff, these damages flowed

directly to EMI's customers in the form of higher electricity bills. (*See id.*; Doc. 135 ¶¶ 7, 44; Ex.

X at 18.)[18] Plaintiff alleges eight causes of action: (1) violation of the Mississippi Consumer

Protection Act; (2) violation of the MPSC's rules/regulations; (3) restitution; (4) unjust enrichment;

(5) violation of the Mississippi Antitrust Act; (6) fraud; (7) breach of the obligation of good faith;

and (8) an accounting. Doc. 135 ¶¶ 106-33.

## ARGUMENT

"Summary judgment is appropriate when the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law…. When

considering a summary judgment motion, the court must view all facts and evidence in the light

most favorable to the non-moving party." *Pace v. Miss. Baptist Health Sys., Inc.*, No. 3:17-cv-

0009-CWR-LRA, 2018 WL 1189918, at *2-3 (S.D. Miss. Mar. 7, 2018) (quotation marks omitted).

I. **MISSISSIPPI LAW, ESPECIALLY AS CLARIFIED BY SB 2295, REQUIRES THAT A CHALLENGE CONCERNING ELECTRICITY RATES BE BROUGHT BEFORE THE MPSC RATHER THAN A COURT**

Every theory asserted in Plaintiff's Amended Complaint concerns EMI conduct that,

according to Plaintiff, resulted in EMI charging higher-than-reasonable rates to its retail customers;

Plaintiff seeks recovery of the amounts of the alleged overcharges. *See supra*, at 14-15; (Ex. M at

33:23-25 ("Q. I'm correct, aren't I, that the state [*i.e.*, Plaintiff] claims that EMI's customers' bills

---

[18] Plaintiff alleges several miscellaneous liability theories, which Defendants address in Point III, *infra*.
None is accompanied by a showing of damages that corresponds to the theory.

were too high?  A.  Yes.")).  Plaintiff is *not* claiming that EMI failed to charge the MPSC-approved

rate.  Instead, Plaintiff claims the rates were too high (*i.e.*, were wrong).  Plaintiff asks for this

Court to award a remedy that would effectively change those rates.

This is ratemaking, pure and simple, and falls squarely within the original jurisdiction of

the MPSC as opposed to a court.  The Mississippi Supreme Court recently held that a "rate," as

defined in § 77-3-3(e), includes any "formula or method" and all "practices or contracts" that affect

the rate the utility charges to its customers.  *Miss. Rural Water Ass'n*, 222 So. 3d at 292-94.  And

Miss. Code Ann. § 77-3-5 provides that "the [MPSC] shall have exclusive *original jurisdiction*

over the intrastate business and property of public utilities."  *Id.* (emphasis added); *see also Singing*

*River Mall Co. v. Mark Fields, Inc.*, 599 So. 2d 938, 942 (Miss. 1992) ("[O]nly the [MPSC] may

initially decide a matter relating to the regulation of intrastate public utility activity….  The

commission's jurisdiction is exclusive, but subject to the appellate process."); *Miss. Pub. Serv.*

*Comm'n v. S. Cent. Bell Tel. Co.*, 464 So. 2d 1133, 1134-35 (Miss. 1984) ("[r]ates" are at the heart

of a utility's "intrastate business and property":  "It is beyond question that the function of rate

making in this state is purely legislative in character *and a court is without power to fix rates*

*charged by a public utility*.") (emphasis added)).  A challenger of utility rates is not without judicial

remedies, but those may be sought only on appeal from the MPSC.  Miss. Code Ann. § 77-3-72(1).

Were any further elucidation needed, it was provided by SB 2295, which "clarif[ied] the

existing scope of said exclusive original jurisdiction" by providing that the MPSC's

> exclusive original jurisdiction extends, but is not limited to … the amount of a retail
> rate or customer bill or whether such rate is just and reasonable; and challenges to
> the validity or accuracy of rates charged by a public utility, or to the accuracy or
> reliability of information submitted to the [MPSC] by a public utility …, regardless
> of the legal theory upon which any such challenge is made.

SB 2295 § 24 (Ex. A at 23-25) (amending Miss. Code Ann. § 77-3-5).

SB 2295 also clarified that § 77-1-43(2) provides no support for Plaintiff's suit. Before SB 2295, § 77-1-43(2) stated: "Any action for violation of the law, or for violation of any lawful rule, regulation or order of the commission may be instituted by the commission or by the Attorney General in any court of competent jurisdiction." Plaintiff previously claimed that this language authorized the Attorney General to bypass the MPSC and to proceed directly in court. Doc. 56 at 31-32. That view is incorrect, especially in light of SB 2295.

*First*, SB 2295 amended § 77-1-43(2) to delete the language on which Plaintiff relies ("may be instituted … by the Attorney General in any court of competent jurisdiction"), and to make clear that the Attorney General may proceed originally in court *only* "at the request of the commission by order after notice and hearing":

> The commission may apply to the circuit or chancery court, by proper proceeding, for aid in the enforcement of obedience to its process, and to compel compliance with *** Title 77, Mississippi Code of 1972 and its lawful rules, regulations, orders, decisions, and determinations. Said courts shall have jurisdiction to grant aid and relief in such cases, subject to the right of appeal to the Supreme Court by the party aggrieved. The commission itself may, by order after notice and hearing, institute such proceedings or, at the request of the commission by order after notice and hearing, the Attorney General, or district attorney in his district, shall institute such proceedings in the name of the commission. * * *

SB 2295 § 19 (Ex. A at 21-22) (underlines (new language) and asterisks (deletions) in original).)

This clarifying language in SB 2295 goes into effect on July 1, 2018, *id.* § 25 (Ex. A at 25), and thus the new versions of §§ 77-3-5 and 77-1-43(2) will apply to this action at that time. The applicability of these statutes to this action is governed by Mississippi law. *Clark v. Jeter*, 486 U.S. 456, 460 (1988); *Marshall v. Tanner*, 651 F. App'x 254, 255 (5th Cir. 2016) (unpub.). Under that law, a "statute modifying a previous statute has the same effect as though the statute had all the while previously existed in the same language as that contained in the modified statute …." *Cellular S., Inc. v. BellSouth Tel., LLC*, 214 So. 3d 208, 214 (Miss. 2017). If "the Legislature

chooses to amend or modify any law related to a pending action, [the Mississippi Supreme] Court applies the Legislature's most recent pronouncement." *Miss. Dep't of Corr. v. Roderick & Solange MacArthur Justice Ctr.*, 220 So. 3d 929, 933 (Miss. 2017). Because SB 2295 contains no saving clause that would prevent applying it to a pending case, and because this case will not proceed to final judgment before July 1, 2018, the amendment applies unless it would impair a right of Plaintiff's that has "vested." *Cellular S.*, 214 So. 3d at 215. But a "right to a particular remedy" in a pending case prior to judgment—here, Plaintiff's supposed remedy of bringing an action originally in court rather than the MPSC—"is not a vested right." *Roderick*, 220 So. 3d at 936.

