# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

| | |
|---|---|
| THE STATE OF MISSISSIPPI, EX REL. JIM HOOD, ATTORNEY GENERAL FOR THE STATE OF MISSISSIPPI, | |
| Plaintiff-Counterclaim Defendant | |
| v. | No. 3:08-CV-780-CWR-LRA |
| ENTERGY MISSISSIPPI, INC., ENTERGY CORPORATION, ENTERGY SERVICES, INC., AND ENTERGY POWER, INC., | |
| Defendants-Counterclaim Plaintiffs | |

**PLAINTIFF'S MEMORANDUM BRIEF IN SUPPORT OF MOTION TO EXCLUDE DEFENDANTS' EXPERTS FRANK GALLAHER, SUSAN TIERNEY, PH.D., LAURA MANZ, BRUCE LOUISELLE, BOB MARSH AND ROBERT HAWKINS**

NOW INTO COURT, through undersigned counsel, comes Jim Hood, the Attorney General for the State of Mississippi (the "State" or "Plaintiff"), to respectfully simit this Memorandum Brief in Support of its Motion to Exclude Defendants' Experts Frank Gallaher, Laura Manz, Susan Tierney, Ph.D., Bruce Louiselle, Bob Marsh and Robert Hawkins ("Motion to Exclude Defendants' Experts"). As explained in further detail, below, the direct expert reports prepared by Frank Gallaher ("Gallaher"), Susan Tierney, Ph.D. ("Tierney"), Laura Manz ("Manz"), Bruce Louiselle ("Louiselle"), Bob Marsh ("Marsh") and Robert Hawkins ("Hawkins"), either in their entirety or in part, fail to meet the admissibility requirements established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, Federal Rule of Evidence 702 for expert testimony.

Federal jurisprudence has held testimony regarding the content or significance of corporate documents, a corporation's intent, motive, or state of mind is outside the sphere of an expert's

1

knowledge and inadmissible expert testimony.[1] The majority of the Expert Report of Frank Gallaher (the "Gallaher Report")[2] contains his opinions as to the Defendants' corporate document, the Entergy System Agreement, and its objectives and requirements. Such testimony is not appropriate expert testimony and should therefore be excluded. For the same reason, Tierney should be excluded from testifying as an expert as to those portions of the Expert Report of Susan Tierney (the "Tierney Report")[3] that address the Entergy System Agreement. The remainder of the Tierney Report, and essentially the entirety of the Expert Report of Laura Manz (the "Manz Report"),[4] the Expert Report of Bruce Louiselle (the "Louiselle Report"),[5] and the Expert Report of Bob Marsh (the "Marsh Report"),[6] together with any testimony thereon, should be excluded as these reports and/or portions of reports are presented for the purpose of constructing factual, historical narratives on either the electric utility industry, regulation of public utilities, and/or Federal Energy Regulatory Commission ("FERC").

Further, the lone conclusion in the Louiselle Report is a legal conclusion, which this Court and the Fifth Circuit have routinely held is not permissible expert opinion testimony.[7] Likewise, Sections V and VI of the Expert Report of Robert M. Hawkins (the "Hawkins Report"),[8] simply consist of legal conclusions based upon annual reports of the Mississippi Public Service Commission ("MPSC") and the Mississippi Public Utilities Staff ("MPUS"). As such, these sections of the Hawkins Report, and any testimony thereon, is not permissible expert opinion.

---

[1] *See Retractable Technologies Inc. v. Abbott Laboratories, Inc.*, 2010 WL 11531436 (E.D.Tex. 2010).
[2] The Gallaher Report is Exhibit "A" to Plaintiff's Motion to Exclude Defendants' Experts.
[3] The Tierney Report is Exhibit "B" to Plaintiff's Motion to Exclude Defendants' Experts.
[4] The Manz Report is Exhibit "C" to Plaintiff's Motion to Exclude Defendants' Experts.
[5] The Louiselle Report is Exhibit "D" to Plaintiff's Motion to Exclude Defendants' Experts.
[6] The Marsh Report is Exhibit "E" to Plaintiff's Motion to Exclude Defendants' Experts.
[7] *See Rader v. Bruister*, 2013 WL 6805403 at *16 (S.D.Miss. 2013); *see also United States v. Daggs*, 448 F. App'x 504, 507 (5th Cir. 2011).
[8] The Hawkins Report is Exhibit "F" to Plaintiff's Motion to Exclude Defendants' Experts.

