**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSISSIPPI, EX REL. | &#124; | |
| JIM HOOD, ATTORNEY GENERAL | &#124; | |
| FOR THE STATE OF MISSISSIPPI, | &#124; | |
| | &#124; | |
| Plaintiff-Counterclaim Defendant | &#124; | |
| | &#124; | |
| v. | &#124; | No. 3:08-CV-780-CWR-LRA |
| | &#124; | |
| ENTERGY MISSISSIPPI, INC., ENTERGY | &#124; | |
| CORPORATION, ENTERGY SERVICES, | &#124; | |
| INC., AND ENTERGY POWER, INC., | &#124; | |
| | &#124; | |
| Defendants-Counterclaim Plaintiffs | &#124; | |

---

**PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION UNDER RULE OF EVIDENCE 702 TO PROHIBIT**
**THE TESTIMONY OF PLAINTIFF'S EXPERT DAVID DERAMUS**
**ON ISSUES OF LIABILITY AND DAMAGES**

---

NOW INTO COURT, through undersigned counsel, comes Jim Hood, the Attorney General for the State of Mississippi (the "State" or "Plaintiff"), to respectfully submit this Memorandum Brief in Opposition to Defendants' Motion Under Rule of Evidence 702 to Prohibit the Testimony of Plaintiff's Expert David DeRamus on Issues of Liability and Damages ("Motion to Prohibit Testimony of DeRamus").[1] For the reasons set forth in further detail herein, Defendants[2] fail to establish that the testimony of Plaintiff's expert David DeRamus, Ph.D. should be excluded pursuant to Federal Rule of Evidence 702.

---

[1] This memorandum brief is timely. Defendants filed their motion on June 20, 2018. Plaintiff's response is due 14 days thereafter, pursuant to Local Rule 7(b)(4). However, when a time period is stated in days – as is this period – and the last day of the period falls on a holiday, the period continues to run until the same time on the next day that is not a legal holiday. F.R.C.P. Rule 6(a)(1)(C). The last day of the 14-day period was July 4, 2018, thus the response period extends to the end of July 5, 2018.

[2] Defendants are also sometimes referred to herein as "Entergy", collectively.

1

## INTRODUCTION

The State has retained four experts that have provided expert reports in this case - David DeRamus, Ph.D, Songhoon ("Spencer") Yang, Ph.D., J. Neil Copeland, P.E., and Charles S. Griffey. Defendants have filed motions challenging two of Plaintiff's four experts, Dr. DeRamus and Mr. Griffey. Defendants did not file motions challenging Plaintiff's other two experts, Dr. Yang and Mr. Copeland (although they level an impermissible back-door attempt to exclude them in their Motion to Prohibit Testimony of DeRamus). Dr. DeRamus is Plaintiff's economist expert who has performed an antitrust and economic analysis that has evaluated Defendants' conduct at issue, determined whether and to what extent Mississippi ratepayers were damaged as a result of Defendants' misconduct, and performed calculations of those damages. Dr. DeRamus' economic analysis incorporates the conclusions and opinions of both Dr. Yang and Mr. Copeland.

Dr. DeRamus made six conclusions in his initial expert report in this case:

1. A substantial amount of less-costly third-party power was available for EMI and/or Entergy to purchase (from independent power producers ("IPPs") located inside the Entergy balancing authority area ("BAA") as well as from IPPs and utilities outside the Entergy BAA) during the damages period, but EMI and/or Entergy failed to purchase such less expensive power and instead continued to rely on its own, higher-cost, less efficient generation, particularly from its legacy units, and on unnecessarily large amounts of higher-cost purchases from other Entergy affiliates ("Entergy Pool Energy").[3]

2. As a result of EMI's (or Entergy's) failure to purchase adequate amounts of available lower-cost third-party power, Mississippi ratepayers served by EMI under its regulated monopoly franchise bore substantial additional costs in their electricity bills.[4]

---

[3] *See* **Ex. "A,"** Initial Expert Report of David DeRamus, Ph.D., attached to and made a part of the State's Response, at ¶5, p. 2, Confidential Pursuant to the Protective Order (herein, **"DeRamus Initial Report"**). (All references to "Exhibits" ("Ex.") hereafter denote exhibits submitted as attachments to Plaintiff's response). Plaintiff is filing contemporaneously herewith a Motion to Seal Ex. "A" and **Ex. "B",** Rebuttal Report of David DeRamus, Ph.D., Confidential Pursuant to the Protective Order (herein, **"DeRamus Rebuttal Report"**), as well as other exhibits.
[4] Ex. "A", DeRamus Initial Report, at ¶6, p. 2.

3. The most likely reason for EMI or Entergy to refuse to purchase adequate amounts of less costly third-party power was Entergy's attempt – ultimately, successful – to foreclose competing IPPs from supplying the wholesale electricity market and, ultimately, Entergy's retail customers, with cheaper power.[5]

4. A reasonable estimate of damages suffered by Mississippi ratepayers as a result of Entergy's conduct from the damages period of 1998-2008 ranges between $569 million and $621 million in nominal terms, and between $666 million and $741 million in present value terms (as of November 2017) using a risk-free interest rate, and applying Mississippi's statutory interest rate of 8% increases the damages to between $1.51 billion and $1.73 billion in present value terms (as of November 2017).[6]

5. A verification of the reasonableness of both damages estimates was performed in several ways: (a) estimates are generally consistent with the preliminary damages estimate calculated by Dr. DeRamus in 2012 based on publicly available FERC Form 1 data, and (b) Entergy's "TRADES" database (a database in which Entergy maintained information on power sales offers that Entergy obtained from third parties during the period at issue, but that it ultimately rejected), confirms not only the reasonableness of the third-party price benchmarks used, but also the ability of Entergy to procure significant additional quantities of third-party power without major deliverability constraints, as well as the overall damages estimate.[7]

6. The analyses and conclusions made by Dr. Yang and Mr. Copeland helped to further confirm the overall reasonableness of the damages estimates. Dr. Yang's analyses are based on an application of the PowerWorld Simulator software utilizing Defendants' transmission modeling data, and Mr. Copeland's PROMOD analysis is based on Defendants' production cost model and input data; both analyses confirm and ensure that the amounts of additional lower-cost third-party purchases used in the damages estimates would have been "deliverable" to Entergy load and would not have been limited by transmission or other operating constraints on the Entergy system.[8]

To derive his estimates of damages, Dr. DeRamus performed two different analyses using two alternative methods: (a) an "hourly damages method", and (b) a "unit displacement method".[9]

In his hourly damages analysis, Dr. DeRamus compared, on an hourly basis, the costs that EMI

---

[5] *See Id.*, at ¶7, p. 3.
[6] *See Id.*, at ¶8, p. 3.
[7] *See Id.*, at ¶11, p. 4.
[8] *See Id.*, at ¶12, pp. 4-5.
[9] *See Id.*, at ¶¶9-10, pp. 3-4. The unit displacement method is also referred to as the "full displacement method."

actually incurred to generate electricity from its own units or purchase from the Entergy System Pool, with the price at which EMI purchased energy from third-party suppliers in those hours. The hourly price for energy purchased serves as a proxy for the price of the energy EMI could have purchased to displace its inefficient legacy generation and Entergy System Pool purchases. It is important to note that Dr. DeRamus does *not* assert that EMI would generate its own power one hour, purchase power from the market the next, and then generate its own power in the following hour. Inherent in Dr. DeRamus' damages model is the portfolio approach, which he clearly explained in his deposition.[10] The portfolio approach is the exact same approach that electric utilities, like EMI, use to supply their customers with power from a variety or resources – including owned generating resources and purchased power resources such as long-, intermediate- and short-term purchases. Under the unit displacement analysis, Dr. DeRamus assumed EMI's legacy generating units would have been fully displaced (*i.e.*, their entire output replaced with purchased power during all hours of the period being evaluated). Dr. DeRamus did *not* assume EMI's legacy units would be retired or dismantled. The displacement of the legacy units rendered the operating characteristics of those units entirely irrelevant because they would not have been run.[11] In this way, Dr. DeRamus imposed a more severe constraint (*i.e.*, his estimate is more conservative) than if he were to have assumed the units were operating and had modeled them in more detail.[12]

The methodology Dr. DeRamus used in this case was based on the same methodology he previously used in *David Jenkins, et al. v. Entergy Corporation, et al.*[13] The conduct at issue and

---

[10] *See* **Ex. "D",** Excerpts from Deposition of David DeRamus, Ph.D., at p. 177, ln. 18 – p. 181, ln. 14; *see also* Ex. B, DeRamus Rebuttal Report, at p. 48 ¶81.

[11] *See* Ex. "A", DeRamus Initial Report, at ¶10, p. 4 and ¶72, p. 30; *see also* Ex. "B", DeRamus Rebuttal Report, at ¶ 5, p. 4 and ¶ 66, p. 39.

[12] *See* Ex. "B", DeRamus Rebuttal Report, at ¶66, p. 39.

