# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

THE STATE OF MISSISSIPPI, EX REL.    |
JIM HOOD, ATTORNEY GENERAL     |
FOR THE STATE OF MISSISSIPPI,      |
                                     |

Plaintiff                           |

v.                                   |      No. 3:08-CV-780-CWR-LRA

ENTERGY MISSISSIPPI, INC., ENTERGY  |
CORPORATION, ENTERGY SERVICES,     |
INC., AND ENTERGY POWER, INC.,       |
                                       |

Defendants                       |

## PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON STATE OR FEDERAL PREEMPTION

### By: JIM HOOD, ATTORNEY GENERAL
### STATE OF MISSISSIPPI

J. Kenton Parsons (La. Bar No. 10377)
Luke F. Piontek (La. Bar No. 19979)
Andre G. Bourgeois (La. Bar No. 19298)
Shelley Ann McGlathery (La. Bar No. 32585)
*Pro Hac Vice*
**ROEDEL PARSONS KOCH BLACHE
BALHOFF & McCOLLISTER**
A Law Corporation
8440 Jefferson Highway, Suite 301
Baton Rouge, Louisiana 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

Harold E. Pizzetta, III, MSB No. 99867
Bridgette W. Wiggins, MSB No. 9676
**Office of the Attorney General**
P. O. Box 220
Jackson, Mississippi 39225-2947
Telephone: (601) 359-4230
Facsimile: (601) 359-4231

Vincent F. Kilborn, III, Esq. (MSB #103028)
Special Assistant Attorney General
**KILBORN, ROEBUCK & McDONALD**
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

David A. McDonald, Esq. (MSB #103027)
Special Assistant Attorney General
**KILBORN, ROEBUCK & McDONALD**
Post Office Box 832
Mobile, Alabama 36601
Telephone: (251) 434-0045
Fax: (251) 434-0047

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... i

I.     INTRODUCTION ................................................................................................... 1

II.    DISPUTED AND UNDISPUTED MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT ............................................................................................................. 2

   A.   UNDISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT ............................ 2

   B.   DISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT ................................. 8

III.   ARGUMENT ......................................................................................................... 10

   A.   THE ATTORNEY GENERAL IS EMPOWERED TO BRING THIS LAWSUIT—SB 2295 DOES NOT ABROGATE THAT AUTHORITY ................................................. 10

      1.   Defendants' SB 2295 Argument is a Transparent Attempt to Legislatively Overturn Judge Wingate's Ruling Denying Defendants' Motion for Judgment on the Pleadings ........................ 10

      2.   SB 2295 is not Expressly Retroactive and, therefore, has only Prospective Force ............. 11

      3.   SB 2295 Cannot Divest the Chancery Court or the Attorney General of their Constitutionally Derived Jurisdiction and Powers ................................................................. 15

      4.   Defendants Short-Circuited the State Litigation Process by Removing this Case  to Federal Court on the Basis of Federal Question Jurisdiction ......................................................... 17

         a.   Removal supplied this Court with exclusive, original jurisdiction involving federal rights that cannot be infringed upon by a state legislature ........................................... 17

         b.   Removal waived Defendants' right to now complain about standing, i.e., the Attorney General's power to file complaints .................................................................. 18

         c.   Removal waived Defendant's' right to assert the defense of ripeness or failure to exhaust administrative remedies (which is what SB 2295, if applicable, would require) ......... 19

      5.   SB 2295 only Applies to Title 77 Claims; this Lawsuit is not Solely a Title 77 Claim .......... 19

      6.   SB 2295 does not Apply to Defendants, Entergy Corporation, Entergy Power, Inc. ("EPI") and ESI, which are Non-Regulated Entities ................................................................. 20

   B.   DEFENDANTS' PREEMPTION MSJ IS AN UNTIMELY REQUEST FOR REHEARING AND VIOLATES THE LAW OF THE CASE ........................................ 20

   C.   ALTERNATIVELY, THE STATE'S CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW ....................................................................................................................... 22

      1.   A Review of the Law and Jurisprudence Reveals FERC has no Jurisdiction .................... 22

      2.   FERC, Itself, has Repeatedly held a State Challenge like the Complaint does not fall under its Subject Matter Jurisdiction ................................................................................ 26

      3.   The Principle Underlying the *Pike County* Exception Applies Here ......................... 28

      4.   There is No Evidence, much less Undisputed Evidence, that the State's Damages Theory would harm Entergy Operating Companies in other States ............................................. 33

a. Defendants' Claims Regarding "State vs. State" Conflicts Rest on Rank Speculation and a Misstatement of Plaintiff's Claims.............................................33

b. Plaintiff does not Claim EMI had or needed "Unfettered Discretion" to make Own Account Purchases, but that does not Excuse its Absolute Failure to Comply with the Law 38

D. THE LIABILITY THEORY IN THE COMPLAINT IS NOT PREEMPTED ...........40

1. EMI's Charges Flowed through the FAC to its Customers were Never Approved, and thus Never Rose to the Level of a "Filed Rate" .......................................................................40

2. Defendants' Stance Regarding EPI and the Bid Rigging Situation is Misplaced..................43

3. Misrepresentations to the MPSC ...............................................................................44

4. "Shell Game" Purchases of Energy and Resale Off-System, Imprudent Purchases from EPI and Improper Loans, Guarantees, and Siphoning Off of GO Zone Tax Benefits ............44

# TABLE OF AUTHORITIES

**Cases**

Adhikari v. Kellogg Brown & Root, Inc., 845 F.3d 184, 201 (5th Cir. 2017) ........................12

AEP Generating Co. Kentucky Power Co., 39 FERC ¶ 61,158, 61,630 (May 13, 1987)....................30

AEP Generating Co., 36 FERC ¶ 61,226 (Aug. 20, 1986) .................................................... 29, 31

AEP Tex. N. Co. v. Tex. Indus. Energy Consumers, 473 F.3d 581 (5th Cir. 2006)...................... 21, 30

Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va., 812 F.2d 898 (4th Cir. 1987)........21, 30, 32

Arkansas-Louisiana Gas Company v. Hall, 7 FERC ¶ 61,175 at 61,322 (1979) ........................27

Bank of Miss. v. Duncan, 52 Miss. 740, 745, 1876 WL 5231, at *3 (Miss. 1876).................................16

Beneficial Nat'l. Bank v. Anderson, 539 U.S. 1, 8, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003) .................25

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) .................................................12

Bronk v. Hobson, 152 So. 3d 1130 (Miss. 2014) .................................................................14

Browning v. Navarro, 887 F.2d 553, 556 (5th Cir. 1989) ......................................................21

California Department of Water Resources, 121 FERC ¶ 61,196 (2007) ..................................27

California Retail Natural Gas and Electricity Antitrust Litigation, 170 F.Supp.2d 1052, 1057 (D.Nev. 2001).................................................................................................................25

California Retail Natural Gas and Power Antitrust Litigation, 170 F.Supp.2d at 1058........................24

California v. ARC America Corp., 490 U.S. 93, 100, 101 (1989) ..............................................22

California, ex rel. Lockyear v. Powerex Corp., 2005 WL 2030718, *4 and *6, respectively (E.D.Cal. 2005)............................................................................................................. 24, 25

Campbell Sixty-Six Exp., Inc. v. J. & G. Exp., Inc., 141 So. 2d 720 (Miss. 1962) ................................14

Capitol Stages v. State, 128 So. 759, 763 (Miss. 1930) ...................................................... 16, 17

Carpa, Inc. v. Ward Foods, Inc., 567 F.2d 1316, 1320 (5th Cir. 1978) ........................................21

Cellular S., Inc. v. BellSouth Tel., LLC, 214 So.3d 208 (Miss. 2017) .........................................15

Cent. Vt. Pub. Serv. Corp., 84 FERC ¶ 61,194 at 61,975 (1998) ............................................27

Constellation Energy, 119 FERC ¶ 61,292 (2007) .............................................................27

Dunn Constr. Co. v. Craig, 2 So.2d 166, 174 (Miss. 1941)......................................................17

Entergy Corp. v. Jenkins, 469 S.W.3d 330, 342, 345 (Tex. App. 2015)............................... 21, 31

Entergy La., Inc. v. La. Pub. Serv. Comm'n, 539 U.S. 39, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003) ...24, 30

F.R.C.P. Rule 10(c). ...................................................................................................44

Farrell Constr. Co. v. Jefferson Parish, La., 896 F.2d 136, 140 (5th Cir. 1990)................................18

FERC v. Electric Power Supply Association, 136 S.Ct. 760, 776 (2016) ......................................25

Grable & Sons Metal Prods. V. Darue Eng'g & Mfg., 545 U.S. 308 (2005) .................................18

Granger v. Slade, 361 F.Supp.2d 588 (S.D. Miss. 2005) ......................................................21

Gulf States Utilities Co. v. Alabama Power Co., 824 F.2d 1465, 1471-72 (5th Cir. 1987) ............ 27, 32

Gulf States Utilities Co. v. Pub. Util. Comm'n of Texas, 841 S.W.2d 459 (Tex. App. 1992), writ denied (1993)..................................................................................................... 29, 31

Hendricks v. Dynegy Power Marketing, Inc., 160 F.Supp.2d 1155, 1162-63 (S.D. Cal. 2001) ............24

Hughes v. Talen Energy Marketing, L.L.C., 136 S.Ct. 1288, 1292 (2016)......................................28

In re Mirant Corp., 378 F.3d 511, 519 (5th Cir. 2004) ........................................................27

In re Signal Intern., LLC, 579 F.3d 478, 487 (5th Cir. 2009) .................................................18

Johnson v. Louisiana Dept. of Agriculture, 18 F.3d 318, 322 (5th Cir. 1994)......................................21

Jones v. Baptist Mem'l Hosp.-Golden Triangle, Inc., 735 So.2d 993, 998...................................15

Joshua Properties, LLC v. D1 Sports Holdings, LLC, 130 So. 3d 1089, 1092 (Miss. 2014) ...............14

Kentucky Utilities Company, 110 FERC ¶ 61,285 at 62,103 (2005) ..........................................27

Kentucky West Virginia Gas Co., v. Pennsylvania Public Utility Commission, 837 F.2d 600, 609 (3rd Cir.); cert. denied, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988) ..........................................28

Landgraf v. USI Film Products, 511 U.S. 244, 268 (1994) ............................................11, 12, 13

Leaf River Forest Products, Inc. v. Deakle, 661 So.2d 188, 193 ..................................................16

Lily Investments v. City of Rochester 674 Fed.Appx. 523 (6th Cir. 2017) .................................19

Marbury v. Madison, 5 U.S. 137, 177 (1803) ...............................................................................12

Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n, 767 F.3d 335, 366 (3d Cir. 2014) .............23

Middle S. Servs., Inc., 20 FERC ¶63,030 (1985), vacated in part on other grds. on reh'g., 822 F.2d 1104 (D.C. Cir. 1987)...................................................................................................................26

Miss. ex rel. Hood v. Au Optronics Corp., 701 F.3d 796, 801 (5th Cir. 2012), rev'd on other grounds, 571 U.S. 161 (2014) ..........................................................................................................3

Miss. Indus. v. FERC, 808 F.2d 1525 (D.C. Cir. 1987).................................................................26

Miss. Pub. Serv. Comm'n v. Holloway Transfer & Storage Co., 150 So. 2d 411 (Miss. 1963) ...........14

Mississippi Power & Light Co. v. Mississippi rel. Moore, 487 U.S. 354, 373-374, 108 S.Ct. 2428, 2440, 101 L.Ed.2d 322 (1988) .....................................................................................................24

Mississippi R.R. Comm'n v. Gulf & S.I.R. Co., 29 So. 789 (Miss. 1901) ....................................14

Mladinich v. Kohn, 186 So.2d 481, 484 (Miss. 1966)..................................................................11

Monongahela Power Co., 39 FERC ¶61,350 (1987) ......................................................................26

Morrow v. Dillard, 580 F.2d 1284, 1290 (5th Cir. 1978) ............................................................21

MP&L, 487 U.S. at 381 ...................................................................................... 25, 26, 29, 39

Nantahala Power & Light Company v. Thornburg, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986)....................................................................................................................................24, 28

Narragansett Electric Company v. Burke, 119 R.I. 559, 381 A.2d 1358 (1977), cert. denied, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978) ...................................................................................28

NCNB Texas Nat. Bank v. Cowden, 895 F.2d 1488, 1500 (5th Cir. 1990) ..................................12

New Orleans Public Service, Inc. v. Council of the City of New Orleans, 491 U.S. 350, 365, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ...............................................................................25, 26, 31

New Orleans Public Service, Inc. v. Council of the City of New Orleans, 911 F.2d 993 (5th Cir. 1990), cert. granted, 499 U.S. 974, 111 S.Ct. 1617, 113 L.Ed.2d 715 (1991), cert. dismissed, 502 U.S. 954, 112 S.Ct. 411, 116 L.Ed.2d 357 (1991) .................................................................26, 31

Office of Public Utility Counsel v. Public Utility Com'n of Texas, 104 S.W.3d 225, 227-28 (Tex. 2003)...........................................................................................................................................3

Oneok, Inc. v. Learjet, Inc., 575 U.S. ____ , 135 S.Ct. 1591, 1595 (2015)....................................... 22, 28

Otter Tail Power Co. v. United States, 410 U.S. 366, 373, 93 S. Ct. 1022, 1027, 35 L. Ed. 2d 359 (1973).....................................................................................................................................23, 24

Pa. Power & Light, 23 FERC ¶61,006 (1983)...........................................................................26, 27

Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 205, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) ...............................................................................................23

Pan American Petroleum Corp. v. Superior Court of Delaware, 366 U.S. 656 (1960) .......................27

Polyplastics, Inc. v. Transconex, Inc., 713 F.2d 875, 877 (1st Cir. 1983)....................................17

Portland General Electric, 72 FERC ¶ 61,109 (1995) .................................................................27

PPL Energyplus, LLC v. Solomon, 766 F.3d 241, 247 (3d Cir. 2014), cert. denied, 136 S.Ct. 1728 (2016)...........................................................................................................................................23

Stand Energy Corp. v. Columbia Gas Transmission Corp., 373 F.Supp.2d 631, 641 (S.D. W.Va. 2005), on reconsideration in part, 521 F.Supp.2d 537 (S.D. W.Va. 2007)........................................23

State ex rel. Patterson v. Warren, 180 So.2d 293, 300 (Miss. 1965) .............................................17

State, ex rel. Utilities Com'n v. Carolina Power & Light Co., 614 S.E.2d 281, 289-90 (N.C. 2005) ...33

Taffet v. Southern Co., 967 F.2d 1483, 1490 (11th Cir. 1992).....................................................42

Totz v. Owens, 2017 WL 2178890, * 4 (Tx. App. 2017). (Unpublished)............................................32
U.S. Fidelity & Guar. Co. v. McKeithen, 226 F.3d 412, 418 (5th Cir. 2000) ..............................12
Wade v. Miss. Co-op. Extension Serv., 392 F.Supp. 229, 232 (N.D. Miss. 1975) ....................16
Ware v. Entergy Mississippi, Inc., 887 So.2d 763, 769 (Miss. 2003) .......................................43
Water and Power Company of the City of Glendale, 113 FERC ¶ 61,285 at 62,153 (2005) .............27

