# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

THE STATE OF MISSISSIPPI,
*EX REL.* JIM HOOD, ATTORNEY
GENERAL FOR THE STATE OF MISSISSIPPI                                    PLAINTIFF


V.                                              CIVIL ACTION NO. 3:08cv780 HTW-LRA


ENTERGY MISSISSIPPI, INC.,
ENTERGY CORPORATION,
ENTERGY SERVICES, INC.,
ENTERGY POWER, INC., AND
FICTITIOUS DEFENDANTS A-Z                                              DEFENDANTS


## ORDER DENYING REMAND


This court now considers a re-urged motion to remand [Docket nos. 60 and 61]

filed by the plaintiff, Mississippi Attorney General Jim Hood on behalf of the State of

Mississippi ("Mississippi").  The ultimate dispute here is whether the above-named

Entergy defendants have engaged in a pattern of charging Mississippi consumers

unreasonably inflated rates in violation of various Mississippi laws.  The immediate

dispute is whether this federal court has the authority to exercise federal subject-matter

jurisdiction over this litigation, initiated in state court and purportedly only containing

demands for relief grounded in state law.

Previously, this court denied the plaintiff's motion to remand [docket no. 37], determining that under the jurisprudence of the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), this court possessed diversity of citizenship jurisdiction under the Class Action Fairness Act[1] ("CAFA").

The United States Supreme Court, since, has rejected the Fifth Circuit's interpretation of CAFA.  *See Mississippi ex rel. Hood v. AU Optronics Corp.*, --- U.S. ---, 134 S.Ct. 736, 187 L.Ed.2d 654 (2014).  Accordingly, plaintiff re-urges its motion for remand in light of the United States Supreme Court's decision, arguing that this court does not possess diversity of citizenship subject-matter jurisdiction.  Defendants respond in opposition, contending that, even in the absence of jurisdiction under CAFA, this court possesses federal question[2] subject-matter jurisdiction [Docket no. 64].

Having reviewed the arguments of the parties, this court denies plaintiff's re-urged motion for remand, finding that a question of federal law exists, thus warranting this court's exercise of federal question subject-matter jurisdiction.

## I.    FACTS AND BACKGROUND

The facts and procedural history are set out in detail in this court's prior order denying remand, dated August 25, 2012 [docket no. 37].  Following is a review of the facts as outlined in that order.

---

[1] Title 28 U.S.C. § 1332(d)(11)(B)(i) states, in its pertinent part:
    [T]he term "mass action" means any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).
[2] Title 28 U.S.C. § 1331 states:  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Entergy Mississippi, Inc. ("EMI") is one of six Entergy Operating Companies ("EOCs"), owned by the holding company, Entergy Corporation.  The EOCs sell electricity to retail customers in Mississippi, Arkansas, Louisiana, and Texas.  Each EOC owns and operates local electricity distribution facilities which serve retail customers in its service area.  EMI's service area encompasses approximately forty-five (45) counties in the western half of Mississippi.

In April 1982, the EOCs entered into the Entergy System Agreement ("Agreement"), a tariff[3] filed with, and approved by, the Federal Energy Regulatory Commission ("FERC"), in accordance with § 205 of the Federal Power Act ("FPA"), Title 16 U.S.C. § 824d[4].  *Entergy Louisiana, Inc. v. Louisiana Public Service Commission*, 539 U.S. 39, 42, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003).  The Agreement provides "a contractual basis for the continued planning, construction, and operation of the electric generation transmission and other facilities of the Companies [the EOCs] in such a manner as to achieve economies consistent with the highest practicable reliability of service [. . .]."  Agreement, Article III, Section 3.01, docket no. 21-2.  The Agreement also has as its goal the "equalizing among the Companies any imbalances of costs

---

[3] A "tariff" is simply an administrative term used to describe rate schedules for regulated goods and services.  *See, e.g.,* Michael Keegan  *Bargaining for Power: Resolving Open Questions from NRG Power Marketing, LLC v. Maine Public Utilities commission,* 65 ME. L. REV 100 (2012).

[4] Title16 U.S.C. § 824d(c) states:
> Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all Companies." *Id.*

The EOCs that are party this agreement are:  Entergy Mississippi, Inc.; Entergy Arkansas, Inc.; Entergy Gulf States Louisiana, LLC; Entergy Louisiana, LLC; Entergy New Orleans, Inc., Entergy Texas, Inc.; and Entergy Services, Inc.  [Docket no. 21-2, 21-3, and 21-4].  The Entergy Operating Committee, composed of representatives of Entergy Corporation and each of the EOCs, administers the Agreement and makes centralized decisions regarding management of the system, its capacity, and costs.