*Second*, putting aside SB 2295, a familiar canon of construction unmasks Plaintiff's error regarding his claim to possess authority to sidestep the MPSC and to bring suit in court under the pre-SB 2295 version of § 77-1-43. Sections 77-1-43 and 77-3-5 must "be read *in pari materia* and to the extent possible each section of the Code must be given effect." *Miss. Pub. Serv. Comm'n v. Mun. Energy Agency of Miss.*, 463 So. 2d 1056, 1058 (Miss. 1985). Section 77-3-5's vesting of "exclusive original jurisdiction" concerning rates in the MPSC can be read consistently with old § 77-1-43(2) by interpreting the latter provision's prerequisite for an Attorney General's court action—"violation of the law, or for violation of any lawful rule, regulation or order of the commission"—in the following way: (1) "violation of the law" means a law that does not overlap with the MPSC's authority over electricity rates; and (2) "violation of any lawful rule, regulation or order of the commission" means a "rule" or "regulation" or "order" that is sufficiently specific that no further interpretation by MPSC is needed to know that it has been violated. Neither is present here: (1) the alleged "violation of the law," a grab-bag of conduct that allegedly affected

electricity rates, is in the heartland of what MPSC ordinarily regulates;[19] and (2) the MPSC, rather than the Attorney General, must be allowed in the first instance to interpret its rules and prior orders to determine whether there has been a violation.[20]  The practice of prior Attorneys General under old § 77-1-43(2) is instructive.  Unlike Plaintiff, they questioned utility rate-making practices only by proceeding first before the MPSC, and then in court on appeal.  *See, e.g.*, *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 356 (1988) ("*MP&L*"); *State ex rel. Allain v. Miss. Pub. Serv. Comm'n*, 418 So. 2d 779, 781 (Miss. 1982).

The foregoing Mississippi statutes reflect the filed-rate doctrine, which precludes attacks in court on rates filed with or regulated by a governmental agency.  The doctrine recognizes the broad authority granted to agencies rather than courts to determine whether rates are reasonable.  Any rate accepted by the agency is *per se* reasonable and unassailable in court (except on appeal of the agency's order).  *See, e.g.*, *United Gas Pipe Line Co. v. Willmut Gas & Oil Co.*, 97 So. 2d 530, 535 (Miss. 1957) (doctrine applies "whether [rate is] fixed or merely accepted by the Commission") (internal quotation marks omitted); *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1204 (Miss. 2001) ("A civil juror, who likely has little, if any, expertise in the area …

---

[19]  To the extent Plaintiff argues that jurisdiction in state court is proper at least as to its antitrust and consumer protection claims, that argument must fail.  First, those claims plainly challenge the rates that Defendants charged, which is within MPSC's domain, as the only cognizable injury is based on excessive rates.  Second, even were those claims somehow outside of the heartland of MPSC regulatory authority, these claims must be dismissed because alleged rate-affecting conduct may not be challenged under the Mississippi Antitrust or Consumer Protection Acts.  *See Cumberland Tel. & Tel. v. State ex rel. Attorney General*, 54 So. 446, 450 (Miss. 1911).  Thus, at a minimum, the only surviving claims are plainly required to be brought to MPSC first.

[20]  Moreover, if § 77-1-43(2) did grant the Attorney General broad authority to file original actions in court concerning conduct that allegedly affected electricity rates, it would irreconcilably conflict with § 77-3-5's grant of "exclusive original jurisdiction" over such matters to the MPSC.

should not be permitted to reject and thereupon impose liability based on the rates … expressly approved by the [agency].").[21]

The foregoing discussion applies both to base rates and the FAC, which is authorized by the MPSC.  Plaintiff claims that EMI improperly manipulated its FAC to obtain higher retail rates, Doc. 135 ¶¶ 46-50, but FAC proceedings are specifically covered by state statutes and MPSC regulations used by the MPSC in exercising its original jurisdiction, Miss. Code Ann. §§ 77-3-42(2)(b), 77-3-45.  The law further requires the MPSC to conduct audits at least once a year of "all fuel purchases for which fuel clauses or riders have been placed" to "totally verify fuel costs … and all purchased energy."  *Id.* § 77-3-42(2)(a).  These audits must include, *inter alia*, "an assessment of a utility's practices for economical purchase and use of fuel and electric energy." *Id.* § 77-3-42(2)(c)(iii); *see also id.* § 77-3-42(5).  If the MPSC, after its review, "has reasonable cause to believe that inefficient or uneconomical procurement or use of fuel or purchased energy has resulted in unreasonable or unjust charges or costs to the consumers, then the commission shall initiate a procedure for hearing … for the purpose of determining whether or not any of the costs or charges included in the fuel adjustment charges to the consumers were unreasonable or unjust." *Id.* § 77-3-42(5).  If, after the hearing, the MPSC determines that a fuel or energy purchase was improper, it "shall order that such costs or charges be refunded," either by a direct refund or a credit to the consumer's account.  *Id.*  In short, FAC proceedings, and any resulting adjustment in rates, are within the MPSC's original jurisdiction.[22]

---

[21]  The federal version of this doctrine is discussed in Point II.A, *infra*.

[22]  Even if such jurisdiction is not mandatory, this Court should defer to MPSC under primary jurisdiction. *Ill. Cent. R.R. Co. v. M. T. Reed Constr. Co.*, 51 So. 2d 573, 575 (Miss. 1951) (*per curiam*).

## II.     PLAINTIFF'S SUIT IS ALSO PREEMPTED BY FEDERAL LAW

Point I above seeks a ruling from this Court that, *as between the MPSC and a court*, the MPSC has original jurisdiction over a challenge concerning electricity rates.  That disposition would leave Plaintiff free to pursue its claims before the MPSC, but would also allow the MPSC to determine that, *as between the MPSC and FERC*, FERC has exclusive jurisdiction because Plaintiff's suit attacks practices governed by a FERC-approved tariff (the ESA), and therefore are within the scope of the filed-rate doctrine and federal preemption.  Alternatively, this Court may choose to address that issue and grant summary judgment to Defendants on that ground.

### A.     The Filed-Rate Doctrine Applies Because Plaintiff Challenges Operational And Purchasing Decisions Governed By A FERC-Approved Tariff, The ESA

"The Supremacy Clause provides a clear rule that … Congress has the power to preempt state law."  *Arizona v. United States*, 567 U.S. 387, 399, 351 (2012).  The principal preemption doctrine in the area of interstate wholesale energy is the filed-rate doctrine, which provides "that interstate power rates filed with FERC or fixed by FERC must be given binding effect," and therefore such rates preempt state regulation.  *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962 (1986); *see also Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39 (2003) ("*ELI*"); *MP&L*, 487 U.S. at 354.

The filed-rate doctrine preempts claims asserting that a filed rate or tariff is not "just and reasonable" or that a utility violated its rate or tariff, when such claims are filed in a forum other than FERC.  *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (state preempted from creating a "retroactive rate increase"); *AEP Tex.*, 473 F.3d at 585 ("[I]t is within FERC's jurisdiction, not the states', to make a final determination as to whether the tariff has been violated.").  The doctrine focuses on the claim's substance, not its label, and thus has been held to preempt claims styled as breach of contract, *Ark. La.*, 453 U.S. at 579-80, constructive fraud, *Montana-Dakota Utils. Co. v.*

*Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-252 (1951), fraud, bribery, or conspiracy relating to regulatory proceedings, *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 486 (8th Cir. 1992); *Taffet v. S. Co.*, 967 F.2d 1483, 1485 (11th Cir. 1992), unfair competition, *Calif. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 852 (9th Cir.), *as amended*, 387 F.3d 966 (9th Cir. 2004), and antitrust, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 (1986); *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507-09 (5th Cir. 2005).[23]

The filed-rate doctrine "is not limited to 'rates' *per se*: 'our inquiry is not at an end because the orders do not deal in terms of prices or volumes of purchases.'" *Nantahala*, 476 U.S. at 966-67 (quoting *N. Nat. Gas Co. v. Kan. Corp. Comm'n*, 372 U.S. 84, 90-91 (1963)). Thus, in *ELI*, the Supreme Court, relying on *Nantahala* and *MP&L*, held that a non-price provision in the ESA is a "filed rate." 539 U.S. at 47-50. Specifically, the Court considered a provision that delegated discretion to the Entergy Operating Committee to determine which generators should be counted as available, which in turn affected cost equalization payments among the EOCs. *Id.* at 44-45. The Court held that the filed-rate doctrine preempted a state public service commission's order that had found the Operating Committee's exercise of discretion imprudent. *Id.* at 49-50.