None of these reports applies any sort of methodology to the facts of the case to form an expert opinion based upon the application of any reliable principles or methods. It is well established that these "opinions" are not within the purview of expert opinion testimony.[9] For these reasons, as set forth in further detail in the sections below, Defendants experts, Frank Gallaher, Susan Tierney, Ph.D., Laura Manz, Bruce Louiselle, Bob Marsh, and Robert Hawkins should be excluded from testifying on either the entirety, or portions, of their expert reports as explained herein.

## BACKGROUND

Defendants have designated eleven (11) experts, each of which submitted an initial expert report.[10] These experts either respond to the initial expert reports submitted by Plaintiff's experts in November 2017 and/or advance Defendants' defenses without addressing Plaintiff's experts. Plaintiff is challenging either portions or all of the expert reports of five of Defendants' witnesses herein. Defendants have also filed several supplemental and/or amended expert reports and Plaintiff has separately filed a Motion to Strike Supplemental Expert Reports challenging two of those supplemental reports.

## ARGUMENT

I. **Federal Rule of Evidence 702 and *Daubert v. Merrell Dow* work together to establish the basic framework for determining admissibility of expert testimony.**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and

---

[9] *See In re Rezulin Products Liability Litigation*, 309 F.Supp.2d 531, 551 (S.D.N.Y. 2004); *see also In re Tasch, Inc.*, 1999 WL 596261 at *2 (E.D.La. 1999).
[10] It should be noted that Defendants stated they would submit expert testimony from five (5) experts in the Case Management Order in this matter. *See* (Doc. 130), at Sec. 1.

methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, this rule establishes the framework for determining the admissibility of expert testimony. Together, *Daubert* and Rule 702 require courts "to act as gate-keepers, making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[11]

In *Daubert v. Merrell Dow*, the Supreme Court set forth four general factors for courts to use to evaluate the reliability of expert testimony:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.[12]

The Supreme Court later extended *Daubert* to non-scientific expert opinion testimony in *Kumho Tire v. Carmichael*.[13]

Working within this framework, federal courts have applied Rule 702 and *Daubert* to situations where proffered expert testimony was similar to the information contained in the expert reports prepared by Defendants' experts, Gallaher, Tierney, Manz, Louiselle, Marsh, and Hawkins, and found that such testimony is outside the scope of admissible expert testimony.

---

[11] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-244 (5th Cir. 2002) (internal quotation marks omitted).
[12] *Kumho Tire v. Carmichael*, 526 U.S. 137, 144, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing *Daubert*, 509 U.S. at 593).
[13] *See Kumho Tire v. Carmichael*, 526 U.S. 137 at 147.

**II.	As the Entergy System Agreement is a corporate document, and the Gallaher Report addresses the objectives and requirements of the Entergy System Agreement, Gallaher's opinions and testimony on these subjects must be excluded.**

Federal courts have held that testimony regarding a corporation's intent, motive, or state of mind as well as testimony regarding the content or significance of corporate documents is outside the sphere of an expert's knowledge and inadmissible expert testimony. In *Retractable Technologies Inc. v. Abbott Laboratories, Inc.*,[14] the defendant objected to expert opinion testimony regarding its intentions, knowledge and conduct, as well as the terms of the agreement at issue. *Retractable Technologies Inc.* was a breach of contract case where the plaintiff alleged the defendant breached the National Marketing and Distribution Agreement ("NMDA") it entered into between the parties. Plaintiff hired an expert, Dr. House, who opined, among other things, as to Abbott's intentions, knowledge, and conduct in entering the NMDA, the meaning of terms in the NMDA, and what facts plaintiff did or did not rely on in entering the NMDA. While it does not appear that this Court has ruled on whether expert testimony on corporate intent, motive, or state of mind is admissible, the United States District Court for the Eastern District of Texas, did in *Retractable Technologies Inc.* and explained that corporate intent is a lay matter which the trier of fact is capable of understanding and deciding without the expert's help:

> While an expert witness may draw inferences and reach conclusions, those inferences and conclusions must nevertheless conform with the other Rules, namely, that the opinion be based on scientific, technical, or specialized knowledge. Several district courts outside this circuit have found that such testimony about "corporate intent" or "state of mind" is inadmissible. For example, in *In re Rezulin Products Liability Litigation,* 309 F.Supp. 531, 545-546 (S.D.N.Y. 2004), the district court found inadmissible expert testimony concerning the motive, intent and state of mind of the defendants and others. The district court found that "the opinions of these witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise." *Id*. at 546.[15]

---

[14] *See Retractable Technologies Inc. v. Abbott Laboratories, Inc.*, 2010 WL 11531436 (E.D.Tex. 2010).
[15] *Id*. at *5.

The court went on to state that although testimony as to a corporation's knowledge, intent or state of mind was not admissible expert testimony, it could be elicited from individual witnesses as trial, such as various corporate representatives who participated in the negotiation of the agreement at issue.[16]

The Gallaher Report focuses exclusively on the Entergy System Agreement. In Section IX (A) – (F),[17] Gallaher walks the reader, and ultimately the trier of fact, through the "relevant provisions of the System Agreement". With each of these relevant provisions, he sets forth the language of the section from the Entergy System Agreement and then provides explanation about the content or significance of that section. Testimony based on this section of the Gallaher Report would constitute inadmissible testimony regarding Defendants' state of mind, knowledge, and intent. Even though Gallaher opines on a document – the Entergy System Agreement – federal courts have found that there in no distinction between inadmissible expert testimony concerning corporate intent or state of mind and testimony regarding the content or significance of corporate documents, even when such testimony deals with scientific, technical or specialized knowledge within the sphere of the expert's expertise.[18]

In addition to addressing the content or significance of the Entergy System Agreement, Gallaher also specifically opines on Defendants' motive, intent and/or state of mind regarding the Entergy System Agreement. For example, in Section XI of the Gallaher Report where he addresses "Own Account Purchases Under the System Agreement", he specifically opines on corporate motive, intent and/or state of mind when he states in paragraph 51 that:

> 51. The Operating Committee's consideration and treatment of own account purchases was based on and reflected its understanding that Section 4.02 had to be

---

[16] *Id.* at *7.
[17] *See* Exhibit "A", the Gallaher Report, at pp. 6-19.
[18] *See Bouchard v. American Home Products Corp.*, 2002 WL 32597992 at * 6 (N.D. Ohio 2002).

read in conjunction with the overarching charge to and responsibility of the Operating Committee under the System Agreement to coordinate purchases in a manner that lowers costs for the integrated System as a whole, not just for the benefit of a single Operating Company. With this understanding, the Operating Committee's implementation of Section 4.02, particularly with respect to its own account purchases, reflected the following:

[Gallaher then goes on to provide ten examples of what Section 4.02 allegedly reflected][19]

Another example of Gallaher opining as to corporate motive, intent and/or state of mind can be seen in paragraphs 59 – 61 of the Gallaher Report:

> 59. As to Dr. DeRamus's assumptions regarding the replacement of legacy units with purchases from third parties, even if EMI had received approval to make own account purchases, it would not have made the decision about what resources on the Entergy System the own account purchases would replace. The Operating Committee would make the determination as to which generating resources would be replaced by such purchases. This determination would have been made based on the needs of the System. As to displacing energy through the commitment and dispatch of existing units, the System Operator would have taken into account the reliability and operation needs of the Entergy System as a whole in making a decision about what resources could be displaced by purchases.
>
> 60. If the System Operator's judgment was that a proposed own-account purchase could not displace a more expensive resource on the System, due to operational and/or reliability considerations at the System level, the Operating Committee would not have approved the purchase.
>
> 61. Dr. DeRamus also asserts that EMI should have made purchases that would have resulted in shifting higher-cost resources onto other Operating Companies through the System Exchange. The assumption that the Operating Committee would have approved own account purchases by EMI that reduced EMI's cost responsibility only by shifting costs to other Operating Companies is wrong. The Operating Committee would have evaluated a proposed purchase, on the basis of the impact on all Operating Companies. Own account purchases by EMI that could not displace more expensive resources on the Entergy System, but simply resulted in the costs of those resources being shifted from EMI customers to the customers of other Operating Companies, would not have been approved by the Operating Committee.[20]

---

[19] Exhibit "A", Gallaher Report, pp. 20-23, ¶51.
[20] *Id.*, pp. 25-26, ¶¶59-61.