[13] *See Jenkins, et al. v. Entergy Corporation, et al.*, Cause No. 20666, District Court of Chambers County, Texas, 344th Judicial District, April 30, 2012.

certain claims in *Jenkins*, a Texas state court decision, are similar to the instant case. Dr. DeRamus concluded in his report in this case that "the underlying conduct at issue [in *Jenkins*] was sufficiently similar to warrant applying a similar approach to estimating damages [here]."[14] And the court in *Jenkins* found, after a multi-day hearing, that Dr. DeRamus' damages model was "a reliable economic model."[15]

Dr. DeRamus has also employed a similar methodology in other cases in addition to *Jenkins*, such as in price-fixing cases (*i.e.,* violations of Section 1 of the U.S. Sherman Act), in which damages are estimated as the difference between actual prices and a competitive benchmark (or "but for") price.[16] For example, as noted by Dr. DeRamus in his curriculum vitae, he previously testified on liability and damages using such a damage model in *In re Methionine Antitrust Litigation*, a price-fixing case involving feed additives.[17]

In response to Defendants' witnesses' criticisms, Dr. DeRamus performed several sensitivity analyses to test the reasonableness of his damages estimates. For example, he performed sensitivity analyses on his hourly damages model and explicitly incorporated the operating constraints Defendants' witnesses incorrectly accused him of ignoring.[18] The results produced by Dr. DeRamus' sensitivity analyses were only 2% lower than his original hourly damages model.[19] Dr. DeRamus also performed a wide range of *additional* sensitivity analyses with his damages model.[20] To further confirm the reasonableness of his results, Dr. DeRamus compared the modeled

---

[14] Ex. "A", DeRamus Initial Report, at ¶4, p. 2.

[15] **Ex. "C",** Excerpts from Findings of Fact and Conclusions of Law on Plaintiff's Motion to Certify, attached to and made a part of the State's Response, at Finding 108 [Doc.262-14] (herein, **"Jenkins Findings of Fact"**).

[16] *See* Ex. "B", DeRamus Rebuttal Report, at ¶65, p. 39.

[17] *See* Dr. DeRamus' curriculum vitae, a copy of which is attached to and made a part of the Declaration of David DeRamus, Ph.D. (herein **"DeRamus Declaration"**) as **Addendum 1,** at p. 6, which declaration is attached to and made a part of the State's Response as **Ex. "E"**.

[18] *See* Ex. "B", DeRamus Rebuttal Report, at ¶¶68-75, pp. 40 - 44.

[19] *Id.*, at ¶75, p. 44.

[20] *Id.*, at ¶77 p. 46.

dispatch and capacity factors of EMI's legacy units with what actually occurred after Entergy joined MISO.[21] In his rebuttal report, Dr. DeRamus also updated his hourly damages model and unit displacement damages model estimates for the time period 2009 − 2013, which estimates were prepared in connection with his direct report and based upon the same methodology.[22] The updated analyses bring the damages estimates to between $756 million and $769 million in nominal terms, and to between $1.83 billion and 1.98 billion using the Mississippi statutory rate of 8%.[23]

## LAW AND ARGUMENT

### I.     LEGAL STANDARDS

#### A.     Standards for Expert Testimony

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* work together to establish the basic framework for determining admissibility of expert testimony.

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[24]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth four factors for trial courts to consider in evaluating the reliability of expert testimony:

---

[21] *Id.*, at ¶78, p. 47.
[22] *See* Ex. "A", DeRamus Initial Report, ¶¶3, p. 1 ("While I have evaluated the Defendants' conduct from 1993 through 2013, I have been asked to restrict my calculation of damages to the period from 1998 through 2008 (the damages period."). *See also, id.*, fn. 1 ("While my damages analysis in this report is limited to the 1998 − 2008 time period, it could be expanded to include 2009 − 2013 as well.").
[23] Plaintiff has fully briefed its position as to the admissibility of Dr. DeRamus' updated 2009 − 2013 damages estimates based upon the hourly damages model as well as the full displacement damages model in its Memorandum in Opposition to Defendants' Motion to Strike Supplemental Expert Reports [Doc. 251] at pp. 9-15.
[24] Fed. Rule. Evid. 702.

(1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.[25]

Together, *Daubert* and Rule 702 require courts "to act as gate-keepers, making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[26] The Supreme Court later extended *Daubert* to non-scientific expert opinion testimony in *Kumho Tire v. Carmichael*.[27]

*Daubert* thus charges trial courts to conduct a reliability assessment to ensure that proffered expert testimony is both relevant and reliable.[28] The focus when determining reliability "must be solely on principles and methodology, not on the conclusions that they generate."[29] The party seeking to admit expert testimony must demonstrate by a preponderance of the evidence that the expert's findings and conclusions are reliable but need not show that the expert's findings and conclusions are correct.[30] In answering the reliability inquiry, the Supreme Court has stated that the variability of type and purpose of the testimony at issue requires flexibility.[31]

Ultimately, this Court has "broad latitude" in weighing the reliability and admissibility of expert testimony.[32] It is important to note that the rejection of expert testimony is the exception rather than the rule, and excluding all the testimony of an expert is an extraordinary measure.[33]

---

[25] *Kumho Tire v. Carmichael*, 526 U.S. 137, 144, 119 S.Ct. 1167, 143 L.3d.2d 238 (1999) (citing *Daubert*, 509 U.S. at 593.
[26] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (internal quotation marks omitted).
[27] *See Kumho Tire v. Carmichael*, 526 U.S. at 147.
[28] *See Daubert*, 509 U.S. at 589, 592-93.
[29] *See Daubert*, 509 U.S. at 595.
[30] *See Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).
[31] *Id.* at 153.
[32] *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (quoting *Kumho Tire Co.*, 526 U.S. at 150–51).
[33] Fed. R. Evid. 702, advisory committee's note to 2000 amendments.

Generally speaking, federal courts have been reluctant to exclude a party's expert testimony, since cross-examination is considered the proper vehicle through which an opposing party can question the ultimate validity and applicability of the expert's conclusions. In *Daubert*, the Supreme Court cautioned federal courts against barring expert testimony when the basis of the testimony is sufficiently reliable and can be attacked at trial:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . . These conventional devices, rather than wholesale exclusion . . . are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.[34]

The first prong of the *Daubert* analysis requires the court to determine whether the expert's testimony is based upon a reliable methodology, while the second prong requires the court to determine whether the proposed testimony is relevant and will assist the trier of fact to understand or determine at issue. For the reasons set forth, below, Dr. DeRamus' expert testimony is both entirely reliable and unquestionably relevant and thus satisfies the two-prong test for determining admissibility articulated by the Supreme Court in *Daubert* and spelled out in Rule 702.

### B.   Standards for Damages Estimates

Under Mississippi substantive law, damages need only be shown "with reasonable certainty and may not be speculative or conjectural." *See Saucier v. Coldwell Banker JME Realty*, 644 F.Supp.2d 769, 782 (*quoting Bagwell Coatings, Inc. v. Middle South Energy, Inc.,* 797 F.2d 1298, 1309 (5th Cir. 1986)).[35] Further, "where it is reasonably certain that the damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages." *Id*. (*quoting Cain v. Cain*, 967 So.2d 654, 668 (Miss.Ct.App. 2007) (*citing*

---

[34] *Daubert*, 509 U.S. at 596.
[35] Middle South Energy, Inc. is the predecessor-in-name to System Energy Resources, Inc., EMI's affiliate that owns and operates the Grand Gulf Unit 1 Nuclear Generating Station.

*Cain v. Mid-South Pump Co.*, 458 So.2d 1048, 1050 (Miss. 1984)). Finally, "When loss has occurred but 'the extent of the injury and the amount of damage are not capable of exact and accurate proof,' damages may be awarded if the evidence lays a 'foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage.'" *Id.*

Expert testimony is the preferred means of presenting damages. "**[E]xpert economist testimony is often preferred in cases involving the present value of future damages**."[36] Under Mississippi law, defendants may not escape liability for their wrongful conduct simply because the damages resulting from such conduct is difficult to estimate with certainty.

> "It is well recognized that Mississippi is equally firm in its determination that a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused.... Where the existence of damages has been established, a plaintiff will not be denied the damages awarded by a fact finder merely because a measure of speculation and conjecture is required in determining the amount of damages."[37]

The use of proxy prices and benchmarks is commonly accepted in the development of damages estimates in antitrust cases.[38] Similarly, in cases brought under Mississippi law on breach of contract (Uniform Commercial Code – Sales; Miss. Code 75-2-711, *et seq*), damages may be established through approximations.[39]

---

[36] *Wise v. Kansas City Life Ins. Co.*, 433 F.Supp.2d 743, 751–52 (N.D. Miss. 2006) (*citing Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 740 (Miss. 1999); *AmSouth Bank v. Gupta*, 838 So.2d 205, 221 (Miss. 2002)). (Bolding added).

[37] *Clemons v. United States*, No. 4:10-CV-209-CWR-FKB, 2012 WL 5364737, at *7 (S.D. Miss. 2012) (citing *TXG Intrastate Pipeline Co v. Grossnickle*, 716 So.2d 991, 1016–17 (Miss. 1997)). (Quotation marks, citations, and brackets omitted).

[38] When estimating lost profits in an antitrust case, the yardstick method – in which an economist analyzes the profits of a business comparable to the plaintiff's, but which did not face anticompetitive conduct, as a proxy for the plaintiff's lost profits – is an appropriate measure of damages. *See MM Steel, L.P. v. JSW Steel (USA), Inc.*, 806 F.3d 835, 851 (5th Cir. 2015), *cert. denied, JSW Steel (USA), Inc. v. MM Steel, L.P.*, 137 S.Ct. 372 (2016) (*citing Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974).