## Statutes

16 U.S.C. § 791a, et seq. .........................................................................................................21
16 U.S.C. 824(b)(1) .................................................................................................................23
28 U.S.C. § 1146 .....................................................................................................................17
28 U.S.C. § 1331 .....................................................................................................................18
Miss Code Ann. § 75-24-19(1)(b) ..........................................................................................40
Miss. Code Ann. § 7-5-1 ..........................................................................................................2
Miss. Code Ann. § 75-21-3(a) ..................................................................................................2
Miss. Code Ann. § 75-21-3(b) ..................................................................................................2
Miss. Code Ann. § 75-21-3(c) ..................................................................................................2
Miss. Code Ann. § 75-24-1, et seq. ...................................................................................2, 3, 16
Miss. Code Ann. § 75-24-11 ......................................................................................................3
Miss. Code Ann. § 75-24-5(1) .................................................................................................40
Miss. Code Ann. § 75-24-9 ...................................................................................................2, 3
Miss. Code Ann. § 7-5-51 ..........................................................................................................2
Miss. Code Ann. § 77-1-43 ...................................................................................13, 14, 17, 20
Miss. Code Ann. § 77-1-43(2) ............................................................................................2, 13
Miss. Code Ann. § 77-3-42(1)(b) .............................................................................................7
Miss. Code Ann. § 77-3-42(2)(a) ..............................................................................................7
Miss. Code Ann. § 77-3-5 ................................................................................................iv, 17, 20
Miss. Const. art. I, § 1 .............................................................................................................17
Miss. Const. art. I, § 2 .............................................................................................................17
Miss. Const. art. VI, § 159 ......................................................................................................15
Miss. Const. art. VI, § 173 ........................................................................................................2

## Other Authorities

Federal Practice and Procedure § 3738 (4th ed. 2018) .........................................................18
Federal Practice and Procedure § 4211 (3d ed. 2018) ..........................................................18
H.M. Ray, Constitutional and Statutory Authority of the Attorney General to Prosecute Actions, 69
    Miss. L.J. 165, 168 (1989) ...................................................................................................16
MS SB 2010 (2013 Regular Session) .................................................................................14, 15

## Rules

Fed. R. Civ. P. 10(c) ............................................................................................................1, 10
Fed. R. Civ. P. 12(b)(1) ...........................................................................................................19
Fed. R. Civ. P. 17(a) ................................................................................................................18
Fed. R. Civ. P. 17(a)(1) ...........................................................................................................18
Fed. R. Civ. P. 17(a)(3) ...........................................................................................................19
Fed. R. Civ. P. 56(a) ..................................................................................................................2
Fed. R. Civ. P. 56(f)(1) .............................................................................................................1
Fed. R. Civ. P. 59(b) ................................................................................................................20
MPSC Rule 17.101(1) ................................................................................................................7
MPSC Rule 17.102 .....................................................................................................................7

# I.     INTRODUCTION

**NOW INTO COURT,** through undersigned counsel, comes Jim Hood, the Attorney General for the State of Mississippi (the "State" or "Plaintiff"), to respectfully submit this Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment based on State or Federal Preemption (Doc. 262) ("Preemption MSJ"). But for new arguments regarding MS SB 2295 (2018 Regular Session), which does not and cannot affect this pending matter, Defendants' Preemption MSJ[1] is nothing more than a rehash of their earlier Motion for Judgment on the Pleadings (Doc. 19) and Amended Motion for Judgment on the Pleadings (Doc. 24) ("Motions for Judgment on the Pleadings").[2] Defendants' claim that they possess a new argument – *i.e.,* that EMI was a member of a multi-state utility system and that this, somehow, renders the *Pike County*[3] exception to the jurisdiction of the Federal Energy Regulatory Commission ("FERC") inapplicable[4] – is not a new argument at all,[5] and, in any event, is wrong. Defendants' instant Preemption MSJ should also be denied under the doctrine of law of the case. The motion is also legally deficient, as it rests on a mischaracterization of applicable law.

Alternatively, the Court should deny the Preemption MSJ because it is meritless and founded upon disputable opinions rather than a lack of genuine issues regarding material facts. In truth, the undisputed facts compel a ruling in Plaintiff's favor finding the State's claims are *not* preempted, pursuant to Fed. R. Civ. P. 56(f)(1).[6]

---

[1] Defendants are Entergy Corporation, Entergy Mississippi, Inc. ("EMI"), Entergy Services, Inc. ("ESI") and Entergy Power, Inc. ("EPI") (sometimes collectively referred to as "Entergy").

[2] Consequently, Plaintiff incorporates by reference all of its law and arguments and exhibits contained in or attached to its Response to Motions for Judgment on the Pleadings (Doc. 56), its Supplemental Authorities Letter (Doc. 71), its Supplemental Brief in Opposition to Motions for Judgment on the Pleadings (Doc. 80), and its Statement of Disputed Facts Material to Defendants' Motions for Judgment on the Pleadings (Doc. 81) herein as if fully copied herein, pursuant to Fed. R. Civ. P. 10(c).

[3] *Pike County Light & Power Company v. Pennsylvania Public Utility Commission*, 465 A.2d 735 (Pa. 1983).

[4] *See* (Doc. 263), Defendants' Brief, at pp. 24-25.

[5] Defendants raised the very same argument in their Memorandum Brief in support of their earlier Motions for Judgment on the Pleadings. *See, e.g.* (Doc. 21), at pp. 2, 3, 5 and 17.

[6] Court may grant summary judgment for a nonmovant.

## II.    DISPUTED AND UNDISPUTED MATERIAL FACTS
## THAT PRECLUDE SUMMARY JUDGMENT

Defendants' "Statement of Facts" included in the Preemption MSJ falls woefully short of the requirement in Fed. R. Civ. P. 56(a) to show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To the contrary, Defendants' Statement of Facts is rife with unsupported opinions, or, alternatively, immaterial and disputed facts. Set forth below is Plaintiff's list of undisputed material facts and its list disputed material facts, each of which precludes summary judgment in Defendants' favor.[7]

## A.    UNDISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT

1.    Attorney General filed suit on behalf of the State of Mississippi in a statutory, equitable and/or common law capacity: (a) in his sovereign capacity, as representative of, and/or as *parens patriae* on behalf of, or for the benefit of, natural persons under state law; (b) as common law *parens patriae* in his sovereign capacity on behalf of the State's general economy; and (c) in his proprietary and/or sovereign capacity, which may include state departments, bureaus, agencies, political subdivisions, and other instrumentalities as purchasers of electricity from EMI. The Attorney General possesses relevant authority to bring such a case, including Miss. Code of 1972, § 7-5-1, § 75-21-3(a), § 75-21-3(b) and § 75-21-3(c), § 75-24-1, *et seq.*, § 77-1-43(2), and Miss. Const. art. VI, § 173.[8]

2.    The Attorney General specifically stated his authority to seek injunctive relief pursuant to § 75-24-9, and then later prayed for such injunctive relief.[9]

3.    The Attorney General also possesses common law authority and numerous duties, paramount of which is his duty to protect the interest of the general public and the economy of the State.[10]

4.    Pursuant to Miss. Code § 7-5-1 (1972), the Attorney General is the "chief legal officer and advisor for the state ... and is charged with managing all litigation on behalf of the state" and holds all such powers as prescribed to him by the Constitution, statutes and common law.[11]

5.    With respect to the MPSC, the Attorney General was, at the time this suit was filed, "authorized to institute any suits arising out of any act or order of the ... public service commission affecting the laws and revenues of the state." Miss. Code § 7-5-51. Section 77-1-43(2) specifically authorizes the Attorney General to institute "in any court of competent

---

[7] Plaintiff will incorporate this statement into its Opposition to Defendants' Motion for Summary Judgment on State Law.

[8] (Doc. 135), First Amended Complaint, at ¶¶9 and 17.

[9] *See* (Doc. 135), First Amended Complaint, at ¶¶17(C), and Prayer (B).

[10] (Doc. 135), First Amended Complaint, at ¶¶9 and 17.

[11] (Doc. 135), First Amended Complaint, at ¶17(a).

jurisdiction" an "action for violation of the law, or for the violation of any lawful rule, regulation or order of the commission."[12]

6.     Pursuant to the Mississippi Consumer Protection Act ("MCPA"), Miss. Code § 75-24-1, *et seq.*, the Attorney General is authorized to file suit to remedy "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Specifically, Miss. Code § 75-24-9 permits the Attorney General to bring an action in the name of the state against violators to enjoin the use of such prohibited acts, methods or practices. The Attorney General may also seek a judgment of restitution under Miss. Code § 75-24-11.[13] MCPA's "Exemptions" provision does not exclude or exempt utilities or sellers of electricity.[14]

7.     EMI has a state-sanctioned monopoly in the provision of retail electricity to portions of Mississippi.[15] EMI's monopoly in the energy market is protected and it is afforded eminent domain authority in exchange for a promise to act in the best interests of the public and in deference to government regulation.[16]

8.     The State of Mississippi is one of EMI's largest power consumers.[17] The State, as an individual ratepayer, was directly affected by Defendants' prohibited practices in violation of the MCPA and the state is a person in interest under Miss. Code Ann. § 75-24-11. "[W]e hold that the real parties in interest in this suit include…the State…".[18]

9.     Plaintiff's expert, Mr. Griffey stated: "Being granted a reasonable opportunity to earn a reasonable return on invested capital used and useful in providing electric service in exchange for *prudent* planning and operation of the utility is part of the "regulatory compact" between a utility and the regulator."[19]

10.     During the relevant time period concerning the Affiliate Issues claims (roughly 1998 through 2013), EMI was a member of the Entergy System, along with five (5) other Entergy Operating Companies ("EOCs").[20] The Entergy System Agreement ("ESA") is a voluntary contract between the Entergy Operating Companies that could be changed or canceled ("exited").[21] Under the ESA, each EOC was an "independent contractor".[22]

---

[12] (Doc. 135), First Amended Complaint, at ¶17(b).

[13] (Doc. 135), First Amended Complaint, at ¶17(c).

[14] Miss. Code § 75-24-7.

[15] (Doc. 135), First Amended Complaint, at ¶4.

[16] *See, e.g., Office of Public Utility Counsel v. Public Utility Com'n of Texas*, 104 S.W.3d 225, 227-28 (Tex. 2003).

[17] *See* (Doc. 135), First Amended Complaint, at ¶7.

[18] *Miss. ex rel. Hood v. Au Optronics Corp.*, 701 F.3d 796, 801 (5th Cir. 2012), *rev'd on other grounds*, 571 U.S. 161 (2014).

[19] (Doc. 272-1) Expert Report of Charles S. Griffey at p. 4. (Emphasis added).

[20] The other Operating Companies were: Entergy Arkansas, Inc. ("EAI"), Entergy Texas, Inc. ("ETI"), Entergy Gulf States Louisiana, LLC ("EGSL"), Entergy Louisiana, L.L.C. ("ELL") and Entergy New Orleans, Inc. ("ENO"). ETI and EGSL were created after a jurisdictional split of Entergy Gulf States, Inc.

[21] *See* (Doc. 262-2), Entergy System Agreement, at Sec. 1.01 (The ESA "shall continue in full force and effect until terminated by mutual agreement of the [EOCs]. Notwithstanding this, Any [EOC] may terminate its participation in this Agreement by ninety-six (96) months written notice to the other [EOCs] hereto…").

[22] *See* (Doc. 262-2), Entergy System Agreement, at Sec. 4.18.

11. EMI exited the ESA effective November 7, 2015.[23] On October 11, 2013, EGSL, ELL, ENO and ETI filed with FERC to shorten "the notice period for an Operating Company to terminate its participation in the System Agreement from 96 months (8 years) to 60 months (5 years) ('Notice Filing')."[24] Thereafter, settlement negotiations commenced, and these remaining EOCs agreed to terminate the ESA early, on August 31, 2016.[25]

12. EMI owns generating units located in Mississippi that it uses to serve its retail customers' electricity needs, including Rex Brown, Baxter Wilson and Gerald Andrus.[26]

13. The ESA operates such that *only the most expensive resources* that are in excess of a "long" EOC's needs are assigned to the Entergy System Pool, therefore, the "short" EOCs are assigned the expensive energy from the Pool to meet their resource deficiencies.[27]

14. EMI was, on average, a significant "net buyer" from the Entergy System Pool, *i.e.*, EMI typically is a short company and must purchase power from the Pool.[28]

15. Each month EMI receives an Intra-System Bill ("ISB") including charges for electricity it purchased from its affiliates through the Entergy System Pool, as well as the costs of running its own generating plants.[29] These charges are significantly and consistently higher than prices for electricity available from non-affiliates.[30]

16. EMI has admitted under oath that the law requires it to provide Mississippi consumers with the lowest reasonable cost, reliable electricity pursuant to the regulatory compact with the State of Mississippi.[31] EMI, therefore, represents to the MPSC that the charges for the electricity purchased from its affiliates and contained in the ISBs and other documents qualify as the

---

[23] *Id.*

[24] (Doc. 80-2) (excerpt of Settlement Agreement among Entergy Gulf States Louisiana, LLC, Entergy Louisiana, LLC, Entergy New Orleans, Inc. and Entergy Texas, Inc., Consolidated FERC Docket Nos. ER14-75-000, *et seq.*), at p. 2.

[25] *Id.*, at p. 7.

[26] *See* Ex. D, "Entergy Utility Fossil / Renewable Generating Assets". (Ex. 7 to 30(b)(6) Deposition of John Hurstell).

[27] *See* (Doc. 262-6), Ex. F, Hurstell Report, at ¶¶221-223, pp. 100-101. *See also,* (Doc. 262-2), Entergy System Agreement, at Sec. 30.03.

[28] *See* Ex. A, Addendum 1, DeRamus Initial Report, at ¶15, p. 5. Noting EMI purchased 7,000,000 MWh of energy from the Entergy System Pool from 1998-2013.

[29] *See* (Doc. 262-6), Ex. F to Preemption MSJ, Hurstell Report, at ¶¶208-212, pp. 95-97.

[30] *See* Ex. A, DeRamus Declaration, Addendum 1, DeRamus Initial Report, at ¶8, p. 3 (A "reasonable estimate of the damages suffered by Mississippi ratepayers as the result of Entergy's conduct over the period 1998 – 2008 ranges between $569 million and $621 million in nominal terms, and between $666 million and $741 million in present value terms (as of the date of this report) using a risk-free interest rate. Applying instead the Mississippi statutory interest rate of 8% to my estimate of nominal damages increases the damages to between $1.51 billion and $1.73 billion in present value terms (as of the date of this report).").

[31] (Doc. 135), First Amended Complaint, at ¶3. *See* Ex. E, Direct Testimony of Robert R. Cooper, MPSC Docket No. 2008-AD-270, July 7, 2008, at p. 3, stating the "projected fuel and purchased power expenses for the third quarter of 2008, which are the subject of Docket No. 2008-AD-270, "are reasonable estimates of the costs needed for [EMI] to continue to meet its legal obligation to provide reasonably adequate electric service to its customers *at the lowest reasonable cost.*" (Emphasis added).

lowest reasonable costs for electricity.[32] EMI also testified to the MPSC that it purportedly does not make a profit off of the fuel adjustment clause.[33]

17. EMI's fuel adjustment clause ("FAC"),[34] is a retail cost-recovery mechanism established under state law that allows an electric utility to recover fuel, purchased power and certain variable operating costs automatically, dollar-for-dollar, from its customers rather than having to wait until the next base rate case which could be years into the future. Contrary to Defendants' assertions, charges included in the FAC, unlike EMI's "base rates".[35]

18. Defendants admit they ran EMI's older "legacy" power plants (Rex Brown, Baxter Wilson and Gerald Andrus) at high levels – especially at night – when it is uneconomic to do so under the principles of economic dispatch that Defendants claim they follow, and pass on to Mississippi customers the cost of this expensive electricity instead of replacing some of it with less expensive electricity from third parties on the open wholesale market.[36]

19. Under the ESA, the costs and benefits of Purchased Power Agreements ("PPAs") entered by the System with third parties on behalf of all EOCs (called "Joint Account Purchases") were divided among the EOCs according to their responsibility ratio share.[37] EMI's responsibility ratio share during the relevant time period was roughly 10%.[38]

20. Pursuant to the ESA, EOCs, like EMI, were permitted – with the consent of or under conditions specified by the Entergy Operating Committee – and acting individually or in combination with one or more other EOCs to enter a PPA with a non-affiliated third party for its/their "own account" (*i.e.,* "Own Account Purchases" (also called "Individual Company Purchases")).[39]

---

[32] (Doc. 135), First Amended Complaint, at ¶¶41-45.