The companies pool electricity under the Agreement in the Entergy System Exchange ("ESX").  EOCs with excess capacity feed electricity into the pool, allowing that excess electricity to be used by EOCs with insufficient capacity to meet customer demands in their service areas. Entergy Services, Inc. ("ESI"), under the direction of the Entergy Operating Committee, provides various purchasing, accounting, and regulatory services to the EOCs.  At the end of each month, ESI performs an accounting for energy transferred into and taken out of the ESX and issues Intra-System Bills to the EOCs to pay for electricity used from the pool.

Importantly, the Agreement contains "service schedules," which determine how costs will be calculated and allocated among the EOCs.  At issue in this litigation here is service schedule "MSS-3," which addresses the exchange of electric energy among the EOCs.  *See* Agreement at 17, [Docket no. 21-3].

The MSS-3 service schedule's stated purpose is "to provide the method of pricing energy exchanged among the Companies and to provide for payments and receipts in accordance with the provisions of Opinion Nos. 480 and 480-A [prior

opinions issued by FERC]." *Id.*  Although service schedule MSS-3 established no fixed rate for payments between/among companies, it provides formulas for calculating payments between the companies based upon actual costs incurred and the allocation of electricity.  [Defendants' memo at 10-11, Docket no. 21].  At the end of each month, ESI applies the formula rates contained in MSS-3 and the other Service Schedules to the usage and cost data that had been collected during the prior month and bills the EOCs for electricity they have drawn from the pool.  *Id* at 11.

As stated earlier, the controversy at issue here is whether plaintiff Mississippi's complaint provides a juridical basis for this court to exercise subject-matter jurisdiction. The defendants removed this litigation, arguing that this federal district court is empowered to exercise federal question jurisdiction or CAFA jurisdiction.  Mississippi, however, contends that no such jurisdiction exists.

## II.    STANDARD OF REVIEW

The federal judiciary possesses a limited jurisdiction, and may only adjudicate those cases or controversies within the jurisdictional realm authorized by Congress. *Hexamer v. Foreness*, 981 F.2d 821, 823 (5th Cir.1993). Two forms of federal subject-matter jurisdiction afford federal courts jurisdiction over a dispute:  federal question jurisdiction, authorized pursuant to Title 28 U.S.C. § 1331; and diversity of citizenship jurisdiction, under Title 28 U.S.C § 1332. The federal judiciary must remand a case when it lacks subject-matter jurisdiction over a dispute. Title 28 U.S.C. § 1447.[5]

---

[5] Title 28 U.S.C. § 1447(c) provides in pertinent part:
> A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney

When approaching motions to remand, federal courts must determine whether federal subject-matter jurisdiction existed over the claims at the time of removal. *Manguno v. Prudential Prop. & Casualty Ins. Co.*, 276 F.3d 720, 723 (5th Cir.2002). The removing defendant bears the burden of proof. *Id.* Federal courts must strictly construe any ambiguities in facts or state law in favor of the party seeking remand. *Id.*

## III.    ANALYSIS

### A.    Diversity of Citizenship Jurisdiction is Lacking

In its previous order denying remand [Docket no. 37], this court determined that this lawsuit constituted a mass action under the CAFA.[6] In reaching that finding, this court relied heavily upon the Fifth Circuit's opinion in *Louisiana ex rel. Caldwell v. Allstate Insurance Co.*, 536 F.3d 418 (5th Cir.2008).

In *Caldwell*, the Fifth Circuit denied remand when the State of Louisiana sued Allstate Insurance Company for restitution under the Louisiana Monopolies Act. The *Caldwell* court concluded that the individual policyholders were the real parties and, accordingly, the lawsuit was a mass action under CAFA. This district court understood *Caldwell* as instructing federal courts to evaluate lawsuits on a claim-by-claim basis to determine the true party in interest.

---

fees, incurred as a result of the removal. A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

[6] CAFA confers jurisdictions over mass actions "brought individually by large groups of plaintiffs." *Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1198 (11th Cir.2007). A lawsuit is removable as a mass action under CAFA if it meets the following requirements:

    (1) an amount in controversy requirement of an aggregate of $5,000,000 in claims;
    (2) a diversity requirement of minimal diversity;
    (3) a numerosity requirement that the action involves the monetary claims of 100 or more plaintiffs; and
    (4) a commonality requirement that the plaintiffs' claims involve common questions of law or fact.

*Id.* at 1202-03 (interpreting §1332(d)(11)(B)(i), which defines a mass action).