The same is true here because Plaintiff's suit challenges the System's and/or EMI's exercise of discretion, under ESA provisions including §§ 4.02 and 30.02, concerning purchases of energy from IPPs and operation of EMI's own generating units. Especially instructive is *Jenkins*, a 2015 Texas appellate decision—which Judge Wingate did not discuss—involving the Entergy System and addressing a theory identical to Plaintiff's here, *i.e.*, that the Entergy System or an individual EOC (there, ETI) should have made additional purchases from IPPs. *Jenkins*, 469 S.W.3d at 339 ("Jenkins claims that ETI, in conspiracy with its parent and affiliates (Entergy), stole the class's

---

[23] Preemption does not leave complainants remediless; they can proceed at FERC. *See infra*, at 23-24.

money by charging them for using system-generated electrical power instead of cheaper power available from third parties ….”); *Jenkins*, Findings Of Fact And Conclusions Of Law On Pltfs.’ Mtn. To Certify ¶ 122 (Tex. Dist. Ct. Apr. 30, 2012) (Ex. N at 48) (“Dr. DeRamus specifically testified that individual operating companies have an option to purchase lower cost power from third-parties subject to the agreement of the operating committee.”).  Plaintiff has conceded his allegations here “are highly similar to, and in some respects *exactly the same as*, allegations raised in [*Jenkins*].”  Doc. 56 at 10 (emphasis in original); *see also* (Ex. C at 40, 56-57, 160-161).

Unlike Judge Wingate, the *Jenkins* court applied the filed-rate doctrine as articulated in *ELI* and *MP&L*, and held the plaintiffs’ claim preempted, 469 S.W.3d at 340-43, explaining:

> Although Jenkins does not allege breach of the FERC-approved ESA as a cause of action, he challenges Entergy’s purchasing decisions—whether to use allegedly available third-party electricity or system-generated electricity—which Entergy undertook pursuant to the ESA.  Determining whether Entergy permissibly exercised its discretion in making its purchasing decisions thus necessarily requires consideration of the ESA, a FERC-approved tariff.

*Id.* at 343; *see also id.* at 345 (“FERC, not the state, is the appropriate arbiter of any disputes involving a tariff’s interpretation.” (quoting *AEP Tex.*, 473 F.3d at 585)); *id.* at 341 (quoting ESA § 30.02 (Ex. A at 14)); *see also infra*, at 25-27 (discussing, *e.g.*, *Appalachian*, 812 F.2d at 904-05, and *AEP*, 36 F.E.R.C. P61,226, at 61,550).

Consistent with *Jenkins’* reasoning, FERC has adjudicated complaints regarding the same or similar conduct as Plaintiff challenges here.  *Entergy Servs., Inc.*, 128 F.E.R.C. P63,015, at 66,116 (2009) (claim that Entergy adopted rules for running its units that “decreas[ed] the potential savings from off-system purchases”), *aff’d in part, rev’d in part*, 137 F.E.R.C. P61,029 (2011); *Entergy Servs., Inc.*, 124 F.E.R.C. P63,026, 63,339 (2008) (claim that Entergy “fail[ed] to purchase lower cost energy allegedly available on the wholesale market”).  Dr. DeRamus did not address these decisions in asserting that “FERC is not inclined to review whether the amount of a utility’s

wholesale purchases was prudent or otherwise acceptable." (Ex. I at 63-64.)[24] Dr. DeRamus did

acknowledge that the *Jenkins* appellate court dismissed that case "on jurisdictional grounds" (*id.*

at 10), which as explained above is the same federal preemption ground Defendants argue here.

> **B.** **The *Pike County* Exception To Federal Preemption Does Not Apply To Purchasing Decisions Made In The Context Of An Integrated, Multi-Utility, Multi-State System Like The Entergy System**

In denying Defendants' Rule 12(c) motion, Judge Wingate distinguished *ELI* on the ground

that Plaintiff's suit would not "impose a substantial limitation to FERC's flexibility in approving

cost[] allocation arrangements." Doc. 86 at 20:10-16; *see id.* at 19:22-23 (drawing "substantially

limit FERC's flexibility" standard from *ELI*). Judge Wingate's basis for ruling that FERC's

flexibility would not be impaired was that (1) under the so-called "*Pike County* exception" to

federal preemption, FERC and several courts have held that a state public service commission,

rather than FERC, may review the prudence of a purchasing utility's choice between two or more

FERC-approved wholesale sources, Doc. 86 at 24:20-25 (quoting *Cent. Vt. Pub. Serv. Corp.*, 84

F.E.R.C. P61,194, at 61,975 (1998) (citing *Pike County Light & Power Co. v. Pa. Pub. Util.

Comm'n*, 465 A.2d 735 (Pa. Commonwealth Ct. 1983))); and (2) Plaintiff's suit concerns such a

decision, alleging that EMI should have purchased more energy from IPPs (at FERC-approved

wholesale rates in the market) instead of operating its generating units and receiving allocations of

Exchange Energy (at FERC-approved wholesale rates in the ESA), Doc. 86 at 27:7-11.

Defendants respectfully submit that Judge Wingate erred in failing to recognize an

important limitation on the *Pike County* exception: it has been applied only in the context of a

---

[24] Dr. DeRamus made this assertion after conceding that preemption "is ultimately a legal argument, not an economic one." (Ex. I at 63.) Despite that concession, and the fact that he is not a lawyer, Dr. DeRamus proceeded to give his opinion on the issue. His opinion is incorrect because it fails to confront the FERC decisions and most of the case law (all but *Jenkins*, which supports Defendants) discussed in text.

*standalone purchasing utility*. In contrast, courts have relied on the Supreme Court's filed-rate decisions and held the *Pike County* exception inapplicable in the context of an integrated *multi-utility, multi-state system* where multiple utilities can act as purchasers or sellers at different times and, more generally, plan and operate their resources on a coordinated basis and allocate the cost of doing so among the member utilities.

In *Appalachian*, the Fourth Circuit considered the AEP system, which included the APC utility (with customers in West Virginia and Virginia) and other "utility companies … located in several states." 812 F.2d at 900. The utilities were connected by an interstate electric transmission system. *Id.* They entered into, and FERC approved, a system agreement named the Transmission Equalization Agreement ("TEA"), "which allocates costs according to a formula that accounts for the demand each company places on the system." *Id.* Like the ESA, the TEA makes cost allocations between utilities: "Through monthly equalization payments, the TEA anticipates that 'deficit' companies will make payments to 'surplus' companies." *Id.* APC was a "deficit" company, such that its "share of costs for the [transmission] system under the TEA are greater than under the former arrangement." *Id.* The West Virginia public service commission ("PSC") denied APC the ability to recover in its retail rates all the costs it had incurred under the TEA, based on PSC's view that it (rather than FERC) had authority over whether "APC made a prudent choice among alternative arrangements for energy supply when it signed the agreement." *Id.* at 901. The district court granted APC summary judgment on preemption grounds, *id.* at 902, and the Fourth Circuit affirmed, holding that "the prudence inquiry the PSC wishes to make is not different from the FERC inquiry into the justness and reasonableness of the TEA," *id.* at 903.