Opining regarding what the Operating Committee (as an instrumentality of the Entergy System Agreement and a decision-making body for the Defendants' system) would or would not have done plainly speaks to corporate motive, intent, and state of mind. The Gallaher Report is replete with opinions as to corporate motive, intent and/or state of mind, similar to the two examples cited herein.

Although Gallaher was a former member of the Operating Committee, the opinions contained in the Gallaher Report are not being presented in his capacity as a corporate representative, but rather his capacity as an expert witness for Defendants. And, as explained by federal courts across multiple different circuits, this type of testimony is outside the scope of admissible expert testimony.

Therefore, Gallaher should be excluded from testifying as an expert witness regarding his opinions and conclusions in his report pertaining to the Entergy System Agreement, including the objectives and requirements of the Agreement as well as any opinions that go to the intent, motives or states of mind of the Defendants, as such opinion testimony is outside the scope of expert testimony.

**III. Permitting Manz and Tierney to testify as expert witnesses based on their expert reports, which do no more than provide a factual and historical overview of the electric utility industry and public utility regulation, would invade the province of the jury.**

The expert reports prepared by Manz and Tierney would not only fail to assist the trier of fact, because they are little more than historical and factual narratives, but, even worse, would invade the province of the trier of fact. Their testimony, based upon their reports and the statements and so-called conclusions contained therein, would merely describe lay matters a trier of fact is capable of understanding and deciding without the expert's help. The Advisory Notes to Rule 702 address this issue:

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'

Following Rule 702, courts have routinely held that, to be admissible, expert testimony must do more than portray lay matters:

Rule 702 thus demands that there by some degree of regulation of the subjects and theories about which an expert may testify. Expert testimony on matters which a jury is capable of understanding and deciding without the expert's help should be excluded. Expert testimony that does nothing more than "mirror" testimony offered by fact witnesses should also be excluded. Finally, the expert witness must "bring to the jury more than the lawyers can offer in argument."[21]

Here, both the Manz Report and the Tierney Report repeat facts or opinions contained either in documents produced in discovery and/or testimony by other witnesses in this case and are, consequently, directed to lay matters which the trier of fact is capable of understanding and deciding without their "expert" help. In Manz's and Tierney's own words, the purpose of their testimony is essentially to provide a historical commentary of a specific industry. These reports are little more than historical narratives, and experts that are presented to simply offer a narrative history which a lay juror is equally capable of constructing have been excluded.[22]

---

[21]*In re Tasch, Inc.*, 1999 WL 596261 at *2 (E.D.La. 1999) (internal citations omitted); *see also Andres v. Metro North Commuter R. Co.*, 882 F.2d 705 (2nd Cir. 1989) *citing McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055-56 (4th Cir. 1986); *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985); *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981) and stating, "[f]or an expert's testimony to be admissible under this Rule [Rule 702], however, it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help".

[22] *See In re Fosamax Products Liability Litigation*, 645 F.Supp.2d 164, 192 (S.D.N.Y. 2009); *see also In re Rezulin Products Liab. Litig.*, 309 F.Supp.2d 531, 546 (S.D.N.Y.2004).