[39] *See Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1339 (5th Cir. 1991) ("As already noted, it is unnecessary for a plaintiff to prove his losses with mathematical precision, and we do not believe that a sales estimate based on historical data from similar advertising campaigns would have rendered this estimate speculative or uncertain."). (Internal citations omitted).

It is also generally understood that estimating damages requires "some improvisation" and that "the party who has caused the loss may not insist on theoretical perfection."[40] Just as in New York, defendants in Mississippi "cannot escape liability because of lack of a scientifically precise measure of damages. "'[A] reasonable basis for computation and the best evidence which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of loss is sufficient proof.'"[41] Courts in Mississippi, like courts in New York (as in *Tractebel Energy*), also have a large degree of flexibility in estimating damages, once liability is established.[42]

## II.    DR. DERAMUS' TESTIMONY MEETS THE LEGAL STANDARDS

### A.    Dr. DeRamus is eminently qualified to testify as to the opinions and conclusions contained in both his initial report and his rebuttal report based on his knowledge, skill, experience, training and education.

Defendants allege that Dr. DeRamus is not qualified because he is "only an economist" and does not have the "necessary operational and energy purchasing expertise" to render the opinions and conclusions contained in his report.[43] Specifically, Defendants contend that "Dr. DeRamus lacks the expertise to support either of the premises [in his expert report] because he has no expertise or training in operating an electric utility or system, or in purchasing energy from IPPs (or selling energy on behalf of IPPs or other wholesale merchants to utilities) on the

---

[40] *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 111 (2d Cir. 2007) (*quoting Entis v. Atl. Wire & Cable Corp.,* 335 F.2d 759, 763 (2d Cir.1964)).

[41] *Par Indus., Inc. v. Target Container Co.,* 708 So.2d 44, 50 (Miss. 1998) (*quoting MBF Corp. v. Century Business Communications, Inc.,* 663 So.2d 595, 599 (Miss. 1995) (*quoting Koehring Co. v. Hyde Construction Co,* 178 So.2d 838, 853 (Miss. 1965))). (Internal quotation marks omitted).

[42] *See Tractebel Energy,* 487 F.3d at 112 (citations omitted); *compare Bagwell Coatings, Inc. v. Middle South Energy, Inc.* 797 F.2d 1298, 1308-09 (5ᵗʰ Cir. 1986) (holding that, once causation is established, "the proof needed to sustain an award of damages is much more flexible.") (*citing Koehring Co, supra*); *Cooper Tire & Rubber Co. v. Farese,* No. 3:02CV210-SA-JAD, 2008 WL 5188233, at *3 (N.D. Miss. 2008) (finding that, "that there is "considerable flexibility in the form of necessary proof of damages…") (*quoting Lynn v. Soterra, Inc.,* 802 So.2d 162, 170 (Miss.App.Ct. 2001)).

[43] (Doc. 281), Defendants' Memorandum Brief in Support of Defendants' Motion to Exclude DeRamus, at p. 1.

market."[44] But, Defendants ignore Dr. DeRamus' extensive experience in antitrust cases, liability determinations, and economic analyses, particularly economic analyses with regard to the issues in this case. Dr. DeRamus has a PhD in economics and has decades of experience with economic modeling concerning a broad array of industries, including the electric utility industry.[45] Here, Dr. DeRamus relied on actual data and sound economic models to quantify the amount of damages. As an initial matter, Dr. DeRamus has testified regarding numerous issues involving electric utilities, including market power issues, before the Federal Energy Regulatory Commission ("FERC"), the Louisiana Public Service Commission ("LPSC"), the Public Utility Commission of Texas ("PUCT"), the Maryland Public Service Commission, the Arizona Corporation Commission, and others. Dr. DeRamus has been accepted as an expert in the fields of energy regulation, antitrust and competition, and damages, and he has testified in federal court multiple times on liability issues, market power, monopoly power, anti-competitive conduct, harm to competition, and damages.[46] Dr. DeRamus has been retained by, and worked on behalf of, the U.S. Department of Justice, the Maryland Public Service Commission, regulated electric utilities, independent power producers, consumers of electricity, industry associations, and other parties.[47]

Dr. DeRamus' extensive background, training, and experience in antitrust, quantitative modeling, damages and economic analyses shows that he has the sufficient expertise to not only testify regarding liability but also to develop a damages model suitable to address the issues in this case and to testify as to his opinions and conclusions resulting from the development of that model. Moreover, to remove any question regarding whether the issues in this case require expertise

---

[44] *Id.*
[45] *See generally,* DeRamus curriculum vitae, Addendum 1 to Ex. "E".
[46] *Id.*, at pp. 5-8.
[47] *See* Ex. "A", DeRamus Initial Report, at ¶1, p. 1.

beyond Dr. DeRamus' expertise, which is denied, in addition to his own extensive analysis, Dr. DeRamus also relied upon the expertise of Plaintiff's other expert witnesses, Dr. Yang (who has a doctorate degree in physics) and Mr. Copeland (a professional engineer with extensive operational experience regarding the PROMOD model and the data used by Entergy, itself, in utility operations) who undoubtedly do have the requisite expertise in their respective areas.

As an expert in the field of economics and energy regulation, Dr. DeRamus has evaluated a wide range of complex issues related to electric energy generation, dispatch, operating characteristics, reliability, transmission constraints, and energy purchases.[48] Dr. DeRamus has performed multiple different economic analyses and has testified regarding market power issues, monopoly power, liability and damages related to the Entergy System in multiple federal and state proceedings, starting in 2004 and continuing to the present.[49] Dr. DeRamus has previously performed, and been accepted by various regulatory bodies and the courts as qualified to testify about, analyses that are similar to or exactly the same as the analyses he conducted in this case.

In this case and in multiple prior cases, Dr. DeRamus has examined the key characteristics of each generating unit located in Entergy's balancing authority area ("BAA"), including its operating capacity and dispatch level, heat rates, generation technology, primary and secondary fuel types, planned and forced outrages, variable Operations and Maintenance ("O&M") costs, and transmission costs.[50] Dr. DeRamus has utilized testimony and filings by Entergy regarding the

---

[48] *See* Addendum 1 to Ex. "E" (DeRamus Declaration), DeRamus' curriculum vitae, at pp. 1-8.

[49] *Id.*

[50] *See, e.g.,* Affidavit of David W. DeRamus, Ph.D. in Entergy Services, Inc., FERC Docket No. ER91-569-023 (August 30, 2004), a copy of which is attached to and made a part of Ex. "E", DeRamus Declaration, as **Addendum 2,** (herein, **"ER91-569-023 DeRamus Affidavit")**, at pp. 22-35 ¶¶45-83; Affidavit of David W. DeRamus, Ph.D. in Entergy Services, Inc., FERC Docket No. ER91-569-024 (December 7, 2004), a copy of which is attached to and made a part of Ex. "E", DeRamus Declaration, as **Addendum 3** (herein, **"ER91-569-024 DeRamus Affidavit")**, at pp. 6-15 ¶¶15-32; Cross-Answering Testimony of David W. DeRamus, Ph.D., Entergy Louisiana, Inc. *et al.,* LPSC Docket No. U-27836 (March 11, 2005), a copy of which is attached to and made a part of Ex. "E", DeRamus Declaration, as **Addendum 4** (herein, **"U-27836 DeRamus Testimony")**, at pp. 20-23 ¶¶48-53; and Affidavit of

name, location, and operating characteristics of Entergy's reliability must run ("RMR") units,[51] and by Entergy and various independent power producers ("IPPs") regarding the operating characteristics and flexibility of Entergy's legacy units as well as the IPP's generating units.[52] He has reviewed the increase in the dispatch (output) of generating facilities from the time they were owned by third parties as compared to after they were acquired by Entergy;[53]analyzed information from IPPs demonstrating the savings that consumers would be able to obtain were Entergy to increase the amount of its purchases from those IPPs;[54] and studied purchase and sales data in the wholesale electricity market, including the purchasing and selling entity, quantity, and price of capacity and/or energy purchased or sold under the contract, duration and type of the contract, terms and conditions of the contract, priority or degree of interruptibility, and provisions of contracts which confer operational control over generation resources to the purchaser.[55] Dr. DeRamus has also analyzed information from IPPs regarding the limitation placed on them by Entergy regarding their ability (or lack thereof) to submit bids to sell power,[56] and has examined transmission capability data, including transmission path, interface, or facility name, total transfer

David. W. DeRamus, Ph.D., Entergy Gulf States, Inc. *et al*., FERC Docket No. EC07-70-000 (April 30, 2007), a copy of which is attached to and made a part of Ex. "E", DeRamus Declaration, as **Addendum 5** (herein, **"EC07-70-000 DeRamus Affidavit"**), at pp. 23-33 ¶¶53-66.

[51] *See, e.g.,* Addendum 2 to Ex. "E", ER91-569-023 DeRamus Affidavit, at pp. 11-12 ¶23, pp. 38-39 ¶91 and Exhibit 1; and Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit, at pp. 32-33 ¶¶59-60.

[52] *See, e.g.,* Addendum 2 to Ex. "E", ER91-569-023 DeRamus Affidavit, at p. 7 ¶13 and p. 2- ¶40; Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit, at pp. 33-36 ¶¶61-70; and Direct Testimony of David W. DeRamus, Ph.D. in Entergy Services, Inc., FERC Docket No. ER05-1065 (August 5, 2005), a copy of which is attached to and made a part of Ex. "E", DeRamus Declaration, as **Addendum 6** (herein, **"ER05-1065 DeRamus Testimony"**), at pp. 43-58 ¶¶98-139.