[33] (Doc. 135), First Amended Complaint, at ¶70. *See also,* Ex. F, Direct Testimony of Theodore H. Bunting, Jr., MPSC Docket No. 2008-AD-270, July 7, 2008, at p. 3, stating, "Entergy Mississippi makes no profit from fuel and purchased power costs collected under [Rider ECR], and although the System takes reasonable steps and commits a significant amount of time and manpower to prudently manage its fuel expenses, it has no direct control over this aspect of the customer bill."

[34] The FAC was replaced by the Energy Cost Recovery Rider ("ECR") in or about 1997. The ECR operates the same as the FAC. EMI also obtained approval to pass certain capacity charges incurred by EMI through power purchase agreements with *non-affiliates* through to its customers on an automatic, dollar-for-dollar basis through the Power Management Rider ("PMR"). All of these automatic recovery mechanisms are referred to in the Complaint and in this Opposition, collectively, as the FAC.

[35] Through the base rates, a utility recovers money from its customers to repay it for its investment in the assets needed to provide electric service, plus a profit or rate of return. Base rates are approved by the MPSC before-the-fact, meaning they cannot be collected from customers until the MPSC scrubs them down, eliminates unnecessary or inappropriate charges, and approves them to be collected. The FAC is a separate and distinct revenue collection mechanism from the utility's typical base rate and is an exception to traditional ratemaking.

[36] (Doc. 135), First Amended Complaint, at ¶ 52. *See also,* (Doc. 262-6), Ex. F to Preemption MSJ, Hurstell Report, at ¶106 (stating a "disadvantage" of EMI's legacy units is that "they were not designed for overnight shutdown and start up.")

[37] *See* (Doc. 262-2), Entergy System Agreement, at Sec. 4.03.

[38] *See* (Doc. 262-6), Ex. F to Preemption MSJ, Hurstell Report, at ¶253, p. 116.

[39] *See* (Doc. 262-2), Entergy System Agreement, at Sec. 4.02. *See also,* (Doc. 135), First Amended Complaint, at ¶38.

21. Entergy was able to "balance supply and demand at all times" without harming the reliability of the System when EMI purchased power pursuant to an 11-month Own Account Purchase with Big Rivers Cooperative, in 1983.[40]

22. Entergy was able to "balance supply and demand at all times" without harming the reliability of the System when EMI purchased power pursuant to a long-term Own Account Purchase from Southern Company.[41]

23. Defendants state typically third-party PPAs were assigned to all of the EOCs according to their responsibility ratio share.[42] Yet, EMI at different points over the relevant time period acquired more than its responsibility ratio share (as specified under the ESA) of PPAs with third parties. For example, EMI was assigned 33.33% of a one-year PPA with Duke Energy Trading and Marketing, L.L.C. ("Duke Energy").[43]

24. Further, During the relevant time period, Entergy assigned Individual Company Purchases ("ICPs") to 1, 2, 3, 4, 5, and 6 of the EOCs in varying combinations. Also during the relevant time period, Entergy likewise assigned Joint Account Purchases ("JAPs") to 1, 2, 3, 4, 5, and 6 of the EOCs in varying combinations.[44]

25. Similarly, EMI was assigned 100% of the PPA with Attala (Central Mississippi Generating Company, an Independent Power Producer ("IPP")) and 25% of the PPA with Cottonwood Energy Company, LP (Coral Power, LLC) (another IPP).[45]

26. Defendants have put forth no evidence showing that the Entergy Operating Committee would have rejected, or would have had a good-faith basis to reject, a request by EMI to make additional purchases of power from non-affiliated third parties.

27. Defendants have no proof EMI ever searched the wholesale power market to locate additional supplies of power from third parties in order to lower the cost of power to its ratepayers in Mississippi; there was no process in place to do so.[46] EMI never had even *one employee* whose duties included searching the wholesale power market for potential supplies of power that may have been purchased from third parties in order to lower the cost of power to its ratepayers in Mississippi.[47]

---

[40] *See* Ex. G, Operating Committee minutes authorizing 11-month PPA with Big Rivers. *See also*, Ex. H to Opposition to Motion for Judgment on the Pleadings (Doc. 56-14).

[41] *See* Ex. I, Gallaher Deposition, at 6:6 – 25, 7:9 – 8:25, and 9:14 – 11:16.

[42] (Doc. 263), Defendants' Brief, at p. 13.

[43] *See* Exh. H (Amendment to January 31, 2003 PPA with Duke Energy, dated June 16, 2003, at Bates Number ENT-00443889 - 00443930).

[44] *See* Ex. A, Addendum 2, DeRamus Rebuttal Report, at ¶98, pp. 58-59, and Table 18.

[45] *See* Ex. S, excerpts of EMI's PMR filing (4Q 2004), at (ENT-00443949), (ENT-00443950), and (ENT-00443953).

[46] Ex. I, Gallaher Deposition, at 17:11 – 18:1.

[47] *Id.*, at 31:17-25.

28. Dr. David W. DeRamus concluded, "EMI's use of its own higher-cost generation rather than available lower-cost power from non-affiliated producers resulted in costs that were 60% higher than for non-affiliate power purchases, with excess costs of approximately $22.45/MWh on average over 1998 – 2008."[48] Also, "EMI's purchases of more expensive Entergy Pool Energy rather than available lower-cost power from non-affiliated producers resulted in costs that were 39% higher than for non-affiliate power purchases, with excess costs of approximately $16.81/MWh on average over 1998 – 2008."[49]

29. Defendants claim they were required to accommodate "puts" of energy from Qualified Facilities ("QFs"),[50] but such QF puts were relatively small compared to (a) the size of the generating capacity owned by Entergy (over 20,000 MW during the relevant time period), and (b) the amount of inefficient, "legacy" generating capacity owned by Defendants, including EMI.[51] Further, after EMI joined MISO, MISO controlled the dispatch of its legacy units and reduced their output dramatically, thus destroying any claim that EMI needed to run such legacy units at such high levels to accommodate QF puts.[52]

30. Mr. Griffey concluded that the MPSC never evaluated the reasonableness of EMI's power procurement prior to 2009 and the process employed by the Public Utilities Commission Staff was inadequate. As such, the "[power] procurement transactions were never audited to determine if they were economical as to both price and reliability," meaning the retail rates charged to consumers were *never approved by the MPSC.*[53]

31. EMI and the other Defendants improperly included non-fuel cost items – including "phantom" $SO_2$ charges, NOx charges and depreciation expenses – in EMI's FAC in direct violation of the MPSC's rules, regulations and orders.[54] Defendants' witness, Mr. Hawkins conceded that EMI never received an order from the MPSC approving the inclusion of $SO_2$ charges and other inappropriate inclusions challenged by the State in the FAC.[55] Mississippi law and MPSC rules permit only the "actual cost" of fuel and purchased energy costs to be included in EMI's FAC and/or Rider ECR.[56]

---

[48] Ex. A, DeRamus Declaration, Addendum 1, DeRamus Initial Report, at ¶65, p. 26.

[49] *Id.*, at ¶68, p. 27.

[50] *See* (Doc. 263), Defendants' Brief, at pp. 6-7.

[51] *See e.g.,* Ex. A, DeRamus Declaration, Addendum 2, DeRamus Rebuttal Report, at ¶49 – 58, pp. 28–36.

[52] *See e.g.,* Ex. A, DeRamus Declaration, Addendum 2, DeRamus Rebuttal Report, at ¶32, p. 19. (Dr. DeRamus states, "Mr. Hurstell and I may disagree on whether Entergy needed to dispatch its inefficient generating units at such high capacity factors prior to Entergy joining MISO due to the QF puts on the system. At a minimum, however, the substantial reduction in the dispatch of EMI's legacy units after Entergy joined MISO demonstrates conclusively that there was no physical reliability need for them to be dispatched at such a high level.").

[53] Ex. B, Griffey Declaration, Addendum2, Rebuttal Report of Charles Griffey, at p. 23; and Ex. J, Order in Docket 2009-AD-005, January 15, 2009. (Emphasis added).

[54] (Doc. 135), First Amended Complaint, at ¶¶61 and 63. *See, also,* Ex. K, Deposition of Robert Hawkins at 26:2 – 28:13.

[55] Ex. K, Deposition of Robert Hawkins at 26:2 – 28:13.

[56] Miss. Code § 77-3-42(1)(b) and § 77-3-42(2)(a); MPSC Rules 17.101(1) and 17.102. (Doc. 135), First Amended Complaint, at ¶59.

32. Defendants have no evidence that the MPSC approved the prudence and reasonableness of the $SO_2$ allowances, NOx charges, ad valorem taxes or depreciation expenses EMI included in its FAC charges.[57] The fuel procurement costs recovered by EMI prior to 2009 were not pursuant to valid retail rates set by the Commission.[58]

33. The State has, in fact, alleged that Defendants misrepresented themselves to regulators *and consumers*.[59]

34. Entergy has made affirmative representations as to how it would conduct itself vis-à-vis consumers: "Each employee/Director **mus**t comply with the *letter and spirit* of this Code. (5) FAIR DEALING: **Employees shall deal fairly with the Company's…*Customers,* *suppliers and competitors*. No employee may take unfair advantage** of the Company's…**customers**, suppliers and competitors, including **through** *manipulation, concealment,* abuse of privileged information, *misrepresentation of material facts* **or any** *other unfair dealing practices***."**[60]

## B.   DISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT

Defendants' claim that "careful planning is required" to maintain reliability of electric supply is a statement of opinion without any support.[61] Defendants' statements regarding the Federal Power Act and FERC's subject matter jurisdiction are arguments regarding the law and are not facts.[62] Similarly, Defendants' arguments regarding the MPSC's subject matter jurisdiction, costs "allowed" to be recovered via the FAC under state law, and related issues are legal arguments and not facts.[63] Likewise, Defendants' claims regarding SB 2295 are purely legal argument.[64]

Defendants' assertions concerning whether it needed "readily available sources of energy capable of immediately ramping up or down to assure the reliability of the grid" in the event a QF ceased putting energy to the System is opinion, not fact.[65] Defendants' citation to the FERC Office of

---

[57] *See, e.g.,* Ex. K, Deposition of Robert Hawkins at 26:2 – 28:13.
[58] *Id.*
[59] *See* (Doc. 135), First Amended Complaint at ¶124.
[60] Ex. L, *Entergy's Code of Business Conduct and Ethics For Employees and For Members of the Board of Directors* (December 8, 2006).
[61] (Doc. 263), Defendants' Brief, at p. 5.
[62] *Id.,* at pp. 5-6.
[63] *Id.,* at p. 6.
[64] *Id.*
[65] *Id.,* at p. 7.

Enforcement Audit of ESI selectively quotes from that document. The FERC Audit found many deficiencies with Defendants' Weekly Procurement Process, including that, *"The level of flexibility has been overstated … by 600 megawatts … due to an error in the model input data provided by Entergy that limited third parties' ability to serve Entergy's native load."*[66]

Defendants misstate the relevant time period by claiming the State only seeks damages for the period 1998-2008.[67] The relevant period for Plaintiff's Affiliate Issues claims is 1998-2013 and for the Improper Inclusions claims is 1993-present.[68] Defendants' claims as to the obligations flowing from and what the ESA allegedly "requires" are legal arguments, not facts.[69] Nonetheless, Defendants' statements concerning the duty of the System to provide the lowest reasonable cost of power and the determination of what sources to use in that effort are so narrow as to render them incorrect.[70] Each EOC had a duty to its retail customers to determine, to the extent possible, which resources to use to supply them with the lowest reasonable cost, reliable power.

Dr. David W. DeRamus has testified before, and filed affidavits with, state and federal regulatory agencies and courts regarding his findings with respect to Defendants' anticompetitive conduct, among other things.[71] Contrary to Defendants' accusations, Dr. DeRamus need not be a

---

[66] Ex. M, FERC Audit of Entergy Services, Inc. (Docket No. PA10-1-000), dated October 29, 2010, at p. 45. (Emphasis added). FERC also found *"the manner in which flexibility is modeled may have restricted competition by limiting third parties' ability to compete to serve Entergy's native load." Id.* (Emphasis added).

[67] *See* (Doc. 263), Defendants' Brief, at p. 8.

[68] *See* (Doc. 130), Case Management Order, at p. 3. *See also*, Ex. A, DeRamus Declaration, Addendum 1, DeRamus Initial Report, at ¶3, p. 1 ("While I have evaluated the Defendants' conduct from 1993 through 2013, I have been asked to restrict my calculation of damages to the period from 1998 through 2008 (the damages period."). *See also, id.*, fn. 1 ("While my damages analysis in this report is limited to the 1998 – 2008 time period, it could be expanded to include 2009 – 2013 as well.").

[69] *See* (Doc. 263), at pp. 9-10.

[70] *See id.*, at p. 10 (stating such determination was "entrusted to the Operating Committee and System Operator.").

[71] *See, generally*, Ex. A, DeRamus Declaration, Addendum 1, DeRamus Initial Report, at Appx. A. (C.V.).

system operator to opine on Defendants' conduct and damages in this matter.[72] Plaintiff also objects

to Defendants' use of the Bates White report, as it constitutes hearsay.[73]

Similarly, Defendants' self-serving conclusion that "EMI charged its retail customers only rates

that had been approved by the MPSC,"[74] is contradicted by the undisputed evidence. EMI's cost items

included in its FAC were never "approved" by the MPSC.

## III.   ARGUMENT

## A.   THE ATTORNEY GENERAL IS EMPOWERED TO BRING THIS LAWSUIT—SB 2295 DOES NOT ABROGATE THAT AUTHORITY

### 1.   Defendants' SB 2295 Argument is a Transparent Attempt to Legislatively Overturn Judge Wingate's Ruling Denying Defendants' Motion for Judgment on the Pleadings

Defendants' reliance on SB 2295 is a transparent attempt to legislatively overturn Judge

Wingate's ruling denying Defendants' Motion for Judgment on the Pleadings.[75] This Court has

unequivocally rejected their tortured argument that this is a "*rate case.*" As Judge Wingate explained in

his reasons denying Defendants' Rule 12(c) motion:

> [T]he case at bar is *not* a case involving the regulation of intrastate public utility activity. This dispute involves the *prudence* of EMI's discretionary decision to purchase [in] an *interstate context*, one source of FERC-approved energy over a cheaper source of FERC-approved energy. . . . [T]his court finds that Mississippi states a claim for relief that is *not* within the MPSC's *exclusive* jurisdiction.[76]

Regardless, Defendants' own admissions doom their argument. They successfully urged the

Fifth Circuit to find an embedded federal question, noting that Judge Wingate "properly concluded

---

[72] *See* (Doc. 263), Defendants' Brief, at p.11. Plaintiff incorporates by reference all of its law and arguments and exhibits contained in or attached to its Response to Defendants' Motion Under Rule of Evidence 702 to Prohibit the Testimony of Plaintiff's Expert Dr. David DeRamus (Doc. 286), and its Memorandum Brief in Opposition to such motion (Doc. 287), pursuant to Fed. R. Civ. P. 10(c).

[73] *See* (Doc. 263), Defendants' Brief, at p. 11. Referencing Bates White report, (Doc. 262-6), Ex. F at Appx. JPH-14.

[74] *Id.*, at p. 2.

[75] *See* (Doc. 263).