The Supreme Court of the United States rejected this approach in *See Mississippi ex rel. Hood v. AU Optronics Corp.*, --- U.S. ---, 134 S.Ct. 736, 187 L.Ed.2d 654.  In *AU Optronics*, the Mississippi Attorney General filed suit against a manufacturer of liquid crystal displays ("LCDs"), alleging that the manufacturer had formed an international cartel to restrict prices.  *Id.* at 740.  The Attorney General filed the lawsuit on behalf of the State of Mississippi and its citizens, seeking redress for injuries they had suffered at the hand of this cartel.  *Id.* at 739.

The manufacturer removed to federal court, arguing, as the defendant had in *Caldwell*, that the true parties in interest were the citizens of Mississippi and that the federal district court should exercise subject-matter jurisdiction under CAFA because there were "100 or more unidentified Mississippi consumers [who] had purchased LCD screens."  *Id.* at 741.  The district court agreed that the lawsuit might constitute a mass action, but elected to remand the lawsuit to Mississippi state court under the "general public exception,"[7] which permits the court to remand a civil action in which the claims are asserted on behalf of the general public.  *Id.*  The Fifth Circuit, although agreeing that the lawsuit was a mass action, disagreed with the district court's application of the "general public exception" and reversed the district court's remand.

Upon appeal to the United States Supreme Court, a unanimous Court rejected the Fifth Circuit's *Caldwell* precedent.  Examining the language of CAFA, the Supreme Court held that the language "100 or more persons" is not to be interpreted as "100 or more named or unnamed real parties in interest."  *Id.* at 742.  The Court found that

---

[7] Title 28 U.S.C. § 1332(d)(11)(B)(ii)(III) states, in its pertinent part:  "[T]he term "mass action" shall not include any civil action in which . . . all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action."

Congress deliberately elected to not include the qualified "named or unnamed" in

CAFA's mass action provision, unlike in the CAFA's class action provision. The Court

also determined that unspecified individuals with no actual participation in a lawsuit do

not constitute the "100 or more persons" required in CAFA's mass action provision;

rather, Congress used the term "persons" in CAFA to refer to "individuals who are

proposing to join as plaintiffs in a single action." *Id.* Accordingly, the Supreme Court

announced that Mississippi was the only named plaintiff in *AU Optronics* and diversity of

citizenship jurisdiction under the mass action provision of CAFA was inapplicable. *Id.* at

745-46.

Here, Mississippi is the sole plaintiff in this action. Applying the logic of *AU

Optronics*, this court seemingly has no basis to exercise diversity of citizenship

jurisdiction over this lawsuit. Such a finding, however, does not end the matter.

Plaintiff EMI alternatively removed this litigation to this federal forum on the basis

of federal question subject-matter jurisdiction. Because this court did not examine

federal question jurisdiction in its previous order [docket no. 37], this court does so now.

**B.      Federal Question Jurisdiction**

Title 28 U.S.C. § 1331 provides that "the [federal] district courts shall have

original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of

the United States." The United States Supreme Court has recognized two separate

categories of cases that may invoke § 1331's federal question subject-matter

jurisdiction: First, when plaintiffs invoke federal question subject-matter jurisdiction by

articulating causes of action created by federal law; and secondly under what the

Supreme Court described as "arising under" jurisdiction. *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 1312, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005).

The Court explained that "[t]he [arising under] doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Id.* Accordingly, even in the absence of an affirmatively-invoked federal law, if a lawsuit implicates substantial issues of federal law, the federal court may exercise subject-matter jurisdiction; a state law cause of action may present a federal question when "plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Id.* at 27-28.

In *Smith v. Kan. City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), the United States Supreme Court held that a state law cause of action presented a federal question because a challenge to a federal statute was an integral component of the plaintiff's complaint. The existence of a federal question in a state law claim depends on "an evaluation of the nature of the federal interest at stake." *Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 814 n.12 (1986); *See* David L. Shapiro, *Jurisdiction and Discretion*, 60 N.Y.U. L. REV. 543, 568 (1985).

In *Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. at 310-11, the Internal Revenue Service ("IRS") seized plaintiff Grable & Sons' property to satisfy its unpaid federal taxes. Before seizing property, the IRS was required to give notice to the property holder. *Id.* at 310. The IRS mailed the notice of impending seizure to Grable & Sons through certified mail, therein informing the company of the seizure and

the date on which the IRS would sell the property.  *Id.*  Grable & Sons brought an action

against the ultimate purchaser of the property, Darue, claiming that the sale of the

property to Darue was invalid because the IRS was statutorily obligated to personally

serve the property owner, not effect service through certified mail.