Importantly, the Circuit rejected PSC's reliance on *Pike County*, explaining, *inter alia*, that

unlike the wholesale agreement at issue in *Pike County*, the TEA has no distinct "buyer" and "seller" of energy. *Pike County* had emphasized that FERC considers

25

interstate agreements from the seller's perspective, while state commissions focus upon the in-state buyer. The nature of the TEA and the AEP system is such that an affiliated utility could be at one time a receiver or "buyer" and at another time a supplier or "seller" of energy. FERC thus necessarily considered the fairness of the agreement from the perspective of all involved parties.

*Id.* at 904. The Circuit then tied its holding to the policy underlying federal preemption:

Contrasted with th[e] broad public interest protected by federal regulation is the narrower state public interest advanced by PSC regulation. *See, e.g.*, W. Va. Code § 24-2-12 (one function of the PSC is to prevent adverse effects on "the public in this state").[25] … No single state commission has the jurisdiction, and neither can it be expected to have the competence or inclination, to make this broad determination. The likelihood of conflict in allowing each state to consider the TEA separately is highlighted by the conflicting contentions of the various states represented before the FERC proceedings regarding the TEA. Consumer groups and commissions from the various states associated with the AEP system claim that their states' citizens are unduly burdened relative to other states. Only FERC has the objectivity and comprehensive overview that transcends these local concerns.

*Id.* at 905.

FERC has distinguished *Pike County* in the same way, in another case involving the AEP system. *AEP*, 36 F.E.R.C. P61,226, at 61,549. Kentucky Power Company ("KEPCO") entered into an agreement to purchase from another AEP member utility 15% of the capacity of the Rockport plant in Indiana. *Id.* The question was whether FERC or the Kentucky PSC had authority to review "KEPCO's prudence in light of the availability of alternative power supplies, in entering into the Rockport unit power sales agreement." *Id.* FERC had initially suggested that this determination was for the Kentucky PSC. But FERC granted rehearing to correct that suggestion and to clarify that, in the context of an integrated multi-utility, multi-state system, the prudence determination is for FERC alone:

We recognize that the November 23, 1984 order in this proceeding stated that the prudence of KEPCO's decision to enter into the Rockport agreement, in light of the availability of alternative power supplies, was not at issue. … Under narrow, *non-*

---

[25] This parochial state interest closely resembles that invoked by Dr. DeRamus. (Ex. A at 33-34 (quoted *supra*, at 4).)

> *pool* circumstances, that view would remain sufficient and dispositive. … The
> continuing controversy that has ensued, however, makes it clear that where, as here,
> the transaction involves *affiliated, jurisdictional utilities, which are members of an*
> *integrated, interstate holding company arrangement*, performing diverse functions
> on a coordinated basis, and particularly where differing interpretations are
> advocated concerning the parties' rights and obligations under the basic system
> agreements, the relevant issues may not be so readily segregated [between FERC
> jurisdiction and state PSC jurisdiction]. Under these circumstances, more complex,
> interrelated questions arise and, whether one characterizes the questions as related
> to prudence, interpretation, or cost allocation, they are clearly matters most
> appropriately resolved by this Commission [*i.e.*, FERC] as part of its overriding
> authority to evaluate and implement all applicable wholesale rate schedules.

*AEP*, 36 F.E.R.C. P61,226, at 61,550 (emphases added).[26]  Additionally, *Jenkins* did not consider

*Pike County* to stand in the way of preemption in the context of a claim identical to Plaintiff's here.

The *Pike County* (and progeny) cases cited by Judge Wingate, by contrast, did not involve

purchases in the context of an integrated multi-utility, multi-state system.  Instead, they involved

purchases by a standalone utility that did not belong to a system.  *Pike County*, 465 A.2d at 736;

*Cent. Vt.*, 84 F.E.R.C. P61,194, at 61,975; *Pa. Power & Light*, 23 F.E.R.C. P61,006, at 61,019

(1983).[27]  And just as courts and agencies faced with multi-utility, multi-state systems have

distinguished *Pike County* as involving a single utility purchaser, cases involving a single utility

purchaser have distinguished the system scenario.  *Gulf States*, 841 S.W.2d at 468 (acknowledging

"FERC has exclusive jurisdiction to review the prudence of a pool member's participation in a

pooling arrangement that involves buying and selling energy at wholesale rates," and then

distinguishing that principle because "Gulf States is not a participant in an integrated pooling

---

[26] This FERC decision was cited approvingly by Justice Scalia in his *MP&L* concurrence.  487 U.S. at 378-79.  Judge Wingate cited that concurrence for the proposition that a court should defer to FERC on the scope of federal preemption, Doc. 86 at 24:2-7, but Judge Wingate disregarded that Justice Scalia understood FERC as adhering to *AEP*—not *Pike County*—in the system context.

[27]  Judge Wingate also cited *MP&L*, which involved the ESA and mentioned *Pike County*.  Doc. 86 at 23:20-25.  However, *MP&L*'s reference was *dicta*:  "As we assumed, *it might well be* unreasonable for a utility to purchase unnecessary quantities of high-cost power …."  487 U.S. at 373-74 (emphasis added).  *MP&L* ultimately held state regulation preempted.  *Id.*

arrangement which might invoke FERC's exclusive jurisdiction"); *Monongahela Power Co.*, 39 F.E.R.C. P61,350, at 62,095 (1987) (similar).

In this case, there is no dispute that, as in *Appalachian* and other cases cited above, during the 1998-2008 period, EMI belonged to an integrated multi-state system governed by a federal tariff (the ESA). Additionally, as in *Appalachian*, EMI was sometimes a buyer from, and other times a seller to, the Entergy Exchange: EMI was short in approximately 58% of hours and long in approximately 41% of hours.[28] Dr. DeRamus acknowledged this, stating that *"generally Entergy Mississippi [i.e., EMI] bought from the pool [i.e., the Exchange]."* (Ex. C at 172:5-6 (emphasis added).) Judge Wingate erred by failing to recognize that *Pike County* does not apply in this multi-state system context.

But even if Plaintiff and Judge Wingate were correct that *Pike County* applies here, they fail to recognize that it would direct the dispute not to a court, but to a state PSC (here, the MPSC). Every one of the *Pike County* decisions involved a purchase (by a standalone utility that did not belong to a system) in the interstate wholesale market, *and deemed the issue appropriate for review by a state PSC. See, e.g., Pike County*, 465 A.2d at 271 (Pennsylvania Public Utility Commission); *Cent. Vt.*, 84 F.E.R.C. P61,194, at 61,972 (New Hampshire Public Utilities Commission); *Pa. Power & Light*, 23 F.E.R.C. P61,006 at 61,019 (New Jersey Board of Public Utilities). Thus, the very decisions on which Judge Wingate relied refute Judge Wingate's suggestion, Doc. 86 at 31:12-23, that the matter here is somehow beyond the MPSC's purview. *See also* Point I, *supra* (describing breadth of MPSC's original jurisdiction over matters that affect retail electricity rates).

---

[28] The sentence in text summarizes, pursuant to Fed. R. Evid. 1006, voluminous business records, specifically Hourly Report Records to the Entergy Intra-System Bill. These records show the percentages of hours EMI was allocated energy from the Exchange or sent energy to the Exchange. Upon request, Defendants will make available for examination or copying the underlying business records.

Besides *Pike County*, Plaintiff has previously relied on two decisions involving Entergy New Orleans' predecessor. Doc. 56 at 28-30 (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) ("*NOPSI III*"); *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 911 F.2d 993 (5th Cir. 1990) ("*NOPSI IV*")).[29] Those decisions arose from an order by the company's retail regulator, the Council of the City of New Orleans, that the company had acted imprudently by failing to attempt to resell nuclear energy it was obligated to purchase under a FERC order. But the decisions provide no relevant guidance here.