Manz states in the very first paragraph of her report that it simply "addresses the evolution of the electric utility industry."[23] And her report goes on to do just that for 57 of its 59 paragraphs. Manz does not employ any methodology in her report. She does not establish any reliable principles or methods, much less test and apply any reliable principles or methods to the facts of this case. What she does, instead, is provide the reader, and ultimately the trier of fact, with a historical overview of the electric utility industry, and then purportedly "applies" these facts to reach three conclusions that are supposed to elevate her history lesson to the level of expert opinion. But, Manz has no relevant expertise in any field and does not perform any independent analyses in her report that would render her testimony based upon her report more than a lay matter. A history of the electric utility industry is not a matter that necessitates, or is even proper for, expert testimony. Her testimony and two-paragraph "conclusions" (which amount to no more than a recitation of facts and attorney argument), would bring nothing more to the trier of fact beyond testimony offered by other witnesses in this case or arguments advanced by Defendants' counsel. The historical overview set forth in Manz's report can be explained to the trier of fact through documents and other, more appropriate, witness testimony.

Likewise, Tierney's report provides the reader, and ultimately the trier of fact, with an overview and explanation of the electric utility industry, specifically addressing federal and state public utility regulation and the FERC. She has eleven (11) opinions, which amount to no more than facts that will be established by documents themselves and/or other witnesses at trial, or, alternatively, legal conclusions. No level of expertise is necessary for any of Tierney's eleven opinions, which she states in her report are:

    (1) the current state of rate regulation of the electric industry reflects the way electricity service has evolved over time **(this is fact/history)**;

---

[23] *See* Exhibit "C", Manz Report, p.3, ¶1.

(2) history of the establishment of the Federal Power Commission (now called FERC) and the responsibilities and supervision of FERC **(this is fact/history/legal conclusion)**;
(3) statement that FERC must approve all sales of electricity and transmission service in interstate commerce **(this is fact/history/legal conclusion)**;
(4) duties of FERC include hearing complaints or petitions re tariff violations or unreasonableness and investigation of public utilities, with remedies **(this is fact/history/legal conclusion)**;
(5) explanation of FERC's ratemaking authorities and state PUC's jurisdiction **(this is fact/history/legal conclusion)**;
(6) development of electric industry and examples of federal policy created **(this is fact/history)**;
(7) Entergy operates pursuant to certain FERC-related tariffs **(this is fact/history)**;
(8) purpose of the Entergy System Agreement **(this is opinion as to corporate documents)**;
(9) history of FERC's actions with respect to the Entergy System Agreement, including initial approval and various findings and complaints **(this is fact/history/legal conclusion)**;
(10) Entergy joined the Midcontinent Independent System Operator ("MISO") **(this is fact/history)**;
(11) Entergy System Agreement is no longer in place **(this is fact/history)**.[24]

As seen from the summary of Tierney's opinions and conclusions, as set forth above, the majority of the Tierney Report amounts to no more than history, facts and data that do not require any expert opinion and are directed to matters that the trier of fact, as a lay person, is capable and understanding without expert help. Alternatively, the Tierney Report purports to opine on legal conclusions, such as the scope and nature of FERC's authority. The portions of Tierney's report that address the Entergy System Agreement simply provide a factual overview and history of the agreement. The portions of her report that purport to offer opinions or conclusions regarding the Entergy System Agreement should also be excluded because they consist of opinion and testimony as to Defendants' or FERC's intent, motive or state of mind, or opinion regarding the Entergy System Agreement or other corporate documents.

Each of the Manz Report and Tierney Report is merely a "narrative of the case which a juror is equally capable of constructing."[25] Therefore, as the purpose of their testimony is to merely

---

[24] *See* Exhibit "B", Tierney Report, pp. 3-5, ¶ 9.
[25] *See In re Rezulin Products Liability Litigation*, 309 F.Supp.2d 531, 551 (S.D.N.Y. 2004) *citing Taylor v. Evans* 1997 WL 154010 at *2.

provide a historical commentary of what happened, layered with a patina of legal conclusions which inappropriately seeks to legitimize Defendants' conduct, and such topics are not acceptable expert opinions.