[53] *See, e.g*., Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit at pp. 33-36 ¶¶61-70; Addendum 4 to Ex. "E", U-27836 DeRamus Testimony, at pp.19-20 ¶¶44-47; and Addendum 5 to Ex. "E", EC07-70-000 DeRamus Affidavit, atpp.52-53 ¶¶100-101.

[54] *See, e.g.,* Addendum 6 to Ex. "E", ER05-1065 DeRamus Testimony, at pp. 8-9 ¶52, pp. 25-26 ¶52, pp. 29-30 ¶62, pp. 37-38 ¶¶82-84, and p. 52 ¶123.

[55] *See, e.g.,* Addendum 2 to Ex. "E", ER91-569-023 DeRamus Affidavit, at pp.22-35 ¶¶45-83 and pp. 37-38 ¶¶86-88; and Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit, at pp. 6-15 ¶¶15-32.

[56] *See, e.g.,* Addendum 2 to Ex. "E", ER91-569-023 DeRamus Affidavit, at pp.17-20 ¶¶33-39; Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit, at pp.28-31 ¶¶52-57; and Addendum 6 to Ex. "E", ER05-1065 DeRamus Testimony, at pp. 43-58 ¶¶98-140.

capability ("TTC"), and available transfer capability ("ATC") on Entergy's System.[57] He has also relied on Dr. Yang's transmission analysis of Entergy's System, which identified the locations of constraints and paths, interfaces or facilities affected by the constraints, the time of the year when particular transmission constraints are binding, and the system conditions under which the constraints are binding, and incorporated Dr. Yang's model in performing his economic analysis.[58]

It is well established that, "A lack of personal experience ... should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: 'knowledge, skill, experience, training, or education.'"[59] In fact, Rule 702 "does not require the expert to have personal familiarity with the subject of his testimony; 'experience' is only one among the five different ways to demonstrate an expert is qualified."[60] For example, in *Dixon v. International Harvester Co.*, the court held that an expert was qualified to testify about the design of a crawler tractor, based on his review of blueprints and photographs, despite a lack of prior experience approving crawler tractor designs.[61]

The cases cited by Defendants, on the other hand, are easily distinguishable. Defendants primarily rely upon *Carlson v. Bioremedi Therapeutic Sys., Inc.*,[62] *Edmonds v. Ill. Cent. Gulf R.R. Co.*,[63] and *Smith v. Goodyear Tire & Rubber Co.*[64] in their memorandum brief.[65] In *Carlson*, the expert at issue was a chiropractor who offered a medical opinion at trial to which the opposing

---

[57] *See, e.g.,* Addendum 2 to Ex. "E", ER91-569-023 DeRamus Affidavit, at Exhibit 1; Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit, at pp. 24-28 ¶¶45-51; and Addendum 5 to Ex. "E", EC07-70-000 DeRamus Affidavit, at pp. 34-35 ¶¶68-70.
[58] *See, e.g.,* Addendum 3 to Ex. "E", ER91-569-024 DeRamus Affidavit, at pp.15-20 ¶¶15-20; and Addendum 5 to Ex. "E", EC07-70-000 DeRamus Affidavit, at pp. 34-35 ¶¶68-70.
[59] *U.S. v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013).
[60] *Id.* (quoting *Exum v. General Electric Co.*, 819 F.2d 1158, 1163 (D.C. Cir. 1987)).
[61] 754 F.2d 573, 579–80 (5th Cir. 1985).
[62] 822 F.3d 194 (5th Cir. 2016).
[63] 910 F.2d 1284 (5th Cir. 1990).
[64] 495 F.3d 224 (5th Cir. 2007).
[65] *See* (Doc. 281), Defendants' Memorandum Brief in Support of Motion to Prohibit Testimony of DeRamus, at pp. 6-7, 9-10, and 12-13.

party objected. The court noted that the witness "is not a medical doctor, cannot prescribe medicine, did not attend medical school, and does not possess a degree from a four-year university."[66] Still, the court held it *could not assess* on appeal whether he was qualified to render his opinion; rather the court ruled the trial court abused its discretion by allowing the witness to testify without conducting a *Daubert* inquiry.[67] In *Edmonds*, a clinical psychologist testified at trial regarding the plaintiff's stress and the worsening of his pre-existing heart condition. The court found that the psychologist "performed no medical tests and made no medical diagnoses"[68] regarding the plaintiff and was "not a medical doctor, and he is not involved in making medical diagnoses or ordering medical studies or tests."[69] The court held that opinions on medical issues were beyond the scope of the witness's expertise in the field of psychology.[70] And, finally, in *Smith*, a polymer scientist who had "never worked in or studied the tire industry in any capacity," had "[n]ever testified as a tire expert," and did "not claim to be a tire expert", testified regarding the cause of a tire blowout.[71] To make matters worse, the expert "based his conclusion almost entirely on one article he found during several hours of online research."[72] The court determined the expert was not qualified to answer the seminal question at issue which was whether the tire's failure was a result of "a manufacture or design defect", since he "is not a tire expert," "has never been employed in any capacity dealing with the design or manufacture of tires," "never published any articles regarding tires nor has he ever examined a tire professionally prior to this litigation," and that "[h]is *only experience with tires is as a consumer*."[73]

---

[66] 822 F.3d at 200.
[67] 822 F.3d at 201.
[68] 910 F.2d at 1286.
[69] 910 F.2d at 1287.
[70] *Id.*
[71] 495 F.3d at 226.
[72] *Id.*
[73] 495 F.3d at 227. (Emphasis added).

Dr. DeRamus, unlike the experts in *Carlson*, *Edmonds* and *Smith*, is highly qualified in the respective fields at issue, relied upon data and information typically relied upon by economists in estimating damages, and even went several steps beyond and confirmed his findings using the results of Dr. Yang's and Mr. Copeland's analyses, which, themselves, utilized Entergy's models, populated with Entergy's operational data. It is important to point out at this juncture that Defendants did not provide *any* competing studies to counter Dr. DeRamus', Dr. Yang's or Mr. Copeland's analyses. In other words, Defendants provided no study to demonstrate the amount of additional power EMI could have purchased from non-affiliated third parties; neglected to analyze its own TRADES database, which (as Dr. DeRamus concluded after review) reveals that abundant supplies of less expensive power were offered for sale to Defendants but were rejected by Defendants; chose not to conduct a transmission study to determine whether such additional amounts of third party power could have been imported; and elected not to perform a PROMOD or other analysis to test whether such additional power could reliably have been imported.

## B. Dr. DeRamus has the necessary expertise to opine on issues related to reliability and availability of additional third-party power purchases.

Next, Defendants argue that Dr. DeRamus lacks the expertise to support his conclusions regarding reliability (*i.e.*, that additional non-affiliate purchases could have been made without hampering the reliability of the system) and availability (*i.e.*, that additional economy purchases were indeed available on the market with the requisite flexibility). Contrary to Entergy's assertions, Dr. DeRamus properly considered the issues of both the availability of third-party purchases and any reliability concerns arising from the import of such purchases, and he concluded that these issues would not likely affect the damages result. First, Dr. DeRamus explained that the additional quantities of non-affiliate power purchases are small relative to the large amount of

available power from third-party generators.[74] Second, Dr. DeRamus analyzed Entergy's

TRADES database and concluded that ample additional economy purchases were indeed available

and deliverable during the time period being studied, but Entergy chose not to purchase such power

from third-party suppliers.[75] Third, Dr. DeRamus relied on Dr. Yang's transmission analysis and

Mr. Copeland's PROMOD analysis to verify that ample amounts of additional third-party supplies

of energy were indeed "deliverable" to the Entergy load without hampering System reliability and

flexibility needs, which conclusion was also indicated by the information contained in the

TRADES database.[76] Fourth, Dr. DeRamus also relied on Entergy's testimony and various

---

[74] *See* Ex. "A", DeRamus Initial Report, p. 17 (In speaking to availability, Dr. DeRamus states, "[b]etween 1999 and 2008, more than **18,000 MW of new and efficient electric generating plants** were developed by IPPs in the Entergy service territory.") (Bolding added); *Id.*, p. 65 (When describing the amount of third-party power EMI needed to purchase to eliminate the damages related to EMI's legacy generation in this case, Dr. DeRamus establishes, "[w]hile substantial, **this amount translates into approximately 350MW of capacity on average**, which accounts for a very small portion of the more than 18,000 MW available non-affiliate capacity in the Entergy BAA. Thus, as discussed further below, I conclude that EMI (or Entergy) could have replaced its higher-cost own generation with additional purchases of lower-cost non-affiliate power, if it had chosen to do so.") (Bolding added); *Id.*, p. 68 (Regarding the amount of third-party power needed to eliminate the damages related to EMI's purchases of expensive Entergy System Pool Energy, Dr. DeRamus opines, "[w]hile substantial, this amount **translates into approximately 198MW of capacity on average,** which accounts for a very small portion of the more than 18,000 MW of non-affiliate capacity available in the Entergy BAA. Thus, I conclude that EMI (or Entergy) could have replaced EMI's higher-cost Entergy Pool Energy purchases with additional purchases of lower-cost non-affiliate power, if it had chosen to do so.") (Bolding added).