[76] (Doc. 263) at pp. 31, 32–33. (Emphasis added).

that the meaning of the FERC tariff [*i.e.*, Entergy Services Agreement ("ESA")] is an 'essential element' of General Hood's state law claims" that "require decision of *substantial disputed questions of federal law*."[77] Defendants' admissions include: (1) "[b]ecause the ESA governs the allocation of power in a system that spans *four states*, interpretation of the ESA plainly *rises beyond the concern of **any individual** state* and implicates questions of important *national* energy policy"; (2) there exists "an important *national* interest . . . in the availability of a *federal* forum to clarify the meaning of laws promulgated by a *federal administrative agency* that impacts Texas, Arkansas, Mississippi[, and Louisiana]"; (3) Plaintiff's "nominal state law claims" were based upon a tariff governing "an integrated *multistate* electrical system"; and (4) "this action *does not implicate any substantial state interests* that warrant deference."[78]

Despite Defendants' assertions to the Fifth Circuit, Defendants' current position is that "[e]very theory asserted in Plaintiff's Amended Complaint … falls squarely within the original jurisdiction of the MPSC as opposed to a court.,"[79] which extends only to "the *intrastate* business and property of public utilities."

### 2. SB 2295 is not Expressly Retroactive and, therefore, has only Prospective Force

"A statute will not be given retroactive effect unless it is manifest from the language that the legislature intended it to so operate."[80] The U.S. Supreme Court has made clear that there is a judicial presumption in favor of prospective-only application of legislation where, as is the case for SB 2295, there is *no* express specification in the statute itself for the retroactive application of the statutory changes. For example, in *Landgraf v. USI Film Products*, the court held that requiring legislature to make

---

[77] Ex. Q, Case: 15-90017, U.S. Fifth Circuit, Doc. 00513054835, Answer in Opposition to Petition for Permission to Appeal Remand Order Under § 1292(b)at pp. 9, 15. (Emphasis added). **If, as Defendant's argue, SB2295 merely "*clarifies*" what they say the law has *always* been, then the significance of these admissions is even more profound because they made these arguments in light of what they now claim the law has always meant.**

[78] *Id.* at pp. 17, 18, 22. (Citation omitted) (internal quotation marks omitted) (emphasis added).

[79] (Doc. 263), Defendants' Brief, at pp. 26, 27.

[80] *Mladinich v. Kohn*, 186 So.2d 481, 484 (Miss. 1966).

clear its intent to apply a statute retroactively "helps ensure that [the legislature] itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness."[81] Furthermore, the principles of legal certainty and legitimate expectations, which are anchored in the rule of law and the concept of fundamental rights, stand firmly opposed to any law purporting to have retroactive effect.[82]

As the Fifth Circuit has recognized, "reliance on subsequent legislative actions to determine the meaning of an earlier statute is hazardous."[83] The present situation is a perfect illustration of the hazards involved, where a claimed retroactive "clarification" of the law may actually be a narrowly tailored effort to insulate a private party from their particular litigious exposure. Because of this danger, courts have routinely rejected the notion that any legislation styled as a "clarification" should necessarily be given retroactive effect. As legal interpretation is the sole duty and province of the judiciary,[84] courts must guard against legislative encroachments that jeopardize standing precedent or offer a "clarification" that is either unnecessary, or that exceeds the bounds of a reasonable interpretation of the statute as written. This logic is embodied in the three-part test adopted by the Fifth Circuit in *Adhikari v. Kellogg Brown & Root, Inc.*:

> Several factors inform whether a statutory amendment merely clarifies the law rather than effects a substantive change. For instance, courts consider: (1) whether the enacting body declared that it was clarifying a prior enactment; (2) whether a conflict or ambiguity existed prior to the amendment; and (3) whether the amendment is consistent with a reasonable interpretation of the prior enactment.[85]

---

[81] *Landgraf v. USI Film Products,* 511 U.S. 244, 268 (1994). *See also, Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[82] *U.S. Fidelity & Guar. Co. v. McKeithen*, 226 F.3d 412, 418 (5th Cir. 2000) ("Retroactivity is generally disfavored in the law. Retroactive legislation, as opposed to the prospective kind, can present more severe problems of unfairness because it can upset legitimate expectations and settled transactions.").

[83] *NCNB Texas Nat. Bank v. Cowden*, 895 F.2d 1488, 1500 (5th Cir. 1990). (Citation omitted).

[84] *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

[85] *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 201 (5th Cir. 2017). (Citations omitted) (internal quotation marks omitted).

Although the Mississippi Legislature stylized SB 2295 as, *inter alia*, a "clarification" of Miss. Code Ann. § 77-1-43, this single factor is neither controlling nor determinative of the issue of retroactivity.[86] Defendants rely on the introductory, stylistic paragraph of SB 2295 in support of its proposition that SB 2295 is merely a "legislative clarification" of Miss. Code Ann. § 77-1-43; however, a side-by-side comparison of the former and current versions of the statute reveals major, substantive changes:

| Miss. Code Ann. § 77-1-43<br>(prior to SB 2295) | Miss. Code Ann. § 77-1-43<br>(as amended by SB 2295) |
|---|---|
| (1) The commission may apply to the circuit or chancery court, by proper proceeding, for aid in the enforcement of obedience to its process, and to compel compliance with the law and its lawful orders, decisions, and determinations. Said courts shall have jurisdiction to grant aid and relief in such cases, subject to the right of appeal to the Supreme Court by the party aggrieved. *The Attorney General, or district attorney in his district, shall institute such proceedings in the name of the commission.*<br><br>(2) Any action for violation of the law, or for the violation of any lawful rule, regulation or order of the commission may be instituted by the commission or by the Attorney General in any court of competent jurisdiction.<br><br>(3) The remedies given by this chapter against all carriers under the supervision of the commission, are cumulative to those now in existence by law. (Emphasis added). | The commission may apply to the circuit or chancery court, by proper proceeding, for aid in the enforcement of obedience to its process, and to compel compliance with Title 77, Mississippi Code of 1972, and its lawful rules, regulations, orders, decisions, and determinations. Said courts shall have jurisdiction to grant aid and relief in such cases, subject to the right of appeal to the Supreme Court by the party aggrieved. *The commission itself may, by order after notice and hearing, institute such proceedings or, at the request of the commission by order after notice and hearing,* the Attorney General, or district attorney in his district, shall institute such proceedings in the name of the commission. (Emphasis added). |

The complete removal of an independent statutory provision (former Miss. Code Ann. § 77-1-43(2)) does not constitute a "clarification" of prior law; rather, it only creates confusion where none

[86] *See Landgraf v. USI Film Products*, 511 U.S. 244, 268 (1994) ("[D]eciding when a statute operates 'retroactively' is not always a simple or mechanical task.").

previously existed.[87] Furthermore, prior to SB 2295 Miss. Code § 77-1-43 stated—in plain terms and in an independent clause—that "[t]he Attorney General . . . shall institute such proceedings in the name of the commission." This unambiguous grant of authority cannot be reconciled with the prefatory clause added by SB 2295, which now envisions a formal request from the MPSC after notice and hearing. This is not a clarification; *this is a fundamentally substantive change to the statute*. There was no conflict or ambiguity in Miss. Code Ann. § 77-1-43 before SB 2295 was enacted, and there are only three reported decisions touching upon this statute, none of which called into question its plain and unambiguous terms.[88]

In *Bronk v. Hobson*,[89] the Mississippi Supreme Court was asked to consider the effect of MS SB 2010 (2013 Regular Session).[90] SB 2010 was likewise stylized "to *clarify* the jurisdiction of the court over the award of custody in the course of a paternity proceeding . . . ."[91] Specifically addressing the issue of retroactivity, the court held that SB 2010, and the "legislative clarification" contained therein, had only *prospective* effect:

> The bill states that it "shall have effect and be in force *from and after* its passage." Accordingly, the bill was effective on the date of its passage, April 24, 2013, and it does not apply retroactively. Further, our determinations of jurisdiction are "decided based on the existing facts at the time the action is commenced." Senate Bill 2010 is not applicable to this dispute.[92]

---

[87] *See* Ex. T, December 3, 2008 News Release of MPSC Commissioner Brandon Presley: "Mr. Fisackerly and Entergy want to bring about a 'turf war' between the PSC and the Attorney General…and use this Commission as a pawn for their own legal maneuvering…The Attorney General has constitutional and legal powers that the Public Service Commission does not have…the lawsuit centers around consumer protection and antitrust violations the Commission has no legal authority to enforce…The issues we are investigating, although similar, are different from those being alleged by the Attorney General."

[88] *See Miss. Pub. Serv. Comm'n v. Holloway Transfer & Storage Co.*, 150 So. 2d 411 (Miss. 1963) (dealing with proper parties and standing to appeal judicial attacks on MPSC orders); *Campbell Sixty-Six Exp., Inc. v. J. & G. Exp., Inc.*, 141 So. 2d 720 (Miss. 1962) (dealing with injunctive relief); *Mississippi R.R. Comm'n v. Gulf & S.I.R. Co.*, 29 So. 789 (Miss. 1901) (discussing jurisdiction between circuit and chancery courts).

[89] *Bronk v. Hobson*, 152 So. 3d 1130 (Miss. 2014).

[90] *Id.* at 1134.

[91] *Id.* (Emphasis added).

[92] *Id.* (citing *Joshua Properties, LLC v. D1 Sports Holdings, LLC*, 130 So. 3d 1089, 1092 (Miss. 2014)). (Emphasis added).

Turning to the present dispute, SB 2295—like SB 2010—states that it "shall take effect and be in force *from and after* July 1, 2018."[93] Thus, the plain language of the amendment indicates that it should be applied prospectively only.[94] Regardless, Defendants' reliance on *Cellular S., Inc. v. BellSouth Tel., LLC,*[95] is misplaced. The Mississippi Supreme Court departed from its usual deference to the principle that, unless the legislature makes it explicitly clear that a statute is retroactive, legislation will not have a retroactive effect because *Cellular S.* involved the repeal or modification of a statute that created the very rights in question. The court explained:

> [T]he question of whether amendments to statutes apply to existing public records covered by the Public Records Act is different from the questions normally considered in the context of the retroactivity of statutory amendments.... [M]ost [cases] … address the effect of new statutes on rights that preexist the statute and, of course, do not derive from the statute. … The rights and remedies at issue here are created *solely* by the Public Records Act . …[96]

The rights and remedies advanced in this suit do not derive *solely* from the statutes changed and modified by SB 2295, thus, SB 2295 is not retroactive and does not foreclose the State's suit.

### 3. SB 2295 Cannot Divest the Chancery Court or the Attorney General of their Constitutionally Derived Jurisdiction and Powers

SB 2295 cannot divest the Chancery Court of its constitutionally derived "full jurisdiction" over all matters of equity. Because Plaintiff's suit lies, in part, on several claims in equity, SB 2295 cannot "kick back" this suit to the MPSC. Chancery Courts' power to hear "[a]ll matters in equity" is *unequivocal*.[97] The Mississippi Constitution's grant of "full jurisdiction" implies that nothing is

---

[93] (Emphasis added).
[94] *Jones v. Baptist Mem'l Hosp.-Golden Triangle, Inc.*, 735 So.2d 993, 998 ("If the statutory language mandates that the statute is to apply from and after passage, it is not to be applied retroactively to causes of action which accrued prior to passage of the statute.").
[95] *Cellular S., Inc. v. BellSouth Tel., LLC,* 214 So.3d 208 (Miss. 2017).
[96] *Id.* 214 So.3d at 213, 215. (Citations omitted) (emphasis added).
[97] Miss. Const. art. VI, § 159.

reserved; whatever is a matter of equity, the Chancery Courts' power to adjudge is full.[98] The legislature may not subtract from the equity jurisdiction vested in the Chancery Court.[99]

Plaintiff's First Amended Complaint spells out its causes of action, including: violation of the Consumer Protection Act under Miss. Code Ann. § 75-24-1, *et seq.*; matters of equity; fraud; and accounting. Thus, Defendants' interpretation of SB 2295 would have the effect of impermissibly depriving the Chancery Court of its constitutionally derived "full jurisdiction" over all matters of equity. Furthermore, any argument that *all* of Plaintiff's claims must fall within the Chancery Court's exclusive jurisdiction should also be dismissed.[100] Because Plaintiff's suit contains multiple independent grounds for such jurisdiction, SB 2295 cannot divest the Chancery Court of its constitutionally derived "full jurisdiction" over all matters of equity.

The power of the Mississippi Attorney General to act in *parens patriae* flows directly from the Mississippi Constitution and the powers of the office at common-law, and cannot be expanded or limited by legislation, including SB 2295. "The Supreme Court of Mississippi has consistently ruled that the constitutional creation of the office, without further statutory enactment, vested in the Attorney General all powers which that officer possessed at common-law and incorporated that common-law authority into the constitution itself."[101] The Attorney General's common-law duties are "numerous and varied."[102] One such common-law power is the duty to represent the state in litigation involving matters of statewide interest.[103] In *Capitol Stages*, the Mississippi Supreme Court stated, "[a]s

---

[98] *Bank of Miss. v. Duncan*, 52 Miss. 740, 745, 1876 WL 5231, at *3 (Miss. 1876).

[99] *Id.* at *4.

[100] The doctrine of pendent jurisdiction holds that where an action is brought in a Chancery Court that presents at least one independent ground for subject matter jurisdiction in the Chancery Court, the entire action may be heard and adjudged in the Chancery Court. *See Leaf River Forest Products, Inc. v. Deakle*, 661 So.2d 188, 193. (Citations omitted).

[101] *Wade v. Miss. Co-op. Extension Serv.*, 392 F.Supp. 229, 232 (N.D. Miss. 1975).

[102] *Id.* (*citing Capitol Stages v. State*, 128 So. 759, 763 (Miss. 1930).

[103] H.M. Ray, *Constitutional and Statutory Authority of the Attorney General to Prosecute Actions*, 69 MISS. L.J. 165, 168 (1989).

to all litigation, the subject-matter of which is of state-wide interest, the Attorney General alone has the right to represent the state."[104] Moreover, the Attorney General has the *sole right* to determine what are matters of statewide interest.[105]

Defendants' interpretation of the revised text of Miss. Code Ann. § 77-3-5 and Miss. Code Ann. § 77-1-43 attempts to not only abrogate the power of the office, but to subordinate the Attorney General to the MPSC, an arm of the Mississippi Legislature. As the Mississippi Constitution makes clear: "The powers of the government of the State of Mississippi shall be divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another."[106] Accordingly, "[n]o person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others."[107] Thus, Defendants' interpretation of SB 2295 would unconstitutionally subject the Attorney General, whose office is grounded in the separate and inviolable executive branch, to the legislative branch

### 4. Defendants Short-Circuited the State Litigation Process by Removing this Case to Federal Court on the Basis of Federal Question Jurisdiction

#### a. *Removal supplied this Court with exclusive, original jurisdiction involving federal rights that cannot be infringed upon by a state legislature*

Defendants chose to remove this suit from Chancery Court, appealing to this Court's discretionary exercise of jurisdiction. Defendants' filing of their Petition for Removal divested the state court of subject-matter jurisdiction.[108] Removal extended to the entire case and to all parties and claims, halting all further proceedings in the state court, unless and until the case is remanded.[109] After

---

[104] *Capitol Stages v. State,* 128 So. at 764.
[105] *See, e.g., State ex rel. Patterson v. Warren*, 180 So.2d 293, 300 (Miss. 1965); *Dunn Constr. Co. v. Craig*, 2 So.2d 166, 174 (Miss. 1941).
[106] Miss. Const. art. I, § 1.
[107] Miss. Const. art. I, § 2.
[108] *See* 28 U.S.C. § 1146.
[109] *See Polyplastics, Inc. v. Transconex, Inc.*, 713 F.2d 875, 877 (1st Cir. 1983).

removal, this Court acquired full and exclusive federal question subject-matter jurisdiction over the litigation.[110] In essence, "[t]he case will proceed as if it originally had been brought in the federal courts."[111] In its written reasons denying remand, this Court already dispensed with any conflicting claims of exclusive jurisdiction under state law.[112]

Acting within its discretion, this Court chose to exercise jurisdiction under 28 U.S.C. § 1331 on independent *federal question* grounds, in spite of the fact that all eight causes of action stated on the face of Plaintiff's complaint invoke issues of state law. The legislature's passage of SB 2295 has no impact upon this Court's stated grounds for exercising jurisdiction, and cannot, therefore, be used as justification for remand to the MPSC. Stated differently, "the jurisdiction of the federal courts cannot be limited or taken away by state statutes."[113]

### b. Removal waived Defendants' right to now complain about standing, i.e., the Attorney General's power to file complaints

Defendants have waived their prudential standing and Fed. R. Civ. P. 17(a) arguments by failing to timely object. Fed. R. Civ. P. 17(a)(1) requires that "[a]n action must be prosecuted in the name of the real party in interest." Defendants' argument lies on the assumption that the MPSC is the real party in interest to prosecute this matter, and not the Attorney General. The Fifth Circuit has defined the real party in interest as "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."[114] Notably, a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be

---

[110] *See generally* 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3738 (4th ed. 2018).
[111] *Id.*
[112] (Doc. 68) at pp. 8–9 (*citing Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)).
[113] 17A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4211 (3d ed. 2018).
[114] *In re Signal Intern., LLC*, 579 F.3d 478, 487 (5th Cir. 2009) (quoting *Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990)).

substituted into the action."[115] The Fifth Circuit has recognized, "[o]bjection is typically practical in the early stages of the litigation …" Defendants have had more than ample time to raise the objection that the MPSC is the real party in interest but have failed to do so.