Darue removed the action to federal court, arguing that an interpretation of a

federal statute would be essential to the case and, thus, federal question jurisdiction

existed.  The Supreme Court agreed, noting that "[w]hether Grable [& Sons] was given

notice within the meaning of the federal statute is thus an essential element of its quiet

title claim." *Id.* at 315

Here, Mississippi's complaint purportedly alleges only state law causes of action,

to wit:

> (1) violation of the Mississippi Consumer Protection Act,
>    Miss. Code Ann. § 75-24-1, *et seq.*;
> (2) violation of the Mississippi Public Service Commission
>    Statutes and Rules and Regulations under Miss. Code
>    Ann. § 77-1-43(2);
> (3) restitution;
> (4) unjust enrichment;
> (5) violation of the Mississippi Antitrust Statutes under Miss.
>    Code Ann. § 75-21-3(a), (b) and (c);
> (6) fraud;
> (7) breach of the obligation of good faith and fair dealing;
>    and
> (8) accounting.

Moreover, Mississippi says it is entitled to disgorgement of profits from the defendants,

as well as damages, costs, expenses and attorney fees under Miss. Code. Ann. §§ 75-

24-11 and 75-24-19(1)(b).

As provided in the factual summary above, EMI does not have unfettered

discretion in the costs it passes on to Mississippi consumers; rather, the utility's

discretion necessarily is curtailed by the provisions of the FERC-sanctioned Agreement and the Agreement's associated Service Schedules.  That FERC-sanction Agreement, however, permitted EMI the discretion to purchase energy from third-party suppliers:

> The Companies, with the consent of or under conditions specified by the Operating Committee, may agree to a contract by one or more of them, for the purchase of capacity and/or energy from outside sources for the account of a Company or Companies.
>
> If purchased by a Company for its own account, the capacity shall be included by the purchasing Company in its Capability to the extent provided by the applicable Service Schedule.  The energy purchased shall be considered as part of the purchasing Company's energy supply.

Entergy Agreement § 4.02.

Mississippi's complaint challenges EMI's failure to use its discretion to purchase the allegedly cheaper energy from third-party suppliers.  Specifically, Mississippi accuses EMI and the other EOCs of failing to "make a purchase of electricity from a non-affiliate for its/their 'own account.'  Entergy Agreement, Sec. 402.  Despite this ability to do so, EMI deliberately decided not to pursue less expensive non-affiliate supplies of electricity, and, instead, merely accepted transfers . . . of the expensive ESX electricity."  Mississippi's Complaint at ¶ 38.

Mississippi's challenge, then, requires an analysis of the Entergy Agreement. The Entergy Agreement is a FERC tariff, which applies with the force of federal law. *See Carter v. Am. Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir. 1966).  In essence, Mississippi is suing EMI for its failure to vindicate its federal power to initiate the process of buying energy from a third-party supplier.  Mississippi's cause of action, therefore, derives from federal law; this court simply cannot adjudicate Mississippi's claim without determining the precise nature of the discretion vested in EMI by federal law.  Whether

EMI had the discretion to purchase energy from third-party suppliers—and failed to do so—within the meaning of the federal tariff is an essential element of Mississippi's claim.

Moreover, this court is persuaded that an important national interest exists in the availability of a federal forum to clarify the meaning of the laws promulgated by a federal administrative agency. *See Grable & Sons Metal Prods. Inc.*, 535 U.S. at 315. The Entergy Agreement does not merely affect Mississippi parties, but is a federal tariff impacting Texas, Arkansas, Louisiana, and Mississippi.

This reasoning seemingly is in line with that reached by other federal courts.  *See Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998) (because a tariff, filed with a federal agency, is the equivalent of a federal regulation, a lawsuit to invalidate or challenge it arises under federal law); *see In re W. States Wholesale Natural Gas Antitrust Litig.*, 346 F.Supp.2d 1123, 1140-41 (D. Nev. 2004) (observing that a cause of action concerning the violation of a FERC tariff arises under federal law); *see Prairie Horizon Agri-Energy LLC v. Tallgrass Interstate Gas Transmission, LLC*, 2014 WL 7384767 *2 (D.Kan. Dec. 29, 2014) ("a claim that involves the validity, construction, or effect of a filed FERC tariff invokes federal subject matter jurisdiction").  Accordingly, this court concludes that plaintiff's nominally state law claims necessarily implicate federal law and national interests.

## IV.    CONCLUSION

This court, in obeisance to the United States Supreme Courts' decision in *AU Optronics Corp.*, 134 S.Ct. 736, finds that diversity of citizenship jurisdiction does not exist.  The absence of diversity of citizenship jurisdiction, however, does not settle the

matter.  This court is persuaded that federal law is necessarily implicated in this

litigation.  Accordingly, this court will exercise its federal question subject-matter

jurisdiction.  Plaintiff's re-urged motion for remand [Docket no. 60 and 61] is denied.

SO ORDERED, this the 10th day of April 2015.


s/ HENRY T. WINGATE_____

UNITED STATES DISTRICT JUDGE