*NOPSI III* was not a filed-rate case, and thus the Court explicitly declined to determine whether the Council's order "conflicts with [its] holdings in *Nantahala* and *Mississippi Power & Light*." *NOPSI III*, 491 U.S. at 353. And the Supreme Court has not cited *NOPSI III* in any subsequent case involving application of the filed-rate doctrine. In particular, neither *NOPSI III* nor *NOPSI IV* was discussed or even cited in the U.S. Supreme Court's *ELI* decision, even though the Louisiana Supreme Court decision the U.S. Supreme Court reversed in *ELI* had relied on *NOPSI III* and *NOPSI IV*. *See Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 815 So. 2d 27, 38 (La. 2002). The U.S. Supreme Court, in reversing the Louisiana Supreme Court, instead relied on *MP&L* and *Nantahala*, explaining that a "FERC tariff that delegates discretion to [a] regulated entity to determine the precise cost allocation" preempts any state-level prudence review.[30] *ELI*, 539 U.S. at 42. *NOPSI IV* is likewise of questionable precedential value after *ELI* (at least in the circumstance of an integrated multi-utility, multi-state system), as shown by the Fifth Circuit's approving citation of *Appalachian* years after *NOPSI IV*. *AEP Tex.*, 473 F.3d at 586 n.20.

---

[29] Although Judge Wingate denied Defendants' Rule 12(c) motion, he did so in reliance on *Pike County*, Doc. 86 at 20-28, and did not mention the *NOPSI* decisions.

[30] *Jenkins* likewise ruled in favor of federal preemption in identical circumstances to those here, with no discussion of the *NOPSI* decisions. 469 S.W.3d at 343.

Finally, law of the case does not foreclose this Court from correcting Judge Wingate's error and granting Defendants summary judgment based on the filed-rate doctrine. Although "[g]enerally, under the law of the case doctrine, courts show deference to decisions already made in the case they are presiding over," *Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727 (5th Cir. 2012), the doctrine does not "operate to prevent a district court from reconsidering prior rulings," *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010). Here, Judge Wingate did not consider *Appalachian*, *AEP*, or *Jenkins*, and therefore reached an erroneous conclusion that this Court should now correct.

**C.    Undisputed Evidence Demonstrates That, If EMI Individually Had Purchased More Energy From IPPs, Entergy Operating Companies In Other States Would Have Been Harmed**

Undisputed evidence developed since Judge Wingate's Rule 12(c) decision underscores that Plaintiff's lone damages theory (*i.e.*, that EMI should have purchased more energy from IPPs) would have harmed EOCs in other states, and therefore Plaintiff's suit should be decided by FERC rather than a jury in a single state. *See, e.g.*, *Appalachian*, 812 F.2d at 905 ("Consumers groups and commissions from the various states associated with the AEP system claim that their states' citizens are unduly burdened relative to other states. Only FERC has the objectivity and comprehensive overview that transcends these local concerns.").[31]

State vs. state conflict is unavoidable under Plaintiff's theory. As discussed, an own account purchase of energy for the benefit of a single EOC means that the purchase is assigned 100% to that EOC. Plaintiff's theory assumes that the single EOC is EMI.[32] In a joint account

---

[31] *See Granger v. Slade*, 361 F. Supp. 2d 588, 592 (S.D. Miss. 2005) (law of the case does not apply where, as here, the "prior motion was filed early in the case, before discovery was completed").

[32] (*See* Ex. C at 208:25-209:3 ("Q. Well, your damages models all assume that 100 percent of each purchase is either made by EMI or is allocated to EMI, correct? A. Yes.").)

purchase, by contrast, the purchase is generally shared by all EOCs according to their Responsibility Ratios.[33] Plaintiff's theory retroactively changes EMI's hourly stack of resources by increasing EMI's own account purchases and decreasing EMI's reliance on energy generated by its legacy units and energy allocated from the Exchange. But changing EMI's stack necessarily changes the hourly cost allocation under MSS-3, with corresponding impacts on the other EOCs.

To illustrate the different impact of a joint account vs. an own account purchase, consider an actual joint account purchase on March 22, 2006—made on behalf of all EOCs but ENOI, which was then in bankruptcy after Hurricane Katrina—of a 16-hour block of 450 MW per hour (totaling 7,200 MWH over the block) at a price of $58.47 per MW from an IPP. As Mr. Hurstell explains, in the "base case" of what actually happened, "EMI's share of the purchase (over the entire block) was 1,080 MWh; other Companies also received shares totaling 6,120 MWh, which, with EMI's share, summed to the 7,200 MWh total block. Each Operating Company's share was placed into its stack and helped determine whether the Operating Company would owe or receive an MSS-3 Exchange payment for each hour, and ultimately (along with the Operating Company's costs of running its own generation units) what the Operating Company's total production costs would be over that time period." (Ex. F at 169.) Mr. Hurstell's Table JPH-11 is the base case, Table JPH-12 shows the changes from the base case if the purchase had been treated as an own account purchase by EMI, and Table JPH-13 shows the changes from the base case if the purchase had been treated as an own account purchase by EGSI. (Ex. A at 41-42.)

As Mr. Hurstell explains, in the first variation (own account purchase by EMI) relative to the base case, "EMI would have been better off (because its total production costs would have

---

[33] (*See* Ex. C at 209:16-19 ("[U]nder the joint purchases where it's done on behalf of all the [EOCs] … it's allocated according to the responsibility ratio.").)

decreased by $90,574), and every other [EOC] (besides EAI, which would have experienced no net impact) would have been worse off…. The reason why EMI would be better off and the other [EOCs] worse off is largely a function of the application of the MSS-3 Exchange principles: with an additional block purchase in its 'stack' of resources to serve EMI load, EMI is able to avoid the higher-priced purchases ($74.72 per MWh) it had been making from the MSS-3 Exchange." (Ex. F at 170-71.) On the other hand, EGSI in Texas and ELL in Louisiana, "with fewer block purchases in their respective 'stacks,' … must either buy more of the higher-priced energy from the MSS-3 Exchange (if they are short as a result of the decreases in block purchases) or sell less energy to the MSS-3 Exchange (if they have excess energy even after the decrease in block purchases). In either case, the net costs of the other [EOCs] would increase." (*Id.*) For example, EGSI's total production costs increase by $71,511. (Ex. A at 41 (tbl. JPH-12).)

In the second variation (own account purchase by EGSI) relative to the base case, EGSI becomes better off by $56,951, while EMI is worse off by $37,610. (*Id.* at 42 (tbl. JPH-13).) This shows that Plaintiff's theory, if adopted in other states, would harm EMI and its customers.

The foregoing discussion took an actual joint account purchase and changed it into an own account purchase by EMI (or EGSI), whereas Plaintiff's theory posits that such an actual joint account purchase should be left as is and *additional* own account purchases by EMI added. Nonetheless, this discussion shows that Plaintiff's theory raises state vs. state conflicts, because every time a new purchase from an IPP is considered, there will be a question whether to treat it as a joint account or own account purchase (and, if own account, by which EOC). That determination, which according to Plaintiff should always be resolved in favor of an own account purchase by EMI, necessarily changes the allocation of costs among the EOCs.