IV. **Likewise, the report prepared by Louiselle and Sections V and VI of the report prepared by Hawkins fail to assist the trier of fact, as they neglect to apply any reliable principles or methods to the facts and are little more than compilations of data from various FERC opinions and dockets (Louiselle) and MPSC and MPUS annual reports (Hawkins).**

Like the Manz Report and the Tierney Report, the Louiselle Report amounts to nothing more than a compilation of data from public documents, simply presenting a narrative of select regulatory events, filings, and opinions involving Defendants. At the outset of his report, Louiselle states that he was asked by Defendants EMI and ESI "…to provide an opinion on whether the production function of EMI and the Entergy System has been subject to regulatory oversight by the Federal Energy Regulatory Commission ("FERC" or "Commission") and, if so, to what extent."[26] Louiselle then goes on to spend the entirety of his report, with the exception of one sentence, walking the reader, and ultimately the trier of fact, through a history and factual explanation of various FERC activities with respect to the Entergy System Agreement. This textual discussion, along with four tables setting forth data obtained from FERC dockets and opinions cited in the report, simply provides historical and factual information regarding the establishment of the Entergy System Agreement, the description of the various service schedules set forth therein, a summary of various FERC opinions and the findings as a result of those opinions, including complaints made by the LPSC and the results of those complaints, and an explanation of the various "Bandwidth" filings the Entergy System was required to make and the payments made in accordance with those filings.

---

[26] Louiselle Report, p. 1 ¶2.

Louiselle's report is essentially a data dump with one lone "conclusion" after his summary presentation. He concludes that, "[i]n my opinion, FERC analysis and oversight of the Entergy System production costs has been continual, extensive and comprehensive."[27]

In order to arrive at this opinion, Mr. Louiselle did not employ any methodology. This opinion is not the result of any theory or reliable principles applied to the facts of this case. Presumably, Defendants will argue in response that Louiselle's Exhibit "A" to his report, which consists of approximately fifty (50) pages of workpapers supporting the tables in his report, show that he employed some methodology and level of expertise in his report. However, as Louiselle himself explains, the four tables in his report are simply calculations and/or compilations in table format of: production cost data for the Entergy Operating Companies as presented in FERC dockets and FERC Form 1's (Table 1); Commission-approved Bandwidth payments and receipts from 2006 (Table 2, which notably required no workpapers); the total of the bandwidth payments and receipts made by the Entergy Operating Companies from June 2005 – December 2008 as contained in Compliance Filings made pursuant to FERC directives (Table 3); and EMI Historical Disparity from System Average Production Costs from 1999 to 2008, which data Louiselle explains were obtained from specific exhibits in FERC dockets (Table 4. Notably the workpapers for Table 4 are all exhibits from the FERC dockets identified in his report). Compilation of these tables did not require the application of any reliable principles or methods but was simply a condensed presentation of data already presented in another form.

As explained in the section above, the relevant case law establishes that "expert testimony on matters which a jury is capable of understanding and deciding without the expert's help should

---

[27] Louiselle Report, p. 10.

be excluded."[28] Here, Louiselle is opining that because FERC has addressed complaints concerning the Entergy System Agreement, implemented various service schedules to the System Agreement, and required the Entergy System to make annual Bandwidth filings, among other things, from the approval of the System Agreement until its termination, FERC's analysis and oversight was "continual, extensive and comprehensive." The trier of fact can read the pertinent FERC material and reach a conclusion as to what FERC did or did not do without assistance from Louiselle. Alternatively, the effect of FERC's actions can be argued by counsel for Defendants. In fact, district courts have granted motions to exclude expert witnesses from offering narrative histories which a lay juror is equally capable of constructing. "[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."[29]

The purported opinion in the Louiselle Report is one that requires no expertise and is within the purview of the trier of fact. The report simply presents a factual and historical summary and compilation of data, derived mainly from FERC dockets and opinions. A lay person would be qualified to examine such material and draw their own conclusions after all the evidence is presented at trial. Alternatively, Louiselle's lone opinion is a legal conclusion that can be argued by counsel. Therefore, Louiselle should be excluded from testifying as an expert witness at trial.

---

[28] *In re Tasch, Inc.*, 1999 WL 596261 at *2 (E.D.La. 1999) (internal citations omitted); *see also Andres v. Metro North Commuter R. Co.*, 882 F.2d 705 (2nd Cir. 1989) *citing McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055-56 (4th Cir. 1986); *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985); *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981) and stating, "[f]or an expert's testimony to be admissible under this Rule [Rule 702], however, it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help".