[75] *See* Ex. "A", DeRamus Initial Report, p. 79 ("Over time, Entergy has collected an extensive amount of data on energy supply offers that third parties have submitted to Entergy, but that Entergy has rejected. Entergy maintains this information in its TRADES database. This database includes not only the prices and volumes of these rejected third-party offers, but also Entergy's assessment of the amount of ATC available at the time that would have enabled the offered energy to be deliverable on the Entergy system."); *Id.*, p. 79 ("On average, the amount of Entergy's actual rejected [economy] purchases **is more than three times greater than the additional amount of non-affiliate purchases indicated in my hourly damages analysis.** Moreover, according to the TRADES database, **there was sufficient ATC to deliver the total amount of rejected [economy] purchases in 93% of the hours in which such rejected purchases were recorded.**") (Bolding added).

[76] *See* Ex. "A", DeRamus Initial Report, p. 87 ("Using Entergy's power flow cases, Dr. Yang has quantified the amount of additional third-party power purchases that Entergy could have made – i.e., to obtain power originating from either outside of or within Entergy's service territory – without hampering the reliability of the Entergy transmission system. The results of **Dr. Yang's transmission study demonstrate that the amount of additional off-system power purchases Entergy could have made from adjoining regions ranges between 3,310 MW and 4,417 MW. This is more than sufficient to accommodate the amount of additional non-affiliate power purchases to fully displace EMI's higher-cost own generation and its purchases of higher-cost Entergy Pool Energy."**) (Bolding added); *Id.*, p. 89 ("I also rely on the PROMOD analysis performed by Mr. Copeland. As Dr. Yang discusses in his report, the PROMOD and PowerWorld Simulator software are complementary, and combined, the results of these simulation programs provide a broad understanding of power system operations, both from the perspective of reliability and security-constrained economic dispatch. Mr. Copeland performed a number of PROMOD runs based on Entergy's

"natural experiments" to support his conclusion that EMI could have replaced its own higher-cost generation and Pool Energy with additional purchases of lower-cost non-affiliate power, if it had chosen to do so.

Natural experiments are tools that economists employ routinely in performing economic analyses, whether in the context of expert testimony, academic research, or public policy analysis. A natural experiment is an empirical or observational study in which the variables of interest are not controlled but rather observed.[77] In other words, a researcher can either design and implement an experiment *de novo* to test a particular hypothesis, or a researcher can rely on particular events that have already occurred in the past, which effectively also can provide a test of a particular hypothesis. In the *Horizontal Merger Guidelines*, for example, the U.S. Department of Justice and Federal Trade Commission encourage the use of natural experiments in analyzing the potential anticompetitive effects of mergers.[78] Economists, and the courts, often look to the Horizontal Merger Guidelines in analyzing other types of potentially anticompetitive conduct, such as in defining relevant markets in cases alleging monopolization or anticompetitive refusals to deal.

Here, Dr. DeRamus has relied on natural experiments to test the hypothesis of whether Entergy could accommodate additional purchases of third-party power. For example, after examining historical data regarding the Entergy System, Dr. DeRamus concluded that Entergy's

---

2006 Business Plan case to evaluate whether Entergy could have operated its system without committing EMI's inefficient units. After reviewing Mr. Copeland's report and his accompanying workpapers, Dr. Yang concludes that fully displacing EMI's inefficient legacy generating units would have been feasible from a security-constrained economic dispatch perspective. This further supports the conclusion that my above damage estimates are reasonable and reliable.").

[77] *See* e.g., Dunning, Thad (2012). "Natural Experiments in the Social Sciences: A Design-Based Approach," and DiNardo, J. (2008). "Natural experiments and quasi-natural experiments".

[78] *See* United States Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (Issued: August 19, 2010), excerpts of which are attached to and made a part of the State's Response, as **Ex. "F",** at Section 2.1.2. "Direct Comparisons Based on Experience." "The Agencies look for historical events, or 'natural experiments,' that are informative regarding the competitive effects of the merger."

purported reliability and flexibility constraints are pretextual and that Entergy could have purchased additional third-party power without hampering the reliability of the System.[79] Dr. DeRamus also analyzed the fact that Entergy purchased an increased amount of third-party power, particular during 2002-2006, without a major expansion of its transmission system,[80] and analyzed data demonstrating that, when Entergy acquired generating facilities from IPPs (which, therefore, were sources of third-party purchase potential), Entergy significantly increased the utilization of these plants without major System upgrades. This demonstrates that Entergy's claimed "system constraints" did not preclude additional third-party purchases.[81] Dr. DeRamus also compared the implied dispatch of EMI's legacy units in his damages analysis with how those units were dispatched by MISO after Entergy joined MISO, *i.e.*, after the damage period, which revealed that EMI's legacy units were dispatched far less, if at all, by MISO than they were previously by Defendants. This confirmed that System constraints would not have prevented Entergy from displacing these units.[82] Additionally, Dr. DeRamus analyzed the fact that Entergy admitted that up to 20% of its annual energy requirement could be displaced by third-party economy purchases and *every one percentage point of displacement of its inefficient generation would result in approximately $30 million in cost savings annually*.[83] This reveals that displacing even a relatively modest fraction of Entergy's inefficient generation would have resulted in a substantial savings.

Each of the methods for analyzing and calculating damages that Dr. DeRamus utilized, discussed above, is the type of analysis economists routinely rely upon in estimating damages.

---

[79] *See* Ex. "A", DeRamus Initial Report, at ¶¶69-70, pp. 28-29, ¶¶78-80, p. 33, and ¶¶86-89, p. 37. Ex. "B", DeRamus Rebuttal Report, at ¶¶39-48, pp. 24-28.
[80] *See,* Ex. "B", DeRamus Rebuttal Report, at ¶5, pp. 2-3.
[81] *See* Ex. "A", DeRamus Initial Report, at ¶52, pp. 21-22. Ex. "B", DeRamus Rebuttal Report, at ¶¶33-34, pp. 19-20.
[82] *See*, Ex. "B", DeRamus Rebuttal Report, at ¶78, p. 47
[83] *See*, Ex. "A", DeRamus Initial Report, at ¶18, p. 8. Ex. "B", DeRamus Rebuttal Report, at ¶59, pp.36-37.

**C. Dr. DeRamus has previously been found qualified to provide expert testimony regarding a similar damages model regarding similar claims made against Entergy that was held to be a "reliable economic model".**

Defendants' position that, in order for Dr. DeRamus to testify as an expert regarding the conclusions and opinions contained in his reports in this case he has to have had on-the-ground experience in utility operations, is incorrect. He does not need to be a utility operator in order to opine on liability or damages. Additionally, Dr. DeRamus has been qualified as an expert many times regarding analyses and opinions very similar to the analyses, opinions, and conclusions contained in his reports in this case.

Dr. DeRamus opined on issues such as whether Entergy could have made additional purchases of energy without hampering the reliability of the Entergy System in *David Jenkins, et al. v. Entergy Corporation, et al.*[84] Although *Jenkins* was ultimately dismissed on jurisdictional grounds, the court in *Jenkins* found Dr. DeRamus' opinions were based upon reliable data, assumptions, and analytic methodology after a multi-day hearing during which Dr. DeRamus testified regarding his damages estimates.[85]

The defendants in *Jenkins* made the same arguments regarding Dr. DeRamus that Defendants assert here, including the argument that because Dr. DeRamus did not have "utility operation experience," he lacked the necessary expertise to opine on the opinions contained in his report. Also just like Defendants are arguing here, the defendants in *Jenkins* attacked the assumptions Dr. DeRamus relied upon in reaching his conclusions for the same reasons. The court in *Jenkins* found no merit to Entergy's arguments, noting that Dr. DeRamus' analysis was based

---

[84] Report of David W. DeRamus, Ph.D., Jenkins, et al. v. Entergy Corp., et al., District Court of Chambers County, Texas, 344th Judicial District (Cause No. 20666), a copy of which is attached to and made a part of Ex. "E", DeRamus Declaration, as **Addendum 8**.
[85] *See* Ex. "C", Jenkins Findings of Fact, Findings 97-118, pp. 40-47.

upon data provided by Entergy as well as publicly-available data relating to Entergy (just like in the instant case) and that the defendants failed to make the requisite showing that Dr. DeRamus was either unqualified or that his opinions were not based on accepted methodology:

> 108. Entergy claims that Dr. DeRamus cannot have helpful conclusions because he performed three different calculations which resulted in different results. Entergy's claim is inaccurate. **Dr. DeRamus used a reliable economic model.** …
>
> Entergy contends that Dr. DeRamus is not credible because his analysis assumes that the more expensive Entergy pool power purchases during the relevant period could have been fully displaced by more economical power purchases from non-affiliates and that there were no other operation constraints on purchases from non-affiliates, such as the availability, deliverability, or reliability of such purchases. **Entergy's contention is inaccurate and misleading.** Dr. DeRamus identified the assumptions for the specific calculations, explained the basis for each assumption, why each assumption was reasonable, and what he did to test the reasonableness of his assumptions, and showed how the calculations would change in the event an adjustment to the assumptions was needed. Entergy did not demonstrate that Dr. DeRamus's assumptions were unreasonable.[86]

This is exactly what Dr. DeRamus did here. The court in *Jenkins* continued:

> 109. Entergy claims that Dr. DeRamus ignored operational constraints. **He did not.** … Dr. DeRamus directed his staff to run a more detailed power flow and transmission modeling exercise. Dr. Yang did so under Dr. DeRamus's direction. **Dr. Yang's work corroborates what Dr. DeRamus had already opined**…
>
> 110. Entergy next argues that Dr. DeRamus does not have "utility operation experience." Entergy did not demonstrate that such experience is a prerequisite for Dr. DeRamus's work. Entergy ignores his extensive experience in economic and econometric analyses and his court (and regulatory body) recognized expertise in offering testimony with respect to economic issues generally, and specifically, related to the Entergy system.[87]

Defendants' arguments in their Motion to Prohibit Testimony of DeRamus are simply a rehash of the same arguments made before the court in *Jenkins*, all of which the court soundly rejected. The *Jenkins* court noted that its findings were being made at a certification hearing and

---

[86] Ex. "C", Jenkins Findings of Fact, Finding 108 at pp. 43-44, in pertinent part. (Bolding added).
[87] *Id*., Findings 109-110 at p. 44, in pertinent part. (Bolding added).

therefore Dr. DeRamus' opinions "need not be tested against the reliability and relevance standards used for admissibility at trial", however, the court went on state it found that, to the extent those standards should be used, Dr. DeRamus' expert testimony was sufficient to meet or exceed the legal standard.[88] The court accepted Dr. DeRamus as a qualified expert and certified the class.