### c. Removal waived Defendant's right to assert the defense of ripeness or failure to exhaust administrative remedies (which is what SB 2295, if applicable, would require)

Defendants' removal of this suit to federal court establishes that their argument is a disguised defense of ripeness or failure to exhaust administrative remedies. In *Lily Investments v. City of Rochester*,[116] the Sixth Circuit examined whether the plaintiff in a state court regulatory takings case was required to exhaust state remedies—*i.e.,* obtain a final judgment from the state court—before seeking redress in federal court. After the defendant successfully removed the suit to federal court, the defendant filed an answer and counterclaims, and later moved to dismiss under Fed. R. Civ. P. 12(b)(1) on ripeness grounds because the plaintiff never received a final judgment from state court.[117] Reversing the district court, the Sixth Circuit noted that both the Second and Fourth Circuits recently held "that a defendant *waives the exhaustion requirement by removing to federal court*" because, in doing so, "it implicitly agrees with the competence of federal courts to decide the plaintiff's claim."[118] The court explained:

> [The Second and Fourth Circuits] recognized that "refusing to apply the state-litigation requirement in this instance ensures that a [defendant] cannot manipulate litigation to deny a plaintiff a forum for his claim. … The primary justification for the state-litigation [exhaustion] requirement is that "state courts undoubtedly have more experience … in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations." But as the Fourth Circuit recognized, "*[t]hat state courts have this advantage … does not mean that federal courts are incapable of handling them.*"[119]

### 5. SB 2295 only Applies to Title 77 Claims; this Lawsuit is not Solely a Title 77 Claim

SB 2295 does not apply because this suit does not solely seek "to compel compliance with

---

[115] Fed. R. Civ. P. 17(a)(3).
[116] *Lily Investments v. City of Rochester,* 674 Fed.Appx. 523 (6th Cir. 2017) (Unpublished.).
[117] *Id.* 674 Fed.Appx. at 526.
[118] *Id.* 674 Fed.Appx. at 530-531. (Citation omitted) (emphasis added) (internal quotation marks omitted).
[119] *Id.* 674 Fed.Appx. at 530. (Citations omitted) (emphasis added).

Title 77, Mississippi Code of 1972, and [the MPSC's] lawful rules, regulations, orders, decisions, and determinations."[120] Nor does this suit seek "the establishment of retail rates," challenge "the amount of a retail rate or customer bill or whether such rate is just and reasonable," attack "the validity or accuracy of rates charged by a public utility" or "the accuracy of reliability of information submitted to" the MPSC.[121] Rather, this suit is premised upon Defendants' anticompetitive conduct, fraud, violations of other state laws and manipulation of rates.

### 6. SB 2295 does not Apply to Defendants, Entergy Corporation, Entergy Power, Inc. ("EPI") and ESI, which are Non-Regulated Entities

SB 2295 also does not apply to Entergy Corporation, EPI and ESI, which are non-regulated entities. Specifically, SB 2295 reenacts or amends 25 different sections contained in Title 77 of the Mississippi Code of 1972. Broadly speaking, Title 77, which is entitled "Public Utilities and Carriers," governs, *inter alia*, public utilities, motor carriers, and other common carriers. Because ETR and ESI, however, are non-regulated entities, SB 2295 – and its various amendments to Title 77 – have no effect on the status of Entergy Corporation, EPI and ESI in this lawsuit.

## B. DEFENDANTS' PREEMPTION MSJ IS AN UNTIMELY REQUEST FOR REHEARING AND VIOLATES THE LAW OF THE CASE

Defendants' Preemption MSJ should be denied because it is, in substance, an untimely request for rehearing of the ruling on their prior Motions for Judgment on the Pleadings. According to Fed. R. Civ. P. 59(b), a motion for new trial (rehearing) must be filed within 28 days of the entry of the judgment at which it is directed. A timely motion for rehearing on Judge Wingate's order denying the Motions for Judgment on the Pleadings was due on October 19, 2016,[122] thus rendering the Preemption MSJ untimely.

---

[120] Miss. Code Ann. § 77-1-43 (as amended by SB 2295).
[121] Miss. Code Ann. § 77-3-5 (as amended by SB 2295).
[122] (Doc. 85), Order Denying Judgment on the Pleadings, was dated September 21, 2016.

Defendants' Preemption MSJ is barred by law of the case. Law of the case is a practice of the courts to generally refuse to reopen that which has been decided.[123] Defendants cite *Granger v. Slade*,[124] for the proposition that law of the case is inapplicable where the prior ruling occurred early in the proceeding before discovery was completed.[125] *Granger*, however, involved a re-urged motion for summary judgment after the denial early in the case of a similar motion for summary judgment, not a jurisdictional motion like the Motions for Judgment on the Pleadings and the merely repackaged Preemption MSJ. Defendants also contend that Judge Wingate did not consider *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*,[126] *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*,[127] or *Entergy Corp. v. Jenkins*,[128] and therefore purportedly reached an erroneous conclusion.[129] While parties are not barred by the law of the case doctrine from asserting matters that could have been, but were not, raised and resolved in the earlier motion, the doctrine ***does prohibit*** reconsideration of matters which were "'decided by necessary implication as well as those decided explicitly.'"[130]

Defendants claimed in their Memorandum Brief in Support of their Motions for Judgment on the Pleadings, "In particular, Hood admits, as he must, *that the four-state Entergy electric system* is governed by tariffs that have been approved by FERC pursuant to the Federal Power Act, 16 U.S.C. § 791a, *et seq.*"[131] They also argued, "But the Federal Power Act gives FERC exclusive jurisdiction to assure that power and cost allocations *among the Operating Companies in the Entergy System* are just, reasonable, and

---

[123] *Johnson v. Louisiana Dept. of Agriculture*, 18 F.3d 318, 322 (5th Cir. 1994) (*quoting, Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989)).

[124] *Granger v. Slade*, 361 F.Supp.2d 588 (S.D. Miss. 2005).

[125] *See* (Doc. 263), Defendants' Brief, at p. 30, fn. 31.

[126] *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898 (4th Cir. 1987).

[127] *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581 (5th Cir. 2006).

[128] *Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 342, 345 (Tex. App. 2015).

[129] *See* (Doc. 263), Defendants' Brief, at pp. 22 - 30.

[130] *Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989) (*quoting Morrow v. Dillard*, 580 F.2d 1284, 1290 (5th Cir. 1978)) (*quoting Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1320 (5th Cir. 1978)).

[131] (Doc. 21), at 2. (Emphasis added).

not unduly discriminatory."[132] In fact, the Background section of Defendants' brief is entitled, "The Multi-State Entergy Electrical System,"[133] and in another section Defendants argue, "[Congress] recognized that the business of generating, transmitting, and selling electricity at wholesale *inherently affects customers in multiple states*."[134]

Defendants thus ignore the *Browning* rule which prohibits reconsideration of matters "decided by necessary implication". Defendants repeatedly raised the *exact same* argument or "matter" regarding the multi-state nature of their System Agreement in their Motions for Judgment on the Pleadings, which arguments were denied by Judge Wingate by implication.[135] In addition, all three decisions that Defendants claim Judge Wingate did not consider were decided *prior to* his rulings on the Motions for Judgment on Pleadings.[136] Consequently, Defendants motion is an improper collateral attack on the Court's prior rulings.

## C.   ALTERNATIVELY, THE STATE'S CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW

### 1.   A Review of the Law and Jurisprudence Reveals FERC has no Jurisdiction

Defendants do not argue that complete preemption applies in this case. The only issue, then, is whether there is conflict preemption which exists when it is shown that compliance with both state and federal law is impossible, or where the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[137] It bears mentioning that

---

[132] *Id.*, at 3. (Emphasis added).
[133] *Id.*, at 5.
[134] *Id.* (Emphasis added).
[135] *See* (Doc. 21), Memorandum Brief in Support of Motions for Judgment on the Pleadings, at p. 36, fn. 14.
[136] *See* (Doc. 85), dated September 21, 2016, (Doc. 86), dated September 28, 2016.
[137] *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. ___ , 135 S.Ct. 1591, 1595 (2015) (*quoting, California v. ARC America Corp.*, 490 U.S. 93, 100, 101 (1989)).

Defendants have had 10 years to bring a claim at FERC (which they argue in their Preemption MSJ has *exclusive* jurisdiction),[138] but chose not to do so.[139]

The Complaint alleges, and the evidence shows, EMI ran its legacy generating units too much, given the availability of cheaper power in the wholesale market.[140] Defendants target their attack in their Preemption MSJ at the Pool purchases and hardly mention the State's claims regarding EMI's overuse of its legacy generation. This is not inconsequential, because FERC does not have jurisdiction over the ownership and operation of a utility's generating facilities.[141] Thus, the State's claims that EMI ran its inefficient legacy generating units too much **are expressly carved out of the scope of the Federal Power Act.**[142] "So while the federal government has exclusive control over interstate rates and transmission, the '[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States.'"[143] For example, in the seminal case of *Otter Tail Power Co. v. U.S.*, the United States sued Otter Tail Power Company in civil antitrust, and the district court found that its "consistent refusals to wholesale or wheel power to its municipal customers constituted illegal monopolization."[144] In affirming that finding, the U.S. Supreme Court

---

[138] *See, e.g.,* (Doc. 263), Defendants' Brief, at 3.

[139] *Metro. Edison Co. v. Pennsylvania Pub. Util. Comm'n*, 767 F.3d 335, 366 (3d Cir. 2014) (denying utilities' claims that PUC decision was preempted by the FPA and FERC's jurisdiction and noting Here, the Companies have even less reason to complain, as they affirmatively chose to litigate their case through the state system. **They admit that "[t]here was nothing preventing [them] from going to FERC"** and that, had they obtained a favorable ruling from FERC, they could have enforced it. In other words, the Companies chose their forum for litigation and lost. (Bolding added) (internal citations omitted).

[140] *See, e.g.,* (Doc. 135), First Amended Complaint, at ¶¶4, 6, 51-53, and 65.

[141] The Federal Power Act provides that the "[Federal Energy Regulatory] Commission … *shall not have jurisdiction … over facilities used for the generation of electric energy* …" 16 U.S.C. 824(b)(1). (Emphasis and bolding added).

[142] *See* (Doc. 135), First Amended Complaint, at ¶¶51-53.

[143] *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 247 (3d Cir. 2014), *cert. denied*, 136 S.Ct. 1728 (2016) (*quoting Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 205, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)).

[144] *Otter Tail Power Co. v. United States*, 410 U.S. 366, 373, 93 S. Ct. 1022, 1027, 35 L. Ed. 2d 359 (1973). *See also, Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F.Supp.2d 631, 641 (S.D. W.Va. 2005), *on reconsideration in part,* 521 F.Supp.2d 537 (S.D. W.Va. 2007) (relying on *Otter Tail* and finding neither Filed Rate Doctrine, nor preemption under the Natural Gas Act, barred state antitrust claims).

held, "There is nothing in the legislative history which reveals a purpose [of the FPA] to insulate electric power companies from the operation of the antitrust laws. To the contrary, the history of Part II of the Federal Power Act indicates an overriding policy of maintaining competition to the maximum extent possible consistent with the public interest."[145]

The lynchpin of federal preemption under the Federal Power Act is whether the asserted claim attacks the reasonableness of the rate or service approved by FERC.[146] If the claim does not attack either the reasonableness of the rate or service, it may proceed under state law in areas such as state antitrust laws and unfair practices statutes.[147] Likewise, it has been held that, "where Defendant argue[d] that [the Attorney General's] claims arise under federal law because they 'cannot be judged without consideration of the ... tariffs [filed with the Federal Energy Regulatory Commission ('FERC')]," **the claims were not preempted,** because "[Plaintiff] seeks to use ... state statute[s], namely California's Unfair Competition Law [and the California Commodity Law], as ... vehicle[s] to hold Defendant[ ] liable for [market manipulation and gaming strategies]," and that "[w]hether Plaintiff's alleged activities underlying these state claims also violated the FPA or a federal tariff is irrelevant since Plaintiff, as master of its complaint, chose to allege that Defendant engaged in conduct that was unlawful under state law, instead of alleging violations of federal law."[148] That the State's claims touch upon the ESA and wholesale power market does not render such claims preempted.[149]

---

[145] *Otter Tail Power Co. v. United States*, 410 U.S. at 373–74, 93 S.Ct. at 1028.

[146] *Nantahala Power & Light Company v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 373-374, 108 S.Ct. 2428, 2440, 101 L.Ed.2d 322 (1988) ("*MP&L*"); *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003).

[147] *See, e.g., California Retail Natural Gas and Power Antitrust Litigation*, 170 F.Supp.2d at 1058 (holding that the Federal Power Act did *not* preempt the claims of the class based on defendants' conspiratorial, anticompetitive conduct and unfair behavior within the definitions of California's Cartwright Act and Unfair Trade Practices Act).

[148] *California, ex rel. Lockyear v. Powerex Corp.*, 2005 WL 2030718, *4 and *6, respectively (E.D.Cal. 2005). (Citations omitted) (bracketing in original)).

[149] *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (finding that federal antitrust claims were not preempted by the FPA); *Hendricks v. Dynegy Power Marketing, Inc.*, 160 F.Supp.2d 1155, 1162-63 (S.D. Cal. 2001) (holding that the class plaintiffs' California Cartwright Act (conspiracy and

As the U.S. Supreme Court recently held, wholesale and retail electricity markets, subject to federal (wholesale) and state (retail) regulation, cannot be "hermetically sealed" from one another.[150]

Even though it primarily concerned abstention, in *NOPSI III*,[151] the U.S. Supreme Court considered ENO's (f/k/a NOPSI) federal preemption argument and held, **"we do not have to decide the matter here, since the proceeding and order at issue do not meet that description."**[152] The court said the state *"has not sought directly to regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI's agreement to participate in Grand Gulf 1 in the first place."*[153] To the contrary, the court found the state, in disallowing over $100 million in ENO's costs, "has examined the prudence of NOPSI's failure … to diversify its supply portfolio, and that finding that failure negligent, it has taken the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences."[154] The court concluded after this review that, "**Nothing in this is directly or even indirectly foreclosed by the federal statute, the regulations implementing it, or the case law applying it.**"[155]

Despite Defendants' best efforts to sweep it under the rug,[156] the Supreme Court's decision in *NOPSI III* is particularly important, because (a) it was decided by the Supreme Court ***after*** *MP&L,*

---

restraint of trade) claims were not preempted by the FPA); *California, ex rel. Lockyear v. Powerex Corp.*, 2005 WL 2030718, *3-4 (E.D.Cal. 2005); *citing, Beneficial Nat'l. Bank v. Anderson*, 539 U.S. 1, 8, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003); *California Retail Natural Gas and Electricity Antitrust Litigation*, 170 F.Supp.2d 1052, 1057 (D.Nev. 2001) (finding "no such complete preemption language appears in . . . the Federal Power Act").