Indeed, Plaintiff's own expert Mr. Copeland found that, in his scenarios of *additional* own account purchases by EMI, state vs. state conflicts arise. These results are depicted by Mr. Hurstell's Figure JPH-51, which corresponds with Mr. Copeland's "Scenario A" where EMI makes additional purchases "[of] up to 1,723 MW of hourly energy," over a year. (Ex. Q at 3; Ex. A at 38-39 ("the way that the transaction was modeled in there is EMI has the ownership of it")).) Figure JPH-51 shows in 2006, for example, that, while EMI's costs go down by $282 million as a result of its additional purchases, EAI's costs go up by $34 million, ELI's by $56 million, ENOI's by $6 million, and EGSI's by $94 million.

**Figure JPH-51**
**Copeland Scenario A vs. Copeland Base Case**



(Ex. A at 42.)[34]  Consistent with his report, Mr. Copeland conceded at deposition that "there may have been some companies that … might have had some losses" if EMI had made more purchases. (Ex. A at 37.)[35]  And similar results are seen in Mr. Copeland's workpapers in support of his rebuttal report:  in 2006, for example, ELL's and EGSI's costs go up by $28 million and $36 million, respectively, while EMI's costs go down by $185 million.  *Compare* "Base.rep," at pages 3608 (ELL), 4704 (EGSI), and 4005 (EMI), *with* "ScenA.rep," at pages 3614 (ELL), 4705 (EGSI), and 4012 (EMI).  (These pages of Mr. Copeland's workpapers are reproduced at Ex. A at 55-57.)

Dr. DeRamus sought to evade these multi-state harms by stating that he "expect[s] that if that were the case, the other EOCs also could and should have purchased third-party power more cheaply to meet [their] needs, rather than relying on EMI's distant, high-cost legacy units."  (Ex. I at 61.)  But this "expect[ation]" is not supported by any damages analysis or calculation that involves other EOCs making additional purchases from IPPs.  Rather, Dr. DeRamus's only actual damages analysis addresses additional own account purchases solely *by EMI*.  And Dr. DeRamus certainly does not explain how, if all six EOCs were making "own account" purchases, they could do so in a manner that would exactly offset all inter-company effects at all times.  Defendants are entitled to evaluate the multi-state impact of the damages analysis Dr. DeRamus actually performed and to demonstrate that it indisputably creates harms in other states.  *See, e.g.*, *Crayton v. Amadeo Rossi, S.A.*, 384 F. App'x 330, 332-33 (5th Cir. 2010) (unpub.) (expert opinions

---

[34]  Mr. Hurstell's Figure JPH-51 is based directly on Mr. Copeland's workpapers for his original expert report.  The relevant pages are reproduced at Ex. A at 44-53.  Blue highlighting has been added to facilitate identifying total costs for each EOC and how they change from the base case to Mr. Copeland's Scenario A.  These excerpts, and those discussed in text from Copeland's rebuttal report workpapers, summarize other portions of Mr. Copeland's voluminous workpapers and are being employed under Fed. R. Evid. 1006.  Upon request, Defendants will make available for examination or copying the complete workpapers.

[35]  Mr. Hurstell similarly found that Dr. DeRamus's "hourly" and "full displacement" analyses would have made other EOCs worse off over a day (March 22, 2006), month (March 2006), and year (2006).  (Ex. F at 172-74, tbl. JPH-14, Apps. JPH-15, JPH-16.)

amounting to "conclusory allegations … devoid of an underlying factual basis and explanation" do not create issues of material fact on summary judgment); *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

The above discussion assumed *arguendo* that EMI had unfettered discretion to make own account purchases, and still demonstrated that such purchases cause multi-state effects that place review of EMI's decisions within FERC's exclusive jurisdiction.[36] In fact, EMI does not have unfettered discretion. Rather, ESA § 4.02 permits an own account purchase only with the "consent of or under conditions specified by the Operating Committee." *Pike County* has never been applied where the purchasing utility had such a FERC-approved constraint (exercised by a FERC-approved multi-state body, the Operating Committee) on its purchases, which furnishes an independent ground for finding *Pike County* inapplicable here.[37]

### D.    Alternatively, This Court Should Defer To FERC Under Primary Jurisdiction

If the Court does not rule that Plaintiff's suit is federally preempted, the Court should defer to FERC under primary jurisdiction "for an initial decision on questions of fact or law within the

---

[36] In *AEP*, the challenged decision had been made by a utility (KEPCO) within the system. 36 F.E.R.C. P61,226, at 61,550.

[37] Even if, at the Rule 12(c) stage, it was appropriate for Judge Wingate to infer from two past transactions that Operating Committee consent would be freely given, Doc. 86 at 26:1-4, 26:23-27:1, evidence in the summary judgment record demonstrates that the transactions do not support such a conclusion. The first transaction (Tennessee Valley Authority or "TVA") was not an own account purchase; to the contrary, it was treated as a joint account purchase (Ex. J at 31-32), and EMI (rather than ESI for the System) was made the contracting party only because TVA would contract only with a utility with which it was physically interconnected, and EMI was the only EOC that qualified (*id.* at 29). The second transaction (Big Rivers) was indeed an own account purchase by EMI authorized by the Operating Committee, but stands as an exceedingly rare example motivated by a desire to achieve greater fairness as between the EOCs by giving EMI individually some low-cost coal-fired energy to offset its disproportionate reliance on high-cost gas- and oil-fired energy. (*Id.* at 32-33.) Ultimately, this court need not reach these issues because, even if EMI had unfettered discretion to make own account purchases, the review of the prudence of EMI's exercise of that discretion is exclusively for FERC because of the consequences on EOCs outside Mississippi.

peculiar competence of the agency." *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 810 F.3d 299, 309 (5th Cir. 2016). FERC has substantial expertise regarding interstate energy sales and the ESA, and FERC adjudication will promote fair treatment and uniformity in resolving challenges to actions by a member of a multi-utility system, as compared to having courts or juries or PSCs in several states adjudicate the claims, with the possibility of conflicting decisions.

## III. THE ENTIRETY OF PLAINTIFF'S SUIT SHOULD BE DISMISSED ON SUMMARY JUDGMENT

### A. Plaintiff's Only Damages Theory, That EMI Should Have Individually Purchased More Energy From IPPs Between 1998 and 2008, Is Preempted

The only damages models Plaintiff provides in support of his lawsuit are based on the theory that EMI should have purchased more energy from IPPs between 1998 and 2008. (*See* Ex. R at 22-23 (two measures of the "unnecessarily higher costs" that Mississippi customers purportedly were forced to pay "due to Entergy's continued dispatch of higher-cost generating units" and "Entergy's refusal to purchase lower-cost energy from third-party suppliers")).) Under well-settled law, Plaintiff cannot recover damages on his causes of action if he fails to prove injury.[38] Because Plaintiff's only claimed injury rests on the damages theory, and the damages theory is preempted, *see* Points I and II, *supra*, all of his causes of action are preempted.

---

[38] *See Washington v. Armstrong World Indus.,* 839 F.2d 1121, 1122 (5th Cir. 1988) (a plaintiff must establish every element of a claim to withstand summary judgment on the claim); *See* Miss. Code Ann. § 75-24-11 (damages on consumer protection claim (Count 1) only to recover for monies acquired through a violation); *Fourth Davis Isl. Land Co. v. Parker*, 469 So. 2d 516, 524 (Miss. 1985) (defining relief for restitution or unjust enrichment (Counts 3, 4) as the amount a defendant was "enriched at the expense of another"); Miss. Code Ann. § 75-21-3 (requiring proof a defendant's conduct causes "results to a degree inimical to public welfare" to sustain an antitrust claim (Count 5)); *Koury v. Ready*, 911 So. 2d 441, 445 (Miss. 2005) (requiring proof of "injury" as an element of fraud (Count 6)); *Cenac v. Murry*, 609 So. 2d 1257, 1275 (Miss. 1992) (the "proper measure of damages [on claim for breach of the duty of good faith and fair dealing (Count 7)] would include losses experienced" from the breach). As to Counts 2 and 8, Plaintiff is entitled at most to injunctive relief, not money damages. Miss. Code Ann. § 77-1-43 (relief on PSC enforcement claim (Count 2) limited to an order "to compel compliance" with PSC orders); Doc. 135 ¶ 131 (seeking only injunctive relief on accounting claim (Count 8)).