[29] *In re Fosamax Products Liability Litigation*, 645 F.Supp.2d 164 (S.D.N.Y. 2009) *citing Highland Capital Management, L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y. 2005); *Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (rejecting portions of expert report on the ground that the testimony consisted of "a narrative of the case which a lay juror is equally capable of constructing"); *In re Rezulin Products Liab. Litig.*, 309 F.Supp.2d 531, 564 (S.D.N.Y.2004) (rejecting portion of expert report presenting history of Rezulin for no purpose but to "provid[e] an historical commentary of what happened").

Similarly, Sections V and VI of the Hawkins Report[30] are merely a regurgitation of facts and historical data derived from the MPSC Annual Report and the MPUS Annual Report. These sections do not provide the trier of fact with any opinions or conclusions that require any degree of expertise. For the reasons explained in detail, above, relative to the reports prepared by Tierney, Manz, and Louiselle, Hawkins should not be permitted to testify to simply construct factual narratives about the history and operations of the MPSC and MPUS to the trier of fact.

V. **Even if Louiselle is not excluded as an expert on the grounds set forth in the section above, he should be excluded because the lone opinion in the Louiselle Report is a legal conclusion and such opinion is outside the scope of expert testimony, and the same applies to Sections V and VI of the Hawkins Report and a portion of the Marsh Report.**

In addition to the reasons set forth in the section above, Louiselle should be excluded from testifying as an expert witness at the trial of this matter as his only opinion in his report is a legal conclusion, which this Circuit has established is not permissible expert opinion testimony. Louiselle's opinion that, "FERC analysis and oversight of the Entergy System production costs has been continual, extensive and comprehensive" is clearly a legal conclusion. The Fifth Circuit has established that expert witnesses are not permitted to testify as to legal conclusions.

Similarly, Hawkins purports to offer legal conclusions as to the MPSC's "responsibility … to regulate the rates, operations and provision of service by electric, gas, and water utilities,"[31] as well as the MPUS's investigative and recommendation functions provided by law.[32]

Likewise, Marsh devotes a portion of his report to sponsoring legal testimony. Rather than opining, from a regulatory perspective, the general rules regarding regulation of utilities in Mississippi and the standards typically applied to those utilities, Marsh attempts to provide a legal

---

[30] *See* Exhibit "F", Hawkins Report, pp. 5-7.
[31] *Id.*, p. 6.
[32] *Id.*, pp. 6-7.

treatise covering the gamut of applicable legal issues in this matter. For example, one section of the Marsh Report is entitled, "Utility Regulation in Mississippi", and discusses the "distinct spheres of regulatory authority of FERC and the MPSC as applied to EMI," as well as FERC's responsibilities and scope of authority as compared to the MPSC's responsibilities scope of authority in that regard.[33] Marsh also addresses the purported "Mississippi Standards Applicable to Utility Regulation and Cost Recovery" and opines as to matters such as the MPSC's "explicit legislative authority to adopt rules implementing the Public Utilities Act," and "the MPSC's orders that direct and authorize specific action for and by public utilities, including cost recovery."[34]

While a qualified expert witness may testify as to the ultimate issue in the case, such testimony may not amount to a legal conclusion, as such testimony would interfere with the role of the judge as the sole arbiter of the law. Both the Fifth Circuit and this Court have found that the Federal Rules of Evidence do not permit an expert to offer legal conclusions.[35] In both jury trials and bench trials, "…testimony will be excluded prior to trial if the expert is merely providing legal opinions which invade the province of the court."[36] Here, because the only opinion offered by Louiselle in his report and the opinions discussed above in the Hawkins Report and Marsh Report amount to pure legal conclusions, Louiselle should be excluded from testifying as an expert, entirely, Hawkins should be prevented from testifying as an expert as to the legal matters contained in Sections V and VI of his report, and Marsh should be precluded from testifying regarding the legal conclusions on pp. 3 – 4 of his report, at the trial of this matter.