Although Dr. DeRamus has not worked as a utility system operator or a wholesale power purchaser, he has testified in numerous proceedings before the FERC, multiple state regulatory authorities, state courts, and federal courts on issues related to competition in electricity markets, market power, market manipulation, antitrust issues, damages, mergers and acquisitions, and the design of wholesale electricity markets – the same issues he is opining on here.[89] As discussed in Dr. DeRamus' curriculum vitae, as well as in his declaration, he has testified on damages in a wide range of proceedings, including not just energy-related disputes, but also antitrust disputes, breach of contract disputes, intellectual property disputes, international arbitration proceedings, and other commercial litigation.[90] As Dr. DeRamus discussed in his rebuttal report, his damages model in this case is similar to the damages models used in price-fixing cases (*i.e.,* violations of Section 1 of the U.S. Sherman Act), in which damages are estimated as the difference between actual prices and a competitive benchmark (or "but for") price.[91] As noted in Dr. DeRamus' curriculum vitae, and in his declaration, he previously testified on damages using such a damage model in *In re Methionine Antitrust Litigation*, a price-fixing case involving feed additives.[92] Dr. DeRamus has also testified on issues of liability in other energy cases, including with regard to allegations of

---

[88] *Id.,* Finding 100, at pp. 41-42.
[89] Addendum 1 to Ex. "E", DeRamus' curriculum vitae, at pp. 1-8. *See also*, discussion of Addenda 2-6 of Ex. "E", *supra*.
[90] *Id. See also*, Ex. "E", DeRamus Declaration, at ¶9.
[91] *See* Ex. "B", DeRamus Rebuttal Report, at ¶65, p. 39.
[92] Addendum 1 to Ex. "E", DeRamus' curriculum vitae, at p. 6. *See also*, Ex. "E", DeRamus Declaration, at ¶10.

collusion (in FERC Docket No. EL07-47-000, on behalf of Constellation Energy Commodities Group, Inc.), cross-subsidization (before the PUCT, in SOAH Docket No. 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 and PUC Docket No. 32766, on behalf of the Texas Industrial Energy Consumers), and improper bidding behavior (in FERC Docket Nos. EL00-95-075 and EL00-98-063, on behalf of Duke Energy).

It is worth noting that EMI's expert, Joe D. Pace, Ph.D., is an economist by training and also has no utility operation experience.[93] Nonetheless, he opined on similar issues as Dr. DeRamus, including issues concerning dispatch of EMI's legacy units and day-ahead and hourly power purchases and issued opinions on the expert reports of Dr. DeRamus, Dr. Yang, and Mr. Copeland.[94] Defendants request this Court to reject Dr. DeRamus based on qualifications, while at the same time neglecting to apply the same standard to their own expert, Dr. Pace.

Therefore, for all of the reasons set forth, above, Dr. DeRamus is qualified to testify based upon his knowledge, skill, experience, training, and education, as detailed above, and his testimony easily satisfies the first prong of *Daubert*. As set forth in the sections, below, Dr. DeRamus' testimony is also reliable and relevant.

### D. Dr. DeRamus' damages models are reliable and not speculative.

In addition to challenging his expertise, Defendants challenge Dr. DeRamus' methodology. Specifically, Defendants allege that both his hourly and full displacement damages models are unreliable and irrelevant because they rely on unrealistic speculation regarding system dispatch and the wholesale power market. Defendants assert that Dr. DeRamus' damages models are unreliable due to his alleged lack of expertise and his purported inability to rely on Dr. Yang's and Mr. Copeland's analyses to provide the necessary expertise. Defendants' arguments are baseless.

---

[93] *See* **Ex. "G,"** excerpts of Expert Report of Joe D. Pace, Ph.D., attached to and made a part of the State's Response, at Section 1, p.1 ¶1 and p. 2 ¶4, and p.1 of Curriculum Vitae of Joe D. Pace, PhD.
[94] *Id.*, at "Table of Contents", p. 2-9 ¶¶6-18 and p. 66 ¶132.

As explained, above, Dr. DeRamus is eminently qualified and has more than sufficient expertise and experience to render the opinions in his reports. In developing his damages models, Dr. DeRamus identified his assumptions for his calculations, explained why each assumption was reasonable, and then verified his assumptions using Entergy's data and models.[95] Dr. DeRamus also considered both Dr. Yang's and Mr. Copeland's analyses in assessing the reasonableness of his assumptions regarding the deliverability of additional non-affiliate purchases and displacement of EMI's legacy units.[96]

Entergy alleges that because information contained in its hourly Intra-System Bill ("ISB") data was not available when actual purchase decisions were made; because EMI's additional third-party power purchases would supposedly increase costs for other Entergy Operating Companies ("EOCs"); and because it is allegedly unrealistic to assume EMI was able to precisely identify the additional quantities of hourly purchases, Dr. DeRamus' analysis is unduly speculative. These arguments are likewise unpersuasive. Entergy's ISB is an after-the-fact accounting program through which each EOC, including EMI, was billed for power generated from its own units, power purchased from the Entergy System Pool, and its portion of the power purchased by the Entergy System on behalf of all of the EOCs during the prior month. Dr. DeRamus utilized Entergy's own detailed hourly ISB reports to perform his damages analysis because it allowed him to analyze the issue at a more detailed level.[97] He then confirmed the reasonableness of using that ISB data by comparing the results from that analysis with the estimates that resulted from alternative data

---

[95] *See* Ex. "A", DeRamus Initial Report, p. 69 (explaining his assumptions regarding the deliverability and availability of third-party power); *Id.*, p. 10 (explaining his displacement assumptions); *Id.*, p. 70 (explaining why his deliverability and availability assumptions are reasonable); *Id.*, pp. 11, 70, 78, 81 and 86 (explaining how he verified his assumptions using the data in Entergy's TRADES database and Mr. Copeland's PROMOD analysis using Entergy's own inputs).; *see also* Ex. "B", DeRamus Rebuttal Report, in which Dr. DeRamus further tests the reasonableness of the assumptions and conclusions in his Initial Report, in response to the criticisms raised by the Defendants' witnesses in their reports.
[96] *See id.*, pp. 72, 87, 88 and 89.
[97] *See id.*, p. 62.

sources, specifically data from Entergy's TRADES database and Entergy's FERC Form 1.[98] Dr. DeRamus also conducted daily, weekly, and monthly damages estimates as well.[99] Only after performing all of these analyses did Dr. DeRamus conclude that his damages estimates were both conservative and reasonable, based in large part on Defendants' own data. In his report, Dr. DeRamus explains that EMI's additional third-party power purchases would not necessarily increase costs for other Entergy Operating Companies[100] and that a reasonable estimate of damages does not require one to assume that EMI is "omniscient".[101] In his rebuttal report, Dr. DeRamus explains, "As an economist, I do not consider that a reasonable damage estimate requires a precise replication and identification of the detailed purchase and dispatch decisions by EMI and/or Entergy in the absence of the conduct at issue, incorporating every operational detail of Entergy's units and 'but-for' purchases…"[102]

Courts have established that an expert's reliance on proxy prices – with far less granularity and support than Dr. DeRamus' – in reviewing a utility's power purchasing activities is a reliable damages model. In *Pike County Light and Power Company-Electric Division v. Pennsylvania Public Utility Commission*, the court found that the public utility commission did not abuse its discretion when it utilized experts to perform a comparison of the utility's purchase power expense with alternative, cheaper, power purchase costs available from a third party supplier during the test period.[103] Pike County, a utility subsidiary of Orange & Rockland Utility purchased 100% of its power supply from its parent Orange & Rockland. The Pennsylvania Public Utilities Commission

---

[98] *See id.*, p. 85.
[99] *See id.*, p. 77.
[100] *See* Ex. "B", DeRamus Rebuttal Report, p. 101.
[101] *Id.*, p. 5.
[102] *Id.*
[103] *See Pike County Light and power Company-Electric Division v. Pennsylvania Public Utility Commission*, 77 Pa.Cmwlth. 268, 465 A.2d 735.

found that Pike County could have lowered the cost to its customers by purchasing power from Pennsylvania Power & Light (PP&L), instead, and thus disallowed its request to recover approximately $600,000 in purchased power expenses charged to it by its parent. Pike County objected to the evidence supporting such a reduction, arguing that the alternate PP&L rate used to determine a reasonable level of purchased power expense was unsupported by substantial evidence. After a thorough review of the record, including expert testimony, the court found that the record contained sufficient, reliable expert testimony that established the viability of power purchases from PP&L, the technical feasibility of purchases from PP&L (including that such purchases could be imported over Orange & Rockland transmission lines), that PP&L's resources were primarily coal-fired and thus, generally cheaper than Orange & Rockland's, which were primarily oil- and gas-fired, and that PP&L stated an interest in selling to Pike County.[104]

EMI is a subsidiary of Entergy Corporation, just as Pike County was a utility subsidiary of Orange & Rockland Utility. And the damages analysis in *Pike County* is similar to what Plaintiff's experts presented here, except Dr. DeRamus went several steps further than the experts in *Pike County* and established the availability and benchmark prices for additional power supplies by utilizing Defendants' ISB data showing actual purchase power prices EMI paid to third parties, analyzing the TRADES database revealing actual offer amounts and prices from third parties that Defendants rejected, relying on Dr. Yang's intricate transmission analyses utilizing Defendants' transmission modeling inputs, relying on Mr. Copeland's reliability analysis with the help of the PROMOD model that Defendants and many other electric utilities use, and examining multiple other data sources to support his hour-by-hour and full displacement analyses.