[150] *FERC v. Electric Power Supply Association*, 136 S.Ct. 760, 776 (2016).

[151] *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 365, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("*NOPSI III*").

[152] *NOPSI III*, 491 U.S. at 367. (Bolding added).

[153] *Id.* (Emphasis added).

[154] *Id.*

[155] *Id.* (Bolding added).

[156] Defendants' argument that *NOPSI III* is not influential because it is not a "filed-rate case" is a classic example of the entreaty to "pay no attention to the man behind the curtain". *See* (Doc. 263), Defendants' Brief, at p. 29.

*Nantahala, Narragansett, Arkansas Louisiana Gas Co., Miss. Indus.,*[157] *Middle S. Servs., Inc.,*[158] *Monongahela Power,*[159] *Pa. Power & Light,*[160] *AEP,* and *Appalachian,* (b) the U nit Power Sales Agreement ("UPSA") at issue dictated *specific amounts* of capacity each EOC was *required to purchase* from the Grand Gulf unit, (c) the UPSA – like the ESA – is a FERC-approved, multi-state, multi-company cost-sharing arrangement, and (d) the ESA – unlike the UPSA – ***does not*** *specify or require* that any of the EOCs purchase any specific amount of energy from the Entergy System Pool.

On remand, in *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, ("*NOPSI IV*"),[161] the Fifth Circuit found that, although *Pike County* did not apply to the facts of the case, **the City Council's order was not preempted** because (a) FERC had not acted to determine the prudence of ENO's failure to reduce its losses caused by the substantial amount of Grand Gulf power it was now required to purchase, and (b) the FPA did *not preempt* the City Council's ordinance that reduced ENO's recovery from its customers as a result of its failure to cut its losses caused by the UPSA.[162] If the City Council's order in *NOPSI III* and *NOPSI IV* was not preempted, the Complaint here cannot be preempted.

## 2. FERC, Itself, has Repeatedly held a State Challenge like the Complaint does not fall under its Subject Matter Jurisdiction

A regulatory agency's determination of the limits of its subject matter jurisdiction – even if emanating from federal law – are to be given appropriate weight as long as they do not violate the plain language of the law and are reasonable.[163] FERC has consistently confirmed it does not have

---

[157] *Miss. Indus. v. FERC,* 808 F.2d 1525 (D.C. Cir. 1987).
[158] *Middle S. Servs., Inc.,* 20 FERC ¶63,030 (1985), *vacated in part on other grds. on reh'g.,* 822 F.2d 1104 (D.C. Cir. 1987).
[159] *Monongahela Power Co.,* 39 FERC ¶61,350 (1987).
[160] *Pa. Power & Light,* 23 FERC ¶61,006 (1983).
[161] *New Orleans Public Service, Inc. v. Council of the City of New Orleans,* 911 F.2d 993 (5th Cir. 1990), *cert. granted,* 499 U.S. 974, 111 S.Ct. 1617, 113 L.Ed.2d 715 (1991), *cert. dismissed,* 502 U.S. 954, 112 S.Ct. 411, 116 L.Ed.2d 357 (1991).
[162] *NOPSI IV,* 911 F.2d at 1001-02.
[163] *MP&L,* 487 U.S. at 381. (String citation omitted).

exclusive subject matter jurisdiction over claims involving a choice among FERC-approved rates. For example, FERC held, "[It] has consistently recognized that wholesale ratemaking does not, as a general matter, determine whether a purchaser has prudently chosen from among available supply options."[164] FERC also ruled, "We do not view our responsibilities under the Federal Power Act as including a determination that the purchaser has purchased wisely or has made the best deal available."[165] FERC has also consistently declined to exercise jurisdiction over contractual disputes between a wholesale seller and purchaser that don't attack rates.[166] So have the courts.[167]

In fact, FERC maintains this stance in its *amici curiae* brief submitted in *Village of Old Mill Creek, et al. v. Star, et al.* ("*Star*"),[168] supporting the state of Illinois' law ordering retail electric utilities to pay incentives to certain customers who were selected by the state as "zero emission facilities", which law was claimed to be preempted under the Federal Power Act. In its brief, FERC asserts "**The Illinois program is not preempted**,"[169] because, "the Illinois [program] is 'targeted' at an attribute of generation resources over which Illinois has regulatory authority; any spillover, indirect effect on wholesale electricity markets over which the Commission has authority does not warrant

[164] *Cent. Vt. Pub. Serv. Corp.*, 84 FERC ¶ 61,194 at 61,975 (1998).
[165] *Pa. Power & Light Co.*, 23 FERC ¶ 61,325 at 61,716 (1983). *See also*, FERC Order No. 888-B, 81 FERC ¶ 61,248 at 62,081 (1997); *Arkansas-Louisiana Gas Company v. Hall*, 7 FERC ¶ 61,175 at 61,322 (1979).
[166] *Water and Power Company of the City of Glendale*, 113 FERC ¶ 61,285 at 62,153 (2005), *quoting Kentucky Utilities Company*, 110 FERC ¶ 61,285 at 62,103 (2005) (finding that "because [the purchaser's] complaint 'only seeks enforcement of an existing contract, and not the setting of a new just and reasonable rate,' the case does not fall within the Commission's exclusive jurisdiction."). *See also*, *Portland General Electric*, 72 FERC ¶ 61,109 (1995); *California Department of Water Resources*, 121 FERC ¶ 61,196 (2007); *Constellation Energy*, 119 FERC ¶ 61,292 (2007).
[167] *See, e.g. Pan American Petroleum Corp. v. Superior Court of Delaware*, 366 U.S. 656 (1960); *Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1471-72 (5th Cir. 1987); *In re Mirant Corp.*, 378 F.3d 511, 519 (5th Cir. 2004) (holding that the "FPA *does not provide* FERC with exclusive jurisdiction over the breach of a FERC approved contract. While the FPA does preempt breach of contract claims *that challenge a filed rate*, district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale." (*citing Gulf States Utils. Co.*, 824 F.2d at 1471-73; *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 579, n. 9, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (emphasis added)).
[168] Ex. N, Docket Nos. 17-2433 and 17-2445, United States Court of Appeals for the Seventh Circuit.
[169] Ex. N, at 7. (Bolding added).

preemption,"[170] because the FPA "**preserves the traditional authority of States … over 'facilities used for the generation' of electricity.**"[171]

### 3. The Principle Underlying the *Pike County* Exception Applies Here

Defendants go to great lengths in their Preemption MSJ in their efforts to claim the *Pike County* exception in inapplicable to this case. Under the "*Pike County* exception"[172] to the "*Narrangasset Doctrine*",[173] **it is solely within the purview of the states to decide whether an electric utility acted lawfully in choosing among various energy supply options, when each such option is priced at FERC-approved rates.** The U.S. Supreme Court has expressly recognized, with approval, the *Pike County* exception. In *Nantahala Power & Light Company v. Thornburg*,[174] the court acknowledged that *Pike County* created an exception to preemption under the Federal Power Act, stating, "Without deciding the issue, we may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive [by the state] if lower cost power is available elsewhere, even though the higher cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price*."[175] The Third Circuit echoed this sentiment in *Kentucky West Virginia Gas Co., v. Pennsylvania Public Utility Commission*,[176] in which it held that, although *Nantahala* court ruled "a state cannot independently pass upon the reasonableness of a wholesale rate on file with FERC," **it in no way undermines the long-standing rule that a state may inquire into whether a utility**

---

[170] *Id.* (*citing Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015)). *See also,* FERC Order No. 888-B, 81 FERC ¶ 61,248 at 62,081 (1997) (holding, "[I]t is likewise clear that the Commission's jurisdiction to consider disputes arising under jurisdictional tariffs does not as a matter of law preclude state courts from also entertaining such disputes in the appropriate circumstances.").

[171] Ex. N, at 7-8. (*citing* 16 U.S.C. § 824(b)(1); *Hughes v. Talen Energy Marketing, L.L.C.*, 136 S.Ct. 1288, 1292 (2016)) (Bolding added).

[172] *Pike County Light & Power Company v. Pennsylvania Public Utility Commission*, 465 A.2d 735 (Pa. 1983).

[173] *Narragansett Electric Company v. Burke*, 119 R.I. 559, 381 A.2d 1358 (1977), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 63 (1978).

[174] *Nantahala Power & Light Company v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

[175] *Id.*, 476 U.S. at 972. (Emphasis in original).

[176] *Kentucky West Virginia Gas Co., v. Pennsylvania Public Utility Commission*, 837 F.2d 600, 609 (3rd Cir.); *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988).

reasonably chose to pay **"the FERC-approved wholesale rate of one source, as opposed to the lower [FERC-approved] rate of another source."**[177] While the United States Supreme Court has not specifically adopted the *Pike County* exception, it has **expressly assumed it exists**.[178]

Defendants also misstate the holding of *Pike County* by claiming the court in that case ruled that "it is for a state public service commission" rather than FERC to decide whether "a standalone utility's" choice among several FERC-approved rates was prudent.[179] In truth, the *Pike County* court made no such findings. While *Pike County* involved a state utility commission's order, nothing in the holding limits the exception to FERC jurisdiction established therein solely to state utility commission actions. Nor was the court's holding tied in any way to the fact that the utility at issue was a "standalone utility".

The court in *Gulf States Utilities Co. v. Pub. Util. Comm'n of Texas*[180] – a case relied upon by Defendants – held similarly, finding, *"Mississippi Power & Light* and *Nantahala* ... involved FERC-mandated allocations of power; the utility companies had no choice but to purchase the quantities that they were allocated. In our present situation, FERC made no allocations; Gulf States was under no obligation to purchase any quantity of power from Southern.[181]

As Defendants concede, the issue before FERC in *AEP*[182] was "KEPCO's prudence in light of the availability of alternative power supplies in *entering into* the Rockport unit power sales

---

[177] *See also, MP&L*, 487 U.S. at 373-374 (finding, in a case addressing preemption with respect to Entergy's UPSA that the *state*, not FERC, has power to find "it might well be unreasonable for a utility to purchase unnecessary quantities of high-cost power, even at FERC-approved rates, if it had the legal right to refuse to buy that power.")

[178] *See MP&L*, 487 U.S. at 373-74, and *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 972, 90 L.Ed.2d 943, 106 S.Ct. 2349 (1986).

[179] (Doc. 263), Defendants' Brief, at p. 3.

[180] *Gulf States Utilities Co. v. Pub. Util. Comm'n of Texas,* 841 S.W.2d 459 (Tex. App. 1992), *writ denied* (1993).

[181] *Id.*, 841 S.W.2d at 469. (Internal citations omitted).

[182] *AEP Generating Co.,* 36 FERC ¶ 61,226 (Aug. 20, 1986) ("*AEP*").

agreement,"[183] rendering it inapposite. Furthermore, in a subsequent order on rehearing in *AEP*,

FERC clarified that *Pike County's* didn't apply to the facts of that case because, "***KEPCO cannot***

***exercise the choice*** *between power available under the Rockport unit power sales agreement and power "purchased"*

*pursuant to the capacity equalization provisions of the Interconnection Agreement.* ***Because the essence of the***

***Pike County inquiry is whether a particular choice was wise, the lack of choice here makes***

***such inquiry an empty one***.[184]

Here, EMI *had* the choice to make off-system purchases of energy under Section 4.02 of the

ESA (with the consent of or under conditions specified by the Operating Committee) which would

have reduced its reliance on its legacy generation and Entergy System Pool purchases. Further, the

ESA does not dictate that EMI must purchase any specified amount of energy from the Pool. Finally,

EMI could have exited the ESA sooner. Essentially, *AEP* is no different than *ELI*[185] where the LPSC

challenged the components of the MSS-1 rate. Here, the State does not challenge EMI's decision to

enter the ESA; nor does it challenge any rate in the ESA.

Defendants' reliance on *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*,[186] is likewise

misplaced. In *AEP Tex. N. Co.*, the court made clear that the agreement at issue (the System

Integration Agreement ("SIA") among the utility members of AEP which was approved by FERC)

*mandated* that profits from sales of excess capacity be divided among the AEP system members,

including AEP Texas North, in a specified manner.[187] The Public Utility Commission of Texas

---

[183] (Doc. 263), Defendants' Brief, at p. 26, *quoting AEP,* 36 FERC ¶ 61,226, 61,549 (Aug. 20, 1986). (Emphasis added).

[184] *AEP Generating Co. Kentucky Power Co.,* 39 FERC ¶ 61,158, 61,630 (May 13, 1987) (*citing Appalachian Power Co. v. Public Service Commission of West Virginia*, 812 F.2d 898, 903 (4th Cir. 1987).). (Emphasis and bolding added) (footnote omitted).

[185] *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39 (2003).

[186] 473 F.3d 581 (5th Cir. 2006).

[187] "The SIA then *mandates* that from sales made by all, AEPSC will distribute the TMRs [profits] between two zones in the AEP system, according to a specific formula." *AEP Texas N. Co.*, 473 F.3d at 583. (Emphasis added).

determined that the profits under the SIA should be calculated in a way that differed from the specific method mandated by the SIA, resulting in AEP Texas North not recovering from its retail ratepayers a certain portion of the profits.[188] The court held that, "[t]he states are bound to implement a FERC-approved agreement."[189]

*Gulf States*[190] actually supports the State's arguments herein. Defendants neglect to point out to this Court that the court in *Gulf States* held FERC's jurisdiction may be invoked "to review the prudence of a pool member's *participation* in a pooling arrangement,"[191] thus, it is also inapposite. Plus, the issue before the court in *Gulf States* did not involve a multi-state integrated system (Gulf States and Southern Companies were not affiliates or members of an interstate agreement), therefore, the statements on which Defendants rely were pure dicta. In any event, the court held state's review of the FERC-approved contract at issue was not preempted.[192]

Similarly, Defendants' place too much emphasis on *Jenkins*.[193] First, the substantive law at issue in *Jenkins* was the "Texas Theft Liability Act", which is obviously not the substantive law at issue in this matter. Second, in would be simply incorrect to apply the Texas appellate court's decision to the claims asserted by the State in this suit, because it is based on *ELI*,[194] which is inapposite. As previously mentioned, in *ELI*, the U.S. Supreme Court held the LPSC inappropriately refused to allow the utility to recover costs directly allocated to it under the MSS-1 schedule to the ESA. Here, to the contrary, the State does not argue that EMI should be denied recovery of any charges associated with the MSS-3 rate to the ESA; rather, like the City Council in *NOPSI III* and *NOPSI IV*, the State asserts EMI is liable for not otherwise reducing its cost of power to its customers by lowering its need for the Pool

---

[188] *Id.*, 473 F.3d at 583-84.
[189] *Id.*, 473 F.3d at 585.
[190] *Gulf States Utilities Co.*, 841 S.W.2d 459 (Tex. App. 1992), *writ denied* (1993).
[191] *Id.*, 841 S.W.2d at 468 (*citing, AEP*). (Emphasis added).
[192] *Id.*, 841 S.W.2d at 468-69.
[193] *Entergy Corp. v. Jenkins*, 469 S.W.3d 330 (Tx. App. 2015).
[194] *See id.*, 469 S.W.3d at 340-42. (*Relying* on *ELI*, 539 U.S. 39 (2003)).

energy (charged at the MSS-3 rate) and running its inefficient legacy generating units at lower levels. Further, the Texas appellate court was simply incorrect in finding that the preemption analysis under the Natural Gas Act and the Federal Power Act are dissimilar (and, consequently, that *Oneok* did not apply since it involved the NGA and not the FPA).[195] Finally, *Jenkins* has only been cited in one case, a Texas appellate court case, for its holding regarding law of the case under Texas law.[196]

*Appalachian*[197] is so factually dissimilar as to be of no use here. There, the state utility commission initially found that it could not consider the Transmission Equalization Agreement ("TEA") among Appalachian Power and its affiliates because such was preempted by the FPA, however, the utility commission reversed its position and ruled Appalachian Power should have sought its approval before entering the TEA and disallowed $1.6 million of costs incurred under the TEA.[198] The state commission asserted it could decide whether Appalachian Power was prudent "when it signed the agreement."[199] The court held that "the prudence inquiry the PSC wishes to make is not different from the FERC inquiry into the justness and reasonableness of the TEA,"[200] and that "FERC and the PSC would be making identical, independent inquiries regarding the merits of the TEA…"[201] The court went on to find *Pike County* inapplicable because, "there is no alternative source of power for [Appalachian Power] to choose other than that available through the AEP system," and the "lack of choice here makes such an inquiry an empty one."[202] The court also distinguished *Pike County* by reasoning that the TEA (a transmission cost-sharing agreement) "has no distinct 'buyer' and

---

[195] *See id.,* 469 S.W.3d at 344-45. See, e.g., *Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1471-72 (5th Cir. 1987) (*citing Arkansas Louisiana Gas Co., supra*) (holding that, with respect to preemption, the NGA and FPA **"have nearly identical provisions**, and we may rely on decisions interpreting the relevant portions of either statute.")