While the Mississippi Consumer Protection Act (Doc. 135 at 35) allows for civil fines, Miss. Code Ann. § 75-24-19(1)(b), absent the preempted theory and its associated alleged injury, Plaintiff may recover fines only if there is "clear and convincing" proof that EMI "knowingly and willfully" violated the law by including improper charges in its FAC, making other misrepresentations to the MPSC, or not purchasing IPP energy. There is no evidence in the record that EMI or other Defendants acted "knowing and willfully" in doing any of these things. As shown below, those theories too are preempted.[39]

## B. Even Aside From Their Reliance On A Preempted Damages Theory, Plaintiff's Liability Theories And Claims Are Preempted

Even apart from their reliance in common on a preempted damages theory, Plaintiff's liability theories and causes of action are preempted. Plaintiff's principal liability theory is the same as his damages theory, namely that EMI should have purchased more energy from IPPs. *E.g.*, Doc. 135 ¶ 44. It is preempted for the reasons in Points I and II, *supra*. Defendants explain below that Plaintiff's subsidiary liability theories and his causes of action are also preempted.

### 1. Allegedly Improper Use Of The Fuel Adjustment Clause

Plaintiff asserts that EMI overcharged customers by including ineligible costs under its FAC. Plaintiff argues that EMI included excessive fuel and purchased power expenses, namely the value of federal environmental compliance requirements, infrastructure depreciation, unit decommissioning expenses, and certain tax and operational expenses. (Ex. T at 17-18.)

Plaintiff's general claim that EMI included "excessive fuel and purchased power expenses," in its FAC, Doc. 135 ¶ 49, is preempted, at the threshold, because the FAC is subject to the MPSC's regulatory oversight. *See* Point I, *supra*. Plaintiff's more specific assertion that

---

[39] Plaintiff does not seek civil fines or penalties under the Mississippi Antitrust Act. Doc. 135 at 37-38. Nor has Plaintiff proffered any evidence to support the amount of fines or penalties.

EMI improperly included excess purchased-energy costs in its FAC because it did not buy low-cost IPP energy, Doc. 135 ¶¶ 51-55, just restates Plaintiff's principal theory and is preempted for the reasons in Points I and II, *supra*. Plaintiff's contention that other EOCs' excessive costs impermissibly flowed to ratepayers because EMI included in its FAC the price of MSS-3 energy allocations that were priced based in part on alleged improper fuel costs, Doc. 135 ¶ 61, is also preempted because MSS-3 is "a FERC approved rate" (Ex. S at 32:4). *See* Point II.A, *supra*.

Plaintiff next argues that one type of environmental compliance cost, the value of $SO_2$ emission allowances,[40] should have been excluded from EMI's FAC if EMI or its sister EOCs "did not pay for" those allowances, but were granted them by the federal government. (Ex. T at 17-18.) This argument has already effectively been rejected by the MPSC, which has designated $SO_2$ allowances as fuel costs that may be included in an FAC. (Ex. K at 35 (citing MPSC Dkt. 1992-UN-59 (Ex. Z)).) And the MPSC approved the very FAC filings Plaintiff complains about, including for the 2008-2009 audit periods raised by Plaintiff's witness Mr. Griffey (Ex. T at 18). (*See* Ex. K at 24-25 ("EMI's fuel and purchased energy costs have been continuously audited by the MPUS since July 1978, and those reports have been certified by the MPSC to the Legislature. During the damages period, the MPUS audits were certified to the Legislature in MPSC Dockets 1999-AD-19, 2000-AD-025, 2001-AD-022, 2002-AD-006, 2003-AD-036, 2004-AD-20, 2005-AD-029, 2006-AD-007, 2007-AD-11, and 2008-AD-13."); *id.* at 34-36.) When the MPUS or the Attorney General has concerns about the costs included in EMI's FAC, the MPSC has procedures

---

[40] $SO_2$ allowances are regulatory rights to emit the pollutant sulfur dioxide; the federal government gives these allowances to power plants covered by the Clean Air Act, such as those owned by EMI and the other EOCs. 42 U.S.C. § 7651b. The allowances, each of which gives its holder the right to emit one ton of the pollutant, have value and may be traded, such that the plant can either use these allowances or sell them to another plant. *Id.* EMI and the other EOCs treated the allowances, when used by them to produce energy, as having a cost corresponding to the amount they would have received had they sold the allowance to an unaffiliated company instead of using the allowance to produce energy. (Ex. U at 25:4-6.)

to review the audits and to take appropriate action. *See, e.g.*, *In Re: Report of Applic. of the Fuel Adjustment Rider of Entergy Miss., Inc.*, 2010-AD-14, 2010 WL 2649748, at *2 (Jan. 15, 2010) (MPSC order concluding proceeding "to verify that costs charged to the fuel adjustment clause match the fuel and purchased energy costs of Entergy Mississippi" regarding FAC charges from October 2007 to September 2009); (Ex. K at 25 n.8 (discussing MPSC's review of this FAC audit period); Ex. T at 18 (same).) If, as Plaintiff argues, EMI should not have included in its FAC the value of allowances that were granted to it, that complaint must be made to the MPSC. *See* Point I, *supra*. Plaintiff's allegation, Doc. 135 ¶ 61, that EMI improperly included in the FAC "charges for energy purchased from the [Entergy System]" under MSS-3 that counted the value of $SO_2$ allowances granted to other EOCs is, again, preempted by federal law because MSS-3 addresses the treatment of $SO_2$ allowances. ESA § 30.08(f) (Ex. A at 17).

Finally, preemption bars Plaintiff's argument that EMI improperly bought energy from its affiliate, ELI, that was generated from natural gas under the Evangeline gas contract, allegedly causing excessive costs to be included in the FAC. Doc. 135 ¶ 63a-n. FERC sets rates for such interstate wholesale gas sales as well as for the allocation to EMI of Exchange Energy that is priced in part based on the cost of ELI energy generated from gas bought under the Evangeline contract. *See Entergy Servs., Inc.*, 137 F.E.R.C. P61,029, at 90 (2011) ("Entergy properly included the costs of the Evangeline Contract paid by Entergy Louisiana to Evangeline" for purposes of determining allocation under MSS-3). Any challenge to ELI's own purchase of gas under the Evangeline contract, an interstate transaction, is subject to FERC's exclusive jurisdiction. *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1604 (2015).

### 2. Allegedly Improper Bidding By EPI For Contract With The System

Plaintiff asserts that "FERC concluded that Entergy, ESI and EAI engaged in affiliate abuse with respect to the 2002 RFP," referring to a request for proposals for the market-based sale

of wholesale energy when "Entergy senior management … shared confidential information with Entergy affiliate EAI, who was also bidding on the RFP, about competitors' bids," permitting EAI to win the bid. Doc. 135 ¶ 76. Since Plaintiff effectively alleges that this conduct led to higher costs for EMI and in turn its customers, the claim belongs, as between the MPSC and a court, before the MPSC. *See* Point I, *supra*. Additionally, because the bidding took place in the interstate wholesale market, and FERC has "exclusive jurisdiction" over that market, the claim is federally preempted. *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1289 (2016). Indeed, FERC has specifically addressed complaints based on this alleged misconduct. *Entergy Servs., Inc.*, 119 F.E.R.C. P61,019, at 61,060 (2007) (considering whether Entergy "improperly used information it obtained from bid proposals to develop certain purchased power agreements").