---

[33] Exhibit "E", Marsh Report, p. 3.
[34] *Id.*, p. 4.
[35] *See Rader v. Bruister*, 2013 WL 6805403 at *16 (S.D.Miss. 2013); *see also United States v. Daggs*, 448 F. App'x 504, 507 (5th Cir. 2011).
[36] *League of United Latin American Citizens (Lulac) v. Edwards Aquifer Authority*, 2014 WL 10762935 at *2 (W.D.Tex. 2004) *citing to Enniss Family Realty I, LLC v. Schneider Nat. Carriers Inc.*, 916 F.Supp.2d 702, 714 (S.D.Miss. 2013) and *Rader v. Bruister*, 2013 WL 6805403 at *16 (S.D.Miss. 2013).

**CONCLUSION**

For the reasons set forth above, Plaintiff Jim Hood, the Attorney General for the State of Mississippi, respectfully requests this Court grant its Motion to Exclude Defendants' Experts Frank Gallaher, Susan Tierney, Ph.D., Laura Manz, Bruce Louiselle, Bob Marsh, and Robert Hawkins from testifying as expert witnesses at the trial of this matter on either the entirety, or portions, of their expert reports as requested herein.

        By: **JIM HOOD, ATTORNEY GENERAL**
            **STATE OF MISSISSIPPI**

/s/ LUKE F. PIONTEK
J. Kenton Parsons (La. Bar No. 10377)
Luke F. Piontek (La. Bar No. 19979)
Andre G. Bourgeois (La. Bar No. 19298)
Shelley Ann McGlathery (La. Bar No. 32585)
*Pro Hac Vice*
**ROEDEL PARSONS KOCH BLACHE BALHOFF & McCOLLISTER**
A Law Corporation
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

*Counsel for Plaintiff*

Vincent F. Kilborn, III, Esq. (MSB #103028)
Special Assistant Attorney General
**KILBORN, ROEBUCK & McDONALD**
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

David A. McDonald, Esq. (MSB #103027)
Special Assistant Attorney General
**KILBORN, ROEBUCK & McDONALD**
Post Office Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Fax: (251) 434-0047

Harold E. Pizzetta, III, MSB No. 99867
Bridgette W. Wiggins, MSB No. 9676
**Office of the Attorney General**
P. O. Box 220
Jackson, Mississippi 39225-2947
Telephone: (601) 359-4230
Facsimile: (601) 359-4231

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Luke F. Piontek, Attorney for the State of Mississippi, do hereby certify that on June 20, 2018, I caused to be electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

| | |
|---|---|
| James L. Robertson, Esq.<br>Michael B. Wallace, Esq.<br>Charles E. Ross, Esq.<br>Rebecca W. Hawkins, Esq.<br>Wise, Carter, Child & Caraway, PA<br>Post Office Box 651<br>Jackson, Mississippi 39205 | Jay Breedveld, Esq.<br>Mark Strain, Esq.<br>Duggins Wren Mann & Romero<br>600 Congress Avenue, Suite 1900<br>Austin, TX 78701 |
| John A. Braymer, Esq.<br>Associate General Counsel<br>Entergy Services, Inc.<br>639 Loyola Avenue, #2600<br>New Orleans, LA 70113 | John D. Martin, Esq.<br>Nelson Mullins Riley & Scarborough, LLP<br>1320 Main Street, 17th Floor<br>Columbia, SC 29201 |
| Roy D. Campbell, III<br>J. William Manuel<br>Alicia N. Netterville<br>Bradley Arant Boult Cummings, LLP<br>One Jackson Place, Suite 400<br>188 East Capitol Street<br>Post Office Box 1789<br>Jackson, MS 39215-1789 | Sanford I. Weisburst, *Pro Hac Vice*<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>Telephone: (212) 849-7000<br>Facsimile: (212) 849-7100<br>sandyweisburst@quinnemanuel.com |
| Tianna H. Raby, Esq.<br>Christopher R. Shaw, Esq.<br>Entergy Mississippi, Inc.<br>308 E. Pearl Street, Suite 700 (39201)<br>Mail Unit M-ELEC-4A<br>P.O. Box 1640<br>Jackson, Mississippi 39215-1640 | |

This the 20th day of June, 2018.

/s/ LUKE F. PIONTEK
Luke F. Piontek (La. Bar No. 19979)