---

[104] *Id*., 77 Pa.Cmwlth at 275-76, 465 A.2d at 738-39.

### E. Dr. DeRamus, along with Plaintiff's other experts, considered the Entergy System's need for flexibility.

Entergy's Motion to Prohibit Testimony of DeRamus is replete with misrepresentations, including its allegation that none of Plaintiff's experts touched on the Entergy System's purported need for flexibility. Contrary to Entergy's assertions, Plaintiff's experts did consider the System's need for "flexibility". Specifically, Dr. DeRamus considered Entergy's need for "flexibility" in the operation of its generation resources and concluded that Entergy's arguments regarding flexibility are largely pretextual, and that purchases from new Combined Cycle Gas Turbine ("CCGT") units – which many IPPs owned and operated – could provide similar, if not better, flexibility as compared to EMI's inefficient legacy units.[105] In his rebuttal report, Dr. DeRamus thoroughly addressed the Entergy System's need for flexibility and explained that the new CCGT units owned by IPPs (if Entergy had chosen to purchase from them) can offer similar, and often better, flexibility at a substantially lower cost, have better ramp rates to "follow" load variations than Entergy's legacy units, and are able to provide Entergy with the needed flexibility.[106]

Dr. Yang's and Mr. Copeland's analyses also considered flexibility. Using Entergy's own power flow cases that model transmission and operating constraints on the Entergy System, Dr. Yang demonstrated that Entergy could have purchased significant amounts of off-system and on-system power, far exceeding the amounts reported in Dr. DeRamus' damages analysis without hampering the reliability of the System.[107] Dr. Yang also considered Mr. Copeland's PROMOD

---

[105] *See* Ex. "A", DeRamus Initial Report, at ¶¶86-89, p. 37. Ex. "B", DeRamus Rebuttal Report, at ¶¶39-48, pp. 24-28.

[106] *See* Ex. "B", DeRamus Rebuttal Report, at ¶¶40-48, pp. 25-28.

[107] *See* **Ex. "H"**, Excerpts from Expert Report of Songhoon (Spencer) Yang, Ph.D., attached to and made a part of the State's Response, Confidential Pursuant to the Protective Order (herein, **"Yang Initial Report"**), at ¶¶27-29, pp. 11-12 and ¶¶41-45, pp. 17-20; *see also* **Ex. "I"**, Excerpts from Rebuttal Report of Songhoon Yang, Ph.D., attached to and made a part of the State's Response, Confidential Pursuant to the Protective Order (herein, **"Yang Rebuttal Report"**), at ¶¶8-11, pp. 5-7 and ¶¶38-46, pp. 19-23.

analysis to confirm his conclusion that Entergy's System constraints, from a security-constrained economic dispatch ("SCED") or reliability perspective, did not prevent Entergy from purchasing additional third-party power.[108] The SCED modeling embedded in the PROMOD model ensures that the resulting economic dispatch outcome does not violate any of the operating constraints, including the System's "flexibility" requirements.[109] In fact, Entergy itself conducted PROMOD studies to address the same issue (*i.e.*, its' "generate or purchase" decision) in *Linda Delaney, et al. v. Entergy Louisiana, Inc., et al.,* LPSC Docket No. U-23356.[110]

> **F.    Defendants have not challenged either Dr. Yang or Mr. Copeland, therefore, whether Dr. DeRamus can rely upon Dr. Yang and Mr. Copeland is a matter of opinion and goes to the weight; it is not appropriate for a Daubert motion.**

It is well established that experts can rely upon other experts in rendering their opinions. As explained, above, Defendants did not file a motion to exclude Plaintiff's expert witnesses, Dr. Yang and Mr. Copeland. And, in fact, Defendants have admitted that both Dr. Yang and Mr. Copeland have expertise with electric utility systems.[111] Therefore, Dr. DeRamus can (and did) rely on their expertise to help inform and confirm his opinions and conclusions. Whether those opinions were reasonable and appropriate for Dr. DeRamus to rely on thus goes to the weight, not to the admissibility of Dr. DeRamus' testimony.

Defendants' arguments as to Dr. Yang and Mr. Copeland constitute nothing more than an unsupported, back-door request for their exclusion. This Court should not consider those arguments as they are procedurally improper. Even if this Court were to entertain Defendants' arguments and exclude the testimony of Dr. Yang and Mr. Copeland (which it should not), Dr.

---

[108] *See* Ex. **"H"**, Excerpts from Yang Initial Report, at ¶¶52-60, pp. 23-25.
[109] *Id.*
[110] *See* Ex. **"I"**, Excerpts from Yang Rebuttal Report, at Appendix A.
[111] *See* Motion to Prohibit Testimony of DeRamus, Section II, p. 13.

DeRamus would still be permitted to rely on the opinions and conclusions contained within their reports.

In *YETI Coolers, LLC v. RTIC Coolers, LLC*,[112] defendant RTIC filed motions challenging a number of plaintiff's experts, including plaintiff's expert, Mr. Hoyer. RTIC's motion requested, among other reasons, that Mr. Hoyer be excluded because it had filed motions challenging some of YETI's other experts on whom Mr. Hoyer had relied. RTIC argued that, if those experts were excluded, Mr. Hoyer's testimony was unreliable for relying on excluded opinions. The court denied RTIC's motions challenging plaintiff's other experts, so this argument was moot, however, the court stated that even if that were not the case and those experts had been excluded, Mr. Hoyer's testimony would not be unreliable simply because he relied on experts whose testimony had been excluded:

> And even if some of those reports had been excluded, this would not make his testimony *per se* unreliable. *See Lithuanian Commerce Corp. v. Sarah Lee Hosiery*, 202 F.Supp.2d 371, 377 (D.N.J. 2002) (allowing testimony of an expert even though he had relied on expert reports that were later excluded). Instead, it would go to the weight of his testimony.[113]

Whether those opinions and conclusions were appropriate for Dr. DeRamus to rely on goes to the weight of his testimony, not to whether his opinion and methodology is reliable pursuant to Rule 702 and *Daubert*.

Defendants allege that Dr. Yang and Mr. Copeland "have not performed an analysis that would suffice to support Dr. DeRamus's assumptions"[114] Again, this argument is appropriate for

---

[112] *YETI Coolers, LLC v. RTIC Coolers, LLC*, 2017 WL 429210 (W.D.Tex. 2017).
[113] *See YETI Coolers, LLC*. at *3.
[114] *See* Defendants' Motion to Prohibit Testimony of DeRamus, p. 13, stating, "Specifically, Dr. Yang and Mr. Copeland, who do have some degree of expertise with electric systems, have not performed an analysis that would suffice to support Dr. DeRamus's assumptions about the ability to displace legacy units and Exchange Energy with purchases of energy from IPPs without jeopardizing the reliability of the System, nor do they address the availability of such purchases in the market."

cross-examination at trial, not for seeking to exclude Dr. DeRamus. Overall, Defendants argue that Dr. Yang and Mr. Copeland "do not bridge the gaps in Dr. DeRamus' expertise".[115] But, contrary to Defendants' statements, there are no "gaps" in Dr. DeRamus' expertise with respect to the opinions and conclusions in his reports, as discussed herein. Dr. Yang's and Mr. Copeland's analyses provide additional support for Dr. DeRamus' conclusions and his damages model. Dr. DeRamus establishes the persistent pattern of Defendants' decisions during the time period at issue, which individually and in the aggregate demonstrate that Defendants have refused to purchase available and economic non-affiliate power from off-system and/or on-system IPPs. Dr. Yang and Mr. Copeland serve to corroborate this conclusion by utilizing Defendants' own data and computer models, which show that such available economic third-party power would have been deliverable without hampering either System reliability or "flexibility" requirements. In fact, during his deposition, Dr. DeRamus testified multiple times that the analyses performed by Dr. Yang and Mr. Copeland merely helped to inform his opinions and confirm the overall reasonableness of his damages opinions. For example, he testified:

> Q.  How do you rely upon Dr. Yang for purposes of your report and your damages analysis?
> A.  Well, it is a -- As I -- I describe how I rely on it in my report, so I point you to those sections.  It's primarily to help me in assessing the overall deliverability of the third-party power that -- the additional third-party power that I think Entergy should have purchased rather than relying on its less efficient generating units. [116]
>
> *        *        *
>
> So Spencer's -- Dr. Yang's testimony provided additional quantification to support what I know based on the trades database to be the case, that there was significant additional transmission capability to -- to accommodate the additional purchases of third-party power during this time period.
>
> Q.  So Dr. Yang confirms for you that the energy you believe should have been purchased was, in fact, deliverable from a transmission perspective; is that correct?