[196] *See Totz v. Owens*, 2017 WL 2178890, * 4 (Tx. App. 2017). (Unpublished).

[197] *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898 (4th Cir. 1987).

[198] *Id.*, 812 F.2d at 901.

[199] *Id.*

[200] *Id.*, 812 F.2d at 903.

[201] *Id.*, 812 F.2d at 905.

[202] *Id.*, 812 F.2d at 903.

'seller' of energy."[203]

**Nowhere in FERC's orders or the cases cited by Defendants is there a holding that *Pike County* categorically does not apply in a pool situation.** Thus, very much like *Pike County*, *NOPSI, III*, and *NOPSI, IV*, the State's claims here do not allege any violation of federal law or challenge a FERC-approved rate, thus the State's claims are not preempted.

### 4. There is No Evidence, much less Undisputed Evidence, that the State's Damages Theory would harm Entergy Operating Companies in other States

Defendants claim that there is "undisputed evidence that Plaintiff's theory would harm Entergy System utilities in other states,"[204] is patently false. Plaintiff alleges that EMI should have made additional purchases from third parties just as Frank Gallaher, as the corporate representative for EMI and Entergy Corporation, testified that EMI did twice by entering long-term PPAs with third parties through its rights under Section 4.02 of the Entergy System Agreement.[205]

### a. Defendants' Claims Regarding "State vs. State" Conflicts Rest on Rank Speculation and a Misstatement of Plaintiff's Claims

The fatal flaw in Defendants' argument is borne out by their own brief. Defendants claim that, "Plaintiff's theory retroactively changes EMI's hourly stack of resources by increasing EMI's own account purchases and decreasing EMI's reliance on energy generated by its legacy units and energy allocated from the Exchange," which they claim "necessarily changes the hourly cost allocation under MSS-3."[206] Defendants conflate Plaintiff's liability theory with its damages theory. The liability is established by EMI engaging in anticompetitive conduct and refusing to purchase alternative, cheaper

---

[203] *Id. Appalachian Power* was distinguished in *State, ex rel. Utilities Com'n v. Carolina Power & Light Co.*, 614 S.E.2d 281, 289-90 (N.C. 2005) (holding *Appalachian Power* didn't apply because "unlike the West Virginia Commission, NCUC is not claiming through its 10 July 2002 order [requiring a pre-sale review of proposed wholesale contract between the utility and a wholesale customer] the authority to overrule or second-guess an agreement filed with or approved by FERC and subject to FERC's jurisdiction.").

[204] (Doc. 263), Defendants' Brief, at p. 4.

[205] *See* Ex. I, Gallaher Deposition, at 6:6 – 8:21, 9:14 – 10:1, and 18:2 – 20:10.

[206] (Doc. 263), Defendants' Brief, at pp. 31-32.

sources of power available to it. The damages analysis is necessarily backwards-looking, but that does not equate with "chang[ing] the hourly cost allocation under MSS-3" of the ESA. In other words, Plaintiff need not (nor is it possible to) recreate hour-by-hour, what would have happened in the past absent the wrongful conduct.

Mr. Hurstell's (Defendants' chief apologist) claims that harm would have befallen the other EOCs as a result of the State's theories are unsupported, speculative and logically flawed. Defendants quote Mr. Hurstell when he postulates that, "EGSI in Texas and ELL in Louisiana, 'with fewer block purchases in their respective 'stacks,' … must either buy more of the higher-priced energy from the MSS-3 Exchange (**if they are short** as a result of the decreases in block purchases) or sell less energy to the MSS-3 Exchange (**if they have excess energy** even after the decrease in block purchases).'"[207] Aside from the embedded speculation in the foregoing argument concerning whether EGSL (f/k/a EGSI) and ELL may or may not have been long or short, Defendants also impliedly assert that purchases would be taken away from those EOCs by claiming that they would have "fewer block purchases in their respective 'stacks'". There is no evidence that, under the State's claims and theories, other EOCs would have had block purchases taken away from them; rather, the claims plainly allege EMI should have (alone or with other EOCs) acquired *additional purchases* of third-party power. Next, Defendants assume, on March 22, 2006, that an actual JAP is *reallocated* by Mr. Hurstell to EMI solely, and then to EGSL, solely.[208] But this is not Plaintiff's theory at all. Nowhere does Plaintiff suggest traveling back in time and *reallocating* resources among the EOCs. Plaintiff's theory doesn't "borrow from Peter to pay Paul", as Defendants incorrectly suggest.

Perhaps recognizing the absurdity of the prior examples, Mr. Hurstell then attempts –

---

[207] (Doc. 263), Defendants' Brief, at p. 32, quoting Hurstell's Report (Doc. 262-6). (Underscoring and bolding added).
[208] (Doc. 263), Defendants' Brief, at p. 31, quoting Ex. F, Hurstell's Report, at p. 169.

incorrectly – to address Plaintiff's model, based on EMI making additional purchases of power.[209] His second attempt is just as defective as his first, however, because he bases it on the mistaken belief that Plaintiff suggests the determination of whether such an additional purchase should be a JAP or Own Account Purchase "should always be resolved in favor of an own account purchase by EMI…"[210] First, as the evidence shows, JAPs and Own Account Purchases (ICPs) were commonly divvied up among 1, 2, 3, 4, 5, and 6 of the EOCs.[211] Dr. DeRamus goes even further and shows that such Own Account Purchases – labeled ICPs in the ISB – occurred with frequency and were entered by 1, 2, 3, 4, 5 and 6 of the EOCs in varying combinations, as displayed below.[212]

**Table 18: Entergy purchases by purchase category and number of EOCs**

| Purchase category | Number of operating companies | Total MWh purchased |
|---|---|---|
| Individual Company Purchase ("ICP") | 1 | 48,779,004 |
| | 2 | 20,878,838 |
| | 3 | 2,622,800 |
| | 4 | 34,701,240 |
| | 5 | 785,930 |
| | 6 | 156,647 |
| Joint Account Purchase ("JAP") | 1 | 22,915 |
| | 2 | 31,230 |
| | 3 | 86,134 |
| | 4 | 9,471,261 |
| | 5 | 177,078,285 |
| | 6 | 66,515,273 |
| Overall | | 361,129,557 |

The evidence shows that the majority of Own Account Purchases were made on behalf of 2, 3, and 4 EOCs. In addition, Joint Account Purchases – instead of being assigned to *all* of the Entergy Operating Companies (as Defendants claim must occur) – were assigned to 1, 2, 3, 4, 5 and 6 Operating Companies.[213] The undisputed evidence reveals Defendants exercised far greater flexibility

---

[209] *See* (Doc. 263), Defendants' Brief, at p. 32.

[210] *Id.*

[211] *See* Exh. A, DeRamus Declaration, Addendum 2, DeRamus Rebuttal Report, at ¶98, pp. 58-59 and Table 18.

[212] *Id.*

[213] *Id.*

under the ESA to assign the costs and benefits of Own Account Purchases to one or more EOCs than Defendants would have this Court believe. Plaintiff's theory never suggests a change to this structure.[214]

Second, Mr. Hurstell's example rests on a single statement, taken out of context, from the deposition of Mr. Copeland, but even that statement is equivocal: "There **may** have been some companies that … **might** have had some losses."[215] When put into context, Mr. Copeland did not – in any fashion – state that the other EOCs would, *in fact*, have experienced higher costs as a result of EMI's additional purchases. In the exchange immediately preceding the one statement Defendants cherry-picked from the deposition, Mr. Copeland explains that there "*might* be places in certain load pockets … that you *might* could see a cost increase,"[216] depending on how the units in those areas would have run, and that Entergy "you *might* end up having some units that might be operating inefficiently" but that, in a construct where EMI's legacy units were turned off (as they are assumed to be under Plaintiff's damages theory), these other inefficient units may operate differently, meaning, "Maybe they wouldn't run as much or maybe they wouldn't have the commitment features that they had to serve, you know, from a pool-based dispatch."[217]

More importantly, Defendants attempt to mislead this Court by implying Mr. Copeland modeled Dr. DeRamus' damages model, when that is plainly false.[218] Mr. Copeland ran the PROMOD

---

[214] *See id.*, at ¶116, pp. 66-67 ("I expect that absent the conduct at issue, Entergy would have entered into a **portfolio of purchases** from the numerous third-party suppliers that owned a "glut" of available generating capacity in Entergy's BAA (or in adjacent control areas), under a variety of purchase terms, conditions, and durations, *similar to the variety of purchase durations that I observe in Entergy's actual purchases.* Included in these purchases would be some amount of shorter term purchases, such as those offers made to Entergy, but rejected by Entergy, as recorded in the TRADES database."). (Bolding added).

[215] (Doc. 263), Defendants' Brief, at p. 34, quoting Copeland Deposition, at 140:10 – 20. (Bolding added).

[216] Ex. P, Copeland deposition, at 138:5-11. (Emphasis added).

[217] *Id.*, at 139:12-14 and 22-25. (Emphasis added).

[218] *See, e.g., id.,* at 26:5 – 28:3. (Mr. Copeland didn't speak to Dr. DeRamus about his report, and Dr. DeRamus didn't instruct Mr. Copeland on the scope of his work with PROMOD; rather, Mr. Copeland modeled additional purchases at locations he chose, with price assumptions provided by Dr. Yang.) The fact that Mr. Copeland didn't model Dr. DeRamus' damages theory is borne out by the fact that the savings PROMOD estimated for EMI (*see* (Doc. 263), at p. 33, Figure JPH-51) are not the damages Dr. DeRamus calculated; rather,

model to determine – as a stress test[219] – how much power could be imported without violating the reliability of the system.[220] The analysis showed that, after modeling the hypothetical power purchases of 1,723 MW per hour and 5,617 MW per hour, respectively (which are substantially larger than the additional purchases needed to fully displace the damages),[221] the unserved energy (reliability metric) changed by only .0007%, a miniscule amount, and production costs were incidentally lowered on the System.[222] Mr. Copeland did *not* run PROMOD to determine the EOCs' relative production costs that might result from his modeled transactions.[223] As his report makes clear, "My analysis was never intended to be … a full economic analysis…"[224]

In any event, simply showing that one EOC's production costs *may* have increased, were EMI to have made an Own Account Purchase (which Mr. Copeland's PROMOD runs were never designed to establish), would not automatically have meant the Operating Committee would have disallowed such Own Account Purchase. Defendants show three years' worth of the production cost output of the PROMOD model.[225] EMI saves a total of $282 million in 2006, whereas all of the other EOCs, *combined*, experience a total increase in 2006 of $189 million. Defendants cannot claim there is no issue of fact regarding whether the Operating Committee would have allowed EMI (one of the smallest EOCs on the System at 10%) to enter the Own Account Purchase, which would have saved it nearly

---

they are the output report from PROMOD, which, again was not run to determine the economics of the massive transactions Mr. Copeland was modeling.

[219] *See, e.g., id.,* at 110:22-111:15.

[220] *See, e.g., id.,* at 212:7-15; 214:21-215:1. He also stated that PROMOD is used commonly because, "[I]t had this integration of generation and transmission together. It doesn't do just generation and overlay it on transmission. They are dynamically working together to make sure that the generators are not violating the transmission constraints."

[221] Recall that Dr. DeRamus, Plaintiff's antitrust and econometrics expert, estimated that, had EMI purchased, on average, **350 MW per hour** of third-party power, it could have fully displaced the output of all of its inefficient legacy generation and, on average, **198 MW per hour** of such power to fully displace its purchases of expensive Entergy System Pool Energy. *See* Ex. A, DeRamus Declaration, Addendum 1, DeRamus Initial Report, at ¶65, pp. 26-27, and ¶68, p. 27, respectively.

[222] *See, e.g., id.,* at 113:24-114:17; 121:14-19.

[223] *See, e.g., id.,* at 219:21-220:8.

[224] Ex. R, Copeland Declaration, Addendum 2, Copeland Rebuttal Report, at ¶3, p. 3.

[225] (Doc. 263), Defendants' Brief, at p. 33, and Figure JPH-51.

$100 million more than the other Operating Companies would have experienced in the way of cost increases on a combined basis.[226]

### b. Plaintiff does not Claim EMI had or needed "Unfettered Discretion" to make Own Account Purchases, but that does not Excuse its Absolute Failure to Comply with the Law

Defendants assert Plaintiff "assumed *arguendo* that EMI had unfettered discretion to make own account purchases."[227] Defendants' accusations ring hollow when viewed in light of the evidence.

First, the Complaint alleges EMI had the ability to make Own Account Purchases *pursuant to the ESA*,[228] which requires the Operating Committee's consent or specified conditions. Further, Dr. DeRamus made it abundantly clear that he never asserted EMI had "unfettered discretion" to make Own Account Purchases willy-nilly.[229] He explained that EMI could and should have pursued own account purchases for its own behalf or with other Entergy Operating Companies (just like the Big Rivers PPA). In addition, EMI, through and with ESI, acquired more than its responsibility ratio share (under the ESA) of PPAs with third parties. For example, EMI was assigned 33.33% of a one-year

---

[226] When discussing how Entergy would divvy up a long-term PPA among the EOCs, Anthony Walz testified that, "there were a number of factors that we looked at, primarily centered around load shape requirements of each operating company … [and] We'd consider whether or not, in addition, it created some sort of **significant change** in relative production cost, which we were sensitive to." Ex. O, Walz Deposition, at 29:9 – 23; *see also id.*, at 34:5 – 13. (Emphasis and bolding added). Since Defendants concede that not any change in production costs would skew an allocation of a PPA (*i.e.,* it must be "significant"), they cannot here assert that Own Account Purchases by EMI would never have been allowed due to some relative production cost changes.

[227] (Doc. 263), Defendants' Brief, at p. 35.

[228] *See, e.g.,* (Doc. 135), First Amended Complaint, at ¶38 (alleging, "The Entergy System Agreement expressly provides that any EOC, acting individually or in combination with one or more other EOCs, may make a purchase of electricity from a non-affiliate for its/their 'own account.' Entergy System Agreement, Sec. 4.02. Despite the ability to do so, EMI deliberately decided not to pursue less expensive non-affiliate supplies of electricity, and, instead, merely accepted transfers (which as previously mentioned, are not physical transfers of electricity, but rather accounting transactions) of the expensive ESX [pool] electricity.").