### 3.    Alleged Misrepresentations To The MPSC

Plaintiff alleges that EMI and ESI made various "misrepresentations" to the MPSC that caused it to approve retail rates that were higher than they should have been. Doc. 135 ¶¶ 63-77. Whether many of these statements are misrepresentations at all—such as Plaintiff's allegation that EMI "fraudulently represented to the MPSC that the costs and amount of electricity EMI purchased from the [Exchange] were and are reasonable," *id.* ¶ 66—depends on the resolution of Plaintiff's core theory, which is a matter within the MPSC's or FERC's jurisdiction. By Plaintiff's own admission, EMI promptly corrected another of the alleged "misrepresentations"—that energy generated with natural gas supplied under the Evangeline Contract was not partly allocated to EMI—one month after making the statement. *Id.* ¶ 63k-63l.

In any event, Plaintiff's fraud allegations concerning "misrepresentations" made to the MPSC are within the original jurisdiction of the MPSC. Courts have rejected challenges to "the reasonableness of a rate approved by the regulatory agency on the basis that the agency's approval was obtained by fraud." *Gipson v. Fleet Mortg. Grp.*, 232 F. Supp. 2d 691, 704 (S.D. Miss. 2002).

### 4. Alleged Purchases Of Energy From IPPs For Resale Off-System

Plaintiff alleges that the Entergy System purchased some low-priced energy from IPPs, but then resold it to buyers outside the System "for an unregulated profit" instead of providing it to the EOCs and their customers. Doc. 135 ¶¶ 54-55. This theory is within the MPSC's or FERC's jurisdiction and in any event is devoid of supporting evidence. *First*, because the alleged misconduct would have impacted EMI's customers' rates, it belongs, as between the MPSC and a court, before the MPSC. *Second*, because the ESA has specific provisions governing such purchases (*e.g.*, §§ 4.02, 4.03 (Ex. A at 11)) and resales (§§ 50.01-.03 (Ex. B at 71-72)), the purchases and resales are governed by the ESA and have multi-state effects just as the energy purchases addressed by Plaintiff's core theory do. Accordingly, the claim is federally preempted. *Third*, as a matter of undisputed fact, any such purchase-followed-by-resale would not, as Plaintiff suggests, create an "unregulated profit." Rather, the full benefit of any profit ("net balance") earned on a joint account sale of energy to a non-System buyer is shared among the EOCs under the System Agreement and passed on entirely to their customers as purchased energy costs under the FAC. ESA § 50.03 (Ex. B. at 72); (Ex. K at 13-14); MPSC Rule 17 § 102.

### 5. Allegedly Imprudent Purchases From EPI

Plaintiff's theory that "Defendants have forced EMI's customers to subsidize the speculative market activities of one of EMI's unregulated affiliates," by "purchas[ing] the excessively-priced EPI electricity in lieu of buying less expensive energy from non-affiliates," Doc. 135 ¶ 85, is a version of Plaintiff's core theory, which is preempted. *See* Points I-II, *supra*.

### 6. Allegedly Improper Tax Benefits, Loans, And Guarantees

Plaintiff's allegations that EMI made loans and guarantees to Entergy affiliate companies, Doc. 135 ¶¶ 91-99, and diverted tax benefits to such companies, *id.* ¶¶ 100-05, if true, would

potentially impact EMI's retail rates to customers. Accordingly, they are within the MPSC's original jurisdiction for the reasons explained in Point I, *supra*.

Even if these allegations were not within the MPSC's original jurisdiction, they should still be disposed of on summary judgment because they are devoid of supporting evidence and contradicted by sworn declarations by Defendants' officials. Steven McNeal, EMI's Treasurer, explained that EMI has not made loans or guaranteed loans to Entergy's affiliates. (Ex. V at ¶¶ 1-2.) And Rory L. Roberts, ESI's Director of Tax, explained that EMI received the full amount of the tax benefits resulting from its Hurricane Katrina-related losses under the Entergy Tax Allocation Agreement, which was approved by both the IRS and the SEC. Specifically, EMI incurred losses of approximately $182,352,224, which could be used to offset income in prior years that would otherwise have been taxed at 35%. (Ex. W at ¶ 8.) EMI was reimbursed for $63.8 million (35% of $182 million). (*Id.*) EMI received no more and no less benefit than it would have received had it filed its own tax return rather than joined a consolidated return. (*Id.* ¶¶ 9-10.) Thus, there was no diversion.

Plaintiff has not identified contrary evidence, despite interrogatories so requesting. (Ex. X; Ex. Y.) Defendants are thus entitled to summary judgment. *Murungi v. Xavier Univ.*, 313 F. App'x 686, 688 (5th Cir. 2008) (unpub.) ("[F]actual controversies [are resolved] in favor of the nonmoving party, but only when … both parties have submitted evidence of contradictory facts." (brackets omitted)).

## <u>CONCLUSION</u>

Summary judgment should be granted to Defendants.

RESPECTFULLY SUBMITTED, this 4th day of June, 2018.

                    ENTERGY MISSISSIPPI, INC.,
                    ENTERGY CORPORATION, ENTERGY
                    SERVICES, INC. AND ENTERGY
                    POWER, INC., Defendants

By /s/ Roy D. Campbell, III
        Roy D. Campbell, III (MSB 5562)
        J. William Manuel (MSB 9891)
        Alicia N. Netterville (MSB 105055)

        BRADLEY ARANT BOULT
        CUMMINGS LLP
        One Jackson Place
        188 East Capitol Street, Suite 400
        P.O. Box 1789
        Jackson, MS 39215-1789
        Telephone: (601) 948-8000
        Facsimile: (601) 948-3000
        rcampbell@bradley.com
        wmanuel@bradley.com
        anetterville@bradley.com

        Charles E. Ross (MSB 5683)
        James L. Robertson (MSB 5612)
        Rebecca Hawkins (MSB 8786)
        WISE CARTER CHILD & CARAWAY, P.A.
        Post Office Box 651
        Jackson, MS  39205-0651
        Telephone: (601) 968-5534
        Facsimile: (601) 944-7738
        jlr@wisecarter.com
        cer@wisecarter.com
        rwh@wisecarter.com

OF COUNSEL:

Tianna H. Raby (MSB 100256)
Christopher R. Shaw (MSB 100393)
ENTERGY MISSISSIPPI, INC.
308 E. Pearl Street, Suite 700 (39201)
Mail Unit M-ELEC-4A
P.O. Box 1640
Jackson, MS 39215-1640
Telephone: (601) 969-2656
Facsimile: (601) 969-2696
traby@entergy.com
cshaw4@entergy.com

John A. Braymer, *Pro Hac Vice*
Associate General Counsel
ENTERGY SERVICES, INC.
639 Loyola Avenue, Suite 2600
New Orleans, LA 70133
jbrayme@entergy.com[41]

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

This 4th day of June, 2018.

/s/ Roy D. Campbell, III
OF COUNSEL

---

[41] Sanford I. Weisburst, of the New York office of Quinn Emanuel Urquhart & Sullivan, LLP, participated in the preparation of this brief and intends promptly to seek *pro hac vice* admission in this case. Mr. Weisburst is admitted in the State of New York and several federal courts.