---

[115] *See id.*, Section II, pp. 13-19.
[116] Ex. "D", Excerpts from Deposition of David DeRamus, Ph.D., at 61:13 – 23.

A.   That's correct, yes.[117]

Dr. DeRamus was asked numerous times whether he relied on their analyses and to what degree he relied on those analyses, as illustrated by the deposition testimony quoted above. When asked yet again, Dr. DeRamus was explicit that while the analyses performed by these experts helped to confirm the overall reasonableness of his damages calculation, those analyses stand on their own:

Q.   What does Dr. -- or Mr. Copeland's report prove in your mind?
A.   It provides additional confirmation from -- of what I already see in Entergy's own trades data and in Dr. Yang's PowerWorld Simulator analysis, that ultimately the amount of damages that I have provided as my opinion is reasonable.[118]

*          *          *

I believe that Mr. Copeland's analysis, his PROMOD analysis, helps to confirm the overall reasonableness of my approach and then ultimately the amount of damages. The 1998 -- The amount of additional purchases in 1998 that the model is showing is actually very modest. So I certainly think that those could have been accommodated, but it's not like I am relying on Mr. Copeland's PROMOD run in order to reach that conclusion.

I rely on, you know, the analysis that I've been performing for a long time associated with the Entergy system, including my review of the way in which Entergy has been able to dispatch independent power – assets previously owned by independent power producers after it acquired them. I've reviewed the -- like I said, the trades database. So there -- and as well as Dr. Yang's analysis. So it is part and parcel of that broader information set that confirms the overall reasonableness of my damage calculation.[119]

*          *          *

[Mr. Copeland] has a -- You know, as I understand it, his analysis was a stress test of the system.[120]

*          *          *

[…] So it was one piece of that broader puzzle.[121]

---

[117] Id., at 62:14 – 25.
[118] Id., at 63:23 – 64:5.
[119] Id., at 75:25 – 76:21.
[120] Id., at 84:15 – 17.
[121] Id., at 85:1 – 2.

For all of these reasons, Dr. DeRamus was not only permitted to rely on Dr. Yang and Mr. Copeland, but it was reasonable for him to do so, and any assertion to the contrary is more properly the subject of cross-examination rather than the instant motion. Nevertheless, Defendants' collateral attacks on Dr. Yang and Mr. Copeland are either misleading and/or baseless. For example, Entergy's argument that Dr. Yang's transmission analysis does not address the System's need for flexible capability is a red herring. Operating constraints, such as load levels, current, minimum, and maximum level of generation dispatch at each generation facility, and voltages are already embedded in Entergy's power flow cases, which Dr. Yang verified have sufficient load following capability and operating reserves for the Entergy BAA.[122] Dr. Yang relied on the PROMOD analysis performed by Mr. Copeland to address the System's need for flexible capability and from a reliability perspective. Mr. Copeland's analysis shows that EMI's legacy units can be fully displaced by non-affiliate purchases, and that Entergy's flexibility requirements did not limit Entergy from purchasing more non-affiliate power.[123]

Likewise, Defendants' assertion that Dr. Yang's analysis addresses off-system purchases while Dr. DeRamus' analysis assumes displacement by on-system IPP purchases is misleading and incorrect. Although he extensively analyzes the availability of a very large quantity of idle or underutilized, efficient "on-system" IPP resources (*i.e.*, resources located within the Entergy BAA), nowhere in either his initial or rebuttal report or his deposition testimony does Dr. DeRamus state that EMI's inefficient legacy generation could have been replaced *only* by on-system IPP purchases, to the exclusion of off-system resources. Furthermore, Dr. Yang's analysis addresses

---

[122] *See* Ex. "I", Yang Rebuttal Report, at ¶19, p.11.
[123] *See* **Ex. "J"**, Excerpts from Economic Reliability Impact Analysis of J. Neil Copeland, P.E., attached to and made a part of the State's Response, Confidential Pursuant to the Protective Order (herein, **"Copeland Initial Report"**), at p. 4. *See also*, Ex. "H", Yang Initial Report, at ¶¶59-60, p.25.

both off-system purchases as well as on-system IPP purchases.[124] Thus, Plaintiff's experts' studies show EMI's legacy units could have been displaced by both off-system purchases and on-system IPP purchases.[125]

Similarly, Defendants' allegations regarding Mr. Copeland's analyses are incorrect. Entergy alleges that Mr. Copeland has not identified specific legacy units for replacement with specific non-affiliate energy allocations. Mr. Copeland's report proves this statement is false. As Mr. Copeland's report explains, he was engaged to perform an analysis regarding the economic reliability impacts of displacing generation from EMI's legacy units, Baxter Wilson, Gerald Andrus, and Rex Brown, and he analyzed two scenarios assuming various non-affiliate energy purchases would flow onto the Entergy system to displace those legacy units.[126] Finally, Defendants' allegation that Dr. DeRamus should have asked Mr. Copeland to perform an analysis to test whether the CCGTs owned by the IPPs were capable of providing sufficient load following capability is pointless busy work. As Dr. DeRamus discussed in both his initial and rebuttal reports and testified to in his deposition, he did not need to ask Mr. Copeland to perform such an analysis because there are over 17,000 MW of IPPs located in the Entergy System BAA and many of those IPPs had already testified that their CCGTs could provide load-following services.[127] Moreover, Defendants also fail to recognize that Mr. Copeland's PROMOD analysis demonstrates EMI's legacy units can be fully displaced (*i.e.*, they are not needed for flexibility or load following services).

---

[124] *See* Ex. "H", Yang Initial Report at ¶¶22-29, pp.9-12 and ¶¶34-45, pp.15-20.
[125] *See* Ex. "A", DeRamus Initial Report at ¶¶87-88, p.37.
[126] *See* Ex. "J", Copeland Initial report, p. 3.
[127] *See* Ex. "B", DeRamus Rebuttal Report, at ¶¶41-44, p.25-26.

**<u>CONCLUSION</u>**

At the end of the day, Defendants' Motion to Prohibit Testimony of DeRamus is essentially asking this Court to agree with their experts and disagree with Dr. DeRamus, as opposed to providing evidence sufficient to support exclusion of his testimony pursuant to Rule 702 and *Daubert*. Challenges to Dr. DeRamus' conclusions should go exclusively to the weight of his testimony, not its admissibility. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[128] When evaluating *Daubert* challenges, courts focus "on [the experts' principles and methodology, not on the conclusions that [the experts] generate."[129] A proffered expert witness is qualified to testify by virtue of his "knowledge, skill, experience, training, or education."[130] "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."[131]

Here, as explained in the sections above, Dr. DeRamus' methodology is sound and based upon his vast experience, knowledge, skill, training, and education. *Daubert*, and the case law interpreting *Daubert*, makes clear that challenges to an expert's conclusions and opinions are not proper grounds for a pre-trial motion and should instead be reserved for cross-examination. Dr. DeRamus will be subject to cross-examination at trial, and Defendants' challenges are more proper to be addressed through vigorous cross-examination, not exclusion.

For the reasons set forth above, Plaintiff Jim Hood, the Attorney General for the State of Mississippi, respectfully requests this Court deny Defendants' Motion Under Rule of Evidence

---

[128] *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) *citing Dixon v. International Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985).
[129] *See Daubert*, 509 U.S. at 595.
[130] Fed. R. Evid. 702.
[131] *Daubert v. Merrell Dow. Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995 ("Daubert II").

702 to Prohibit the Testimony of Plaintiff's Expert David DeRamus on the Issues of Liability and

Damages.

**By: JIM HOOD, ATTORNEY GENERAL**
    **STATE OF MISSISSIPPI**

/s/ LUKE F. PIONTEK
J. Kenton Parsons (La. Bar No. 10377)
Luke F. Piontek (La. Bar No. 19979)
Andre G. Bourgeois (La. Bar No. 19298)
Shelley Ann McGlathery (La. Bar No. 32585)
*Pro Hac Vice*
**ROEDEL PARSONS KOCH BLACHE**
**BALHOFF & McCOLLISTER**
A Law Corporation
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

Harold E. Pizzetta, III, MSB No. 99867
Bridgette W. Wiggins, MSB No. 9676
**Office of the Attorney General**
P. O. Box 220
Jackson, Mississippi 39225-2947
Telephone: (601) 359-4230
Facsimile: (601) 359-4231

*Counsel for Plaintiff*

Vincent F. Kilborn, III, Esq. (MSB #103028)
Special Assistant Attorney General
**KILBORN, ROEBUCK & McDONALD**
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

David A. McDonald, Esq. (MSB #103027)
Special Assistant Attorney General
**KILBORN, ROEBUCK & McDONALD**
Post Office Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Fax: (251) 434-0047

## CERTIFICATE OF SERVICE

    I, Luke F. Piontek, Attorney for the State of Mississippi, do hereby certify that on July 5, 2018, I caused to be electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

    This the 5th day of July, 2018.

                    /s/ LUKE F. PIONTEK
                    Luke F. Piontek (La. Bar No. 19979)