[229] *See* Exh. A, DeRamus Declaration, Addendum 2, DeRamus Rebuttal Report, at ¶5(g), ¶¶96-100. *See also,* Ex. C, DeRamus Deposition, at 109:1 – 111:21 (stating, *inter alia,* "So I can see lots of different ways in which EMI could have met its obligations to its customer by relying more on third-party power regardless of, you know, who actually entered into the contracts. A lot of the contracts, the third-party contracts here that Entergy actually is relying on are done – some of them are jointly with other companies, some of them are individual company purchases, others are joint account purchases."); *id.*, at 192:7 – 193:1 (acknowledging that Own Account Purchases "would be subject to the approval of the … operating committee.").

PPA with Duke Energy Trading and Marketing, L.L.C. ("Duke Energy"), along with EAI and EGSL.[230] EMI's responsibility ratio share during the relevant time period was roughly 10%.[231] So, by convincing the Entergy Operating Committee to assign it 33% of the Duke Energy PPA, EMI obtained more of this PPA than it otherwise would have under the ESA. Gaining more of a JAP than its 10% responsibility ratio share was not an isolated incident.[232]

Moreover, as the evidence further reveals, Defendants, EMI and Entergy Corporation, freely **admit** that EMI did **absolutely nothing** to attempt to acquire cheaper third-party power to provide the lowest reasonable cost of power to its customers.[233] In fact, EMI **did not have a single employee** for the entire relevant time period whose duties included searching the wholesale power market for potential supplies of power that may have been purchased from third parties in order to lower the cost of power to its ratepayers in Mississippi.[234] Whether EMI could and should have made *more* purchases from third parties – like the Big Rivers PPA, the Southern Company PPA and the Duke Energy PPA[235] – and/or pursued assignment to it of additional purchases through ICPs or JAPs to satisfy its duty to its customers in Mississippi to provide them with the lowest reasonable cost for power is a question of fact for the jury to decide.

Finally, Defendants argument that the Court should defer to FERC under primary jurisdiction is lacking. The only case cited by Defendants is one in which undersigned counsel represented the

---

[230] *See* Exh. H (Amendment to January 31, 2003 PPA with Duke Energy, dated June 16, 2003, at Bates Number ENT-00443889 - 00443930).

[231] *See* (Doc. 262-6), Ex. F to Preemption MSJ, Hurstell Report, at ¶253, p. 116.

[232] *See* Ex. S, excerpts of EMI's PMR filing (4Q 2004) indicating it was assigned 100% of the PPA with Attala (Central Mississippi Generating Company, at the time, an IPP) (ENT-00443949), 33% of the afore-mentioned PPA with Duke Energy (ENT-00443950), and 25% of the PPA with Cottonwood Energy Company, LP (Coral Power, LLC) (another IPP) (ENT-00443953).

[233] Ex. I, Gallaher Deposition, at 17:11 – 18:1. EMI had no process to search for cheaper power in the wholesale power market during the relevant time period.

[234] *Id.*, at 31:17-25.

[235] *See* Ex. G (Doc. 56-14) (Exh. H to State's Response to Motions for Judgment on the Pleadings (Operating Committee minutes approving 300 MW purchase from Big Rivers, "100 MW of which would be a company purchase of MP&L [n/k/a EMI], and the other 200 MW of which would be a System purchase.") *Id.*, at 3). *See also*, Ex. I, Gallaher Deposition, at 7:17 – 8:25, and 9:14 – 11:16.

plaintiff, *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*,[236] but in that case, the defendants sought deference to FERC because the plaintiff filed a FERC proceeding that the court described as "largely concern[ing] the same issues," that may have resolved the federal suit. The defendants, including Entergy Louisiana, LLC, moved for a stay based on primary jurisdiction which the district court granted, but the Fifth Circuit *reversed*.[237] Here, Defendants have had 10 years to approach FERC and have chosen not to do so. Their primary jurisdiction claim is untimely, waived and baseless.

## D.    THE LIABILITY THEORY IN THE COMPLAINT IS NOT PREEMPTED

Defendants argue in Point III of their memorandum brief that the State's suit should be dismissed. Defendants are wrong for all of the above and foregoing reasons and law.[238] In addition, their claims regarding MPSC jurisdiction are legally and factually deficient. The Attorney General is singularly authorized to seek injunctive relief for violations of § 75-24-5(1). Similarly, the Attorney General is *solely authorized* to seek civil penalties on behalf of the state for violations of § 75-24-5(1).[239]

### 1.    EMI's Charges Flowed through the FAC to its Customers were Never Approved, and thus Never Rose to the Level of a "Filed Rate"

Defendants assert Plaintiff's claim is that, "EMI's MPSC-approved rates were excessive,"[240] that, "Plaintiff's sole theory of damages is based upon the difference between the costs EMI actually incurred and the costs Plaintiff says EMI would have incurred had it purchased the additional amounts of energy from IPPs that Plaintiff claims should have been purchased,"[241] and "EMI charged its retail customers only rates that had been approved by the MPSC."[242]  To the contrary, Plaintiff claims that

---

[236] 810 F.3d 299 (5th Cir. 2016).

[237] *Id.*, 810 F.3d at 313.

[238] Defendants argue that there is no evidence they acted "knowing and willfully", but all of the State's evidence points to the opposite conclusion.  *See* (Doc. 263), at p. 37. At a minimum, this is a question of fact for the jury to decide.

[239] *See* Miss Code Ann. § 75-24-19(1)(b).

[240] *Id.*, at p. 14.

[241] *Id.*, at p. 15.

[242] *Id.*, at p. 2.

EMI and the other Defendants manipulated and abused its rates, engaged in anticompetitive conduct and otherwise harmed its customers.[243] While the FAC *mechanism* (formula rate) may have been approved by the MPSC, EMI's cost items and excessive purchased power costs included in its FAC were never "approved" by the MPSC.[244] Likewise, the audit procedures employed were not designed to, nor did they, truly audit EMI's purchased power costs flowed through its FAC.[245] Approval of a mechanism does not extend – nor could it – to all cost items and purchased power costs flowed through that mechanism subsequent to its approval. Defendants argument that mere "acceptance" of a rate is approval is misplaced. First, Defendants offer no proof that the MPSC ever "accepted", "filed", "fixed" or "approved" the excessive power costs or improper inclusions in EMI's FAC.[246] In any event, the MPSC never "approved" any such audits, reviews or cost inclusions, instead it merely spread the audits on its minutes and sent the audits to the state legislature.[247] Defendants readily admit there is no MPSC order approving as prudent and reasonable the improper cost inclusions.[248] Miss. Code 77-3-42(1)(a) provides,

No public utility … shall increase its rate or rate schedule in addition to its base rate

---

[243] *See, e.g.*, (Doc. 1-3) and (Doc. 135), Complaint and First Amended Complaint, respectively, at ¶¶9, 16, 17, 19-29, 41, 43-46, 50, 53, 59-63, 64-78, and 84.

[244] *See, e.g.*, Ex. K, Deposition of Robert Hawkins at 26:2 – 28:13.

[245] *See, e.g.*, Ex. U, MPUS Fuel Adjustment Audit, Oct. 1, 2008 – Sept. 30, 2009 (MPUS states "the transactions on the bills are not audited by the Staff, they are subject to audit by the FERC and [EMI's] internal and external auditors" (p. 3)), and Independent Auditor's Report, attached thereto ("the extent of auditing procedures applied to purchased energy [by EMI] *was limited* to examining the computerized data from the system bills and *correlating and reconciling this data* to the accounting records of EMI" (p. 1)). (Emphasis added). (ENT-00275624 – 00275643). *See also*, Ex. V, Horne's Fuel Adjustment Audit , Oct. 1, 2008 – Sept. 30, 2009 ("[N]or did we audit the economic justification or reasonableness of power purchase or fuel purchase processes or decisions." (Independent Auditor's Report, p. 1); "There are certain fuel and purchased power costs included in Rider ECR-2 (FAC) which are *not clearly allowable or excludable under Rule 17* and Rule 19. These costs are as follows: (a) Nitrogen oxide ('NOX')… (d) Sulfur dioxide ('SO2')…" (*Id.*, p. 11)). (Emphasis added).

[246] *See* Exh. B, Griffey Declaration, Addendum 2, Griffey Rebuttal Report, at pp. 21 – 25 (noting the many deficiencies in the review process of EMI's FAC charges, including the stark admission by Mr. Virden Jones (MPUS) that "the Public Utilities Staff cannot determine if fuel [or power] is purchased 'on the best terms and prices available at the time' in seeming contravention to the requirements" of Mississippi law and MPSC rules, as well as the lack of any MPSC approval of same).

[247] *See* (Doc. 263), Defendants' Brief, at p. 38 acknowledging that all the MPSC did was provide the audits to the legislature.

[248] *See, e.g.*, Ex. K, Deposition of Robert Hawkins at 26:2 – 28:13.

41

as a result of what is commonly referred to as "fuel adjustment clauses" increase or "fuel adjustment riders" if the application of such clause or rider shall result in ultimate cost recovery exceeding the actual cost of fuel burned or consumed in its generating facilities and the cost of purchased energy.

Therefore, charges that do not represent "actual" costs of fuel or purchased power may not lawfully be included in a FAC.

With respect to the $SO_2$ costs, Defendants cite MPSC Order 1992-UN-59 as support for their argument that such environmental emissions allowances obtained by EMI's affiliates for free are "actual costs" so as to be allowable in the FAC,[249] but that order pertains to Mississippi Power Company ("MPC"),[250] not EMI. Further, Order 1992-UN-59 states that MPC may include its $SO_2$ costs as "direct costs associated with burning coal", can be included. Here, EMI paid its affiliate for $SO_2$ allowances that the affiliate obtained for free – *i.e.,* they were "phantom" $SO_2$ costs, just as the LPSC disallowed in Docket No. U-25116.[251] Phantom costs are not "actual" costs.

Defendants rely on *United Gas Pipe Line Co. v. Willmut Gas & Oil Co.* for the proposition that the MPSC need not approve rates for them to be considered "filed rates".[252] *Willmut*, in turn, quotes *Montana-Dakota Utils. Co. v. Northwestern Public Service Co.,*[253] (a seminal Filed Rate Doctrine case in the electric utility arena) for that holding. In the very next sentence in *Montana-Dakota* after the one quoted in *Willmut*, however, the court held, "We hold that the right to a reasonable rate is the right to the rate which *the Commission files or fixes*, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one."[254] Another case Defendants cite, *Am Bankers' Ins. Co. of Fla. v. Wells*, also holds that

---

[249] *Id.*

[250] *See* (Doc. 262-26), MPSC Order 92-UN-0059.

[251] *See* (Doc. 56-15); Exh. I (LPSC Order No. U-25116 finding $SO_2$ costs improperly included in ELL's FAC).

[252] 97 So.2d 530, 535 (Miss. 1957); *see also,* (Doc. 263), Defendants' Brief, at p. 19.

[253] 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

[254] 341 U.S. at 251-52, 71 S.Ct. at 695. (Emphasis added). *See also, Taffet v. Southern Co.,* 967 F.2d 1483, 1490 (11th Cir. 1992) (holding that, under *Montana-Dakota,* for a utility to rely on rates as "filed rates", they must be "*filed with and accepted by*" the regulator).

"Under the filed rate doctrine, any 'filed rate' – that is, *a rate approved by the governing regulatory agency* – is 'per se reasonable and unassailable in judicial proceedings brought by ratepayers.'"[255] Thus, EMI's assertion that any rate schedule it drops at the door of the MPSC is inviolate without Commission approval (*i.e.,* some affirmative finding that the rate is reasonable) is baseless.

In any event, the State is not challenging a "filed rate" (*e.g.,* the FAC); rather it is contesting Defendants' manipulation of that rate through anticompetitive and unlawful conduct. The Mississippi Supreme Court has likewise refused EMI's position that such "acceptance" of a rate (or policy) by the MPSC means no cause of action relating to such rate (or policy) can be maintained.[256] Additionally, while the FAC mechanism may have been approved by the MPSC, Defendants offer no proof that charges flowing through that mechanism have been "filed with and fixed, accepted or approved by" the MPSC.

### 2. Defendants' Stance Regarding EPI and the Bid Rigging Situation is Misplaced

Defendants complain that the State intends to use their corporate officers' misconduct in the 2002 bid rigging incident in this matter. Defendants are mistaken when they assert that the State attempts to assert this Court's jurisdiction over the bid rigging incident. First, the incident is but one of many pieces of evidence showing intent and state of mind of Defendants to harm competition. In this incident, Mr. William Mohl, a corporate officer with Defendants deliberately shared confidential bid information from competitors who were bidding into an Entergy Request for Proposals ("RFP") to acquire power for the EOCs, including EMI, which allowed EMI's unregulated affiliates, including EPI, to "win" the bid by constructing their own bid priced just below the lowest competitor's bid.[257] This is evidence and not the subject of a summary judgment.

---

[255] 819 So.2d 1196, 1203-04 (Miss. 2001). (Emphasis added) (citations omitted).
[256] *See Ware v. Entergy Mississippi, Inc.*, 887 So.2d 763, 769 (Miss. 2003) (finding Filed Rate Doctrine did **not** bar claim against EMI for failure to bury electrical lines, because EMI's policy regarding the installation of underground lines filed with the MPSC "does not prohibit Entergy from placing the high voltage lines underground at its own expense.").
[257] *See* (Doc. 135), First Amended Complaint, at ¶¶74 and 76.

### 3. Misrepresentations to the MPSC

Plaintiff incorporates its arguments in its Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment as a Matter of State Law (Doc. 266) as if fully copied herein, pursuant to F.R.C.P. Rule 10(c).

### 4. "Shell Game" Purchases of Energy and Resale Off-System, Imprudent Purchases from EPI and Improper Loans, Guarantees, and Siphoning Off of GO Zone Tax Benefits

Plaintiff will present evidence through cross-examination, in addition to the documentary evidence referenced in the Complaint, to establish these claims at trial.

**WHEREFORE**, Plaintiff, Attorney General Jim Hood, respectfully submits that Defendants' Motion for Summary Judgment (Doc. 262) should be denied.

**By: JIM HOOD, ATTORNEY GENERAL**
**STATE OF MISSISSIPPI**

/s/ LUKE F. PIONTEK

| | |
|---|---|
| J. Kenton Parsons (La. Bar No. 10377) | Vincent F. Kilborn, III, Esq. (MSB #103028) |
| Luke F. Piontek (La. Bar No. 19979) | Special Assistant Attorney General |
| Andre G. Bourgeois (La. Bar No. 19298) | **KILBORN, ROEBUCK & McDONALD** |
| Shelley Ann McGlathery (La. Bar No. 32585) | Post Office Box 66710 |
| *Pro Hac Vice* | Mobile, Alabama 36660 |
| **ROEDEL PARSONS KOCH BLACHE** | Telephone: (251) 479-9010 |
| **BALHOFF & McCOLLISTER, ALC** | Fax: (251) 479-6747 |
| 8440 Jefferson Highway, Suite 301 | David A. McDonald, Esq. (MSB #103027) |
| Baton Rouge, Louisiana 70809 | Special Assistant Attorney General |
| Tel: (225) 929-7033 Fax: (225) 928-4925 | **KILBORN, ROEBUCK & McDONALD** |
| | Post Office Box 832 |
| Harold E. Pizzetta, III, MSB No. 99867 | Mobile, Alabama 36601 |
| Bridgette W. Wiggins, MSB No. 9676 | Tel: (251) 434-0045 Fax: (251) 434-0047 |
| **Office of the Attorney General** | |
| P. O. Box 220 | |
| Jackson, Mississippi 39225-2947 | |
| Telephone: (601) 359-4230 Fax: (601) 359-4231 | |
| *Counsel for Plaintiff* | |

### CERTIFICATE OF SERVICE

I, Luke F. Piontek, Attorney for the State of Mississippi, do hereby certify that on July 13, 2018, I caused to be electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This the 13th day of July, 2018.

/s/ LUKE F. PIONTEK
Luke F. Piontek (La. Bar No. 19979)